1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| BENJAMIN DRESNER, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:21-cv-1499-TLF |
| Plaintiffs, | AMENDED CLASS ACTION COMPLAINT |
| v. | |
| SILVERBACK THERAPEUTICS, INC., LAURA K. SHAWVER, JONATHAN PIAZZA, RUSS HAWKINSON, PETER THOMPSON, VICKIE L. CAPPS, ROBERT HERSHBERG, SAQIB ISLAM, ANDREW POWELL, JONATHAN ROOT, THILO SCHROEDER, and SCOTT PLATSHON, | JURY TRIAL DEMANDED |
| Defendants. | |

AMENDED CLASS ACTION COMPLAINT - 1

Lead Plaintiff Benjamin Dresner ("Lead Plaintiff") and additional Plaintiff Ann Ettinger ("Additional Plaintiff," collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Silverback Therapeutics, Inc. ("Silverback" or the "Company"), analyst reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Silverback common stock pursuant and/or traceable to the Offering Documents (defined below) issued in connection with the Company's initial public offering conducted on or about December 3, 2020 (the "IPO" or "Offering"); and/or (b) Silverback securities between December 3, 2020 and March 31, 2022, both dates inclusive (the "Class Period").  Plaintiffs pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Silverback, a clinical-stage biopharmaceutical company that has never earned revenue for product sales and has no approved marketable drugs, develops tissue-targeted

therapeutics for the treatment of cancer, chronic viral infections, and other serious diseases.  The Company's lead product candidate during the Class Period was SBT6050, a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody that targets tumors, such as breast, gastric, and non-small cell lung cancers, for which the Company initiated Phase 1/1b clinical testing in July 2020.  According to Defendants, they were not just examining safety and tolerability in early clinical testing of SBT6050, but also biomarkers of immune cell activation and anti-tumor activity so that the Company could seek expedited approval from the FDA.

3.    On November 10, 2020, Silverback filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on December 3, 2020 (the "Registration Statement").

4.    On or about December 3, 2020, pursuant to the Registration Statement, Silverback's common stock began trading on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "SBTX."  On December 4, 2020, Silverback filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

5.    Pursuant to the Offering Documents, Silverback conducted the IPO, issuing 11.5 million shares of common stock priced at $21.00 per share.

6.    The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance

1    policies.   Specifically, the Offering Documents and Defendants made false and/or misleading

2    statements and/or failed to disclose that: (i) SBT6050 showed limited anti-tumor activity in

3    patients treated with only SBT6050 in Phase 1/1b; (ii) seventeen out of forty trial participants

4    withdrew from the trial due to disease progression; (iii) SBT6050 did not have a manageable safety

5    profile as demonstrated by dose-limiting adverse event experienced by trial patients treated with

6    SBT6050 along with pembrolizumab in Phase 1/1b; (iv) accordingly, the Company had overstated

7    SBT6050's commercial and/or clinical prospects; and (v) as a result, the Offering Documents and

8    Defendants' public statements throughout the Class Period were materially false and/or misleading

9    and failed to state information required to be stated therein.

10          7.     On September 13, 2021, Silverback issued a press release "announc[ing] that

11   interim data from the dose-escalation portion of its Phase 1/1b clinical trial evaluating SBT6050

12   as a monotherapy and in combination with pembrolizumab in patients with advanced or metastatic

13   HER2-expressing or amplified solid tumors will be presented at the upcoming European Society

14   for Medical Oncology (ESMO) 2021 Congress from September 16-21, 2021" and advising that

15   "[t]he accepted abstract . . . is now available on the ESMO website."  Per the accepted abstract

16   (the "Abstract"), the data indicated that among 18 evaluable patients for tumor types of interest,

17   one patient with HER2 IHC 2+ NSCLC had a confirmed PR (-55% per RECIST) maintained at

18   the most recent scan obtained at 36 weeks post-enrollment, and eight weeks after discontinuing

19   study treatment and seven patients had "stable disease."   However, Defendants continued to

20   maintain that SBT6050 "conferred clinical benefit to patients with heavily pre-treated, advanced

21   solid tumors," showed early signals of anti-tumor activity," and claimed SBT6050 had a

22   "manageable safety profile."

8.      On this news, Silverback's stock dropped $4.54 per share, or 23.35%, to close at $14.90 per share on September 13, 2021.

9.      Then, on March 31, 2022, Silverback filed a 10-K announcing its financial results for the fourth quarter and full year ended December 31, 2021 and providing a corporate update, which revealed that Silverback had discontinued its SBT6050 program based on limited monotherapy anti-tumor activity and observed cytokine-related adverse events that limited the dose in combination with pembrolizumab.  Based on the data regarding SBT6050, the Company announced that it would also discontinue its program for SBT6290 due to the likelihood of it having a similar clinical profile to SBT6050.  Silverback further revealed that, as a result of these discontinued programs, it would cut its workforce by 27%.

10.     On this news, Silverback's stock dropped 8.55% to close at $3.20.

11.     To date, the price of Silverback common stock continues to trade far below the $21.00 per share Offering price, damaging investors.

12.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Silverback's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Silverback is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Lead Plaintiff, as set forth in the certification previously filed with this Court, and Additional Plaintiff, as set forth in the attached certification (Exhibit 1), purchased or otherwise acquired Silverback common stock pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and/or purchased or otherwise acquired Silverback securities at artificially inflated prices during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.     Defendant Silverback is a Delaware corporation with principal executive offices located at 500 Fairview Ave N, Suite 600, Seattle, Washington 98109.  The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "SBTX."

19.     Defendant Laura K. Shawver ("Shawver") has served as Silverback's Chief Executive Officer and as a Director at all relevant times.  Shawver signed or authorized the signing of the Registration Statement filed with the SEC, as well as each of the Company's annual 10-Ks and quarterly 10-Qs filed during the Class Period.

20.     Defendant Jonathan Piazza ("Piazza") has served as Silverback's Chief Financial Officer at all relevant times.  Piazza signed or authorized the signing of the Registration Statement filed with the SEC, as well as each of the Company's annual 10-Ks and quarterly 10-Qs filed during the Class Period.

21.     Defendants Shawver and Piazza are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

22.     The Exchange Act Individual Defendants possessed the power and authority to control the contents of Silverback's SEC filings, press releases, and other market communications. The Exchange Act Individual Defendants were provided with copies of Silverback's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Silverback, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

23.     Silverback and the Exchange Act Individual Defendants are sometimes referred to herein collectively as the "Exchange Act Defendants."

24.     Defendant Russ Hawkinson ("Hawkinson") has served as Senior Vice President of Finance of Silverback at all relevant times.  Hawkinson signed or authorized the signing of the Registration Statement filed with the SEC, as well as the Company's annual 10-Ks.

25.     Defendant Peter Thompson ("Thompson") has served as Silverback's Chairman of the Board of Directors at all relevant times.  Thompson signed or authorized the signing of the Registration Statement filed with the SEC, as well as the Company's annual 10-Ks.

26.     Defendant Vickie L. Capps ("Capps") served as a Director of the Company at the time of the IPO.  Capps signed or authorized the signing of the Registration Statement filed with the SEC, as well as the Company's annual 10-Ks.

27.     Defendant Robert Hershberg ("Hershberg") served as a Director of the Company at the time of the IPO.  Hershberg signed or authorized the signing of the Registration Statement filed with the SEC, as well as the Company's annual 10-Ks.

28.     Defendant Saqib Islam ("Islam") served as a Director of the Company at the time of the IPO.  Islam signed or authorized the signing of the Registration Statement filed with the SEC, as well as the Company's annual 10-Ks.

29.     Defendant Andrew Powell ("Powell") served as a Director of the Company at the time of the IPO.  Powell signed or authorized the signing of the Registration Statement filed with the SEC, as well as the Company's annual 10-Ks.

30.     Defendant Jonathan Root ("Root") served as a Director of the Company at the time of the IPO.  Root signed or authorized the signing of the Registration Statement filed with the SEC, as well as the Company's annual 10-Ks.

31.     Defendant Thilo Schroeder ("Schroeder") served as a Director of the Company at the time of the IPO.  Schroeder signed or authorized the signing of the Registration Statement filed with the SEC, as well as the Company's annual 10-Ks.

32.     Defendant Scott Platshon ("Platshon") served as a Director of the Company at the time of the IPO.  Platshon signed or authorized the signing of the Registration Statement filed with the SEC, as well as the Company's annual 10-Ks.

33.     The Exchange Act Individual Defendants and Defendants Hawkinson, Thompson, Capps, Hershberg, Islam, Powell, Root, Schroeder, and Platshon are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

34.     As directors, executive officers and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Silverback common stock in the IPO for their own benefit and the benefit of Silverback.  The Securities Act Individual Defendants were key members of the IPO working group and executives of Silverback who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

35.     Silverback and the Securities Act Individual Defendants are sometimes referred to herein collectively as the "Securities Act Defendants."

36.     The Exchange Act Defendants and the Securities Act Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

37.     Silverback, a clinical-stage biopharmaceutical company, develops tissue targeted therapeutics for the treatment of cancer, chronic viral infections, and other serious diseases.  The Company has explained in its 10-Ks that it has incurred significant operating losses since

inception, that it does not have any products approved for sale and has not generated any revenue from product sales or otherwise.  Indeed, its accumulated deficit has doubled from $96.7 million as of December 31, 2020 to $186.2 million as of December 31, 2021 and its net losses tripled from $32.9 million to $89.5 million.   Defendants explained that "until such time as we can generate significant revenue from sales of our product candidates, if ever, we expect to finance our cash needs through public or private equity offerings, debt financings, collaborations and licensing arrangements or other capital sources." 2020 10-K (defined below).

38.     The Company's lead product candidate during the Class Period was SBT6050, a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody that targets tumors, such as breast, gastric, and non-small cell lung cancers.  SBT 6050 is an Antibody-Drug Conjugate ("ADC").  ADC's consist of a payload, which is a small molecule drug, and an antibody that is engineered against an antigen, like a tumor-specific antigen, on the target cell surface.  The payload and the antibody are joined by a chemical linker.  When the ADC binds to the target antigen, the payload is released and exerts its effect in the targeted cell, ideally minimizing the effect on non-targeted cells that don't have the antigen of interest.

39.     Figuring out optimal dosing is key because the payload is cytotoxic, or toxic to living cells, so a small increase in systemic exposure of the payload can cause significant adverse reactions.  For SBT6050, designed to treat tumors such as certain breast, gastric and non-small cell lung cancers, the payload is a TLR8 agonist, which is linked to a HER2-directed antibody.   It is designed to activate myeloid cells that exert an immune response to treat targets.  Myeloid cells play major roles in innate immunity and can comprise between 5% and 10% of a tumor.  Per the Company, activating those myeloid cells  "results in direct tumor killing and recruitment of immune cells."

**Clinical Testing of SBT6050**

40.     The Company initiated a Phase 1/1b clinical trial in July 2020, "designed to evaluate the safety, tolerability, PK [(pharmacokinetics)], pharmacodynamics, (PD), immunogenicity, and anti-tumor activity of SBT6050 as a single agent and in combination with pembrolizumab, a PD-1 inhibitor." 2020 10-K.

41.     The Company conducted the Phase 1/1b trial in four parts: monotherapy dose-escalation and expansion (Part 1), monotherapy dose expansion in tumor-specific cohorts (Part 2), pembrolizumab combination dose-escalation (Part 3), and a pembrolizumab combination dose expansion cohort (Part 4).

42.     The Company explained that the trial would evaluate biomarkers of immune cell activation and anti-tumor activity of SBT6050 in patients that have failed all available therapies associated with clinical benefit, in addition to measuring biomarkers of immune cell activation. More specifically, the Company stated in its SEC filings, including the Offering Documents, that:

> In our Phase 1/1b clinical trial, we are monitoring key PD biomarkers in both the blood and the tumor which have been associated with tumor regression in our preclinical mouse studies and was observed in our preclinical NHP studies. Key biomarkers in the blood include elevations in MCP-1, IP-10, and C-reactive protein and induction of additional PD markers indicative of on target mechanism of action such as IFNg. We will be obtaining tumor biopsies at baseline and on treatment to measure biomarkers that correlate with the activation of myeloid cells, T cells and NK cells in cohorts 2 and later.

43.     In the Phase I/IB trial, the Company tested the safety and efficacy of SBT6050 both as a monotherapy and in combination with pembrolizumab, a PD-1 inhibitor which is a type of immunotherapy that stimulates the body's immune system to fight cancer cells.

44.     The trial was open-label, meaning both the researchers and participants knew what treatment was being administered.  Throughout the duration of the trial, patients received CT scans every eight weeks until week twenty-four and then every sixteen weeks thereafter.  According to

Confidential Witness ("CW") 1, who worked for Silverback from April 2018 until August 2021 as a senior research scientist and then an associate scientist, Defendant Shawver held company wide meetings every two weeks with mandatory attendance for all employees to report and discuss trial data.  Various teams presented information on the progress of the SBT6050 clinical trials, including the in-house clinical lab team and employees sharing data gathered from external clinical testing sites.

45.     In the Offering Documents and in filings throughout the Class Period, Defendants touted SBT6050 for the treatment of HER2-expressing solid tumors as compared to other FDA approved therapies and spoke in detail about the Phase 1/1b trial including observed changes in pharmacodynamic markers and observed adverse events.  At no point during the Class Period did Defendants reveal that they observed limited anti-tumor activity in patients treated with SBT6050 alone, that a large percentage of trial patients discontinued the trial due to disease progression, and that SBT6050 administered along with pembrolizumab caused dose-limiting toxicities.

46.     Plaintiffs consulted an expert, Todd Clark, to assess Defendants' statements regarding the Phase 1/1b trial data and results.  Mr. Clark has a Master of Science degree in drug development and regulation from Johns Hopkins University and an MBA from the Kellogg School of Business at Northwestern University.  He is a pharmaceutical expert with approximately 30 years experience consulting for branded and generic drug companies, as well as biotech firms, investment banks, and health technology services to advise them on, among other things, drug development and clinical trial design.  According to Mr. Clark, Silverback had no credible basis for stating in its September 16, 2021 investor presentation  that "SBT6050 conferred clinical benefit to patients with heavily pre-treated, advanced solid tumors." First, because most patients did not experience any apparent benefit. Indeed, of the twenty-four patients with evaluable CT

scans, fifteen showed progressive disease, eight had stable disease, and only one experienced an improvement in the form of partial tumor response. Four of the eight with stable disease were also treated with pembrolizumab, a highly successful FDA-approved cancer agent. In addition, seventeen patients treated during the trial withdrew prior to August 1, 2021 due to disease progression. The Company, which had been tracking data as the open-label trial progressed, should have known that treatment with SBT6050 alone showed limited anti-tumor activity, thereby providing a sufficient basis for discontinuing the trial for SBT6050 as a monotherapy. Second, because this trial lacked a control arm, it is not possible to measure SBT6050 performance *relative* to another treatment option. Thus, as a matter of sound clinical research practices, Silverback lacked a reasonable basis for concluding that, if there was any clinical benefit, that it was "conferred" by SBT6050.

## Materially False and Misleading Statements Issued in the Offering Documents

47.    Regarding the SBT6050 Phase 1/1b trial data, the Offering Documents, stated, in relevant part:

> SBT6050 is currently in a Phase 1/1b clinical trial as monotherapy and in combination with pembrolizumab, in patients with advanced or metastatic HER2-expressing solid tumors. In this trial, we have observed changes in pharmacodynamic markers in the first dose cohort, and we anticipate providing an update on interim data from the Phase 1 dose-escalation cohorts in the second half of 2021.

48.    Moreover, Defendants touted the advantage of SBT6050 over *untargeted* TLR8 small molecule therapeutic candidates from other companies which "have resulted in an adverse event profile that we believe has limited achieving a dose level sufficient to produce the desired therapeutic benefit."

49.    Regarding adverse events for patients treated with SBT6050, the Offering Documents stated in relevant part:

The treated patients, each receiving 0.3 mg/kg of SBT6050, have received between one and eight doses, and no DLTs have been observed. The most common adverse events are flu-like symptoms and redness and swelling at the injection site. Changes in pharmacodynamic markers consistent with the potential mechanism of action have been observed in treated patients where data are available. This includes increases in plasma levels of CRP (C-reactive protein), a marker of inflammation, increases in MCP-1, IP-10 and IL-6, which are indicative of myeloid cell activation, increases in IFNg which is a marker for T and NK cell activation, and decreases in hemoglobin which we believe to be due to macrophage phagocytosis. For example, in patient 1, after the first dose, CRP levels increased from 2 mg/L to 288 mg/L, IP-10 increased from 354 pg/ml to 3040 pg/ml, MCP-1 increased from 340 pg/ml to 849 pg/ml, IL-6 increased from <0.6 to 138 pg/ml and IFNg increased from 7.6 pg/ml to 465 pg/ml while hemoglobin transiently decreased following each of four administrations but not to levels considered clinically adverse. Transient decreases in hemoglobin and changes in cytokines and chemokines had also been observed in the NHP studies after treatment with SBT6050, with the exception of IFNg which was only observed intratumorally in mice upon treatment with SBT6050-S. Repeat dose PK, with timepoints inclusive of $C_{max}$, is available in two patients through two and four subcutaneous doses. Exposure was consistent following the second dose and the fourth dose compared to the first dose for each patient. As of November 6, one patient had a formal reassessment of tumor status after 8 weeks on study with stable disease and is now 15 weeks on treatment.

50.     Next, touting SBT6050 as compared to FDA approved HER2 targeted therapies, the Offering Documents stated, in relevant part:

SBT6050 utilizes HER2 to localize and facilitate the delivery of the TLR8 agonist conjugate into myeloid cells in the TME [(tumor microenvironment)]. Therefore, unlike HER2 targeted therapies that have been approved by the U.S. Food and Drug Administration (FDA) such as Herceptin (trastuzumab), SBT6050 does not require HER2 to be an oncogenic driver to elicit anti-tumor activity. Furthermore, SBT6050 recognizes the HER2 sub-domain II, the pertuzumab epitope, and does not cross-block trastuzumab, allowing for potential combinations with trastuzumab-based agents, which are standard of care therapies in some HER2-expressing cancers.

***

*Changes in pharmacodynamic markers have been observed in the first dose-escalation cohort of this trial.*

(Emphasis added).

51.     Further, in discussing the Company's strategy, the Offering Documents stated, in relevant part:

AMENDED CLASS ACTION COMPLAINT - 14

- In early clinical trials, we will be examining the anti-tumor activity of SBT6050 in patients that have failed all available therapies associated with clinical benefit, in addition to measuring biomarkers of immune cell activation. This approach may allow us to seek expedited approval from the FDA based on surrogate endpoints (through the Accelerated Approval path) and expedited FDA review through programs such as Breakthrough Therapy, Priority Review, or Fast Track designation. We are evaluating activity broadly across HER2-expressing cancer types, including cancers where no HER2-directed therapies are currently approved, and have identified several tumor types and lines of therapy that potentially present opportunities for utilizing one or more of these accelerated approval pathways.

- ***Advance SBT6050 subsequently into earlier lines of therapy to maximize patient benefit and commercial success, if approved.*** Our long-term clinical development goal is to position SBT6050 in early-line standard of care regimens in key indications to potentially provide benefit to patients. We seek to accomplish this by evaluating combination therapy approaches with therapeutics approved as standard of care.

(Emphasis in original.)

52.     Finally, in the Offering Documents, Defendants touted the addressable market for SBT6050 as compared to FDA-approved therapies that require HER2 signaling as opposed to SBT6050 which does not require the tumor cells to be dependent on HER2 signaling for anti-tumor activity, stating, in relevant part:

[. . .] HER2 IHC 2+ and 3+ overexpression and amplification are documented in at least 11 different tumor types including breast (estimated 83,000), gastric (estimated 6,400), non-small cell lung (estimated 31,500), colorectal (estimated 9,000), bladder (estimated 7,500), uterine (estimated 11,000), pancreatic (estimated 4,000), head and neck (estimated 2,000), ovarian (estimated 1,100), esophageal (estimated 3,000), and biliary (estimated 3,000) cancers, providing the potential to address a large HER2-expressing tumor agnostic market estimated to be more than 160,000 newly-diagnosed patients annually in the United States based in part on estimated prevalence rates. HER2 IHC2+ and 3+ overexpression in breast cancer, gastric cancer, and NSCLC are 30.0%, 16.4%, and 23.2%, respectively. Most HER2 targeted therapies require the tumor cells to be dependent on HER2 signaling, often called an oncogenic driver. HER2 oncogenic-driven tumors are limited to subsets of breast and gastric cancer and hence the FDA-approved therapies that require HER2 signaling are limited to these indications as noted in the figure. SBT6050 does not require the tumor cells to be dependent on HER2

signaling for its anti-tumor activity and instead utilizes the HER2 protein to deliver the conjugate to adjacent myeloid cells. ***We believe that this expands the market opportunity beyond HER2-driven breast and gastric cancer in which targeted HER2 agents have been approved and are established as standard of care. Because of the rationale to combine SBT6050 with CPI's, which is supported by our preclinical data*** [. . .]

(Emphasis added.)

53.     The statements referenced in ¶¶ 47-52 were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) SBT6050 showed limited anti-tumor activity in patients treated with only SBT6050 in Phase 1/1b; (ii) accordingly, the Company had overstated SBT6050's commercial and/or clinical prospects; and (iii) as a result, the Offering Documents and Defendants' public statements throughout the Class Period were materially false and/or misleading and failed to state information required to be stated therein.

**Materially False and Misleading Statements Issued During the Class Period**

54.     The Class Period begins on December 3, 2020, when Silverback's securities began publicly trading on the NASDAQ pursuant to the materially false or misleading statements or omissions in the Offering Documents, as referenced in ¶¶ 47-52, *supra*.

55.     On March 29. 2021, Silverback filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K").  In providing an overview of the Company, the 2020 10-K stated, in relevant part:

Our lead product candidate, SBT6050, is comprised of a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody that targets tumors such as certain breast, gastric and non-small cell lung cancers. SBT6050 is currently in a Phase 1/1b clinical trial as a monotherapy and in combination with pembrolizumab, in patients with advanced or metastatic HER2-expressing solid tumors. In this trial, we have observed changes in pharmacodynamic markers in the first dose cohort, and we anticipate providing an update on interim data from the Phase 1 single agent dose-escalation cohorts in the second half of 2021.

56.     Next, in discussing the Company's development pipeline, the 2020 10-K stated, in relevant part:

**SBT6050**

Our lead product candidate, SBT6050, is comprised of a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody and is designed to activate myeloid cells in tumors expressing moderate to high levels of HER2. TLR8 is expressed in myeloid cell types prevalent in human tumors and TLR8 agonism can activate a broad spectrum of anti-tumor immune mechanisms. Therefore, we believe that TLR8 is the optimal target for activating human myeloid cell types in the TME.

\*\*\*

SBT6050 utilizes HER2 to localize and facilitate the delivery of the TLR8 agonist conjugate into myeloid cells in the TME. Therefore, unlike HER2 targeted therapies that have been approved by the U.S. Food and Drug Administration (FDA) such as Herceptin (trastuzumab), SBT6050 does not require HER2 to be an oncogenic driver to elicit anti-tumor activity. Furthermore, SBT6050 recognizes the HER2 sub-domain II, the pertuzumab epitope, and does not cross-block trastuzumab, allowing for potential combinations with trastuzumab-based agents, which are standard of care therapies in some HER2-expressing cancers.

\*\*\*

***Changes in pharmacodynamic markers have been observed in the first dose-escalation cohort of this trial***.

(Emphasis added).

57.     Further, in discussing the Company's strategy, the 2020 10-K stated, in relevant part:

AMENDED CLASS ACTION COMPLAINT - 17

- In early clinical trials, we will be examining the anti-tumor activity of SBT6050 in patients that have failed all available therapies associated with clinical benefit, in addition to measuring biomarkers of immune cell activation. This approach may allow us to seek expedited approval from the FDA based on surrogate endpoints (through the Accelerated Approval path) and expedited FDA review through programs such as Breakthrough Therapy, Priority Review, or Fast Track designation. We are evaluating activity broadly across HER2-expressing cancer types, including cancers where no HER2-directed therapies are currently approved, and have identified several tumor types and lines of therapy that potentially present opportunities for utilizing one or more of these accelerated approval pathways.

- ***Advance SBT6050 subsequently into earlier lines of therapy to maximize patient benefit and commercial success, if approved.*** Our long-term clinical development goal is to position SBT6050 in early-line standard of care regimens in key indications to potentially provide benefit to patients. We seek to accomplish this by evaluating combination therapy approaches with therapeutics approved as standard of care.

(Emphasis in original.)

58.     Finally, in the 2020 10-K, Defendants touted the addressable market for SBT6050 as compared to FDA-approved therapies that require HER2 signaling as opposed to SBT6050 which does not require the tumor cells to be dependent on HER2 signaling for anti-tumor activity, stating, in relevant part:

[. . .] HER2 IHC 2+ and 3+ overexpression and amplification are documented in at least 11 different tumor types including breast (estimated 83,000), gastric (estimated 6,400), non-small cell lung (estimated 31,500), colorectal (estimated 9,000), bladder (estimated 7,500), uterine (estimated 11,000), pancreatic (estimated 4,000), head and neck (estimated 2,000), ovarian (estimated 1,100), esophageal (estimated 3,000), and biliary (estimated 3,000) cancers, providing the potential to address a large HER2-expressing tumor agnostic market estimated to be more than 160,000 newly-diagnosed patients annually in the United States based in part on estimated prevalence rates. HER2 IHC2+ and 3+ overexpression in breast cancer, gastric cancer, and NSCLC are 30.0%, 16.4%, and 23.2%, respectively. Most HER2 targeted therapies require the tumor cells to be dependent on HER2 signaling, often called an oncogenic driver. HER2 oncogenic-driven tumors are limited to subsets of breast and gastric cancer and hence the FDA-approved therapies that require HER2 signaling are limited to these indications as noted in the figure. SBT6050 does not require the tumor cells to be dependent on HER2 signaling for its anti-tumor activity and instead utilizes the HER2 protein to deliver

the conjugate to adjacent myeloid cells. ***We believe that this expands the market opportunity beyond HER2-driven breast and gastric cancer in which targeted HER2 agents have been approved and are established as standard of care. Because of the rationale to combine SBT6050 with CPI's, which is supported by our preclinical data*** [. . .]

(Emphasis added.)

59.    Unsurprisingly, the Exchange Act Defendants identified efficacy as a "key competitive factor affecting the success of all of our programs."

60.    Regarding specific safety and efficacy data emerging from the Phase 1/1b trial, the 2020 10-K stated, in relevant part:

As of November 25, 2020, six patients had been enrolled at 0.3 mg/kg in Part 1 of the study (SBT6050 monotherapy dose-escalation). This first cohort of patients included two patients who had radiological reassessments, one patient with stable disease at her 8 and 16 week reassessments, one patient with a greater than 30% reduction in the diameter of her target lesion at 8 weeks per the investigator's assessment, and two additional patients that had completed the DLT period and remained on study. The most common adverse events included flu-like symptoms (fever, chills, nausea, vomiting, fatigue) and redness and swelling at the injection site. Changes in pharmacodynamic markers consistent with the potential mechanism of action were observed in treated patients. This included increases in plasma levels of CRP (C-reactive protein), a marker of inflammation, increases in MCP-1, IP-10 and IL-6, which are indicative of myeloid cell activation, increases in IFNg, which is a marker for T and NK cell activation, and transient decreases in hemoglobin, which we believe to be due to macrophage phagocytosis.

61.    Appended to the 2020 10-K as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Shawver and Piazza, attesting that, "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

62.    Corresponding with the 2020 10-K, Silverback issued a press release announcing the Company's Q4 and full year 2020 financial results and recent corporate updates.  The press release stated, in relevant part:

"2020 was an extraordinary year for Silverback, with the initiation of our first clinical study for SBT6050, *in which pharmacological activity was observed in the first dose cohort*, the advancement of each of our preclinical programs, expansion of our strong team, and the successful closing of our IPO in December," said Laura Shawver, Ph.D., chief executive officer of Silverback.

The press release further stated that:

*Changes in pharmacodynamic markers consistent with the potential mechanism of action have been observed in patients treated in the first monotherapy dose cohort.*

(Emphasis added).

63.     The foregoing statements were false and misleading because (i) SBT6050 showed limited anti-tumor activity in patients treated with only SBT6050 in Phase 1/1b; (ii) an overwhelming percentage of trial participants withdrew from the trial due to disease progression; (iii) SBT6050 did not have a manageable safety profile; and (iv) accordingly, the Company had overstated SBT6050's commercial and/or clinical prospects.

64.     On May 13, 2021, Silverback filed its 10-Q and issued a press release the same day announcing the Company's Q1 2021 financial results.

65.     Regarding the SBT6050 Phase 1/1b trial, the 10-Q once again stated that, "In this trial, we have observed changes in pharmacodynamic markers in the first dose cohort."  The press release further stated, in relevant part:

"In our first quarter as a public company, our team continues to execute on Silverback's mission to bring tissue-targeted therapies to patients in need," said Laura Shawver, Ph.D., chief executive officer of Silverback. "We are on track to report interim clinical data for SBT6050 in the second half of this year, and we are equally excited about the progress and preclinical data emerging from SBT6290 and SBT8230, highlighting the broad applicability of our ImmunoTAC platform."

**Recent Highlights**

- **SBT6050 (HER2-TLR8 ImmunoTAC) continues to advance through monotherapy and pembrolizumab combination dose escalation arms of the Phase 1/1b clinical study**. Silverback is on track to deliver interim

clinical data from the monotherapy dose escalation arm of the study in the second half of 2021.

66.     The foregoing statements were false and misleading because (i) SBT6050 showed limited anti-tumor activity in patients treated with only SBT6050 in Phase 1/1b; (ii) an overwhelming percentage of trial participants withdrew from the trial due to disease progression; (iii) SBT6050 did not have a manageable safety profile; and (iv) accordingly, the Company had overstated SBT6050's commercial and/or clinical prospects.

67.     On August 12, 2021, Silverback filed its 10-Q and issued a press release the same day announcing the Company's Q2 2021 financial results and providing a business update. Regarding the SBT6050 Phase 1/1b trial, the 10-Q once again stated that, "In this trial, we have observed changes in pharmacodynamic markers in the first dose cohort."  The press release further stated, in relevant part:

> "The second quarter was notable for the significant progress we made across our entire pipeline of tissue-targeted therapies, with SBT6050, our HER2-TLR8 ImmunoTAC leading the way with continued robust enrollment in our Phase 1/1b study," said Laura Shawver, Ph.D., chief executive officer of Silverback.

68.     The foregoing statements were false and misleading because (i) SBT6050 showed limited anti-tumor activity in patients treated with only SBT6050 in Phase 1/1b; (ii) an overwhelming percentage of trial participants withdrew from the trial due to disease progression; (iii) SBT6050 did not have a manageable safety profile; and (iv) accordingly, the Company had overstated SBT6050's commercial and/or clinical prospects.

### The Truth Begins to Emerge

69.     On September 13, 2021, Silverback issued a press release "announc[ing] that interim data from the dose-escalation portion of its Phase 1/1b clinical trial evaluating SBT6050 as a monotherapy and in combination with pembrolizumab in patients with advanced or metastatic

HER2-expressing or amplified solid tumors will be presented at the upcoming European Society for Medical Oncology (ESMO) 2021 Congress from September 16-21, 2021" and advising that "[t]he accepted abstract . . . is now available on the ESMO website."  Per the Abstract, the data reported on September 16 had a cut-off date of August 1, 2021, with 40 patients enrolled, and indicated that among 18 evaluable patients for tumor types of interest, one patient with HER2 IHC 2+ NSCLC had a confirmed PR (-55% per RECIST), maintained at the most recent scan obtained at 36 weeks post-enrollment, and eight weeks after discontinuing study treatment.    However, Defendants continued to maintain that SBT6050 "conferred clinical benefit to patients with heavily pre-treated, advanced solid tumors," showed early signals of anti-tumor activity as a monotherapy and in combination with a PD-1 inhibitor," and claimed SBT6050 had a "manageable safety profile."

70.     Specifically, the Abstract stated, in relevant part:

**Results**

As of 4 April 2021, 18 patients across 10 tumor types were treated at 4 dose levels (Part 1, n=14; Part 3, n=4). Dose levels of SBT6050 ranging from 0.15 mg/kg to 1.2 mg/kg were pharmacologically active as demonstrated by the induction of blood-based biomarkers associated with myeloid cell and NK or T cell activation. SBT6050 exposures up to 0.6 mg/kg increase greater than dose-proportionally, and linear thereafter, reflecting evidence of target saturation at 0.6 mg/kg. Furthermore, increases in IFNγ, a marker for NK and/or T cell activation, along with additional on-target biomarkers, plateaued at 0.6 mg/kg. The most frequent (>25%) related TEAEs were chills, diarrhea, fatigue, hypotension, injection site reaction, nausea, pyrexia, and vomiting. Dose levels >0.6 mg/kg were evaluated to assess the upper limits of the dose range; Grade 3 DLTs that resolved with supportive care were observed in Part 1 at 1.2 mg/kg Q2 weeks. ***In response-evaluable patients (N=14), best overall response was PR (n=1), SD (n=3), and PD (n=10).***

**Conclusions**

Based on preliminary safety data, SBT6050 given alone or in combination with pembrolizumab has a manageable safety profile. Related TEAEs are consistent with immune activation. A single-agent dose of 0.6 mg/kg administered Q2 weeks

had a tolerable safety profile, drug exposure that reflects evidence of target saturation, and pharmacodynamics indicative of myeloid, NK and T cell activation.

(Emphasis added).

71.     On this news, Silverback stock dropped $4.54 per share, or 23.35%, to close at $14.90 per share on September 13, 2021.

72.     On November the Company filed its 10-Q for the third quarter 2021, which stated the following regarding the Phase 1/1b trial data:

> Our lead product candidate, SBT6050, is comprised of a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody that targets HER2-expressing solid tumors, such as certain breast, gastric and non-small cell lung cancers. SBT6050 is currently being evaluated in a Phase 1/1b clinical trial as a monotherapy and in combination with pembrolizumab, in patients with advanced or metastatic HER2-expressing solid tumors. In September 2021, we presented interim clinical results from our ongoing Phase 1/1b study of SBT6050 with a data cut-off date of August 1, 2021, ***The interim update included data we believe are consistent with proof-of-mechanism through SBT6050's ability to activate myeloid, T and NK cells, as well as evidence of SBT6050 payload localization in the tumor microenvironment, observed adverse events consistent with on-mechanism immune activation, and early signals of anti-tumor activity***.
>
> ***
>
> As reported in the September 2021 interim update, at the 0.15 mg/kg and 0.3 mg/kg SBT6050 dose levels in combination with pembrolizumab, ***we observed induction of pharmacodynamic biomarkers indicative of myeloid, T, and NK cell activation, early signs of anti-tumor activity, and no dose limiting toxicities (DLTs)***).
>
> At SBT6050 dose levels above 0.3 mg/kg in combination with pembrolizumab, DLTs were observed. Two patients dosed at 0.6 mg/kg each experienced a DLT, including hypotension and cytokine release syndrome (CRS). These adverse events resolved with supportive care and both patients continued treatment at a reduced dose. Two patients were subsequently enrolled at a dose level of 0.45 mg/kg plus pembrolizumab. The first patient tolerated the first dose well and remained on study. The second patient, a 75-year-old with metastatic gastric cancer and underlying conditions including diabetes, hyperlipidemia and anemia, experienced serious adverse events (SAEs) of CRS, hypoxia, and hypotension following the first dose. The patient received supportive care that included tocilizumab and vasopressors; however, the patient developed decreased cardiac function due to demand-related ischemia. The patient made the decision not to further escalate supportive care and subsequently passed away. The investigator reported that the cause of death was attributed to Grade 5 hypotension considered related to

AMENDED CLASS ACTION COMPLAINT - 23

SBT6050. Patients currently enrolled in the pembrolizumab dose-escalation arm were dose-reduced to 0.3 mg/kg, as applicable.

(Emphasis added).

73.     Regarding Silverback's second product candidate utilizing the same mechanism as SBT6050, Defendants stated in relevant part:

SBT6290, our second product candidate, expands on the potential of a TLR8 agonist as a payload. SBT6290 is a TLR8 linker-payload conjugated to a monoclonal antibody that targets Nectin4, which is expressed in certain bladder, triple negative breast, head and neck, and non-small cell lung cancers. We submitted an investigational new drug application for SBT6290 in the fourth quarter of 2021, and we anticipate beginning clinical development in the first quarter of 2022.

74.     The foregoing statements in the 10-Q for the third quarter of 2021 were false and misleading because (i) SBT6050 showed limited anti-tumor activity in patients treated with only SBT6050 in Phase 1/1b; (ii) an overwhelming percentage of trial participants withdrew from the trial due to disease progression; (iii) SBT6050 did not have a manageable safety profile; (iv) the Company would have to discontinue the clinical program for SBT6050; (v) the Company would also have to discontinue the clinical program for SBT6290 due to the fact that it would have a similar clinical profile as SBT6050; and (vi) accordingly, the Company had overstated SBT6050's commercial and/or clinical prospects.

75.     Then, on March 31, 2022, Silverback reported its fourth quarter results for 2021 and announced that it had discontinued its SBT6050 program based on limited monotherapy anti-tumor activity and observed cytokine-related adverse events that limited the dose in combination with pembrolizumab.  Based on the data regarding SBT6050, the Company announced that it would also discontinue its program for SBT6290 due to the likelihood of it having a similar clinical profile to SBT6050.  Silverback further revealed that, as a result of these discontinued programs, it would cut its workforce by 27%.

AMENDED CLASS ACTION COMPLAINT - 24

76.     On this news, Silverback's stock dropped 8.55% to close at $3.20.

77.     To date, the price of Silverback common stock continues to trade far below the $21.00 per share Offering price, damaging investors.

78.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Silverback's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

79.     Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Silverback common stock in the IPO or purchased Silverback common stock thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO; or (b) Silverback securities during the Class Period; and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

80.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Silverback securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Silverback or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

81.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

82.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs has no interests antagonistic to or in conflict with those of the Class.

83.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of Silverback;

- whether the Securities Act Individual Defendants negligently prepared the Offering Documents for the IPO and, as a result, the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- whether the Exchange Act Individual Defendants caused Silverback to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Silverback securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

AMENDED CLASS ACTION COMPLAINT - 26

84.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

85.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Silverback securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Silverback securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

86.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

87.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

AMENDED CLASS ACTION COMPLAINT - 27

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### COUNT I

**(Violations of Section 11 of the Securities Act Against the Securities Act Defendants)**

88.     Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

89.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Securities Act Defendants.

90.     The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

91.     Silverback is the registrant for the IPO.  The Securities Act Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

92.     As issuer of the shares, Silverback is strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Offering Documents.

93.     None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

94.     By reasons of the conduct herein alleged, each Securities Act Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

95.     Plaintiffs acquired Silverback shares pursuant and/or traceable to the Offering Documents for the IPO.

96. Plaintiffs and the Class have sustained damages. The value of Silverback common stock has declined substantially subsequent to and because of the Securities Act Defendants' violations.

## COUNT II

**(Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)**

97. Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

98. This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

99. The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Silverback within the meaning of Section 15 of the Securities Act. The Securities Act Individual Defendants had the power and influence and exercised the same to cause Silverback to engage in the acts described herein.

100. The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

101. By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)**

102.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

103.    This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

104.    During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Silverback securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Silverback securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

105.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Silverback securities.  Such reports, filings, releases and statements

were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Silverback's finances and business prospects.

106.    By virtue of their positions at Silverback, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.  Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

107.    Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.  As the senior managers and/or directors of Silverback, the Exchange Act Individual Defendants had knowledge of the details of Silverback's internal affairs.

108.    The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Silverback.  As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Silverback's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and

public statements, the market price of Silverback securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Silverback's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Silverback securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

109.    During the Class Period, Silverback securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Silverback securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Silverback securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Silverback securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

110.    By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

111.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their

respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

**(Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)**

112.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

113.     During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Silverback, and conducted and participated, directly and indirectly, in the conduct of Silverback's business affairs.  Because of their senior positions, they knew the adverse non-public information about Silverback's misstatement of income and expenses and false financial statements.

114.     As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Silverback's financial condition and results of operations, and to correct promptly any public statements issued by Silverback which had become materially false or misleading.

115.     Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Silverback disseminated in the marketplace during the Class Period concerning Silverback's results of operations.  Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Silverback to engage in the wrongful acts complained of herein.  The Exchange Act Individual Defendants therefore were "controlling persons" of Silverback within the meaning of Section 20(a) of the Exchange Act.  In

this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Silverback securities.

116.    Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Silverback.  By reason of their senior management positions and/or being directors of Silverback, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Silverback to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Individual Defendants exercised control over the general operations of Silverback and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

117.    By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Silverback.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

1

2   Dated:  April 11, 2022                          **BADGLEY MULLINS TURNER PLLC**

3                                                   /s/ *Duncan C. Turner*
                                                    Duncan C. Turner, WSBA No. 20597
4                                                   19929 Ballinger Way NE, Suite 200
                                                    Seattle, WA 98155
5                                                   Telephone: (206) 621-6566
                                                    dturner@badgleymullins.com
6
                                                    *Of Counsel*
7
                                                    **POMERANTZ LLP**
8                                                   Jeremy A. Lieberman
                                                    (*pro hac vice*)
9                                                   Tamar A. Weinrib
                                                    (*pro hac vice*)
10                                                  600 Third Avenue
                                                    New York, New York 10016
11                                                  Telephone: (212) 661-1100
                                                    Facsimile: (917) 463-1044
12                                                  jalieberman@pomlaw.com
                                                    taweinrib@pomlaw.com
13
14                                                  *Lead Counsel for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT - 35