The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

BENJAMIN DRESNER Individually and On Behalf of All Others Similarly Situated,

Plaintiffs,

v.

SILVERBACK THERAPEUTICS, INC., LAURA K. SHAWVER, JONATHAN PIAZZA, RUSS HAWKINSON, PETER THOMPSON, VICKIE L. CAPPS, ROBERT HERSHBERG, SAQIB ISLAM, ANDREW POWELL, JONATHAN ROOT, THILO SCHROEDER, and SCOTT PLATSHON,

Defendants.

Case No. 2:21-cv-01499-MJP

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

NOTE ON MOTION CALENDAR:
**August 10, 2022**

**ORAL ARGUMENT REQUESTED**

**DEFS.' REPLY I/S/O MOT. TO DISMISS**
**Case No. 2:21-cv-01499-MJP**

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

**TABLE OF CONTENTS**

PAGE

I.   INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ...................................................................................................... 2

   A.   Both of Plaintiffs' Claims Are Subject to Heightened Pleading Standards. .......... 2

   B.   The CAC Is Improperly "Puzzle Pled" and Should Be Dismissed. ..................... 2

   C.   The Challenged Statements Are Not Actionable Under Sections 11 or 10(b). .................................................................................................. 3

   D.   Plaintiffs' Claims Should Be Dismissed for Failure to Allege Falsity. ................. 4

      1.   Plaintiffs allege no facts that render any challenged statement in the Registration Statement false or misleading *when made* ...................... 4

      2.   Plaintiffs fail to plead any false or misleading Class-Period statements. ................................................................................ 6

      3.   Plaintiffs fail to allege any material omissions. ...................................... 9

   E.   Plaintiffs' Section 10(b) Claim Fails to Allege a Strong Inference of Scienter. ..................................................................................... 11

   F.   Plaintiffs' Failure to Allege Loss Causation Bars their Section 10(b) Claim. ......................................................................................... 12

   G.   Plaintiffs Cannot State a Control Person Claim Under Sections 15 or 20(a). ......................................................................................... 12

III. CONCLUSION ................................................................................................. 12

**DEFS.' REPLY I/S/O MOT. TO DISMISS**
**Case No. 2:21-cv-01499-MJP**

i.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*In re Acadia Pharmaceuticals Inc. Securities Litigation*,
2020 WL 2838686 (S.D. Cal. June 1, 2020)................................................................3

*In re Amgen Inc. Securities Litigation*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)......................................................11, 12

*Boston Retirement System v. Uber Technologies, Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ......................................................3, 11

*Callan v. Motricity Inc.*,
2013 WL 195194 (W.D. Wash. Jan. 17, 2013)...........................................................2

*Construction Workers Pension Trust Fund v. Genoptix, Inc.*,
2013 WL 12123841 (S.D. Cal. Mar. 22, 2013) ........................................................12

*In re Daou Systems, Inc.*,
411 F.3d 1006 (9th Cir. 2005) .................................................................................11

*Kendall v. Odonate Therapeutics, Inc.*,
2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ............................................................10

*Knollenberg v. Harmonic, Inc.*,
152 F. App'x 674 (9th Cir. 2005) ..............................................................................2

*In re Nektar Therapeutics Securities Litigation*,
34 F.4th 828 (9th Cir. 2022) .............................................................................8, 12

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
*America West Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ..................................................................................12

*In re NVIDIA Corp. Securities Litigation*,
768 F.3d 1046 (9th Cir. 2014) ................................................................................12

*Fresno County Employees' Retirement Association v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017).......................................................................2

*Schueneman v. Arena Pharmaceuticals, Inc.*,
840 F.3d 698 (9th Cir. 2016) ..................................................................................11

**DEFS.' REPLY I/S/O MOT. TO DISMISS**
**Case No. 2:21-cv-01499-MJP**

ii.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

# TABLE OF AUTHORITIES
(continued)

PAGE(S)

*In re Worlds of Wonder Securities Litigation,*
    35 F.3d 1407 (9th Cir. 1994) ...........................................................................................4

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) .........................................................................................11

**STATUTES**

Securities Exchange Act of 1934, Section
    10(b) .......................................................................................................... *passim*
    20(a) .........................................................................................................................12

Securities Act of 1933 ("Securities Act") Section
    11............................................................................................................... *passim*
    12..............................................................................................................................4
    15............................................................................................................................12

**OTHER AUTHORITIES**

Federal Rules of Civil Procedure
    8................................................................................................................................6
    9(b) ..........................................................................................................................2

**DEFS.' REPLY I/S/O MOT. TO DISMISS**
**Case No. 2:21-cv-01499-MJP**

iii.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

## I.  INTRODUCTION[1]

Building on promising pre-clinical studies, Silverback invested millions and dedicated years to its oncology programs—including the Phase 1/1b clinical trial of its lead drug candidate, SBT6050, which began in July 2020. At its December 2020 IPO and throughout the Class Period, Silverback described in detail the mechanisms of SBT6050 and its related drug-product, SBT6290; explained the methodology and objectives of the Phase 1/1b trial; forecasted the commercial prospects of the drug *if* it received FDA approval; periodically disclosed the clinical-trial data; and expressed opinions about what the data revealed. But in the end, like many companies before it, Silverback's efforts ultimately did not produce clinical data that merited further investment of time or money. That outcome, while unfortunate, is not uncommon. Investors in life-sciences companies are well aware—as were Silverback's investors—that curing cancer is hard.

It is all-too easy, in hindsight, for Plaintiffs to deride Silverback as a "no-trick pony" and allege securities fraud. Plaintiffs' theory is Defendants *must have known* as far back as *December 2020* what they announced 15 months later, in March 2022. In other words, Silverback wasted all that time and money conducting a clinical trial when the data produced by the trial was known to them (and concealed from investors) from the very start. This makes no sense. But Plaintiffs seem to believe that if they incant "open label" and "the data" often enough—as if "the data" were a TV-news chyron or Bloomberg ticker—it will obscure the fact that their case is built entirely on hindsight. Plaintiffs' Opposition confirms, however, that the CAC lacks well-pled factual allegations showing *what specific data* was known to Defendants, *when* and *how* it was known, and *specifically* how it rendered any challenged statement false or misleading *when made*. Because Plaintiffs fail to plead the essential element of falsity for their Section 11 and Section 10(b) claims, the Court can and should dismiss the CAC.

Plaintiffs' Section 10(b) claim is deficient for two additional and independent reasons:

---

[1] "CAC" and "¶ _" refer to the Amended Class Action Complaint (Dkt. No. 29). "Ex. _" refers to the exhibits to the Fukumura Declaration (Dkt. No. 35-2) and, with respect to Exhibits R–U, to the Declaration of Christopher B. Durbin in support of Defendants' reply, filed herewith. All emphases are added and citations and internal quotation marks are omitted, unless otherwise stated.

(1) the CAC does not contain *particularized* factual allegations supporting a *strong* inference that Silverback or any individual Defendant acted with intent to defraud investors ("scienter"), nor offer any cogent or compelling reason why Defendants would do so; and (2) Plaintiffs fail to plead facts sufficient to demonstrate loss causation—*i.e.*, that the revelation of previously *concealed facts* or the *correction* of a prior misstatement caused their claimed losses in the stock drops in September 2021 or March 2022.

## II.    ARGUMENT

### A.    Both of Plaintiffs' Claims Are Subject to Heightened Pleading Standards.

Plaintiffs do not dispute that their Section 10(b) claim must meet the heightened pleading standards of Rule 9(b) and the PSLRA. (*See* Mot. at 10–11.) Their Section 11 claim also is subject to Rule 9(b)'s heightened pleading standards because the claim is grounded in fraud. (*See id.*) Here, unlike the cases Plaintiffs rely on (Opp. at 11 & n.7), the CAC alleges a *unified* course of fraudulent conduct for both claims—citing the *same* alleged reasons for falsity (*see* Mot. at 11 & n.7)—and does *not* allege meaningfully different theories.[2] Plaintiffs cannot evade Rule 9(b) by disavowing fraud allegations for their Section 11 claim or using section headers in the CAC for their Section 11 and Section 10(b) allegations. *See Callan v. Motricity Inc.*, 2013 WL 195194, at *5 (W.D. Wash. Jan. 17, 2013). Plaintiffs must plead *with particularity* the "who, what, when, where, and how" of the alleged fraudulent conduct for *both* claims. (*See* Mot. at 10–11.)

### B.    The CAC Is Improperly "Puzzle Pled" and Should Be Dismissed.

The CAC fails to meet heightened pleading requirements because it does not (1) identify precisely *which* statements in the CAC's lengthy block quotes Plaintiffs contest, or (2) allege with particularity *how* each challenged statement is rendered false by Plaintiffs' blanket list of reasons. (*See* Mot. 11–12.) Plaintiffs argue to no avail that the CAC "alleges each misleading statement and related omission, including date and the author thereof, and *after each group of misstatements*,

---

[2] *Cf. Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 683–84 (9th Cir. 2005) (alleging only omission theory; no "wholesale adoption" of fraud allegations); *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017) ("different theories" underlying fraud and negligence claims).

**DEFS.' REPLY I/S/O MOT. TO DISMISS**
**Case No. 2:21-cv-01499-MJP**                    2.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

lists the reasons why those statements were misleading." (Opp. at 20.) The CAC repeats *the same list* of reasons after *every* group of block quotes covering the entire 15-month Class Period, leaving Defendants and the Court to guess which specific statements are challenged and specifically *how* they are rendered false *when made*.[3] None of the cases Plaintiffs cite (Opp. at 20) sanction this type of pleading. *Cf. Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *5 (N.D. Cal. Aug. 7, 2020); *In re Acadia Pharm. Inc. Sec. Litig.*, 2020 WL 2838686, at *4 (S.D. Cal. June 1, 2020).[4]

### C.     The Challenged Statements Are Not Actionable Under Sections 11 or 10(b).

Plaintiffs' Opposition cannot conceal a fatal flaw in the CAC that applies equally to both of their claims: the challenged statements are not actionable. (*See* Mot. at 12–16.) In response, Plaintiffs *abandon* their challenge to Defendants' statements before and during the Class Period regarding observed "[c]hanges in pharmacodynamic markers" in monotherapy and combination therapy through multiple patient cohorts and dose levels. (¶¶ 47, 49–50, 55–56, 60, 62.) Plaintiffs now wave this off by saying "[w]hether Defendants had indeed observed changes in pharmacodynamic markers" is "beside the point." (Opp. at 12; *id.* at 14 & n.9.)

This is no small concession. It confirms that these factually accurate statements are not actionable (Mot. at 12 & Ex. 1) and undermines Plaintiffs' entire theory of falsity. Because they do not dispute the accuracy of the clinical-trial data or the corresponding scientific conclusions, they are left to challenge *only* Defendants' *interpretations* of the data—*e.g.*, the interim data was "consistent with proof-of-mechanism through SBT6050's ability to activate myeloid, T and NK cells" (¶ 72); and "SBT6050 conferred clinical benefit to patients with heavily pre-treated, advanced solid tumors" (¶ 46). These statements, among others, are non-actionable opinions. (*See* Mot. at 14–16; Ex. 3.) Plaintiffs respond with vague references to Defendants' alleged "contemporaneous review of trial data" (*see* Opp. at 20; *id.* at 18–19), but there are no factual allegations identifying the specific "data" that rendered the premises of Defendants' opinions false,

---

[3] This is why Defendants submitted Exhibits 1–5 to the Fukumura Declaration, which compile the challenged statements and cross-reference the Motion to aid the Court in navigating the puzzle-pled CAC.
[4] Tellingly, Plaintiffs fall back in asking the Court not to dismiss *with prejudice*. (Opp. at 21 n.12.) The Court should dismiss the CAC, and there is no reason to believe an amendment would cure its fatal flaws.

**DEFS.' REPLY I/S/O MOT. TO DISMISS**
**Case No. 2:21-cv-01499-MJP**                                    3.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

or when or how precisely such data became known to Defendants (*see* Mot. at 15).

Plaintiffs respond only in passing (if at all) to Defendants' arguments regarding the other categories of non-actionable statements. They do not contest the statements identified as inactionable puffery. (Mot. 13; Ex. 2.) And their only response to the statements identified as forward-looking (Mot. at 13–14; Ex. 4) is a footnote arguing that Silverback's risk warnings were "insufficient" because Defendants had "contemporaneous access to the deficient trial data" (Opp. at 18 n.10). But the CAC lacks any well-pled factual allegations identifying the supposedly "deficient trial data"—much less showing Defendants' actual knowledge that such data rendered their forward-looking statements false *when made*. (Mot. at 14, 16–19; *see infra* § II.D.1.) This requires dismissal of Plaintiffs' Section 10(b) claim under the PSLRA's safe-harbor provisions.[5]

**D.      Plaintiffs' Claims Should Be Dismissed for Failure to Allege Falsity.**

Plaintiffs' theory of fraud—and their attempt to plead falsity—boils down to one sentence: "The [SBT6050 Phase 1/1b] trial was open label (not blinded), so Defendants had access to trial data in real time starting day one." (Opp. at 12.) But the CAC begs the dispositive questions upon which Plaintiffs' theory depends: *What* specific "trial data"? *When* precisely did this unidentified data exist and when was it known to Defendants? And *how* did this unidentified data render any particular challenged statement false or misleading *when made*? (*See* Mot. at 17.) The Opposition confirms that Plaintiffs cannot answer those questions and, therefore, cannot plead falsity—an essential element of their Section 11 and Section 10(b) claims.[6] Specifically, Plaintiffs (1) offer no factual allegations showing that any challenged statements were false or misleading when made; and (2) identify no material omissions.

**1.      Plaintiffs allege no facts that render any challenged statement in the Registration Statement false or misleading *when made*.**

[5] Plaintiffs' Section 11 claim is subject to the similar "bespeaks caution" doctrine, under which a court can—and here, should—rule as a matter of law "that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413–14 (9th Cir. 1994).

[6] Plaintiffs concede implicitly that they do *not* assert a claim under Section 12 of the Securities Act challenging any statement in Silverback's Form 424B Prospectus. (*See* Mot. at 10 n.6.) Nor do Plaintiffs respond to Defendants' arguments about why a challenge to any such statement fails. (*See id.*)

Both of Plaintiffs' claims share a unified attempt to plead falsity that depends *entirely* on the fiction—unsupported by *any* particularized factual allegations—that Defendants knew in *December 2020* the same clinical-trial data that led them to discontinue their oncology program over 15 months later, in *March 2022*. This is a quintessential example of pleading fraud by hindsight. No matter how often Plaintiffs repeat the phrase "open label" with vague references to "the data," it does not suffice to demonstrate falsity. Indeed, Plaintiffs' own factual allegations undercut their theory: Silverback "conducted the Phase 1/1b trial *in four parts*: monotherapy dose-escalation and expansion (Part 1), monotherapy dose expansion in tumor-specific cohorts (Part 2), pembrolizumab combination dose-escalation (Part 3), and a pembrolizumab combination dose expansion cohort (Part 4)." (¶ 41.) In other words, over its 20-month duration (July 2020 to March 2022), the SBT6050 trial proceeded in *distinct parts* involving *different* patient cohorts and *different* dosages of SBT6050 alone (monotherapy) *and* in combination with other drugs. (*See* Dkt. No. 37-3 at 11.) Each distinct part of the trial was designed to produce—and did produce—***new and different clinical data*** that was not previously available. For example, Silverback's December 2020 Registration Statement disclosed that the trial included six patients, all taking SBT6050 as a monotherapy at dose level 0.3 mg/kg. (Ex. C at 129.) Plaintiffs insist that Defendants should have *foreseen* that "*ultimately*, all six of the patients . . . discontinued study treatment due to disease progression." (Opp. at 13.) But the Registration Statement disclosed that ***all six patients* were then *still in the trial*** (Ex. C at 129). Based on nothing but hindsight, Plaintiffs allege that Defendants knew *all along* what they disclosed in *September 2021*, when the interim data showed that the six patients had discontinued treatment.[7] (Dkt. No. 37-3 at 11.)

Just as implausible is Plaintiffs' allegation that Defendants knew and failed to disclose in late 2020 that "SBT6050 showed limited anti-tumor activity in patients treated with

---

[7] Plaintiffs ignore or elide the full scope of Silverback's September 2021 disclosures: on September 13, 2021, Silverback disclosed an abstract of interim results as of April 4, 2021 (Ex. P at 2), followed three-days later by a detailed presentation of the interim data as of August 1, 2021 (Ex. L). (*See* Mot. at 7–8.) In any event, there are no factual allegations showing any Defendant's knowledge of specific clinical data at the time of any challenged statement predating Silverback's September 2021 disclosures.

[monotherapy]." (¶ 53.) Again, the patient cohorts and dose levels in the monotherapy arm of the Phase 1/1b *changed* as the study moved through its discrete parts. (¶ 41.) When Silverback filed the Registration Statement, the *only* pending study was of the first monotherapy cohort of six patients dosed at 0.3 mg/kg; the second monotherapy study (dose-escalation to 0.6 mg/kg) had just begun enrollment; and the subsequent 0.9 mg/kg and 1.2 mg/kg studies had not even progressed that far.[8] (*See* Ex. C at 129.) According to Plaintiffs, however, Defendants knew enough in December 2020 to reach the conclusion they announced in March 2022—which, at that time, was based "[u]pon *comprehensive review* of our clinical and preclinical data for our TLR8 oncology programs," after "a total of *58 patients were enrolled* and received SBT6050 as *monotherapy and in combination* with a checkpoint inhibitor *at dose levels ranging from 0.15 mg/kg through 1.2 mg/kg.*" (Ex. O.) Nothing in the CAC supports such an inferential leap. Because Plaintiffs' alleged reasons for falsity **were not known or knowable** at the time of the Registration Statement, the CAC's attempt to plead fraud by hindsight requires dismissal of Plaintiffs' Section 11 claim.[9]

**2.      Plaintiffs fail to plead any false or misleading Class-Period statements.**

Plaintiffs' Section 10(b) claim is just as much "fraud by hindsight" as the Section 11 claim. The only distinction lies in the timing of the challenged statements, which fall into three categories: (1) the start of the Class Period in December 2020 through August 2021 (¶¶ 54–68); (2) Silverback's September 2021 disclosure of interim clinical-trial data (¶¶ 69–70); and (3) Silverback's November 2021 Form 10-Q (¶¶ 72–74). The CAC does not allege with the requisite particularity that any of these challenged statements were false or misleading when made.

***Statements Before the Release of Interim Data.*** Plaintiffs' arguments regarding challenged statements before the September 2021 disclosure of interim results (¶¶ 55–68) repackage the same flawed hindsight allegations as their Section 11 arguments. Here too, Plaintiffs

---

[8] Analysts understood that clinical data available in December 2020 would not determine the outcome of this early-stage trial. (*E.g.*, Ex. R at 14 ("Silverback reported encouraging, albeit *very early*, clinical benefit from the first two patients treated in the [Phase 1] dose-escalation trial[.]").)

[9] The same result holds even under the more-permissive Rule 8 pleading standards because Plaintiffs do not allege what data Defendants had access to at the time of any challenged statement. (*See* Mot. at 16–17.)

**DEFS.' REPLY I/S/O MOT. TO DISMISS**
**Case No. 2:21-cv-01499-MJP**

6.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

allege that Defendants failed to disclose (1) that "any anti-tumor activity observed was limited and potentially attributable to pembrolizumab"; and (2) "that an overwhelming percentage of trial participants withdrew from the trial due to disease progression." (Opp. at 14–15.) But the CAC still lacks *particularized* factual allegations showing that the entire body of clinical-trial data that led Silverback to terminate its oncology program in *March 2022* was known to Defendants before the September 2021 interim-data disclosure. (*See* Mot. at 16–17; *supra* § II.D.1.)

***Interim Data Disclosure.*** Next, Plaintiffs challenge statements regarding the September 2021 interim data, including: (1) that dose levels of SBT6050 were "pharmacologically active as demonstrated by the induction of blood-based biomarkers associated with myeloid cell and NK or T cell activation" (¶ 70); and (2) that SBT6050 "showed early signals of anti-tumor activity as a monotherapy and in combination with a PD-1 inhibitor" (¶ 69). But Plaintiffs *no longer dispute* the accuracy of these scientific observations (*see supra* § II.C), so they argue their *non-actionable opinion* that Defendants should have terminated SBT6050 *immediately* (*see* Opp. at 16).

In the same vein, Plaintiffs disagree with Defendants' observation that "SBT6050 conferred clinical benefit to patients with heavily pre-treated" advanced solid tumors. (*See* Opp. at 17–18.) That statement was accompanied by disclosure of the patient-response data (*e.g.*, Exs. K, L, P) and did not state or suggest that *all* patients received a clinical benefit from SBT6050. Indeed, the analyst reports Plaintiffs cite suggest that investors could (and did) draw their own conclusions from the data.[10] Here again, Plaintiffs cannot ground a securities-fraud claim on their own opinions and interpretations of clinical-trial data (as regurgitated by their "expert," Todd Clark) that was ***disclosed to investors***. (*See* Mot. at 16.) Nor can they distinguish on-point authorities by relying on conclusory allegations that "the data" was known to Defendants "throughout the trial." (*See* Opp. at 18–19.) On this point, *Nektar* remains instructive: generalized allegations of unspecified data or disagreements with clinical-trial methodologies are insufficient.

---

[10] (*E.g.*, Dkt. No. 37-7 at 2 (noting that "monotherapy arm efficacy might be disappointing," but "commercial target for SBT6050 is use in combination with other therapies").)

*In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 836–37 (9th Cir. 2022).

Similarly, Plaintiffs' allegations that Defendants "misled investors regarding safety, assuring that SBT6050 had a manageable safety profile, with no dose limiting toxicities, and only minor adverse events" (Opp. at 15) do not withstand scrutiny. A "manageable safety profile" refers to Defendants' *opinion* about the interim data. (*See* Ex. L at 9.) Thus, Plaintiffs must allege that (1) Defendants did not actually hold this belief *and* (2) that it was objectively false. (Mot. at 15–16.) Plaintiffs do not attempt to argue the former, and they argue objective falsity based only on Defendants' supposed "contemporaneous review of trial data." (*See* Opp. at 19–20.) Here again, Plaintiffs fail to identify well-pled allegations *specifying* what *contemporaneously available data* rendered Defendants' opinions false or misleading in any way. (*Id.* at 20; *see supra* § II.D.1.)

Finally, Defendants' statements that there were "no dose limiting toxicities" and only minor adverse events were factually accurate because they refer to interim data for patients who had received 0.3 mg/kg or below SBT6050 dose levels in combination with pembrolizumab. (Ex. M at 23.) Plaintiffs simply disregard Defendants' disclosure in the interim data that DLTs *had* occurred for eight patients receiving *higher* dose levels of SBT6050. (*See* Ex. L at 15.) Defendants further explained that after seven of those eight patients continued treatment at a lower dose, *none* had suffered significant adverse events leading them to discontinue the trial. (*See id.*)

***November 2021 Disclosures.*** Plaintiffs assert that the market accepted "assurances" in the November 2021 Form 10-Q that "based on pharmacodynamic biomarkers [Defendants] observed early signs of anti-tumor activity." (Opp. at 16.) But again, Plaintiffs have conceded the factual accuracy of those statements (*see supra* § II.C.) and they ignore the 10-Q's other relevant disclosures. Specifically, Silverback disclosed that *after* the release of interim data, three patients had experienced DLTs when taking SBT6050 at dose levels above 0.3 mg/kg in combination with pembrolizumab; two of these patients continued the trial at a lower dosage, the third patient discontinued treatment and died thereafter.[11] (Ex. M at 24.) Plaintiffs cite analyst reports to suggest

---

[11] Silverback had warned investors from the outset of the risks attendant to "[t]he inclusion of critically ill

**DEFS.' REPLY I/S/O MOT. TO DISMISS**
**Case No. 2:21-cv-01499-MJP**

8.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

that Defendants' disclosures did not impact the outlook for SBT6050 and SBT6290, but those reports *predate* Silverback's November 2021 10-Q. (Opp. at 16; Dkt. Nos. 37-6–7.) Analysts drew their own conclusions from the November disclosures, viewing the most-recent data as "indicative of a narrower-than anticipated therapeutic window for SBT6050" that potentially "diminishes the drug's combinatorial prospects going forward." (Ex. T at 1.)

 ***March 2022 Disclosures.*** At last, Plaintiffs get to the disclosures that form the basis of their hindsight theory of fraud: the allegations that Defendants knew *in December 2020 and throughout the trial* that "SBT6050 did not confer a clinical benefit" or "have a manageable safety profile"—both lifted from Silverback's March 2022 announcement that it would terminate SBT6050 and SBT6290. (Opp. at 18.) Plaintiffs insist that "[n]ot a single disclosure stated that new trial data generated *after September 2021* altered Defendants' conclusion that SBT6050 conferred clinical benefit or had a manageable safety profile . . . ." (*Id.* at 17.) In fact, Silverback's ***November 2021*** 10-Q reported DLTs in combination with pembrolizumab (Ex. M at 24), and the CAC contains no particularized factual allegations suggesting that data was known to Defendants any earlier. Nor do Plaintiffs challenge any statements *after* that disclosure. When Defendants next spoke, in March 2022, Silverback expressly cited the November 2021 data as among the reasons it decided to discontinue development of its oncology programs. (Ex. N at 41.)

### 3. Plaintiffs fail to allege any material omissions.

 For similar reasons, Plaintiffs' Opposition does not salvage the CAC's failed attempt to plead a material omission from the Registration Statement or Class-Period statements. ***First***, the CAC alleges no facts supporting Defendants' knowledge of the facts underpinning the conclusion they announced in March 2022—*i.e.*, that "they had observed limited anti-tumor activity" in monotherapy dose-escalation studies—at any earlier point in time. (*See* Mot. at 16–17.) It is nonsense for Plaintiffs to argue that this gave the "false impression" that Defendants had "observed

patients in [its] clinical trials," including potentially "deaths or other adverse medical events due to other therapies or medications that such patients may be using," and that "[Silverback's] product candidates could potentially cause adverse events." (Ex. C at 18.)

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

promising signs of *efficacy*." (Opp. at 13.) Evaluating "efficacy" is *not even the purpose* of a Phase 1/1b trial, which aims to assess *safety* and *dosage*.[12] Silverback made that clear in the Registration Statement and every later disclosure. (*See* Ex. C at 3 ("We are currently evaluating the *safety* and *tolerability* of SBT6050 in a Phase 1 dose-escalation trial."); *see also* Exs. E at 6, Ex. N at 5.).)

    *Second*, Plaintiffs' assertion that Defendants "never disclosed the large percentage of trial patients that discontinued the trial due to disease progression" (Opp. at 13) is pure hindsight (*see supra* § II.D.1.). For example, the Registration Statement disclosed that six patients were then enrolled in the trial and "[t]wo of the first four patients did not complete the [dose-limiting toxicity ("DLT")] period and, therefore, were replaced per the clinical protocol." (*See* Ex. C at 129.) The CAC contains no allegations supporting the existence of any contemporaneous fact rendering that disclosure incomplete or misleading *at the time it was made*. Plaintiffs overlook that distinction in relying on *Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271 (S.D. Cal. Aug. 4, 2021). (Opp. at 15.) In *Kendall*, Defendants "continued to make public statements regarding [their clinical trial]'s enrollment, value proposition, and topline results" despite allegedly knowing of an "emergency change in [the trial's] protocol resulting from elevated rates of neutropenia and patient withdrawals." *Id.* at *6. Here, in contrast, Plaintiffs rely on nothing more than their "open label" mantra and speculation that "the data" must have been available to Defendants at the time.

    *Third*, Plaintiffs stretch even further by arguing that Defendants failed to disclose "they could not develop SBT6290 if SBT6050's trial data reflected a lack of *efficacy*"—which Phase 1 trials are *not designed to study*—"and/or safety." (*See* Opp. at 13–14.) Plaintiffs admit that the Registration Statement "*comprehensively* illustrated how [SBT6290] works" (*id.* at 5), and indeed, it disclosed that SBT6290 relied on the "*same* TLR8 linker-payload used in SBT6050" and was intended to "*expand*[] on the *potential* of a TLR8 agonist as a payload" (Ex. C at 3).[13] At the same

---

[12] (Ex. U at 2.) Efficacy studies are reserved for *Phase 2* trials. (*See id.*)

[13] Shortly thereafter, market analysts observed that SBT6290's prospects depended in part on the outcome of SBT6050's clinical studies. (*E.g.*, Ex. S at 30 ("SBT6290 would be significantly de-risked by SBT6050's clinical success since they use the same immunomodulatory payload. . . .").)

**DEFS.' REPLY I/S/O MOT. TO DISMISS**
**Case No. 2:21-cv-01499-MJP**

10.

time, Silverback expressly cautioned investors that "[a]*ny product candidate* that we advance into clinical trials, including SBT6050, may not achieve favorable results in later clinical trials, if any, or receive marketing approval." (*Id.* at 17.) Plaintiffs cite no authority imposing an obligation on Silverback to state differently what was obvious from the company's disclosures in the Registration Statement and its subsequent Class-Period disclosures.[14]

### E.    Plaintiffs' Section 10(b) Claim Fails to Allege a Strong Inference of Scienter.

The Opposition also confirms that the CAC does not allege facts giving rise to a *strong* inference that Defendants acted with scienter. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). This is a separate and independent basis to dismiss Plaintiffs' Section 10(b) claim, for several reasons. To start, Plaintiffs' allegations that "[t]he SBT6050 trial was open label" and that Silverback "held company wide meetings every two weeks" (Opp. at 21–22) are not *particularized* facts showing what data was available to Defendants or specifically when or how Defendants learned of that data. (*See supra* § II.D.) Plaintiffs' reliance on *In re Daou Systems, Inc.*, 411 F.3d 1006, 1023–24 (9th Cir. 2005) does not salvage their argument. There, the plaintiffs' scienter allegations included "suspicious corporate acquisitions and *insider stock sales*" and "*specific* allegations of *deliberate* [ ] misfeasance." *Id.* No such allegations appear in the CAC—only generalized allegations that "attendees discussed" "matters of efficacy and safety" at company-wide meetings. (Opp. at 22.) And unlike *Amgen*, Plaintiffs do not identify **specific and contemporaneously available data** that contradicted Defendants' statements and was communicated to them at a specific meeting. *See In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *10–11 (C.D. Cal. Aug. 4, 2014).

Plaintiffs also cannot invoke the core operations doctrine (Opp. at 23) because the CAC

---

[14] Plaintiffs' cases are easily distinguishable. (*See* Opp. at 14.) In *Uber*, plaintiffs alleged that when the registration statement was filed, many of its risk factors "had already come to fruition," including "intentionally delay[ing] layoffs and restructuring [the company] knew were inevitable given its financial position at the time of its IPO, in order to mislead the markets." *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020). In *Arena*, the company "did more than just express its confidence"; it "affirmatively represented" that all completed studies supported FDA approval of a drug, despite then knowing that these studies "were *the* sticking point with the FDA." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 708 (9th Cir. 2016).

**DEFS.' REPLY I/S/O MOT. TO DISMISS**
**Case No. 2:21-cv-01499-MJP**                11.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

"never plausibly allege[s] that *specific* information was conveyed" to any Defendant. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014).[15] And Plaintiffs do not even bother to cite factual allegations or legal authority supporting their argument that they allege scienter through Sarbanes-Oxley certifications of Silverback's SEC filings. (*See* Opp. at 23.)

Finally, the CAC's scienter allegations also do not withstand holistic review. In particular, Plaintiffs do not rebut Defendants' arguments that the CAC's allegations lead to inferences of scienter far-less compelling than the reasonable opposing inference that Defendants made a considered judgment to discontinue their oncology programs only after evaluating *all* the trial data generated *before and after* the September 2021 interim data release. (Mot. at 22–23; *supra* § II.D.)

**F.      Plaintiffs' Failure to Allege Loss Causation Bars their Section 10(b) Claim.**

The Opposition does not remedy Plaintiffs' failure to plead loss causation (Opp. at 23–24), which is another independent basis to dismiss their Section 10(b) claim. First, Silverback's September 13, 2021 disclosure of the abstract of Phase 1/1b interim results did not "correct" any prior disclosure. (Mot. at 23–24.) Second, Silverback's March 2022 disclosure that it would cease development of SBT6050 and SBT6290 also did not "reveal" anything that was *known to and concealed by* Defendants *at the time* of any challenged statement.[16] (*Id.* at 24.) *See Nektar*, 34 F.4th at 839 (alleged corrective disclosure "did not correct or revise previous patient data").

**G.      Plaintiffs Cannot State a Control Person Claim Under Sections 15 or 20(a).**

Because Plaintiffs' Section 11 and 10(b) claims fail, so do the Section 15 and 20(a) claims.

**III.    CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the CAC.

---

[15] Plaintiffs' cited cases involved allegations of *specific* data *contemporaneously* available that rendered statements false or misleading. *See Amgen*, 2014 WL 12585809, at *10–11; *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 942–43 (9th Cir. 2003).

[16] Plaintiffs do not even try to distinguish Defendants' cases (*see* Mot. at 23–24), and the only case Plaintiffs cite could scarcely be *less* analogous. (*See* Opp. at 24); *Constr. Workers Pension Tr. Fund v. Genoptix, Inc.*, 2013 WL 12123841, at *1, *7–8 (S.D. Cal. Mar. 22, 2013) (disclosure of lower-than-expected revenue and guidance corrected prior misstatements that demand for services was "growing" and "increasing").

Dated: August 10, 2022

*/s/Christopher B. Durbin*

Christopher B. Durbin (WSBA No. 41159)
COOLEY LLP
1700 Seventh Avenue, Suite 1900
Seattle, WA 98101-1355
Tel.: (206) 452-8700
Fax: (206) 452-8800
Email: cdurbin@cooley.com

Koji F. Fukumura (*pro hac vice*)
COOLEY LLP
4401 Eastgate Mall
San Diego, CA 92121-1909
Tel.: (858) 550-6000
Fax: (858) 550-6420
Email: kfukumura@cooley.com

Attorneys for Defendants SILVERBACK
THERAPEUTICS, INC., LAURA L. SHAWVER, JONATHAN
PIAZZA, RUSS HAWKINSON, PETER THOMPSON, VICKIE
L. CAPPS, ROBERT HERSHBERG, SAQIB ISLAM,
ANDREW POWELL, JONATHAN ROOT, THILO
SCHROEDER, and SCOTT PLATSHON

**DEFS.' REPLY I/S/O MOT. TO DISMISS**
**Case No. 2:21-cv-01499-MJP**                    13.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700