The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| BENJAMIN DRESNER Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>SILVERBACK THERAPEUTICS, INC., LAURA K. SHAWVER, JONATHAN PIAZZA, RUSS HAWKINSON, PETER THOMPSON, VICKIE L. CAPPS, ROBERT HERSHBERG, SAQIB ISLAM, ANDREW POWELL, JONATHAN ROOT, THILO SCHROEDER, and SCOTT PLATSHON,<br><br>Defendants. | Case No. 2:21-cv-01499-MJP<br><br>**DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>NOTE ON MOTION CALENDAR: **January 27, 2023**<br><br><br>**ORAL ARGUMENT REQUESTED** |

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**

**TABLE OF CONTENTS**

PAGE

I.      INTRODUCTION ..................................................................................................... 1

II.     FACTUAL BACKGROUND ..................................................................................... 2

    A.   Silverback's Officers and Directors and Lead Drug Candidate............................ 2

    B.   July 2020: Silverback Commences Phase 1/1b Clinical Trial of SBT6050 .......... 2

    C.   December 2020: Silverback's Initial Public Offering ......................................... 3

    D.   March–August 2021: Silverback's First Annual and Quarterly Reports............... 5

    E.   Sept.–Nov. 2021: Silverback Discloses the Phase 1/1b Trial Interim Results............................................................................................................... 5

    F.   March 2022: Silverback Ceases Development of SBT6050 and SBT6290. ......... 6

    G.   The Court's Order Dismissing the Consolidated Amended Complaint................. 7

III.    APPLICABLE LEGAL STANDARDS ...................................................................... 7

IV.     ARGUMENT............................................................................................................. 8

    A.   Plaintiff's Section 11 Claim Remains Subject to Rule 9(b) Pleading Standards................................................................................................................ 8

    B.   Plaintiff's Truncated Section 11 Claim Still Fails to Plead Falsity. ...................... 9

        1.   Statements regarding tumor status in the first monotherapy cohort ........ 10

        2.   Statements regarding anti-tumor activity in the first monotherapy cohort ...................................................................................................... 11

        3.   Statements regarding SBT6290's clinical or commercial prospects ....... 12

    C.   Plaintiff's Amended Section 10(b) Claim Still Fails to Plead Falsity. ................ 12

        1.   The SAC's Section 10(b) allegations are still "puzzle pled.".................. 13

        2.   Plaintiffs still fail to allege with particularity that Defendants made any false or misleading statements or material omissions. ...................... 14

            a.   Statements prior to Silverback's disclosure of interim data. ....... 14

            b.   Statements regarding the interim data......................................... 18

    D.   Plaintiffs Still Fail to Allege Facts Supporting a Strong Inference of Scienter. .............................................................................................................. 21

    E.   The SAC Still Pleads an "Apples/Oranges" Theory of Loss Causation.............. 23

    F.   Plaintiffs Fail to State a Control Person Claim Under Sections 15 or 20(a)........ 24

V.      CONCLUSION........................................................................................................ 24

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**                    i

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

**TABLE OF AUTHORITIES**

PAGE(S)

**CASES**

*In re Amgen Inc. Securities Litigation*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014).........................................................................22

*Callan v. Motricity Inc.*,
2013 WL 195194 (W.D. Wash. Jan. 17, 2013), *aff'd sub nom.*
*Mosco v. Motricity, Inc.*, 649 F. App'x 526 (9th Cir. 2016).........................................................9

*Carr v. Zosano Pharma Corp.*,
2021 WL 3913509 (N.D. Cal. Sept. 1, 2021) .........................................................................23

*City of Dearborn Heights Act 345 Police & Fire Retirement System*
*v. Align Technology, Inc.*,
856 F.3d 605 (9th Cir. 2017) .............................................................................................20, 21

*City of Royal Oak Retirement System v. Juniper Networks, Inc.*,
2013 WL 2156358 (N.D. Cal. May 17, 2013).........................................................................20

*In re Cutera Securities Litigation*,
610 F.3d 1103 (9th Cir. 2010) .................................................................................................17

*In re CytRx Corp. Securities Litigation*,
2017 WL 5643161 (C.D. Cal. Aug. 14, 2017).........................................................................16

*In re DDi Corp. Securities Litigation*,
2005 WL 8157394 (C.D. Cal. Jan. 7, 2005) ..............................................................................9

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) .......................................................24

*Gammel v. Hewlett-Packard Co.*,
905 F. Supp. 2d 1052 (C.D. Cal. 2012) ....................................................................11, 22, 23

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ...................................................................................................8

*Kendall v. Odonate Therapeutics, Inc.*,
2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ...........................................................................15

*Leavitt v. Alnylam Pharmaceuticals, Inc.*,
451 F. Supp. 3d 176 (D. Mass. 2020) ......................................................................................20

*Lloyd v. CVB Financial Corp.*,
811 F.3d 1200 (9th Cir. 2016) .................................................................................................23

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)....................................................................................................................14

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**                    ii

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ......................................................................................8, 23

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ....................................................................................8, 23, 24

*In re Nektar Therapeutics Securities Litigation*,
34 F.4th 828 (9th Cir. 2022) ...................................................................................18, 20, 24

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015)...............................................................................................10, 19, 21

*Oregon Public Employees Retirement Fund v. Apollo Group Inc.*,
774 F.3d 598 (9th Cir. 2014) ...................................................................................14, 23, 24

*Patel v. Seattle Genetics, Inc.*,
2018 WL 2359137 (W.D. Wash. May 24, 2018)................................................................22

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ...............................................................................4, 14, 17, 23

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ........................................................................................7

*In re Regulus Therapeutics Inc. Sec. Litig.*,
406 F. Supp. 3d 845 (S.D. Cal. 2019)................................................................................22

*In re Resonant Inc. Securities Litigation*,
2016 WL 1737959 (C.D. Cal. Feb. 8, 2016)......................................................................12

*Fort Worth Employers' Retirement Fund v. Biovail Corp.*,
615 F. Supp. 2d 218 (S.D.N.Y. 2009).................................................................................24

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
697 F.3d 869 (9th Cir. 2012) ...............................................................................8, 22, 24

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ..........................................................................................8

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009), The SAC ........................................................................7, 10

*In re Sanofi Securities Litigation*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015)..................................................................................20

*Singh v. Schikan*,
106 F. Supp. 3d 439 (S.D.N.Y. 2015)..........................................................................10, 12

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**                    iii

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Sprewell v. Golden State Warriors,*
   266 F.3d 979 (9th Cir. 2001) ...............................................................................8

*In re Stac Electronics Securities Litigation,*
   89 F.3d 1399 (9th Cir. 1996) ...............................................................................8

*In re Tesla Motors, Inc. Securities Litigation,*
   671 F. App'x 670 (9th Cir. 2016) ........................................................................9

*Twinde v. Threshold Pharmaceuticals Inc.,*
   2008 WL 2740457 (N.D. Cal. July 11, 2008)......................................................7

*Vess v. Ciba-Geigy Corp. USA,*
   317 F.3d 1097 (9th Cir. 2003) .............................................................................8

*Weston Family Partnership LLLP v. Twitter, Inc.,*
   29 F.4th 611 (9th Cir. 2022) ..............................................................................12

*In re Worlds of Wonder Securities Litigation,*
   35 F.3d 1407 (9th Cir. 1994) ...............................................................................4

*Zucco Partners, LLC v. Digimarc Corp.,*
   552 F.3d 981 (9th Cir. 2009) ...............................................................................8

**STATUTES**

15 U.S.C.
   § 77a *et seq.*, § 11.................................................................................... *passim*
   § 77a *et seq.*, § 15...........................................................................................24
   § 77a *et seq.*, § 20(a) .....................................................................................24
   § 77l(a)(2), § 12 ............................................................................................7, 8
   §§77z-1 .............................................................................................................4
   § 77z-2 .............................................................................................................4
   § 78a *et seq.*, § 10(b) ............................................................................. *passim*
   § 78u-4(b)(3)(A) ...............................................................................................8
   § 78u-5(c) ..........................................................................................................4

**OTHER AUTHORITIES**

21 C.F.R. § 312.21 .................................................................................................2

FDA, *E6(R2) Good Clinical Practice: Integrated Addendum to ICH E6(R1) Guidance for Industry* (2018)..................................................................................................17

Federal Rule of Civil Procedure 8 ................................................................7, 8, 10

Federal Rule of Civil Procedure 9(b).......................................................7, 8, 9, 23

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**     iv

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Merriam Webster online dictionary, "misleading,"
    https://www.merriam-webster.com/dictionary/misleading.......................................................10

Mei Day & Ann Croft, *Implementation of Data Cut Off in Analysis of Clinical Trials*,
    PharmaSUG 2018 – DS19 ........................................................................................................17

SEC Rule 10b-5 ........................................................................................................7

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**                      v

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

## I.   INTRODUCTION

The Court's Order dismissing the Amended Class Action Complaint ("CAC") clearly identified the flaws in Plaintiffs' claims under Section 11 of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934: (i) "puzzle pleading" that failed to specify which statements were challenged and why they were false or misleading when made; (ii) pleading falsity in hindsight, based on information that was not known to Defendants (or did not exist) at the time the statement was made; (iii) conclusory allegations from a confidential witness who could not identify any information that rendered any challenged statement false or misleading when made; and (iv) alleging facts that did not support even a plausible inference of scienter. Plaintiffs were given leave to amend and a clear roadmap to cure the CAC's flaws. They have not done so.

Plaintiffs' Second Amended Class Action Complaint ("SAC") repeats every pleading deficiency of the CAC with only superficial revisions. Their Section 11 claim is now premised entirely on alleged omissions and separated in time from the Section 10(b) class period, which is three months shorter—beginning with Silverback's March 2021 Form 10-K rather than its December 2020 IPO. Plaintiffs' Section 10(b) claim also alleges only misleading omissions, until Silverback's disclosure of interim results in September 2021. But the SAC asserts the same hindsight-based challenges to Defendants' statements without regard to when or how contrary information was known to Defendants. Plaintiffs still rely on conclusory allegations that Silverback's clinical trial was "open label," and thus Defendants must have known data that did not even exist at the time of a given challenged statement. And, in the 10 months since Silverback "cut its workforce by 27%," Plaintiffs have not found a single former employee—including their lone confidential witness—who could say that Defendants were aware of any data that contradicted or was omitted from a single challenged statement at the time it was made.

The deck chairs have been rearranged, but Plaintiffs have not cured the failings the Court identified. Because there is no reason to believe that giving Plaintiffs a third chance to state a claim would be anything but futile, the Court should dismiss the SAC with prejudice.

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**

1.

## II.    FACTUAL BACKGROUND

### A.    Silverback's Officers and Directors and Lead Drug Candidate

During the Class Period, the Individual Defendants were Silverback officers and/or directors, alleged to have made material misstatements by virtue of signing Silverback's SEC filings and/or other public disclosures. (¶¶ 28–45.[1]) Silverback's then-lead product candidate, SBT6050, was developed as a novel treatment option for patients with certain cancers expressing a HER2 protein. (¶ 47.) SBT6050 is an Antibody-Drug Conjugate (ADC) comprised of a biologically active small molecule called TLR8 (the "payload") linked to an antibody engineered to bind to HER2 on the surface of tumor cells while minimizing any impact on non-targeted cells. (*Id.*) Immune cells in the tumor then internalize the ADC and the payload is released to activate those immune cells—specifically, myeloid cells, a class of innate immune cell that can consist of up to 10% of the cells in a tumor—to promote direct tumor killing and recruitment of other immune cells that can also have tumor-killing properties. (¶ 48; **Ex. E** at 4–5.[2]) In other words, Silverback developed SBT6050 to induce the body's own immune system to attack and kill cancer cells.

### B.    July 2020: Silverback Commences Phase 1/1b Clinical Trial of SBT6050

Before drug candidates like SBT6050 can be sold commercially, the FDA requires that they undergo three phases of clinical trials. *See* 21 C.F.R. § 312.21. Phase 1 trials test the drug's safety, dose tolerance, and other properties. *Id*. Silverback began such a trial in July 2020, after years of preclinical research on SBT6050.[3] (¶¶ 50–52.) The "Phase 1/1b Trial" was designed to evaluate SBT6050's safety, tolerability, pharmacokinetics ("PK"), pharmacodynamics ("PD"), and anti-tumor activity for the treatment of advanced or metastatic HER2-expressing solid tumors in patients for whom all available therapies associated with clinical benefit had failed. (¶¶ 50–52.) The trial would track PD "biomarkers in both the blood and the tumor which have been *associated*

---

[1] All "¶ __" references are to the SAC (Dkt. No. 45).

[2] All "**Ex. __**" references are to the exhibits to the Declaration of Koji F. Fukumura, filed herewith.

[3] Silverback described in detail the preclinical studies it relied on to design the Phase 1/1b Trial. (*E.g.*, **Ex. C** at 127 (SBT6050 "starting dose of 0.3 mg/kg, . . . was *projected* to be pharmacologically active and within 2–3 cohorts of where we could *potentially* achieve anti-tumor activity").)

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**

2.

*with tumor regression* in our *preclinical* studies"—the "potential mechanism of action" (**Ex. C** at 127–28). Those biomarkers, such as "elevations in MCP-1, IP-10, and C-reactive protein" (¶ 53[4]), could identify the activation of myeloid, T, and NK cell in the tumor microenvironment, which would potentially "elicit broad, durable anti-tumor responses." (*Id.* at 3).

Because SBT6050 was designed to induce the immune system to kill cancer cells without harming healthy cells, it was critical to identify the optimal dosages. (*See* ¶ 48; **Ex. C** at 111.) Accordingly, the Phase 1/1b Trial was designed to evaluate safety and tolerability through a series of dose-escalation studies in monotherapy and combination therapy (¶ 50) that was anticipated to continue for more than two years (*See* **Ex. S** at 3). Specifically, the trial would proceed through four parts, with data from each cohort informing the dose escalation for the proceeding cohorts: Part 1, monotherapy doses escalating from 0.3 mg/kg, 0.6 mg/kg, 0.9 mg/kg, to 1.2 mg/kg; Part 2, monotherapy in tumor-specific cohorts, using the optimal dose identified in Part 1; Part 3, combination therapy with pembrolizumab ("pembro") doses escalating from 0.15 mg/kg, 0.3 mg/kg, to 0.6 mg/kg; and Part 4, combination therapy with pembro in tumor-specific cohorts, using the optimal dose identified in Part 3. (**Ex. C** at 128–29). To gather relevant data from a dozen clinical sites in the U.S., Australia, and South Korea (**Ex. S**),[5] "patients received CT scans every eight weeks until week twenty-four and then every sixteen weeks thereafter" (¶ 54; **Ex. C** at 129.)

## C.    December 2020: Silverback's Initial Public Offering

Silverback's IPO took place on December 3, 2020, some five months after it commenced the Phase 1/1b Trial. (¶¶ 3, 4.) In the Form S-1 Registration Statement, as amended, and Form 424B4 Prospectus, Silverback informed investors of the design, objectives, and progress of the trial. (**Ex. C** at 1–4[6]; **Ex. D** at 5.) The Company disclosed that six patients were enrolled in the

---

[4] Unless otherwise noted, all emphases are added and all internal cites and quotations are omitted.
[5] The Phase 1/1b Trial's Principal Investigator was Dr. Sam Klempner, M.D., of Massachusetts General Hospital and the Dana Farber Cancer Institute. (**Ex. O at 4**.)
[6] Silverback's original Form S-1 (filed Nov. 10, 2020) and first amended S-1 (filed Nov. 30, 2020) contained substantially identical disclosures as its second amended S-1, which was declared effective on December 3, 2020. (*See* **Ex. A** at 3; **Ex. B** at 2–3.)

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**

3.

first, lowest-dose cohort of Part 1—monotherapy at 0.3 mg/kg every two weeks—of whom one had "stable disease at each scan" "at 8 and 16 weeks," another had "greater than 30% reduction in the diameter of her target lesions at 8 weeks," and two others had withdrawn from the trial. (**Ex. C** at 129.) Silverback further disclosed that "[c]hanges in [PD] markers consistent with the potential mechanism of action have been observed" in the first cohort, including increases in "plasma levels of CRP (C-reactive protein)," "MCP-1, IP-10 and IL-6, which are indicative of myeloid cell activation," and "IFNγ, which is a marker for T and NK cell activation." (*Id.* at 129.)

Silverback also "described at length" (¶ 6) its second drug candidate, SBT6290, "as expanding upon the *potential* of a TLR8 agonist as a payload, *the same mechanism* as SBT6050" (¶ 58); *see also* **Ex. C** at 131 (same); **Ex. D** at 5 (explaining that, unlike SBT6050, "existing companion diagnostic does not currently exist" for anticipated therapeutic use of SBT6290). Silverback further explained that an investigational new drug application for SBT6290 would need to be submitted and approved as a predicate to a first clinical trial. (*See* **Ex. C** at 1, 91, 110.[7])

Silverback's disclosures also cautioned investors that the clinical development of SBT6050 was "***extremely risky***" (**Ex. C** at 17), its "approach to the discovery and development of product candidates is ***unproven***," and its "product candidates are based on ***novel technologies***" (*id.* at 19). Silverback further stated, "while we have conducted ***preclinical*** studies of SBT6050, ***we do not know how SBT6050 will perform*** in the ongoing Phase 1/1b clinical trial . . . , ***whether any initial tumor responses that may be observed will be durable*** or ***whether adverse events will arise over time***." (**Ex. D** at 17.) The Company was equally clear that it "ha[d] not yet succeeded and ***may not succeed in demonstrating efficacy and safety for any product candidates*** based on our platform technologies in clinical trials ***or in obtaining marketing approval thereafter***." (**Ex. D** at 19.[8])

---

[7] For the Court's convenience, these and other forward-looking statements in the Offering Documents and Class Period disclosures are excerpted in **Exhibit 4**. Such statements in the Offering Documents are not actionable under the "bespeaks caution" doctrine, *see In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413–14 (9th Cir. 1994), nor in the Class Period disclosures under the PSLRA safe harbor, *see* 15 U.S.C § 78u-5(c); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059–60 (9th Cir. 2014).

[8] Silverback repeated these and other relevant warnings in its disclosures through the Class Period, (*see* **Ex. E** at 3, 63–64, 67–71, 73, 79–80 71, 63–64, 67–71, 73, 79–80; **Ex. H** at 5, 30, 33; **Ex. J** at 4; **Ex. P** at 4;

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**

4.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

**D.    March–August 2021: Silverback's First Annual and Quarterly Reports.**

Silverback issued its first 10-K on March 29, 2021 (¶ 66; **Ex. E**), in which it reiterated that it had "observed changes in [patients'] [PD] markers in the first [monotherapy] dose cohort" (*id.*)—*i.e.*, clinical data that had been "*associated* with tumor regression in *preclinical* studies." (*See* ¶¶ 64, 78; **Ex. E** at 18, 23; **Ex. F** at 1.) Silverback "anticipate[d] providing an update on interim data . . . in the second half of 2021," but again cautioned that "the results of *preclinical* studies and early clinical trials are *not always predictive of future results*." (**Ex. E** at 3, 68.)

Silverback later filed 10-Qs in May and August 2021. (¶¶ 74, 78; **Exs. H, J**.) The Company announced in May that SBT6050 "continue[d] to advance through monotherapy and [pembro] combination dose escalation arms." (**Ex. G**.) In August, Silverback reiterated that it had "observed changes in [PD] markers in the first monotherapy dose cohort" (**Ex. J** at 19) and announced "continued robust enrollment" in additional dose-escalation studies (**Ex. I** at 1). In both reports, Silverback cautioned investors that, among other things, "*failure in clinical trials can occur at any stage of testing* . . . due to lack of efficacy or adverse safety profiles, *notwithstanding promising results in earlier trials*" (**Ex. H** at 33; *see also* **Ex. J** at 33).

**E.    Sept.–Nov. 2021: Silverback Discloses the Phase 1/1b Trial Interim Results.**

Silverback disclosed interim results the Phase 1/1b Trial on September 13, 2021. Silverback's press release directed investors to an abstract of the interim results and conclusions as of April 4, 2021. (¶ 12; **Ex. K**.) The Abstract explained that "18 patients across 10 tumor types were treated at 4 dose levels" in monotherapy and combination therapy and that dose levels "ranging from 0.15 mg/kg to 1.2 mg/kg were pharmacologically active as demonstrated by the induction of blood-based biomarkers associated with myeloid cell and NK or T cell activation." (See ¶ 82; **Ex. L** at 1.) Among those 18 evaluable patients, one demonstrated a partial response and three others demonstrated stable disease. (¶ 82.) The Abstract further explained that the most-common adverse events, flu-like symptoms, "are consistent with immune activation" and

Ex. Q at 4, 35, 36, 40–44, 48), which are excerpted for the Court's convenience in **Exhibit 5**.

concluded that, "[b]ased on *preliminary* safety data, SBT6050 given alone or in combination with [pembro] has a manageable safety profile." (¶ 84.) On this news, Silverback's stock price dropped from $19.44 to $14.90 per share. (*See* ¶ 85.)

Three days later, the Company provided a further analysis of the interim results based on clinical data as of August 1, 2021. (**Ex. N.**[9]) For example, Silverback disclosed the doses, treatment duration, and tumor-response rates for six specific patients, concluding that "SBT6050 conferred clinical benefit to patients with heavily pre-treated, advanced solid tumors." (*Id.* at 22; ¶ 88.) Silverback further disclosed statistics regarding treatment discontinuation due to progressive disease (**Ex. O** at 11), just as it disclosed in the Registration Statement that two of the six patients in the first cohort had ceased treatment (**Ex. C** at 129). The trial's inclusion criteria required a very ill population for whom all prior therapies had failed (**Ex. S**), and Silverback had fully disclosed the risks inherent in developing therapies for such patients (*see* **Ex. C** at 18; **Ex. E** at 69).

In Silverback's November 10, 2021 10-Q, it announced that three patients treated with higher doses of SBT6050 in combination therapy had experienced serious dose-limiting toxicities ("DLTs"), including one patient death. (¶ 72; **Ex. P** at 24.) Silverback reported that it would continue combination therapy at a lower dose for which no such DLTs had occurred and which, the Company believed, the interim data had shown "SBT6050's ability to activate myeloid[] cells" and "early signals of anti-tumor activity." (¶ 72; *see also* **Ex. P** at 22.)

**F.    March 2022: Silverback Ceases Development of SBT6050 and SBT6290.**

Silverback filed its 10-K for fiscal year 2021 on March 31, 2022 (**Ex. Q**) and announced that it had undertaken a "comprehensive review of our clinical and preclinical data for our TLR8 oncology programs," including SBT6050 and SBT6290 (**Ex. R** at 1). Silverback continued to believe that SBT6050's interim data showed changes "in [PD] markers," but the entire body of data showed "limited monotherapy anti-tumor activity and cytokine-related adverse events that

---

[9] The Company's extensive public disclosures of the interim results on September 16, 2021 included a large single-page poster (**Ex. M**), a presentation to the 2021 Congress of the European Society for Medical Oncology ("ESMO") (**Ex. O**), and a similar "Corporate Presentation" (**Ex. N**).

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**

6.

limited the dose in combination with pembrolizumab." (*Id.*) In other words, SBT6050 alone did not induce sufficient anti-tumor activity, and a dosage sufficient to elicit anti-tumor activity in combination therapy caused increased frequency and severity of adverse events. (*See id.*) Accordingly, Silverback announced its decision to terminate development of SBT6050 and SBT6290. (¶98.) On this news, Silverback's stock price declined to $3.20 per share. (¶ 99.)

**G.      The Court's Order Dismissing the Consolidated Amended Complaint.**

The Court dismissed the CAC on November 4, 2022 (Dkt. No. 42 ("Order")). The Court held that the entire CAC sounded in fraud because Plaintiffs "rely on the same allegations to support their Section 11 claim as the Section 10(b) fraud claim." (Order at 12.) The Court then concluded that Plaintiffs failed to satisfy Rule 9(b) or Rule 8, including because the CAC was "puzzle pled." (*Id.* at 14.) The Court also held that none of the four alleged categories of misstatements were actionable under either Section 11 or Section 10(b). (*See id.* at 15–16).

Plaintiffs' Section 10(b) claim also failed because Plaintiffs failed to plead a strong inference of scienter: "Plaintiffs put forth no evidence suggesting that Defendants were on notice of clinical findings that contradicted their public statements at the time those statements were made other than to point to the trial's 'open label.'" (*Id.* at 24–25.) The Court also found "unconvincing" Plaintiffs' allegations based on statements from a confidential witness. (*Id.* at 23–24.) The Court granted leave to amend, and Plaintiffs filed the SAC on December 5, 2022. (Dkt. No. 45.)

**III.     APPLICABLE LEGAL STANDARDS**

***Elements*.** To state a claim under Section 10(b) and SEC Rule 10b-5, Plaintiffs must plead, among other things, a material misrepresentation or omission, scienter, and loss causation. *Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014). Plaintiffs' Section 11 claim requires them to plead that the Registration Statement contained a material omission or misrepresentation. *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009).[10]

---

[10] The SAC again defines "Offering Documents" to include Silverback's Form 424B Prospectus (¶ 4) and challenges statements in the Prospectus (¶¶ 61, 63, 64), but still does not assert a claim under Section 12 of the Securities Act, 15 U.S.C. § 77*l*(a)(2). *See also Twinde v. Threshold Pharmas. Inc.*, 2008 WL 2740457,

***Pleading Standards.*** First, the SAC must satisfy Rule 8, under which courts do not accept as true legal conclusions asserted as "facts" or any other unsupported, conclusory allegations, *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996), and do not indulge unreasonable inferences or unwarranted deductions, or accept allegations that contradict matters properly subject to judicial notice, *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Courts may, however, consider matters subject to judicial notice and materials incorporated by reference in the complaint. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

Second, Plaintiffs must also satisfy Rule 9(b)'s heightened pleading requirements, which compel them to "state *with particularity* the circumstances constituting fraud [or mistake]." *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). Rule 9(b) applies to allegations "grounded in fraud," including such allegations underlying Section 11 claims, *Stac Elecs.*, 89 F.3d at 1405, and requires Plaintiffs to allege the "who, what, when, where, and how" of the alleged fraudulent conduct, and "set forth what is false or misleading about a statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

Third, Plaintiffs' Section 10(b) claim must satisfy the PSLRA's "formidable" pleading requirements, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1054–55 (9th Cir. 2008), which reflect congressional intent to impose the *most-rigorous* pleading standards for securities fraud claims, *Ronconi v. Larkin*, 253 F.3d 423, 428 (9th Cir. 2001). Failure to meet these heightened pleading standards requires dismissal. *See* 15 U.S.C. § 78u-4(b)(3)(A).

## IV.    ARGUMENT

### A.    Plaintiff's Section 11 Claim Remains Subject to Rule 9(b) Pleading Standards.

Plaintiffs' allegations underpinning their Section 10(b) *and* Section 11 claims sound in fraud because they *still* "allege a unified course of fraudulent conduct' and 'rely entirely on that course of conduct as the basis of [both] claim[s]." *See In re Rigel Pharms., Inc. Sec. Litig.*, 697

---

at *5 (N.D. Cal. July 11, 2008) (analyzing challenge to statements in prospectus under Section 12). Regardless, Plaintiffs' challenges to the Offering Documents as a whole fail for the same reasons.

F.3d 869, 880, 885–86 (9th Cir. 2012). The Court applied Rule 9(b) to the CAC because, in part, "many of the statements Plaintiffs allege are false and misleading in the Offering Documents are repeated verbatim in Silverback's later SEC quarterly filings." (Order at 13.) The same is true of the SAC.[11] Plaintiffs no longer *explicitly* incorporate the Offering Documents into their Section 10(b) claim, but that superficial change is no better than "a general disclaimer that a claim is based on negligence rather than fraud." (*See id.* at 12.) Nor does it matter that the Section 10(b) Class Period now starts after the IPO (¶ 66). *See Callan v. Motricity Inc.*, 2013 WL 195194, at *5 (W.D. Wash. Jan. 17, 2013) (applying Rule 9(b) and rejecting plaintiffs' argument that they "structured the SAC so that their Section 11 claims are alleged separately," including by starting Section 10(b) class period after IPO), *aff'd sub nom. Mosco v. Motricity, Inc.*, 649 F. App'x 526 (9th Cir. 2016). The SAC still alleges a **unified course of fraudulent conduct** and thus remains subject to Rule 9(b). *See In re DDi Corp. Sec. Litig.*, 2005 WL 8157394, at *16 (C.D. Cal. Jan. 7, 2005) ("Plaintiffs cannot allege fraud based on a series of events occurring before the [IPO] and on essentially identical events continuing after the [IPO], and then scissor out a non-fraud claim from the center of that unified course of conduct in order to evade the Rule 9(b) requirement.").

## B.  Plaintiff's Truncated Section 11 Claim Still Fails to Plead Falsity.

The SAC no longer pleads any affirmatively false statements in the Offering Documents, *only* allegedly misleading omissions. (*See* ¶¶ 60–65.) Plaintiffs thus concede what they implicitly acknowledged in opposing the last motion to dismiss: Defendants accurately represented that they "had indeed observed changes in [PD] markers" in the first cohort. (Order at 15.) Plaintiffs also do not contest that those changes in PD markers were "consistent with the potential mechanism of action." (¶ 61.) In fact, Plaintiffs acknowledge that Defendants "described the [PD] changes observed in detail" (*id.*), as well as the tumor responses for two patients in the first cohort (¶ 62).[12]

[11] (*Compare* ¶¶ 61–63 *with* ¶¶ 66–68 (challenging same statements under Sections 11 and 10(b)); *compare also* ¶ 64 *with* ¶¶ 71, 73 (asserting same reasons for falsity for Sections 11 and 10(b) claims).)

[12] For the Court's convenience, these and other non-actionable factually accurate statements cited in the SAC and documents incorporated by reference therein are excerpted in **Exhibit 1**. *See In re Tesla Motors, Inc. Sec. Litig.*, 671 F. App'x 670, 670 (9th Cir. 2016).

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**                    9.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

Plaintiffs' Section 11 claim now rests on the theory that Defendants *failed to disclose* (1) the tumor status of four patients in the first cohort, thereby "providing investors with the false impression that the SBT6050 showed early signs of efficacy" (¶ 62); (2) that "patients treated with SBT6050 as a monotherapy in the first dose cohort of the Phase 1/1b trial only exhibited limited anti-tumor activity" (¶ 64); and (3) that "if SBT6050 did not demonstrate more than limited anti-tumor activity as a monotherapy," Silverback would also have to terminate SBT6290 (*id.*).

But Section 11 "is not a general disclosure requirement; it affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).[13] Here, Plaintiffs allege no contemporaneous facts that Defendants *could have* disclosed—much less were *obligated* to disclose—at the time of the Registration Statement. *See Rubke*, 551 F.3d at 1164 (plaintiff must plead "that *the omitted information existed* at the time the registration statement became effective"); *Singh v. Schikan*, 106 F. Supp. 3d 439, 447 (S.D.N.Y. 2015) (dismissing Section 11 claim where "key details" of clinical studies "were disclosed in the Registration Statement"). Accordingly, even under Rule 8, Plaintiffs' Section 11 claim fails to plead falsity.

### 1. Statements regarding tumor status in the first monotherapy cohort

First, Plaintiffs allege that Defendants "provid[ed] investors with the false impression that the SBT6050 showed early signs of efficacy" by disclosing ***accurately*** that, "as of November 25, 2020, one of the six patients treated with SBT6050 as a monotherapy in the dose cohort had 'stable disease' and one other had 'target lesion reduction.'" (¶ 62.) This "false impression," according to Plaintiffs, was created because "Defendants had access to the open label data regarding the remaining four trial participants, [but] did not disclose their tumor status." (*Id.*)

This is just another attempt to plead fraud by hindsight. The SAC still rests on the fallacy that because the trial was "open-label," Defendants knew in December 2020 the same data and

---

[13] *See also* Merriam-Webster online dictionary (defining "mislead" as "to lead in a wrong direction or into a mistaken action or belief often by deliberate deceit"), *available at* https://www.merriam-webster.com/dictionary/misleading (last visited Dec. 30, 2022).

conclusions disclosed in the interim results *nine months later*.[14] The Court already rejected this same theory in the CAC: "the data supporting this assertion was presented to investors in September 2021, nine months after the initial public offering, and Plaintiffs do not allege that the data was available at the time of the IPO." (Order at 15.) Moreover, the Court found "no indication that [this statement] was misleading" because "*only two patients* from the first cohort had formal reassessments of their tumor status." (*Id.*; *see also* **Ex. C** at 129 (same).) Plaintiffs still plead no *particularized facts* suggesting that any other patients had had formal reassessments of tumor status at the time of the Registration Statement—much less that Defendants withheld those results.

### 2.    Statements regarding anti-tumor activity in the first monotherapy cohort

Second, Plaintiffs' assertion that Defendants failed to disclose "limited anti-tumor activity" is again cut-and-pasted from Silverback's *March 2022* announcement that it would discontinue its oncology programs (**Ex. R**). Plaintiffs allege that Defendants *must have* been aware of these "facts" at the time of the Registration statement, but the SAC relies on the same conclusory allegations that Silverback was "tracking data as the open-label trial progressed," (¶ 59), and "trial data" was presented at "biweekly companywide meetings, with mandatory attendance for all employees" (¶ 103). The Court previously rejected these allegations as a basis to plead scienter (Order at 23–24), and they are just as inadequate to plead falsity. *Cf. Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1072–75 (C.D. Cal. 2012) (finding allegations from multiple CWs insufficient to plead falsity under Section 10(b)). Nowhere does the SAC allege *what* specific data, *when* it became known to Defendants, or *how* Defendants came to know it. (*See* Order at 24 ("Plaintiffs do not allege that CW1 can confirm what data was discussed, that safety and efficacy were discussed, when they were discussed, and what documents and data were presented at these meetings.").) Plaintiffs still "put forth no evidence suggesting that Defendants were on notice of clinical findings that contradicted their public statements *at the time those statements were made* other than to point

---

[14] Even if this data was immediately available on April 4, 2021, the first data cut-off (*see* ¶ 62 n.7)—and there are no alleged *facts* supporting that conclusory allegation—that was still *four months after* the IPO.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

to the trial's 'open label.'" (*Id.*) This does not suffice to "show that a purported misstatement in a registration statement was misleading *at the time the registration statement was issued.*" *See In re Resonant Inc. Sec. Litig.*, 2016 WL 1737959, at *6–7 (C.D. Cal. Feb. 8, 2016).

### 3. Statements regarding SBT6290's clinical or commercial prospects

Finally, Plaintiffs allege Defendants failed to disclose that "if SBT6050 did not demonstrate more than limited anti-tumor activity," then Silverback "would have to discontinue the clinical programs for both SBT6050 and SBT6290." (¶ 64.) Plaintiffs do not allege, however, the omission of any *facts*. They even admit Defendants disclosed that SBT6050 and SBT6290 "both utilize the TLR8 agonist as a payload (*i.e.* function using the same mechanism to activate immune cells for targeted tumor treatment)." (*Id.*) This made the interlocked fates of SBT6050 and SBT6290 obvious to investors—as analysts recognized at the time. (*E.g.*, **Ex. U** at 30 ("SBT6290 would be significantly de-risked by SBT6050's clinical success since they use the same immunomodulatory payload[.]").) Silverback need not have spelled out the obvious implications of its accurate disclosures. *See Singh*, 106 F. Supp. 3d at 447 (rejecting allegations that Registration Statement omitted "an extra level of disclosure spelling out inferences and drawing conclusions for investors"; "defendants were not required to draw out such inferences or to make such forecasts in order to provide complete and accurate disclosures").

\* \* \*

Plaintiffs fail to plead that the Offering Documents omitted any ***then-existing data*** that rendered any of Defendants' statements misleading ***when made***. *See Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) ("[C]ompanies do not have an obligation to offer an instantaneous update of every internal development, especially when it involves the oft-tortuous path of product development."). Plaintiffs' Section 11 claim should be dismissed with prejudice.

### C. Plaintiff's Amended Section 10(b) Claim Still Fails to Plead Falsity.

The SAC asserts a lightly revised Section 10(b) claim that remains just as deficient as the CAC. Plaintiffs cite nine Silverback disclosures over a seven-month period—from the March 2021

10-K to the November 2021 10-Q—and they no longer allege that *even one* factual statement was inaccurate on its face. The SAC instead (1) alleges a series of misleading omissions, all improperly premised on hindsight, prior to Silverback's disclosure of interim results in September 2021 (¶¶ 66–80); (2) challenges Defendants' *opinions* about the *fully disclosed* interim data in September 2021 (¶¶ 81–91); and (3) recycles the same hindsight-based omissions and opinion challenges in attacking the Company's November 2021 10-Q (¶¶ 92–97). These illusory differences do not cure the flaws that led the Court to dismiss Plaintiffs' Section 10(b) claim in the CAC.

### 1. The SAC's Section 10(b) allegations are still "puzzle pled."

The SAC is again "puzzle-pled," in many ways worse so than before. Disregarding the Court's criticism of the CAC (*see* Order at 18), Plaintiffs still string together lengthy block quotes from Silverback's public disclosures followed by the same list of supposed reasons for falsity (*e.g.*, ¶¶ 66–71) regardless *when* the challenged statements were made (*compare* ¶ 64 (challenging December 2020 Registration Statement) *with* ¶ 71 (challenging March 2021 10-K)). Or, worse yet, Plaintiffs omit *any* alleged reasons for falsity, instead wrapping up a series of apparently unchallenged disclosures with quotes from third-party analysts (*e.g.*, ¶¶ 81–86, 87–91).

Plaintiffs' use of bold italics is even more confusing in the SAC, leaving one to guess whether it signifies merely rhetorical emphasis (*e.g.*, ¶ 75 ("by no later than April 4, 2021 (*over a month prior*), . . .")), accurate factual statements that Plaintiffs do not challenge (*e.g.*, ¶ 70 ("'*pharmacological activity was observed in the first dose cohort*'")), statements by third parties that cannot be challenged (*e.g.*, ¶ 86 ("SVB Leerink still found that the 'abstract did report *a clear signal of immune activation and disease control with clinical benefit* . . .'")), or perhaps Defendants' inactionable statements of opinion (*e.g.*, ¶ 88 ("SBT6050 has demonstrated *early signals of anti-tumor activity* . . . .")). Plaintiffs thus shift "the burden on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." (Order at 17.) Their Section 10(b) claim fails on this basis alone.

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**

13.

**2.      Plaintiffs still fail to allege with particularity that Defendants made *any* false or misleading statements or material omissions.**

**a.          Statements prior to Silverback's disclosure of interim data.**

Plaintiffs' theory of falsity in the SAC appears to differ during three distinct time periods, the first encompassing Silverback's March 29, 2021 10-K and related press release (¶¶ 66–73), the May 13, 2021 first-quarter 10-Q and press release (¶¶ 74–77), and the August 12, 2021 second-quarter 10-Q (¶¶ 78–79).[15] Plaintiffs allege *only* material omissions in those disclosures, but they again fail to allege any *particularized facts* showing that Defendants were *contemporaneously* aware of information that rendered any of their statements misleading by omission. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *see also Intuitive Surgical*, 759 F.3d at 1061 (actionable omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists"); *Oregon Pub. Empl. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) ("Plaintiffs' omissions theory fails to state a claim because the Defendants clearly disclosed material information to investors.").

***March 29, 2021 10-K and Press Release.*** To start the Class Period, Plaintiffs recite a series of unchallenged factually accurate statements describing Silverback's findings in the Phase 1/1b Trial to that point. (¶¶ 66–70.) Plaintiffs then repurpose the same alleged omissions from their Section 11 claim, nearly verbatim, asserting Defendants concealed that (1) patients in the first-dose monotherapy cohort "only exhibited limited anti-tumor activity" (¶ 71); (2) "patients treated in Part 3 of the trial with SBT6050 in combination with pembrolizumab suffered cytokine related adverse events" (¶ 72); and (3) if SBT6050 showed only "limited anti-tumor activity" in monotherapy or "demonstrated troubling safety signals," Silverback would also have to terminate SBT6290 (¶ 73). The Court already rejected Plaintiffs' challenge to these same disclosures (Order at 19–22), and Plaintiffs still fail to allege with particularity that Defendants concealed any contemporaneous information that rendered their statements misleading by omission.

[15] The SAC quotes Silverback's August 12, 2021 press release that accompanied its second-quarter 10-Q, but does not allege any false or misleading statement or material omission in that document. (*See* ¶ 80.)

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**

14.

First, the SAC fails to allege that *any* new clinical data was available as of March 29, 2021, much less that Defendants withheld any data rendered their statements misleading. Indeed, the SAC contains *no particularized facts* demonstrating that Defendants *knew then* the data forming the basis of the conclusion they announced in March 2022—*i.e.*, that "they had observed limited anti-tumor activity" in monotherapy dose-escalation studies (¶¶ 75, 79). Plaintiffs' only "new" allegation is that "by no later than April 4, 2021" Defendants knew that ten patients had "experienced disease progression." (¶ 71.) But the SAC does not explain—much less plead with particularity—how Defendants knew of data that was not collected from the study until a week later. *Cf. Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, at *6 (S.D. Cal. Aug. 4, 2021).

Second, and equally flawed, is the allegation that Defendants concealed from investors that "patients treated *in Part 3* of the trial with SBT6050 in combination with [pembro] suffered cytokine related adverse events" (¶ 72). Plaintiffs speculate that Defendants *must have known* in March what they disclosed *eight months later* (*see* **Ex. P** at 24), but there are no particularized factual allegations that data from Part 3 of the trial even existed at the time (*See* Order at 24–25 ("the trial proceeded in distinct parts involving different patient cohorts and different dosages" and "each part of the trial produced new and different data that was not previously available").)

Third, Plaintiffs' allegation that Defendants somehow concealed SBT6290's dependence on SBT6050 (¶ 73) makes no more sense here than it does in their Section 11 claim. (*See* Section B.3 *supra*.) The SAC itself recites Defendants' disclosure that SBT6050 and SBT6290 "both utilize the TLR8 agonist as a payload (*i.e.* function using the same mechanism to activate immune cells for targeted tumor treatment)." (¶ 77.) Given those disclosures, it makes no sense to assert that statements about SBT6050's "progress and preclinical data" (*id.*) were rendered misleading by failing to say more about SBT6290. In fact, analysts observed that SBT6290's prospects depended in part on the results from SBT6050's clinical trial. (*E.g.*, **Ex. U** at 30.)

*May 13, 2021 10-Q and Press Release.* Plaintiffs' challenge to these disclosures begins, again, with Defendants' uncontested statement that they had "observed changes in [PD] markers

in the first dose cohort." (¶ 74.) The SAC then trots out the same alleged omission: that patients in the first monotherapy cohort "only exhibited limited anti-tumor activity." (¶ 75.) Plaintiffs then try to salvage their "open label" theory by citing the April 4, 2021 data cut-off identified in the September 13, 2021 Abstract of interim data. (*Id.*) Plaintiffs contend that "no later than April 4, 2021 (and likely sooner)," Defendants *must have known* what the Abstract disclosed in September: "*ten out of fourteen* evaluable trial participants—including patients that had been treated with SBT6050 as a monotherapy as well as patients that had received SBT6050 in combination with pembrolizumab—had experienced *disease progression*." (¶ 9.[16])

Put simply, the Abstract's data cut-off date is **not a particularized factual allegation** of what Defendants knew at that time. It just as conclusory as Plaintiffs' CW allegations, because they cannot describe a single person, meeting, document, or other source to substantiate what exactly Defendants knew on the data cut-off date or any point thereafter. (*Cf.* Order at 24 (CW1 could not "confirm what data was discussed, that safety and efficacy were discussed, when they were discussed, and what documents and data were presented")); *In re CytRx Corp. Sec. Litig.*, 2017 WL 5643161, at *9 (C.D. Cal. Aug. 14, 2017) (alleging that trial was not double-blinded did not show that defendants "had access to information concerning enrollment, what treatment was administered to individual patients, and when patients 'evented'" because "there is no allegation that Defendants actually performed these calculations or had actual knowledge of this risk").

There is no shortage of reputable public sources Plaintiffs could have consulted—in lieu of conclusory and speculative allegations—explaining that data in an open-label trial is *not* available immediately following data cut-off. To start, the National Cancer Institute defines an open-label study as "a type of study in which both the **health providers** and the **patients** are aware of the drug or treatment being given." (**Ex. X**; *see also* ¶ 54 (Phase 1/1b Trial "researchers and participants knew what treatment was being administered").) Silverback was the trial **sponsor**, not

---

[16] Plaintiffs also claim inexplicably that Silverback's May 2021 disclosures omitted data alleged to have been available *three months later*—*i.e.*, "by no later than August 1, 2021." (¶ 75.)

a "health provider" or "researcher" (*see* **Ex. S** at 1 (identifying Silverback as Sponsor); **Ex. M**). Indeed, the FDA counsels sponsors to "utilize appropriately qualified individuals to supervise the overall conduct of the trial, to handle the data, to verify the data, to conduct statistical analyses, and to prepare the trial reports"—which takes time after the data cut-off. *See* FDA, *E6(R2) Good Clinical Practice: Integrated Addendum to ICH E6(R1) Guidance for Industry* (2018) at 27; *see also* Mei Day & Ann Croft, *Implementation of Data Cut Off in Analysis of Clinical Trials*, PharmaSUG 2018 – DS19, at 12 ("several weeks are commonly required for data cleaning and query resolution" after data cut-off, which "is not a simple undertaking and requires careful planning and coordination of cross-functional teams"). This is consistent with Silverback's disclosures that it was "dependent on third parties to conduct our preclinical studies" and that "the initiation and completion of these studies and trials will therefore be partially controlled by such third parties and may result in delays to our developmental programs." (**Ex. D** at 30.)

Plaintiffs also recycle the allegation that a statement describing SBT6290's "progress and preclinical data" (¶ 76)—which the Court previously found "hardly seems material to investors" (Order at 22)—was misleading by omitting that SBT6290 would be doomed "if SBT6050 did not demonstrate more than limited anti-tumor activity as a monotherapy" (¶ 77).[17] Plaintiffs fail to allege a material omission here for the same reasons, explained above, as the identical allegations regarding the Registration Statement and March 2021 10-K.

***August 12, 2021 10-Q.*** Plaintiffs' challenge to Silverback's second-quarter 10-Q differs from the earlier alleged omissions in only one immaterial respect. They again allege Defendants concealed that patients in the first-dose monotherapy cohort "only exhibited limited anti-tumor activity," but then cite the *August 1*, 2021 data cut-off for the ESMO presentation—rather than the *April 4*, 2021 data cut-off for the Abstract. (¶ 79.) It's a distinction without a substantive difference. For the same reasons as Plaintiffs' challenges to earlier disclosures, their conclusory allegation

---

[17] For the Court's convenience, these and other non-actionable statements of corporate optimism cited in the SAC and documents incorporated by reference therein are excerpted in **Exhibit 2**. *See Intuitive Surgical*, 759 F.3d at 1060; *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

that Defendants knew by August 12, 2021 the interim data disclosed more than a month later is bereft of any supporting particularized factual allegations.

In any event, alleging that Defendants' statements about *observed changes in PD markers* were rendered misleading by omitting information about *disease progression* is both wrong and illogical. Defendants made **no representations** about how many patients were expected to show stable disease. Rather, Silverback cautioned investors that "[t]he inclusion of critically ill patients in our clinical trials may result in deaths or other adverse medical events" (**Ex. C** at 18) and that it could not predict "whether any initial tumor responses that may be observed will be durable or whether adverse events will arise over time" (*id.* at 17). So, Plaintiffs manufacture a theory that investors were misled to believe that observed changes in PD markers meant these patients—for whom **all prior therapies had failed**—would show stable or improved disease and remain on study for the duration. But the SAC does not cite a single analyst who seems to have been laboring under that misimpression. (*Cf.* ¶¶ 65, 86, 91.) *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 837 (9th Cir. 2022) ("[P]laintiffs must provide some specificity to anchor their contentions that investors would find one study outcome to be meaningfully different from another.").

### b.    Statements regarding the interim data.

***September 13, 2021 Press Release and Abstract.*** Plaintiffs now appear to view Silverback's September 13th disclosures (**Exs. K & L**) *solely* as corrective because they do not challenge a single statement. (*See* ¶¶ 81–86.) The SAC simply recites the uncontested interim data as of the April 4, 2021 data cut-off without any particularized factual allegations that Defendants previously knew and concealed *any* reported data. And then Plaintiffs undercut their own theory of fraud: In the same paragraph that asserts investors had been misled by Defendants' unidentified "assuring statements," Plaintiffs quote an analyst who obviously ***drew his own conclusions from the actual data***. (*See* ¶ 86 ("*In any event*, SVB Leerink still found that the '*abstract* did report *a clear signal of immune activation and disease control with clinical benefit . . . .*'").)

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**

18.

*September 16, 2021 ESMO Presentation.* As with the Abstract, Plaintiffs do not challenge a single disclosure of clinical data in the ESMO presentation (**Ex. O**) or allege any material omissions (*see* ¶¶ 87–89). Instead, Plaintiffs challenge the *opinions* that Defendants rendered based on the *fully disclosed data*. These statements are just as inactionable now as they were in the CAC. *See Omnicare*, 575 U.S. at 194 (insufficient to "alleg[e] only that an opinion was wrong"; plaintiff must allege facts "call[ing] into question the issuer's basis for offering the opinion").

First, Plaintiffs challenge Defendants' opinion that "SBT6050 conferred clinical benefit to patients with heavily pre-treated, advanced solid tumors." (¶ 88; *see also* **Ex. N** at 22.) Tellingly, Plaintiffs gloss over the context of that statement: a single slide of the ESMO presentation describing the diagnoses, ages, prior lines of therapy, SBT6050 doses, treatment duration, and tumor-response rates for six specific patients. (**Ex. N** at 22.) The data itself—which showed one confirmed partial response, four patients with stable disease, and one with disease progression (*id.*)—was all there for investors to review and draw their own conclusions. (*See also* **Exs. M**, **N**.) And, as Plaintiffs themselves allege, that is exactly what investors did. (*See* ¶ 91 (quoting H.C. Wainwright & Co. analyst report: "*We view the safety data and the biomarker data* seen in the monotherapy arm to be positive and persuasive for development in combination to proceed.").)

The same is true of every other challenged statement in the ESMO presentation. Defendants' conclusion that "[e]merging clinical data supports proof-of-mechanism" (¶ 88) was accompanied detailed clinical data showing activation of myeloid, T, and NK cells (**Ex. O** at 15–16) and evidence of SBT6050's payload on tumor cells (*id.* at 18). Similarly, Defendants' conclusion that the clinical data showed "early signals of anti-tumor activity" (¶ 88) appeared in the same slide as the supporting clinical data, broken down by patient diagnoses and SBT6050 dose levels in monotherapy and combination therapy with pembro (**Ex. O** at 19). So too with Defendants' conclusion that SBT6050 "has a manageable safety profile." (¶¶ 88–89.) As of the August 1, 2021 data cut-off, the Phase 1/1b Trial had evaluated *40 patients* across *five dose levels* in both *monotherapy and combination therapy* with pembro over more than a year. (¶ 87; **Ex. O**

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**

19.

at 11.) There had been no treatment-related deaths, no treatment-related adverse events leading to discontinuation, and all DLTs were resolved with supportive care. (*See* **Ex. O** at 12; ¶ 89.)

Undeterred, Plaintiffs again dispute Defendants' *interpretations* of clinical data—which are still inactionable "because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 543 (S.D.N.Y. 2015). Indeed, Plaintiffs still do not allege particularized facts showing "both that the speaker did not hold the belief she professed and that the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017). Instead, the SAC improperly cites the same "expert" from the CAC, who again merely parrots Plaintiffs' legal conclusions. (¶ 59.[18]) *See Nektar*, 34 F.4th at 837 ("Plaintiffs cannot evade the PSLRA's exacting pleading standards by merely citing an expert who makes assertions about falsity based on questionable assumptions and unexplained reasoning."); *see also Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 184–85 (D. Mass. 2020) (absent "*specific* allegations of falsity," "scientific opinions are just that: opinions").[19]

*November 2021 Disclosures.* In the last set of challenged statements (¶¶ 92–97), Plaintiffs revisit many of the same clinical opinions they disputed in Defendants' September disclosures. They start, however, by misrepresenting what Defendants *actually said*: Nowhere in the November 10-Q did Silverback "continu[e] to represent that SBT6050 conferred clinical benefit" (¶ 93). That opinion was specific to the clinical data disclosed in the ESMO presentation (**Ex. N** at 22; **Ex. O** at 21) and it appears nowhere else in the record. The interim data that Defendants reiterated in November, however, remains unchallenged. (*See* ¶ 92.) So Plaintiffs again simply dispute Defendants' interpretations of the data, arguing ***their own belief*** that ***in November*** "the trial data to date demonstrated limited tumor activity in patients treated with SBT6050 as a monotherapy"

[18] The Court should again disregard Plaintiffs' improper use of unqualified "expert" opinion (*see* ¶ 59) in lieu of particularized factual allegations. *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 2013 WL 2156358, at *7 (N.D. Cal. May 17, 2013).

[19] For the Court's convenience, these and other non-actionable opinion statements cited in the SAC and documents incorporated by reference therein are aggregated in **Exhibit 3**.

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**

20.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

(¶ 93). These are still inactionable opinion statements, as are Defendants' conclusions that the interim results included data "*we believe* are consistent with proof-of-mechanism . . ." and showed "early signs of anti-tumor activity" (¶ 92). Plaintiffs allege no particularized facts showing that Defendants did not honestly believe these opinions, or that their beliefs were objectively false. (*See* Section C, *supra*); *Omnicare*, 575 U.S. at 194.

Plaintiffs also challenge Defendants' disclosure of *new* data that was not in the interim results: "[t]wo patients dosed at 0.6 mg/kg [in combination with pembro] each experienced a DLT, including hypotension and cytokine release syndrome"; one patient's DLT resolved and they remained on study, while the other passed away from "Grade 5 hypotension considered related to SBT6050." (¶ 94; **Ex. P** at 24.) Plaintiffs seize on this newly announced data to bolster their hindsight-based argument—cribbed from Silverback's March 2022 disclosures (**Ex. R** at 1)—that SBT6050 "did not have a manageable safety profile" and "limited [the] dose the Company could administer." (¶ 95.) Still missing is any *particularized* allegation of *contemporaneous* facts that rendered Defendants' *actual statements* in November false or misleading *when made*.[20]

### D. Plaintiffs Still Fail to Allege Facts Supporting a Strong Inference of Scienter.

The SAC, despite its "Additional Scienter Allegations" (¶¶ 102–06), comes no closer than the CAC did to alleging "*with particularity* facts giving rise to a *strong* inference that the defendant acted with the required state of mind." *Align Tech.*, 856 F.3d at 619. The Court should again hold that Plaintiffs fail to plead facts supporting a strong inference of scienter. (*See* Order at 23.)

***Confidential Witness.*** The SAC trots out the same CW1 allegations (¶¶ 57, 103) the Court found "unconvincing" in the CAC—namely, that Silverback "held company wide meetings every two weeks to report and discuss trial data" (Order at 23). Plaintiffs provide a veneer of new detail by saying the purportedly discussed "trial data" included "safety tolerability, pharmacodynamics,

---

[20] The same flaw afflicts Plaintiffs' repeated allegation that the clinical data Defendants revealed in November "meant they'd have to discontinue developing SBT6050 altogether" (¶ 95), as well as SBT6290 (¶ 97). The SAC contains no particularized allegations of any facts known to Defendants *in November* that rendered the discontinuation of Silverback's oncology programs *in March* a foregone conclusion.

anti-tumor activity, and immune cell activation" (¶ 103), but they've just cut-and-pasted that text from Silverback's description of the Phase 1/1b Trial (*see* ¶ 50 (trial "was 'designed to evaluate the *safety*, *tolerability*, . . . *pharmacodynamics*, . . . and *anti-tumor activity* . . . and to measure 'biomarkers of *immune cell activation*.'")) (quoting (**Ex. C** at 113, 128). CW1 *still* cannot "confirm what data was discussed, that safety and efficacy were discussed, when they were discussed, and what documents and data were presented at these meetings." (Order at 24, citing *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)). Courts have found far-more detailed allegations from *multiple* CWs insufficient to plead scienter. *See Patel v. Seattle Genetics, Inc.*, 2018 WL 2359137, at *5–6 (W.D. Wash. May 24, 2018) (rejecting CW allegations that defendants "attended company-wide meetings . . . where 'deep concerns about the hepatotoxicity associated with' [drug] were expressed"); *Gammel*, 905 F. Supp. 2d at 1079.[21]

***Phase 1/1b Trial Clinical Data.*** The SAC also fails to allege a strong inference of scienter by adding conclusory allegations that Defendants "had access" to the interim data no later than the April 4, 2021 or August 1, 2021 data cut-off dates. (*See* ¶¶ 104–05.) This is a retread of Plaintiffs' failed "open label" theory, which remains "hardly demonstrative of a strong inference of scienter absent evidence that the information was actually available when Defendants made the statements." (*See* Order at 25.) Nothing in the Abstract "makes clear" that Defendants "***had access*** to efficacy data from Parts 1 and 3" by the April 4, 2021 data cut-off (¶ 104), and Plaintiffs sacrifice all credibility by alleging that the "ESMO Presentation ***explicitly states*** that [Defendants] ***had access*** to data from Parts 1 and 3" by August 1, 2021 (¶ 105). That presentation states no such thing. (*See* **Ex. O** at 9 ("Data presented are interim data with a data cut-off date of August 1, 2021").) In any event, the SAC still lacks any particularized factual allegations even suggesting that Defendants did not honestly believe their statements, *see Rigel*, 697 F.3d at 883, or that their statements or opinions had no factual basis, *see In re Regulus Therapeutics Inc. Sec. Litig.*, 406 F.

---

[21] Despite the Court's prior ruling (*see* Order at 23), Plaintiffs still do not allege that any non-executive director Defendants attended the "company-wide meetings" (*see* ¶ 103).

Supp. 3d 845, 859–60 (S.D. Cal. 2019). (*See also* Section C, *supra*.[22])

**Other Indicia of Scienter.** Plaintiffs again fail to plead particularized facts establishing a strong inference of scienter for *each* Defendant. *Apollo Grp.*, 774 F.3d at 607. This still is not a case where "a company's public statements [are] so important and *so dramatically false* that they would create a strong inference that at least *some* corporate officials *knew of the falsity* upon publication." (*See* Order at 25.) And, nearly all of the quintessential hallmarks of scienter, such as internal documents or improper stock sales remain absent from the SAC. *See Intuitive Surgical*, 759 F.3d at 1062–64; *Metzler*, 540 F.3d at 1067.

**Holistic Review.** The SAC adds nothing to alter the Court's previous ruling that Plaintiffs' allegations are "insufficient to give rise to a strong inference of scienter" upon holistic review. (*See* Order at 25.) The only *compelling* inference permitted by the SAC's allegations is that Defendants thoughtfully decided to cease developing SBT6050 and SBT6290 after assessing the entire body of clinical data, the cost of further developing these drugs, and the potential of other clinical- programs. (*See* **Ex. R** at 1.) Any argument to the contrary is pleading fraud by hindsight. *Cf. Carr v. Zosano Pharma Corp.*, 2021 WL 3913509, at *12 (N.D. Cal. Sept. 1, 2021) ("[T]he complaint alleges little more than that the FDA ultimately found the [data] material, coupled with Plaintiffs' conclusory allegation that Defendants must have seen it coming.").

### E.    The SAC Still Pleads an "Apples/Oranges" Theory of Loss Causation.

Plaintiffs still do not allege *with particularity* under Rule 9(b)'s heightened pleading standards that a "misstatement, as opposed to some other fact, foreseeably caused [their] loss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). The SAC does not allege any **corrective** disclosures in which **previously misstated or concealed truth was revealed**, "caus[ing] the company's stock price to drop and investors to lose money." *See Lloyd v.*

---

[22] The SAC's conclusory allegations still do not support a finding that the "core operations" inference applies. (*See* ¶ 106 ("Defendants' sole focus was on the Phase 1/1b data, which they contemporaneously evaluated for safety and early signs of efficacy").) *See Gammel*, 905 F. Supp. 2d at 1077–78.

*CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). In other words, the alleged corrective disclosures do not match the prior alleged misstatements or omissions.

*First*, Defendants' disclosures of clinical data in September and November 2021 (¶¶ 81–97) were not "corrective" because they did not reveal any previously **concealed facts**. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The disclosed data did not show that Defendants' opinions regarding SBT6050 were subjectively or objectively false when made, and Plaintiffs still do not plead with particularity any *contemporaneous* facts that Defendants knew and concealed from investors. (*See* Section C.2.a, *supra*.) Rather, the decline was a reaction to **the clinical data itself**. *See Fort Worth Emps.' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009) (stock drop caused by FDA's "failure to approve the drug—not by any 'corrective' disclosure of some prior untruth").

*Second*, as to Silverback's March 31, 2022 announcement of its decision to cease development of SBT6050 and SBT6290, the SAC alleges no particularized facts demonstrating *which* prior statements were made false by this announcement or what previously concealed facts were revealed. *See Apollo Grp.*, 774 F.3d at 608. Nor is there anything new to suggest that Defendants made that decision based on anything but the *entirety* of the clinical data from dose-escalation studies *up to that point*. *See Nektar*, 34 F.4th at 839 (alleged corrective disclosure "merely integrated newly collected data from the trial [and] did not correct or revise previous patient data").

**F.      Plaintiffs Fail to State a Control Person Claim Under Sections 15 or 20(a).**

Because Plaintiffs fail to plead a primary violation of the securities laws, Plaintiffs' control-person claims under Sections 15 and 20(a) fail as a matter of law. *See Rigel*, 697 F.3d at 886.

**V.      CONCLUSION**

For these reasons, Defendants respectfully request that the Court dismiss the SAC, *with prejudice*, for failure to state a claim under Section 11 or Section 10(b).

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**

24.

Dated:  January 2, 2023

_/s/Christopher B. Durbin_

Christopher B. Durbin (WSBA No. 41159)
COOLEY LLP
1700 Seventh Avenue, Suite 1900
Seattle, WA  98101-1355
Tel.: (206) 452-8700
Fax: (206) 452-8800
Email: cdurbin@cooley.com

Koji F. Fukumura (*pro hac vice*)
COOLEY LLP
4401 Eastgate Mall
San Diego, CA  92121-1909
Tel.: (858) 550-6000
Fax: (858) 550-6420
Email: kfukumura@cooley.com

Attorneys for Defendants SILVERBACK
THERAPEUTICS, INC., LAURA L. SHAWVER, JONATHAN
PIAZZA, RUSS HAWKINSON, PETER THOMPSON, VICKIE
L. CAPPS, ROBERT HERSHBERG, SAQIB ISLAM,
ANDREW POWELL, JONATHAN ROOT, THILO
SCHROEDER, and SCOTT PLATSHON

**DEFS.' MOTION TO DISMISS SAC**
**Case No. 2:21-cv-01499-MJP**                25.

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700