# EXHIBIT A

Table of Contents

**As filed with the Securities and Exchange Commission on November 10, 2020.**

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## FORM S-1

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# Silverback Therapeutics, Inc.

**(Exact name of registrant as specified in its charter)**

| Delaware | 2834 | 81-1489190 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**500 Fairview Ave N, Suite 600**
**Seattle, Washington 98109**
**(206) 456-2900**

**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

**Laura Shawver, Ph.D.**
**Chief Executive Officer**
**Silverback Therapeutics, Inc.**
**500 Fairview Ave N, Suite 600**
**Seattle, Washington 98109**
**(206) 456-2900**

**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*

| | |
|---|---|
| **Kenneth J. Rollins** | **Brian J. Cuneo** |
| **Charles S. Kim** | **Phillip S. Stoup** |
| **James Pennington** | **Latham & Watkins LLP** |
| **Cooley LLP** | **140 Scott Drive** |
| **4401 Eastgate Mall** | **Menlo Park, California 94025** |
| **San Diego, California 92121** | **(650) 328-4600** |
| **(858) 550-6000** | |

**Approximate date of commencement of proposed sale to the public:**
**As soon as practicable after the effective date of this Registration Statement.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to be Registered | Proposed Maximum Aggregate Offering Price(1) | Amount of Registration Fee(2) |
|---|---|---|
| Common Stock, $0.0001 par value per share | $100,000,000 | $10,910 |

(1)  Estimated solely for the purpose of computing the amount of the registration fee pursuant to Rule 457(o) under the Securities Act of 1933, as amended. Includes the aggregate offering price of additional shares of common stock that the underwriters have the option to purchase.

(2)  Calculated pursuant to Rule 457(o) based on an estimate of the proposed maximum aggregate offering price.

**The registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

**PROSPECTUS SUMMARY**

*This summary highlights selected information contained in greater detail elsewhere in this prospectus. This summary is not complete and does not contain all of the information you should consider in making your investment decision. Before investing in our common stock, you should carefully read this entire prospectus. You should carefully consider, among other things, the sections of this prospectus titled "Risk Factors," "Special Note Regarding Forward-Looking Statements" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes included elsewhere in this prospectus. Unless the context otherwise requires, the terms "Silverback Therapeutics," "Silverback," "we," "us," "our" and similar references in this prospectus refer to Silverback Therapeutics, Inc.*

**Overview**

We are a clinical-stage biopharmaceutical company with one product candidate in a Phase 1/1b clinical trial, and we are focused on leveraging our proprietary ImmunoTAC technology platform to develop systemically delivered, tissue targeted therapeutics for the treatment of cancer, chronic viral infections, and other serious diseases. Our platform enables us to strategically pair proprietary linker-payloads that modulate key disease-modifying pathways with monoclonal antibodies directed to specific disease sites. Initially, we are applying our platform to create a new class of targeted immuno-oncology agents that direct a myeloid cell activator to the tumor microenvironment (TME) in solid tumors to promote cancer cell killing. Our lead product candidate, SBT6050, is comprised of a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody that targets tumors such as certain breast, gastric and non-small cell lung cancers. SBT6050 is currently in a Phase 1/1b clinical trial in patients with advanced or metastatic HER2-expressing solid tumors. In this trial, we have observed changes in pharmacodynamic markers in the first dose cohort, and we anticipate providing an update on interim data from the Phase 1 dose-escalation cohorts in the second half of 2021. SBT6290 is our second product candidate, expanding on the potential of a TLR8 agonist as a payload. SBT6290 is a TLR8 linker-payload conjugated to a monoclonal antibody that targets Nectin4, which is expressed in certain bladder, triple negative breast, head and neck, and non-small cell lung cancers. We anticipate submitting an investigational new drug application (IND) for SBT6290 in the fourth quarter of 2021. Our third TLR8 program, SBT8230, is comprised of a TLR8 linker-payload conjugated to an ASGR1 monoclonal antibody that is under development for the treatment of chronic hepatitis B virus infection (cHBV). We are also developing agents that localize therapies to modulate important pathways in additional oncology and fibrosis indications using TLR8 and other linker-payloads.

**Our ImmunoTAC Platform**

Our ImmunoTAC platform is the result of a focused effort to discover ways to systemically deliver disease-modifying small molecules in a directed fashion to sites of disease. Many potentially promising systemic therapies fail to maximize their therapeutic potential due to toxicities in healthy tissues. Our approach is designed to increase the therapeutic window and avert unacceptable toxicities by directly targeting specific disease sites where our therapeutics are locally active.

As shown in the figure below, our ImmunoTAC platform is comprised of three components:
(1)  **Antigen binding domain**—which is responsible for localizing the therapeutic activity of the payload to the site of the disease;
(2)  **Linker-payload**—a disease-modifying small molecule optimized for potency when conjugated to a monoclonal antibody via its linker; and

1

Table of Contents

Our most advanced discovery and research programs are shown in the chart below:



ASGR1 = Asialoglycoprotein Receptor 1 (Liver Localized Protein)
TGFβR = Transforming Growth Factor Beta Receptor
TLR8 = Toll Like Receptor 8

### SBT6050

Our lead product candidate, SBT6050, is comprised of a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody and is designed to activate myeloid cells in tumors expressing moderate or high levels of HER2. TLR8 is expressed in myeloid cell types prevalent in human tumors and TLR8 agonism can activate a broad spectrum of anti-tumor immune mechanisms. Therefore, we believe that TLR8 is the optimal target for activating human myeloid cell types in the TME.

Myeloid cells are a class of innate immune cells that develop from common monocyte-dendritic cell progenitor cells and are comprised of both immunosuppressive and pro-inflammatory subpopulations. Tumors are permeated with myeloid cells, which can comprise between 5% and 10% of the tumor. Activation of myeloid cells, either by reprogramming immunosuppressive myeloid cells towards a more pro-inflammatory phenotype or stimulating other myeloid cells that have been silenced (e.g., dendritic cells), results in direct tumor killing and recruitment of immune cells. Further, activated myeloid cells can prime and amplify T cell and natural killer (NK) cell responses, bridging the innate and adaptive immunity to elicit broad, durable anti-tumor responses.

SBT6050 utilizes HER2 to localize and facilitate the delivery of the TLR8 agonist conjugate into myeloid cells in the TME. Therefore, unlike HER2 targeted therapies that have been approved by the U.S. Food and Drug Administration (FDA) such as Herceptin (trastuzumab), SBT6050 does not require HER2 to be an oncogenic driver to elicit anti-tumor activity. Furthermore, SBT6050 recognizes the HER2 sub-domain II, the pertuzumab epitope, and does not cross-block trastuzumab, allowing for potential combinations with trastuzumab-based agents, which are standard of care therapies in some HER2-expressing cancers.

We are currently evaluating the safety and tolerability of SBT6050 in a Phase 1 dose-escalation trial in patients with advanced or metastatic HER2-expressing solid tumors. Changes in pharmacodynamic markers have been observed in the first dose-escalation cohort of this trial. We anticipate providing an update on interim data from the Phase 1 dose-escalation cohorts in the second half of 2021.

### SBT6290

SBT6290 is our second product candidate, expanding on the potential of a TLR8 agonist as a payload. The same TLR8 linker-payload used in SBT6050 is conjugated to a monoclonal antibody that targets Nectin4. Nectin4 is expressed in subsets of solid tumors including bladder, triple negative breast, head and neck, and non-small cell lung cancers, and has been clinically validated by Seattle Genetics through the approval of the Nectin4-directed antibody-drug conjugate enfortumab vedotin (Padcev). In 2019, Padcev was approved under the FDA's accelerated approval program indicated for

3

Table of Contents

the treatment of adult patients with locally advanced or metastatic urothelial cancer who have previously received a programmed death receptor-1 (PD-1) inhibitor, and a platinum-containing chemotherapy. We anticipate submitting the IND for SBT6290 in the fourth quarter of 2021.

### SBT8230

SBT8230, an ASGR1-TLR8 ImmunoTAC therapeutic, is our third TLR8 program. SBT8230 is engineered to potently activate human myeloid cells in the liver for the treatment of cHBV. Selgantolimod (GS-9688), an existing untargeted, orally administered TLR8 agonist being developed by Gilead Sciences, generated anti-viral immune responses in a cHBV animal model. The clinical development of this untargeted TLR8 agonist has shown promise, but we believe that toxicity prevented the use of a sufficient dose to elicit optimal clinical activity. We believe liver-localized TLR8 agonism could better realize the potential for effective therapy and potentially lead to functional cures, which is defined as sustained loss of hepatitis B surface antigen (HBsAg) in the blood, in patients suffering from cHBV. We anticipate selecting a development candidate for this program in the fourth quarter of 2020.

### Additional Immuno-Oncology Programs

In addition to SBT6050 and SBT6290, we are evaluating other solid tumor targets to leverage the TLR8 linker-payload paired with additional tumor directed antibodies. These targets are differentially expressed on tumors compared to normal tissue.

### ASGR1-TGFß Receptor Antagonist—Fibrosis Program

TGFß signaling is a key mediator of fibrosis across multiple organ systems, including the liver. In the liver, TGFß drives fibrosis initiation and progression through multiple mechanisms, including hepatocyte apoptosis, hepatic stellate cell transdifferentiation to myofibroblasts, and pro-fibrotic macrophage activation. Our ASGR1-TGFßR1 antagonist conjugate pairs the ASGR1 antibody used in SBT8230 with a proprietary TGFßR1 antagonist to achieve liver-localized inhibition of TGFß signaling to treat fibrosis. Our tissue-directed approach has been designed to prevent toxicities associated with untargeted systemically distributed TGFßR1 antagonist agents. Our ASGR1-TGFßR1 antagonist conjugates are currently in preclinical testing and have demonstrated potent inhibition of TGFß signaling *in vitro*. We are currently evaluating conjugates *in vivo* in mouse disease models.

### Our Strategy

Our goal is to transform the treatment of cancer and other serious diseases with unmet need using our ImmunoTAC platform to deliver a new class of systemically delivered, tissue-directed, and locally active therapies. The key elements of our business strategy are to:

- Advance SBT6050 through clinical development in late-stage disease that may allow us to initially seek expedited approval using potentially accelerated regulatory pathways such as Accelerated Approval, Breakthrough Therapy, Priority Review or Fast Track designation.
- Advance SBT6050 subsequently into earlier lines of therapy to maximize patient benefit and commercial success, if approved.
- Maximize the therapeutic potential of TLR8 in oncology and other serious diseases.
- Leverage our ImmunoTAC platform for promising new antibody-linker-payload combinations.
- Evaluate opportunities to accelerate development timelines and/or enhance the commercial potential of our programs in partnership with third parties.

4

Table of Contents

**Our Team and Investors**

We have assembled an accomplished management team with a proven track record of therapeutic development expertise and of generating meaningful shareholder value. The members of our team have deep experience in discovering, developing, and commercializing therapeutics with a particular focus on cancer, having worked at companies such as Synthorx (acquired by Sanofi), Juno Therapeutics (acquired by Celgene), Cascadian Therapeutics (acquired by Seattle Genetics), Acerta Pharma (acquired by AstraZeneca), Ignyta (acquired by Roche), Roche/Genentech, Seattle Genetics, SUGEN (acquired by Pharmacia), and Trubion Pharmaceuticals (acquired by Emergent Biosolutions).

Since our inception in 2016 through September 30, 2020, we have raised over $215 million in capital from leading investors including OrbiMed Advisors, Alexandria Venture Investments, Boxer Capital of Tavistock Group, Celgene, Colt Ventures, EcoR1 Capital, Fidelity, Hunt Technology Ventures, Nantahala Capital Management, Nextech Invest, Pontifax, RA Capital, and U.S. Venture Partners.

**Risks Associated with Our Business**

Our business is subject to a number of risks that you should be aware of before making a decision to invest in our common stock. These risks are more fully described in the section titled "Risk Factors" immediately following this prospectus summary. These risks include, among others, the following:

- We have incurred significant net losses since inception, and we anticipate that we will continue to incur significant losses for the foreseeable future and may never be able to achieve or sustain revenues or profitability in the future.
- Even if this offering is successful, we will need substantial additional funding.
- We have a limited operating history and face significant challenges and will incur substantial expenses as we build our capabilities.
- Drug development involves a lengthy and expensive process with uncertain outcomes, and the results of preclinical studies and early clinical trials are not necessarily predictive of future results.
- Our discovery and development activities are focused on developing systemically delivered and tissue targeted therapeutics for the treatment of cancer and other serious diseases and it is difficult to predict the time and cost of product candidate development and obtaining regulatory approval.
- Our product candidates are targeted to treat tumors that express specific antigens at certain levels, such as those that express moderate or high levels of HER2 or Nectin4. This requires diagnostic assays that may be subject to scrutiny by regulatory authorities. Commercial tests are available for HER2, but not currently for Nectin4. As an existing companion diagnostic does not currently exist for Nectin4, unless one is developed and approved, we may need to develop and obtain approval for a companion diagnostic for the SBT6290 program. We may not be successful in developing diagnostic assays or securing the assays for use.
- Our approach to the discovery and development of product candidates is unproven, and we may not be successful in our efforts to use and further develop our product engine to expand our pipeline of product candidates with commercial value.
- The market opportunities for our product candidates may be relatively small as it will be limited to those patients who are ineligible for or have failed prior treatments and our estimates of the prevalence of our target patient populations may be inaccurate.

5

Table of Contents

## RISK FACTORS

*Investing in our common stock is speculative and involves a high degree of risk. You should consider carefully the risks described below, together with the other information contained in this prospectus, including our financial statements and the related notes included elsewhere in this prospectus and in the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" before deciding whether to invest in our common stock. If any of the following risks occur, our business, financial condition, results of operations and future growth prospects could be materially and adversely affected. In these circumstances, the market price of our common stock could decline, and you may lose all or part of your investment. This prospectus also contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of a number of factors, including the risks described below. See the section titled "Special Note Regarding Forward-Looking Statements."*

**Risks Related to Our Limited Operating History, Financial Position and Capital Requirements**

***We have a limited operating history, have incurred net losses since our inception, and anticipate that we will continue to incur significant losses for the foreseeable future. We may never generate any revenue or become profitable or, if we achieve profitability, may not be able to sustain it.***

We are an early-stage biopharmaceutical company with a limited operating history that may make it difficult to evaluate the success of our business to date and to assess our future viability. Our operations to date have been limited to organizing and staffing our company, business planning, raising capital, developing and optimizing our technology platform, identifying potential product candidates, undertaking research and preclinical studies and a clinical trial for our lead program, engaging in manufacturing for our development programs, establishing and enhancing our intellectual property portfolio, and providing general and administrative support for these operations. We have one product candidate in early clinical development and all of our other product candidates are in preclinical development, and none have been approved for commercial sale. We have never generated any revenue from product sales and have incurred net losses each year since we commenced operations. For the years ended December 31, 2018 and 2019, our net losses were $17.6 million and $24.0 million, respectively. We expect that it will be several years, if ever, before we have a product candidate ready for regulatory approval and commercialization. We expect to incur increasing levels of operating losses over the next several years and for the foreseeable future as we advance our product candidates through clinical development. Our prior losses, combined with expected future losses, have had and will continue to have an adverse effect on our stockholders' deficit and working capital.

To become and remain profitable, we must develop and eventually commercialize a product or products with significant market potential. This will require us to be successful in a range of challenging activities, including completing preclinical studies and clinical trials of our product candidates, obtaining marketing approval for these product candidates, manufacturing, marketing and selling those products for which we may obtain marketing approval and satisfying any post-marketing requirements. We may never succeed in these activities and, even if we succeed in commercializing one or more of our product candidates, we may never generate revenue that is significant or large enough to achieve profitability. In addition, as a young business, we may encounter unforeseen expenses, difficulties, complications, delays and other known and unknown challenges. If we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis and we will continue to incur substantial research and development and other expenditures to develop and market additional product candidates. Our failure to become and remain profitable would decrease the value of the company and could impair our ability to raise capital, maintain our research and development efforts, expand our business or continue our operations. A decline in the value of our company could also cause you to lose all or part of your investment.

13

Table of Contents

***Even if this offering is successful, we will need to obtain substantial additional funding to complete the development and commercialization of our product candidates. If we are unable to raise this capital when needed, we may be forced to delay, reduce or eliminate our product development programs or other operations.***

Since our inception, we have used substantial amounts of cash to fund our operations and expect our expenses to increase substantially during the next few years. The development of biopharmaceutical product candidates is capital intensive. As our product candidates enter and advance through preclinical studies and clinical trials, we will need substantial additional funds to expand our clinical, regulatory, quality and manufacturing capabilities. In addition, if we obtain marketing approval for any of our product candidates, we expect to incur significant commercialization expenses related to marketing, sales, manufacturing and distribution. Furthermore, upon the completion of this offering, we expect to incur additional costs associated with operating as a public company.

As of September 30, 2020, we had $142.3 million in cash and cash equivalents. Based upon our current operating plan, we estimate that our existing cash and cash equivalents as of the date of this prospectus, together with the estimated net proceeds from this offering, will be sufficient to fund our operating expenses and capital expenditure requirements for at least the next months. However, the expected net proceeds from this offering will not be sufficient to fund any of our product candidates through regulatory approval, and we will need to raise substantial additional capital to complete the development and commercialization of our product candidates.

We have based these estimates on assumptions that may prove to be incorrect or require adjustment as a result of business decisions, and we could utilize our available capital resources sooner than we currently expect. Our future capital requirements will depend on many factors, including:

- the initiation, trial design, progress, timing, costs and results of drug discovery, preclinical studies and clinical trials of our product candidates, and in particular the clinical trials for SBT6050;
- the number and characteristics of product candidates that we pursue;
- the length of our clinical trials, including, among other things, as a result of delays in enrollment, difficulties enrolling sufficient subjects or delays or difficulties in clinical trial site initiations;
- the outcome, timing and costs of seeking FDA, European Medicines Agency (EMA) and any other regulatory approvals;
- the costs of manufacturing our product candidates, in particular for clinical trials in preparation for marketing approval and in preparation for commercialization;
- the costs of any third-party products used in our combination clinical trials that are not covered by such third party or other sources;
- the costs associated with hiring additional personnel and consultants as our preclinical, manufacturing and clinical activities increase;
- the receipt of marketing approval and revenue received from any commercial sales of any of our product candidates, if approved;
- the cost of commercialization activities for any of our product candidates, if approved, including marketing, sales and distribution costs;
- the emergence of competing therapies and other adverse market developments;
- the ability to establish and maintain strategic collaboration, licensing or other arrangements and the financial terms of such agreements;

14

Table of Contents

***The terms of our loan agreement place restrictions on our operating and financial flexibility. If we raise additional capital through debt financing, the terms of any new debt could further restrict our ability to operate our business.***

As of September 30, 2020, we had an outstanding term loan including principal and final payment fee of $1.1 million under our loan and security agreement, as amended, with Silicon Valley Bank (SVB). The loan is secured by a lien covering substantially all of our personal property, rights and assets, excluding intellectual property. The loan agreement contains customary affirmative and negative covenants and events of default applicable to us and any subsidiaries. The affirmative covenants include, among others, covenants requiring us (and us to cause our subsidiaries, if any) to maintain governmental approvals, deliver certain financial reports, maintain insurance coverage, and protect material intellectual property. The negative covenants include, among others, restrictions on us and our subsidiaries transferring collateral, changing our business, engaging in mergers or acquisitions, incurring additional indebtedness, paying cash dividends or making other distributions, making investments, creating liens, selling assets and making any payment on subordinated debt, in each case subject to certain exceptions. The restrictive covenants of the loan agreement could cause us to be unable to pursue business opportunities that we or our stockholders may consider beneficial. In addition, SVB could declare a default upon the occurrence of any event that it interprets as a material adverse change as defined under the loan agreement. If we default under the loan agreement, SVB may accelerate all of our repayment obligations and take control of our pledged assets, potentially requiring us to renegotiate our agreement on terms less favorable to us or to immediately cease operations. Further, if we are liquidated, SVB's right to repayment would be senior to the rights of the holders of our common stock to receive any proceeds from the liquidation. Any declaration by SVB of an event of default could significantly harm our business and prospects and could cause the price of our common stock to decline. If we raise any additional debt financing, the terms of such additional debt could further restrict our operating and financial flexibility.

**Risks Related to the Discovery, Development and Regulatory Approval of Our Product Candidates**

***We are early in our development efforts and we have only one product candidate in clinical development. We have a limited history of conducting clinical trials to test our product candidates in humans.***

We are early in our development efforts and most of our operations to date have been limited to developing our platform technologies and conducting drug discovery and preclinical studies. Our lead product candidate, SBT6050, entered Phase 1/1b clinical trial in July 2020, which was the first time one of our product candidates had been tested in humans. As a result, we have limited infrastructure, experience conducting clinical trials as a company and regulatory interactions, and cannot be certain that our current or planned clinical trials will be completed on time, if at all, that our planned development programs would be acceptable to the FDA or other comparable foreign regulatory authorities, or that, if approval is obtained, such product candidates can be successfully commercialized.

Because of the early stage of development of our products candidates, our ability to eventually generate significant revenues from product sales will depend on a number of factors, including:
- successful completion of additional preclinical studies;
- submission of our INDs or other regulatory applications to allow for initiation of our planned clinical trials or future clinical trials and authorizations from regulators to initiate clinical studies;
- successful enrollment in, and completion of, clinical trials and achieving positive results from the trials;

16

Table of Contents

- demonstrating a risk-benefit profile acceptable to regulatory authorities;
- receipt of marketing approvals from applicable regulatory authorities;
- establishing manufacturing capabilities or arrangements with third-party manufacturers for clinical supply and, if and when approved, for commercial supply;
- establishing sales, marketing and distribution capabilities and launching commercial sales of our products, if and when approved, whether alone or in combination with others;
- acceptance of our products, if and when approved, by patients, the medical community and third-party payors;
- effectively competing with other therapies;
- developing and implementing marketing and reimbursement strategies;
- obtaining and maintaining third-party coverage and adequate reimbursement;
- obtaining and maintaining patent, trade secret and other intellectual property protection and regulatory exclusivity for our product candidates;
- the ability to obtain clearance or approval of companion diagnostic tests, on a timely basis, or at all; and
- maintaining a continued acceptable safety profile of any product following approval, if any.

If we do not achieve one or more of these requirements in a timely manner, we could experience significant delays or an inability to successfully commercialize our product candidates, which would materially harm our business.

***Preclinical and clinical development is a lengthy, expensive and uncertain process. The results of preclinical studies and early clinical trials are not always predictive of future results. Any product candidate that we advance into clinical trials, including SBT6050, may not achieve favorable results in later clinical trials, if any, or receive marketing approval.***

The research and development of drugs and biological products is extremely risky. Only a small percentage of product candidates that enter the development process ever receive marketing approval. Before obtaining marketing approval from regulatory authorities for the sale of our product candidates, we must conduct extensive clinical trials to demonstrate the safety and efficacy of the product candidates in humans. Clinical testing is expensive, can take many years to complete and its outcome is uncertain. We may face unforeseen challenges in our product candidate development strategy, and we can provide no assurances that we will ultimately be successful in our current and future clinical trials or that our product candidates will be able to receive regulatory approval. The results of preclinical studies and early clinical trials of our product candidates and other products, even those with the same or similar mechanisms of action, may not be predictive of the results of later-stage clinical trials. For example, it is not uncommon for product candidates to exhibit unforeseen safety or efficacy issues when tested in humans despite promising results in preclinical animal models. In particular, while we have conducted preclinical studies of SBT6050, we do not know how SBT6050 will perform in the ongoing Phase 1/1b clinical trial or in future clinical trials, whether any initial tumor responses that may be observed will be durable or whether adverse events will arise over time. Future results of preclinical and clinical testing of our product candidates are also less certain due to the novel and relatively untested nature of our approach to TLR8 and related platform technologies. In general, clinical trial failure may result from a multitude of factors including flaws in study design, dose selection, patient enrollment criteria and failure to demonstrate favorable safety or efficacy traits. As such, failure in clinical trials can occur at any stage of testing. A number of companies in the biopharmaceutical industry have suffered setbacks in the advancement of clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials.

17

Table of Contents

Even if we eventually complete clinical testing and receive approval of a biologics license application (BLA) or foreign marketing application for our product candidates, the FDA or the comparable foreign regulatory authorities may grant approval contingent on the performance of costly additional clinical trials, including post-market clinical trials. The FDA or the comparable foreign regulatory authorities also may approve a product candidate for a more limited indication or patient population than we originally request, and the FDA or comparable foreign regulatory authorities may not approve the labeling that we believe is necessary or desirable for the successful commercialization of a product candidate. Any delay in obtaining, or inability to obtain, applicable regulatory approval would delay or prevent commercialization of that product candidate and would adversely impact our business and prospects.

In addition, the FDA or comparable foreign regulatory authorities may change their policies, adopt additional regulations or revise existing regulations or take other actions, which may prevent or delay approval of our future product candidates under development on a timely basis. Such policy or regulatory changes could impose additional requirements upon us that could delay our ability to obtain approvals, increase the costs of compliance or restrict our ability to maintain any marketing authorizations we may have obtained.

***Our product candidates are based on novel technologies, which make it difficult to predict the timing, results and cost of product candidate development and likelihood of obtaining regulatory approval.***

We have concentrated our research and development efforts on product candidates using our platform technologies, and our future success depends on the successful development of this approach. We have not yet succeeded and may not succeed in demonstrating efficacy and safety for any product candidates based on our platform technologies in clinical trials or in obtaining marketing approval thereafter, and use of our platform technologies may not ever result in marketable products. We may also experience delays in developing a sustainable, reproducible and scalable manufacturing process or transferring that process to commercial partners or establishing our own commercial manufacturing capabilities, which may prevent us from completing our clinical trials or commercializing any products on a timely or profitable basis, if at all.

Our product candidates are targeted to treat tumors that express specific antigens at certain levels, such as those that express moderate or high levels of HER2 or Nectin4. This requires diagnostic assays that may be subject to scrutiny by regulatory authorities. Commercial tests are available for HER2, but not currently for Nectin4. We may not be successful in developing diagnostic assays or securing the assays for use. If we are successful in securing a diagnostic assay for a specific antigen, it may be difficult to enroll patients with tumors that have the required level of antigen expression.

In addition, the clinical trial requirements of the FDA, EMA and other regulatory agencies such as Australia and the criteria these regulators use to determine the safety and efficacy of a product candidate vary substantially according to the type, complexity, novelty and intended use and market of the potential products. The regulatory approval process for novel product candidates such as ours can be more expensive and take longer than for other, better known or extensively studied pharmaceutical or other product candidates.

The immuno-oncology industry is also rapidly developing, and our competitors may introduce new technologies improving the immune response to cancer that render our technologies obsolete or less attractive. New technology could emerge at any point in the development cycle of our product candidates.

19

Table of Contents

The TLR field is also rapidly evolving and as competitors use or develop alternative TLR technologies, any failures of such technologies could adversely impact our programs. For example, companies are developing TLR7, TLR7/8 and TLR9 agonists, some of which are conjugated to monoclonal antibodies. Regardless of our belief that our approach to activating the innate immune system has advantages, issues encountered with other TLR programs will create a negative perception of or increase scrutiny for our technologies and product candidates.

***We depend on enrollment of patients in our clinical trials for our product candidates. If we experience delays or difficulties enrolling in our clinical trials, our research and development efforts and business, financial condition and results of operations could be materially adversely affected.***

Successful and timely completion of clinical trials will require that we enroll a sufficient number of patient candidates. These trials and other trials we conduct may be subject to delays as a result of patient enrollment taking longer than anticipated, patient withdrawal or adverse events. For example, we have an ongoing Phase 1/1b clinical trial for our lead product candidate, SBT6050, which could generate adverse events that may cause us to delay the trial or halt further development. As of November 6, 2020, six patients were enrolled in the clinical trial, a very small number relative to the number of patients required for a full clinical development program. As has been described with other immune agonists administered in the presence of ADA in preclinical species, anaphylaxis upon repeat intravenous dosing with SBT6050 was observed in animal models. While our product candidate in humans is administered by the subcutaneous route of administration, If similar adverse events were to manifest, that could adversely impact our enrollment.

Our clinical trials will likely compete with other clinical trials that are in the same therapeutic areas as our product candidates, and this competition will reduce the number and types of patients available to us, because some patients who might have opted to enroll in our trials may instead opt to enroll in a trial being conducted by one of our competitors. Because the number of qualified clinical investigators and clinical trial sites is limited, we expect to conduct some of our clinical trials at the same clinical trial sites that some of our competitors use, which will reduce the number of patients who are available for our clinical trials at such clinical trial sites.

Patient enrollment depends on many factors, including the size and nature of the patient population, the severity of the disease under investigation, eligibility criteria for the trial, the proximity of patients to clinical sites, the design of the clinical protocol, the ability to obtain and maintain patient consents, the ability to recruit clinical trial investigators with the appropriate competencies and experience, the risk that patients enrolled in clinical trials will drop out of the trials before the administration of our product candidates or trial completion, the availability of competing clinical trials, the availability of new drugs approved for the indication the clinical trial is investigating, and clinicians' and patients' perceptions as to the potential advantages of the drug being studied in relation to other available therapies. These factors may make it difficult for us to enroll enough patients to complete our clinical trials in a timely and cost-effective manner. Delays in the completion of any clinical trial of our product candidates will increase our costs, slow down our product candidate development and approval process and delay or potentially jeopardize our ability to commence product sales and generate revenue. In addition, some of the factors that cause, or lead to, a delay in the commencement or completion of clinical trials may also ultimately lead to the denial of regulatory approval of our product candidates.

20

Table of Contents

***Serious adverse events, undesirable side effects or other unexpected properties of our product candidates may be identified during development or after approval, which could lead to the discontinuation of our clinical development programs, refusal by regulatory authorities to approve our product candidates or, if discovered following marketing approval, revocation of marketing authorizations or limitations on the use of our product candidates thereby limiting the commercial potential of such product candidate.***

To date, we have only tested SBT6050 in a limited number of patients with cancer and these clinical trial participants have only been observed for a limited period of time after dosing. As we continue developing our product candidates and initiate clinical trials of our additional product candidates, serious adverse events (SAEs), undesirable side effects, relapse of disease or unexpected characteristics may emerge causing us to abandon these product candidates or limit their development to more narrow uses or subpopulations in which the SAEs or undesirable side effects or other characteristics are less prevalent, less severe or more acceptable from a risk-benefit perspective or in which efficacy is more pronounced or durable. For example, a significant risk observed with systemic administration of motolimod, an unconjugated TLR8 small molecule agonist, was the induction of significant injection site reactions (ISR), and cytokine-induced flu-like symptoms that prevented dose-escalation. Should we observe severe cases of ISR and cytokine release syndrome in our clinical trials or identify other undesirable side effects or other unexpected findings depending on their severity, our trials could be delayed or even stopped and our development programs may be halted entirely.

Our TLR8 agonist containing product candidates, including SBT6050, activate dendritic cells among other innate immune cells. As a result, significant anti-drug antibodies (ADA) could develop that neutralize the effects of SBT6050 by reducing exposure. The development of ADA could also trigger hypersensitivity reactions that manifest as serious adverse events. For example, as has been described with other immune agonists administered in the presence of ADA in preclinical species, anaphylaxis upon repeat intravenous dosing with SBT6050 was observed. As a result, we have modified our dosing to subcutaneous; however, if patients experience adverse events (AEs), including anaphylaxis, our trials could be delayed or stopped and our development programs may be halted entirely if this is observed during clinical development. Even if ADAs are not detected in the early clinical trials, they may be detected after product launch and may significantly reduce the commercial potential or even result in the product being pulled from the market.

Even if our product candidates initially show promise in early clinical trials, the side effects of biological products are frequently only detectable after they are tested in larger, longer and more extensive clinical trials or, in some cases, after they are made available to patients on a commercial scale after approval. Sometimes, it can be difficult to determine if the serious adverse or unexpected side effects were caused by the product candidate or another factor, especially in oncology subjects who may suffer from other medical conditions and be taking other medications. If serious adverse or unexpected side effects are identified during development or after approval and are determined to be attributed to our product candidate, we may be required to develop a REMS to ensure that the benefits of treatment with such product candidate outweigh the risks for each potential patient, which may include, among other things, a communication plan to health care practitioners, patient education, extensive patient monitoring or distribution systems and processes that are highly controlled, restrictive and more costly than what is typical for the industry. Product-related side effects could also result in potential product liability claims. Any of these occurrences may harm our business, financial condition and prospects significantly.

In addition, if one or more of our product candidates receives marketing approval, and we or others later identify undesirable side effects or ADA caused by such products, a number of potentially significant negative consequences could result, including:
- regulatory authorities may suspend, withdraw or limit approvals of such product, or seek an injunction against its manufacture or distribution;

21

Table of Contents

- regulatory authorities may require additional warnings on the label, including "boxed" warnings, or issue safety alerts, Dear Healthcare Provider letters, press releases or other communications containing warnings or other safety information about the product;
- we may be required to create a medication guide outlining the risks of such side effects for distribution to patients;
- we may be required to change the way a product is administered or conduct additional clinical trials;
- the product may become less competitive, and our reputation may suffer;
- we may decide to remove the product from the marketplace; and
- we may be subject to fines, injunctions or the imposition of civil or criminal penalties.

***Interim, topline and preliminary data from our clinical trials may change as more patient data become available, and are subject to audit and verification procedures that could result in material changes in the final data.***

From time to time, we may publicly disclose preliminary, interim or topline data from our preclinical studies and clinical trials, which is based on a preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change as patient enrollment and treatment continues and more patient data become available. Adverse differences between previous preliminary or interim data and future interim or final data could significantly harm our business prospects. We may also announce topline data following the completion of a preclinical study or clinical trial, which may be subject to change following a more comprehensive review of the data related to the particular study or trial. We also make assumptions, estimations, calculations and conclusions as part of our analyses of data, and we may not have received or had the opportunity to fully and carefully evaluate all data. As a result, the interim, topline or preliminary results that we report may differ from future results of the same studies, or different conclusions or considerations may qualify such results, once additional data have been received and fully evaluated. Topline data also remain subject to audit and verification procedures that may result in the final data being materially different from the preliminary data we previously published. As a result, interim, topline and preliminary data should be viewed with caution until the final data are available.

Further, others, including regulatory agencies, may not accept or agree with our assumptions, estimates, calculations, conclusions or analyses or may interpret or weigh the importance of data differently, which could impact the value of the particular program, the approvability or commercialization of the particular product candidate or product and our company in general. In addition, the information we choose to publicly disclose regarding a particular study or clinical trial is based on what is typically extensive information, and you or others may not agree with what we determine to be material or otherwise appropriate information to include in our disclosure, and any information we determine not to disclose may ultimately be deemed significant with respect to future decisions, conclusions, views, activities or otherwise regarding a particular product candidate or our business. If the interim, topline, or preliminary data that we report differ from actual results, or if others, including regulatory authorities, disagree with the conclusions reached, our ability to obtain approval for and commercialize our product candidates, our business, operating results, prospects or financial condition may be harmed.

***We may encounter substantial delays in our clinical trials or we may fail to demonstrate safety and efficacy to the satisfaction of applicable regulatory authorities.***

Before obtaining marketing approval from regulatory authorities for the sale of our product candidates, we must conduct extensive clinical trials to demonstrate the safety and efficacy of the

22

Table of Contents

product candidate for its intended indications. Clinical trials are expensive, time-consuming and uncertain as to outcome. We cannot guarantee that any clinical trials will be conducted as planned or completed on schedule, if at all. For example, we cannot begin our planned Phase 1 clinical trials for SBT6290, our Nectin4-targeted product candidate until we complete certain preclinical development and submit and receive authorization to proceed under INDs. We also dosed the first patient in a Phase 1/1b clinical trial for SBT6050 in July 2020 and cannot predict how our technology may work in solid tumor indications until we have completed dose-escalation and dose expansion. Finally, the COVID-19 pandemic has impacted clinical trials broadly, including our own with some sites pausing or slowing enrollment.

A failure of one or more clinical trials can occur at any stage of testing. Events that may prevent successful or timely completion of clinical development include:

- delays in reaching a consensus with regulatory authorities on trial design or implementation of any future potential collaborators', clinical trials;
- delays in reaching agreement or failing to agree on acceptable terms with prospective CROs and clinical trial sites;
- delays in opening sites, including delays in obtaining required approvals from institutional review boards (IRBs) and recruiting suitable patients to participate in our clinical trials;
- delays in enrollment due to travel or quarantine policies, or other factors, related to COVID-19, other pandemics or other events outside our control;
- failure by our CROs, other third parties or us to adhere to the trial protocol or applicable regulatory requirements, including the FDA's good clinical practices (GCPs) or applicable regulatory requirements in other countries;
- regulatory authorities may find deficiencies in the manufacturing processes or facilities of third-party manufacturers with which we or any of our potential future collaborators contract for clinical and commercial supplies;
- delays in the testing, validation, manufacturing and delivery of our product candidates to the treatment sites, including due to a facility manufacturing any of our product candidates or any of their components being ordered by the FDA or comparable foreign regulatory authorities to temporarily or permanently shut down due to violations of current good manufacturing practices (cGMP) regulations or other applicable requirements, or infections or cross-contaminations of product candidates in the manufacturing process;
- imposition of a clinical hold by IRBs or regulatory authorities as a result of a serious adverse event, concerns with a class of product candidates, after an inspection of our clinical trial operations or trial sites, or for other reasons;
- suspensions or terminations by us, the IRBs of the institutions at which such trials are being conducted, by the Safety Review Committee or Data Safety Monitoring Board, for such trial or by regulatory authorities due to a number of factors, including those described above;
- delays in having patients complete participation in a trial or return for post-treatment follow-up;
- occurrence of serious adverse events associated with the product candidate that are viewed to outweigh its potential benefits or the discovery of other safety issues;
- lack of adequate funding; or
- changes in regulatory requirements and guidance that require amending or submitting new clinical protocols.

For instance, the ongoing COVID-19 pandemic and the measures taken by the governmental authorities could disrupt the supply chain and the manufacture or shipment of drug substances and

23

Table of Contents

Track Designation or Breakthrough Therapy Designation if it believes that the designation is no longer supported. These designations do not guarantee qualification for the FDA's priority review procedures or a faster review or approval process.

***If we are required by the FDA to obtain approval of a companion diagnostic test in connection with approval of any of our product candidates, and we do not obtain or face delays in obtaining FDA approval of a diagnostic device, we will not be able to commercialize such product candidate and our ability to generate revenue will be materially impaired.***

If safe and effective use of any of our product candidates depends on an *in vitro* diagnostic that is not otherwise commercially available, then the FDA generally will require approval or clearance of that diagnostic, known as a companion diagnostic, at the same time that the FDA approves our product candidates, if at all. Commercially available diagnostics are available for HER2, but not currently available for Nectin4. As an existing companion diagnostic does not currently exist for Nectin4, unless one is developed and approved, we may need to develop and obtain approval for a companion diagnostic for the SBT6290 program. The process of obtaining or creating such diagnostic is time consuming and costly.

Companion diagnostics are developed in conjunction with clinical programs for the associated product and are subject to regulation as medical devices by the FDA and comparable regulatory authorities. The approval of a companion diagnostic as part of the therapeutic product's labeling limits the use of the therapeutic product to only those patients who express the specific genetic alteration that the companion diagnostic was developed to detect. If the FDA or a comparable regulatory authority requires approval of a companion diagnostic for any of our product candidates, whether before or after it obtains marketing approval, we, and/or future collaborators, may encounter difficulties in developing and obtaining approval for such product candidate. Any delay or failure by us or third-party collaborators to develop or obtain regulatory approval of a companion diagnostic could delay or prevent approval or continued marketing of such product candidate.

We may also experience delays in developing a sustainable, reproducible and scalable manufacturing process for the companion diagnostic or in transferring that process to commercial partners or negotiating insurance reimbursement plans, all of which may prevent us from completing our clinical trials or commercializing our product candidate, if approved, on a timely or profitable basis, if at all.

***Even if we obtain regulatory approval for our product candidates, they will remain subject to ongoing regulatory oversight. Additionally, our product candidates, if approved, could be subject to labeling and other restrictions on marketing or withdrawal from the market, and we may be subject to penalties if we fail to comply with regulatory requirements or if we experience unanticipated problems with our product candidates, when and if any of them are approved***

Even if we obtain regulatory approval for any of our product candidates, they will be subject to extensive and ongoing regulatory requirements for manufacturing, labeling, packaging, distribution, adverse event reporting, storage, advertising, promotion, sampling and record-keeping. These requirements include submissions of safety and other post-marketing information and reports, registration, as well as continued compliance with cGMP regulations, as well as GCPs for any clinical trials that we conduct post-approval, all of which may result in significant expense and limit our ability to commercialize such products. In addition, any regulatory approvals that we receive for our product candidates may also be subject to limitations on the approved indicated uses for which the product may be marketed or to the conditions of approval, or contain requirements for potentially costly post-marketing testing, including Phase 4 clinical trials, and surveillance to monitor the safety and efficacy of

Table of Contents

its intention to resume certain on-site inspections of domestic manufacturing facilities subject to a risk-based prioritization system. The FDA intends to use this risk-based assessment system to identify the categories of regulatory activity that can occur within a given geographic area, ranging from mission critical inspections to resumption of all regulatory activities. Regulatory authorities outside the United States may adopt similar restrictions or other policy measures in response to the COVID-19 pandemic. If a prolonged government shutdown occurs, or if global health concerns continue to prevent the FDA or other regulatory authorities from conducting their regular inspections, reviews, or other regulatory activities, it could significantly impact the ability of the FDA or other regulatory authorities to timely review and process our regulatory submissions, which could have a material adverse effect on our business.

***We may expend our limited resources to pursue a particular product candidate or indication and fail to capitalize on product candidates or indications that may be more profitable or for which there is a greater likelihood of success.***

Because we have limited financial and managerial resources, we must prioritize our research programs and will need to focus our discovery and development on select product candidates and indications. Correctly prioritizing our research and development activities is particularly important for us due to the breadth of potential product candidates and indications that we believe could be pursued using our platform technologies. As a result, we may forego or delay pursuit of opportunities with other product candidates or for other indications that later prove to have greater commercial potential. Our resource allocation decisions may cause us to fail to capitalize on viable commercial products or profitable market opportunities. Our spending on current and future research and development programs and product candidates for specific indications may not yield any commercially viable products. If we do not accurately evaluate the commercial potential or target market for a particular product candidate, we may also relinquish valuable rights to that product candidate through collaboration, licensing or other royalty arrangements in cases in which it would have been more advantageous for us to retain sole development and commercialization rights to such product candidate.

***We may not be successful in our efforts to identify or discover additional product candidates in the future.***

Our research programs may initially show promise in identifying potential product candidates, yet fail to yield product candidates for clinical development for a number of reasons, including:

- our inability to design such product candidates with the properties that we desire; or
- potential product candidates may, on further study, be shown to have harmful side effects or other characteristics that indicate that they are unlikely to be products that will receive marketing approval and achieve market acceptance.

Research programs to identify new product candidates require substantial technical, financial and human resources. If we are unable to identify suitable additional candidates for preclinical and clinical development, our opportunities to successfully develop and commercialize therapeutic products will be limited.

29

Table of Contents

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion and analysis of our financial condition and results of operations together with the section of this prospectus titled "Selected Financial Data" and our financial statements and related notes included elsewhere in this prospectus. Some of the information contained in this discussion and analysis are set forth elsewhere in this prospectus, including information with respect to our plans and strategy for our business and related financing, and includes forward-looking statements that involve risks and uncertainties. As a result of many factors, including those factors set forth in the section of this prospectus titled "Risk Factors," our actual results could differ materially from the results described in or implied by the forward-looking statements contained in the following discussion and analysis.*

**Overview**

We are a clinical-stage biopharmaceutical company with one product candidate in a Phase 1/1b clinical trial, and we are focused on leveraging our proprietary ImmunoTAC technology platform to develop systemically delivered, tissue targeted therapeutics for the treatment of cancer, chronic viral infections, and other serious diseases. Our platform enables us to strategically pair proprietary linker-payloads that modulate key disease-modifying pathways with monoclonal antibodies directed to specific disease sites. Initially, we are applying our platform to create a new class of targeted immuno-oncology agents that direct a myeloid cell activator to the tumor microenvironment in solid tumors to promote cancer cell killing. Our lead product candidate, SBT6050, is comprised of a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody that targets tumors such as certain breast, gastric and non-small cell lung cancers among others. SBT6050 is currently in a Phase 1/1b clinical trial in patients with advanced or metastatic HER2-expressing solid tumors. In this trial, we have observed changes in pharmacodynamic markers in the first dose cohort, and we anticipate providing an update on interim data from the Phase 1 dose-escalation cohorts in the second half of 2021. SBT6290 is our second product candidate, expanding on the potential of a TLR8 agonist as a payload. SBT6290 is a TLR8 linker-payload conjugated to a monoclonal antibody that targets Nectin4, which is expressed in certain bladder, triple negative breast, head and neck, and non-small cell lung cancers. We anticipate submitting an investigational new drug application for SBT6290 in the fourth quarter of 2021. Our third TLR8 program, SBT8230, is comprised of a TLR8 linker-payload conjugated to an ASGR1 monoclonal antibody that is under development for the treatment of cHBV. We are also developing agents that localize therapies to modulate important pathways in additional oncology and fibrosis indications using TLR8 and other linker-payloads.

91

Table of Contents

**BUSINESS**

**Overview**

We are a clinical-stage biopharmaceutical company with one product candidate in a Phase 1/1b clinical trial, and we are focused on leveraging our proprietary ImmunoTAC technology platform to develop systemically delivered, tissue targeted therapeutics for the treatment of cancer, chronic viral infections, and other serious diseases. Our platform enables us to strategically pair proprietary linker-payloads that modulate key disease-modifying pathways with monoclonal antibodies directed to specific disease sites. Initially, we are applying our platform to create a new class of targeted immuno-oncology agents that direct a myeloid cell activator to the tumor microenvironment (TME) in solid tumors to promote cancer cell killing. Our lead product candidate, SBT6050, is comprised of a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody that targets tumors such as certain breast, gastric and non-small cell lung cancers. SBT6050 is currently in a Phase 1/1b clinical trial in patients with advanced or metastatic HER2-expressing solid tumors. In this trial, we have observed changes in pharmacodynamic markers in the first dose cohort, and we anticipate providing an update on interim data from the Phase 1 dose-escalation cohorts in the second half of 2021. SBT6290 is our second product candidate, expanding on the potential of a TLR8 agonist as a payload. SBT6290 is a TLR8 linker-payload conjugated to a monoclonal antibody that targets Nectin4, which is expressed in certain bladder, triple negative breast, head and neck, and non-small cell lung cancers. We anticipate submitting an investigational new drug application (IND) for SBT6290 in the fourth quarter of 2021. Our third TLR8 program, SBT8230, is comprised of a TLR8 linker-payload conjugated to an ASGR1 monoclonal antibody that is under development for the treatment of chronic hepatitis B virus infection (cHBV). We are also developing agents that localize therapies to modulate important pathways in additional oncology and fibrosis indications using TLR8 and other linker-payloads.

**Our ImmunoTAC Platform**

Our ImmunoTAC platform is the result of a focused effort to discover ways to systemically deliver disease-modifying small molecules in a directed fashion to sites of disease. Many potentially promising systemic therapies fail to maximize their therapeutic potential due to toxicities in healthy tissues. Our approach is designed to increase the therapeutic window and avert unacceptable toxicities by directly targeting specific disease sites where our therapeutics are locally active.

As shown in the figure below, our ImmunoTAC platform is comprised of three components:
(1)     **Antigen binding domain**—which is responsible for localizing the therapeutic activity of the payload to the site of the disease;
(2)     **Linker-payload**—a disease-modifying small molecule optimized for potency when conjugated to a monoclonal antibody via its linker; and
(3)     **Fc region**—tuned for requisite effector function.

We have built a library of proprietary small molecule linker-payloads and antigen binding domains that allows us to mix and match these components to strategically pair and create new therapeutic agents.

111

Table of Contents

### SBT6050

Our lead product candidate, SBT6050, is comprised of a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody and is designed to activate myeloid cells in tumors expressing moderate to high levels of HER2. TLR8 is expressed in myeloid cell types prevalent in human tumors and TLR8 agonism can activate a broad spectrum of anti-tumor immune mechanisms. Therefore, we believe that TLR8 is the optimal target for activating human myeloid cell types in the TME.

Myeloid cells are a class of innate immune cells that develop from common monocyte-dendritic cell progenitor cells and are comprised of both immunosuppressive and pro-inflammatory subpopulations. Tumors are permeated with myeloid cells, which can comprise between 5% and 10% of the tumor. Activation of myeloid cells, either by reprogramming immunosuppressive myeloid cells towards a more pro-inflammatory phenotype or stimulating other myeloid cells that have been silenced (e.g., dendritic cells), results in direct tumor killing and recruitment of immune cells. Further, activated myeloid cells can prime and amplify T cell and natural killer (NK) cell responses, bridging the innate and adaptive immunity to elicit broad, durable anti-tumor responses.

SBT6050 utilizes HER2 to localize and facilitate the delivery of the TLR8 agonist conjugate into myeloid cells in the TME. Therefore, unlike HER2 targeted therapies that have been approved by the U.S. Food and Drug Administration (FDA) such as Herceptin (trastuzumab), SBT6050 does not require HER2 to be an oncogenic driver to elicit anti-tumor activity. Furthermore, SBT6050 recognizes the HER2 sub-domain II, the pertuzumab epitope, and does not cross-block trastuzumab, allowing for potential combinations with trastuzumab-based agents, which are standard of care therapies in some HER2-expressing cancers.

We are currently evaluating the safety and tolerability of SBT6050 in a Phase 1 dose-escalation trial in patients with advanced or metastatic HER2-expressing solid tumors. Changes in pharmacodynamic markers have been observed in the first dose-escalation cohort of this trial. We anticipate providing an update on interim data from the Phase 1 dose-escalation cohorts in the second half of 2021.

### SBT6290

SBT6290 is our second product candidate, expanding on the potential of a TLR8 agonist as a payload. The same TLR8 linker-payload used in SBT6050 is conjugated to a monoclonal antibody that targets Nectin4. Nectin4 is expressed in subsets of solid tumors including bladder, triple negative breast, head and neck, and non-small cell lung cancers, and has been clinically validated through the approval of the antibody-drug conjugate enfortumab vedotin (Padcev). We anticipate submitting the IND for SBT6290 in the fourth quarter of 2021.

### SBT8230

SBT8230, an ASGR1-TLR8 ImmunoTAC therapeutic, is our third TLR8 program. SBT8230 is engineered to potently activate human myeloid cells in the liver for the treatment of cHBV. Selgantolimod (GS-9688), an existing untargeted, orally administered TLR8 agonist being developed by Gilead Sciences, generated anti-viral immune responses in a cHBV animal model. The clinical development of this untargeted TLR8 agonist has shown promise, but we believe that toxicity prevented the use of a sufficient dose to elicit optimal clinical activity. We believe liver- localized TLR8 agonism could better realize the potential for effective therapy and potentially lead to functional cures, which is defined as sustained loss of hepatitis B surface antigen (HBsAg) in the blood, in patients suffering from cHBV. We anticipate selecting a development candidate for this program in the fourth quarter of 2020.

113

Table of Contents

*Additional Immuno-Oncology Programs*

In addition to SBT6050 and SBT6290, we are evaluating other solid tumor targets to leverage the TLR8 linker-payload paired with additional tumor directed antibodies. These targets are differentially expressed on tumors compared to normal tissue.

*ASGR1-TGFß Receptor Antagonist—Fibrosis Program*

TGFß signaling is a key mediator of fibrosis across multiple organ systems, including the liver. In the liver, TGFß drives fibrosis initiation and progression through multiple mechanisms, including hepatocyte apoptosis, hepatic stellate cell transdifferentiation to myofibroblasts, and pro-fibrotic macrophage activation. Our ASGR1-TGFßR1 antagonist conjugate pairs the ASGR1 antibody used in SBT8230 with a proprietary TGFßR1 antagonist to achieve liver-localized inhibition of TGFß signaling to treat fibrosis. Our tissue-directed approach has been designed to prevent toxicities associated with untargeted systemically distributed TGFßR1 antagonist agents. Our ASGR1-TGFßR1 antagonist conjugates are currently in preclinical testing and have demonstrated potent inhibition of TGFß signaling *in vitro*. We are currently evaluating conjugates *in vivo* in mouse disease models.

## Our Strategy

Our goal is to transform the treatment of cancer and other serious diseases with unmet need using our ImmunoTAC platform to deliver a new class of systemically delivered, tissue-directed, and locally active therapies. The key elements of our business strategy are to:

- *Advance SBT6050 through clinical development in late-stage disease that may allow us to seek expedited approval using regulatory pathways available from the FDA such as Accelerated Approval, Breakthrough Therapy, Priority Review or Fast Track designation.* In early clinical trials, we will be examining the anti-tumor activity of SBT6050 in patients that have failed all available therapies associated with clinical benefit, in addition to measuring biomarkers of immune cell activation. This approach may allow us to seek expedited approval from the FDA based on surrogate endpoints (through the Accelerated Approval path) and expedited FDA review through programs such as Breakthrough Therapy, Priority Review, or Fast Track designation. We are evaluating activity broadly across HER2-expressing cancer types, including cancers where no HER2-directed therapies are currently approved, and have identified several tumor types and lines of therapy that potentially present opportunities for utilizing one or more of these accelerated approval pathways.
- *Advance SBT6050 subsequently into earlier lines of therapy to maximize patient benefit and commercial success, if approved.* Our long-term clinical development goal is to position SBT6050 in early-line standard of care regimens in key indications to potentially provide benefit to patients. We seek to accomplish this by evaluating combination therapy approaches with therapeutics approved as standard of care. We believe SBT6050 has the potential to be an ideal combination therapy in early line settings.
- *Maximize the therapeutic potential of TLR8 in oncology and other serious diseases*. We are adapting learnings from our SBT6050 program to expand the TLR8 agonist franchise by conjugating this payload to antibodies that target different tumor antigens that are prevalent in other cancer types. Additionally, the ability to drive myeloid cell activation in the liver presents an opportunity to treat cHBV infections, which is our most advanced initiative outside of immuno-oncology.
- *Leverage our ImmunoTAC platform for promising new antibody-linker-payload combinations*. We are strategically pairing our disease-modulating payloads with tissue targeted antibodies, such as our ASGR1-TGFßR1 antagonist conjugate, to create new

114

Table of Contents

*Preclinical Data Supporting the Potential for Combination of SBT6050 with Other Therapies*

In our preclinical studies, SBT6050-S drove robust anti-tumor activity as a single agent and in combination with standard of care agents.

As shown in the figures below, our preclinical data demonstrated that the single agent activity of SBT6050-S in the immune-competent, checkpoint resistant HER2-EMT6 tumor model was further enhanced when combined with an anti-PD-1.



*The Combination of SBT6050-S and Anti-PD-1 Drove Robust, Durable Anti-Tumor Activity*

In a HER2$^{pos}$ human xenograft mouse model, a combination of low dose SBT6050-S with trastuzumab greatly enhanced the anti-tumor activity observed with either agent alone. As shown in the figures below, our preclinical data demonstrated the potential for enhanced clinical activity with SBT6050 in combination with trastuzumab. In this study, a lower dose of SBT6050-S (1 mg/kg) was used to allow for the combinatorial benefit to be observed. A lower dose of SBT6050-S (1 mg/kg) was used as a monotherapy control. We believe that the potential to combine with trastuzumab-based therapies unlocks the possibility of accessing earlier lines of therapy in breast and gastric cancer, where trastuzumab is a part of the standard of care.



*The Combination of SBT6050-S and Trastuzumab Drove Robust, Durable Anti-Tumor Activity*

***SBT6050 Was Well Tolerated in Non-Human Primates by the Subcutaneous Route of Administration***

SBT6050 demonstrated a wide therapeutic window in safety and tolerability studies following repeat subcutaneous administration including in the GLP toxicology study in non-human primates (NHP) that determined our first-in-human (FIH) dose. Forty-one NHPs have been administered repeat SC doses of SBT6050 in three NHP toxicity studies. In two non-GLP studies, 15 NHPs were treated at SC dose levels of 0.1 to 12 mg/kg, with the majority (8 of 15) administered 6 or 12 mg/kg every 2 or 3

127

Table of Contents

Our IND for SBT6050 was cleared in June 2020 with a starting dose of 0.3 mg/kg. In July 2020, we initiated a Phase 1/1b FIH, open-label, multicenter, dose-escalation and expansion clinical trial in patients with HER2-expressing solid tumors that have progressed following standard therapies. The trial is designed to evaluate the safety, tolerability, PK, pharmacodynamics (PD), immunogenicity, and anti-tumor activity of SBT6050 as a single agent and in combination with pembrolizumab, a PD-1 inhibitor.

In our Phase 1/1b clinical trial, we are monitoring key PD biomarkers in both the blood and the tumor which have been associated with tumor regression in our preclinical mouse studies and was observed in our preclinical NHP studies. Key biomarkers in the blood include elevations in MCP-1, IP-10, and C-reactive protein and induction of additional PD markers indicative of on target mechanism of action such as IFN$\gamma$. We will be obtaining tumor biopsies at baseline and on treatment to measure biomarkers that correlate with the activation of myeloid cells, T cells and NK cells in cohorts 2 and later.

The trial consists of 4 parts: monotherapy dose-escalation and expansion (Part 1), monotherapy dose expansion in tumor-specific cohorts (Part 2), pembrolizumab combination dose-escalation (Part 3), and a pembrolizumab combination dose expansion cohort (Part 4).

### Part 1: SBT6050 Single Agent Dose-Escalation and Expansion

In Part 1, a standard 3 + 3 dose-escalation of SBT6050 is planned to study safety, tolerability, and PK of SBT6050, and to determine the maximum tolerated dose (MTD) and the RP2D. The MTD is defined as the dose just below the dose level where 2 or more out of 6 patients ($\geq$33%) experience dose-limiting toxicities (DLTs). The starting dose of the SBT6050 regimen is 0.3 mg/kg administered via subcutaneous injection once every 14 days. One or two dose levels may be expanded to 12 patients to obtain additional information to select the RP2D. Eligible patients must have HER2-expressing (HER2 IHC 2/3+) or HER2-amplified cancer refractory to or relapsed after standard therapies. We anticipate enrolling approximately 30 participants in Part 1.

### Part 2: SBT6050 Single Agent Dose Expansion in Tumor-Specific Cohorts

Patients will be enrolled into parallel expansion cohorts based on tumor type and HER2 expression level. Patients enrolled in the expansion cohorts will receive SBT6050 at the recommended dose and schedule established in Part 1. The purpose of Part 2 is to further characterize the tolerability profile of the RP2D and evaluate the anti-tumor activity and PD effects of SBT6050 as a single agent. Enrollment will follow a Simon 2-stage design. Planned expansion cohorts, which may also be informed by experience in the dose-escalation phase, include the following tumor types:
- Cohort A: HER2$^{pos}$ breast cancer, n=40.
- Cohort B: HER2 low-expressing (IHC2+/amplification negative) breast cancer, n=30.
- Cohort C: HER2$^{pos}$ gastric cancer, n=40.
- Cohort D: HER2-expressing (IHC 2/3+) or HER2-amplified non-small cell lung cancer, n=40.
- Cohort E: HER2-expressing (IHC 2/3+) or HER2-amplified solid tumors, n=30.

### Part 3: SBT6050 Plus Pembrolizumab Dose-Escalation

In Part 3, a standard 3 + 3 dose-escalation of SBT6050 plus the anti-PD-1 CPI, pembrolizumab is planned to determine the MTD and RP2D of SBT6050 when given in combination with pembrolizumab. The MTD is defined as above. SBT6050 will be administered via subcutaneous injection on Days 1, 15, and 29 of 42-day cycles in combination with 400 mg pembrolizumab administered via intravenous

129

Table of Contents

injection on Day 1 of each cycle. Eligible patients will have HER2-expressing or HER2-amplified solid tumors. Part 3 of the study will open when changes in PD markers exceeds the pre-defined criteria for pharmacological activity with demonstration of acceptable safety and tolerability in a cohort treated with single agent SBT6050. The pre-defined threshold is based on changes in peripheral PD markers in preclinical studies, and includes C-reactive protein elevation to $\geq$ 150 mg/L and 3-5 fold changes from baseline in certain cytokines and chemokines such as IP-10, IFN$\gamma$ and/or MCP-1. We anticipate enrolling approximately 15 participants in Part 3.

### Part 4: SBT6050 Plus Pembrolizumab Dose Expansion Cohort

The combination treatment expansion part of the trial will be initiated once the RP2D has been defined by the safety monitoring committee from Part 3. The purpose of Part 4 is to further characterize the tolerability profile of the RP2D and evaluate the anti-tumor activity and PD effects of SBT6050 in combination with pembrolizumab. Approximately 30 patients with HER2-expressing or HER2-amplified tumors of multiple histologies will be enrolled.

### SBT6050 Preliminary Phase 1/1b Clinical Data

We are currently in Part 1 of our Phase 1/1b clinical trial and as of November 6, 2020, six patients have been enrolled. Patients are administered SBT6050 every two weeks by subcutaneous injection. The treated patients, each receiving 0.3 mg/kg of SBT6050, have received between one and eight doses, and no DLTs have been observed. The most common adverse events are flu-like symptoms and redness and swelling at the injection site. Changes in pharmacodynamic markers consistent with the potential mechanism of action have been observed in treated patients where data are available. This includes increases in plasma levels of CRP (C-reactive protein), a marker of inflammation, increases in MCP-1, IP-10 and IL-6, which are indicative of myeloid cell activation, increases in IFN$\gamma$ which is a marker for T and NK cell activation, and decreases in hemoglobin which we believe to be due to macrophage phagocytosis. For example, in patient 1, after the first dose, CRP levels increased from 2 mg/L to 288 mg/L, IP-10 increased from 354 pg/ml to 3040 pg/ml, MCP-1 increased from 340 pg/ml to 849 pg/ml, IL-6 increased from <0.6 to 138 pg/ml and IFN$\gamma$ increased from 7.6 pg/ml to 465 pg/ml while hemoglobin transiently decreased following each of four administrations but not to levels considered clinically adverse. Transient decreases in hemoglobin and changes in cytokines and chemokines had also been observed in the NHP studies after treatment with SBT6050, with the exception of IFN$\gamma$ which was only observed intratumorally in mice upon treatment with SBT6050-S. Repeat dose PK, with timepoints inclusive of $C_{max}$, is available in two patients through two and four subcutaneous doses. Exposure was consistent following the second dose and the fourth dose compared to the first dose for each patient. As of November 6, one patient had a formal reassessment of tumor status after 8 weeks on study with stable disease and is now 15 weeks on treatment.

We expect to initiate the Phase 1 SBT6050 combined with pembrolizumab in the first quarter of 2021. We anticipate providing an update on interim data from the Phase 1 single agent dose-escalation cohorts and the Phase 1 SBT6050 and pembrolizumab combination in the first half of 2022. We anticipate providing a further update on interim data from the Phase 1 monotherapy and combination dose-escalation as well as a first update of the Phase 1b monotherapy in tumor-specific expansion cohorts and the Phase 1b combination cohort the second half of 2022.

### SBT6050 Addressable Market

As shown in the figure below, HER2 IHC 2+ and 3+ overexpression and amplification are documented in at least 11 different tumor types including breast (estimated 83,000), gastric (estimated 6,400), non-small cell lung (estimated 31,500), colorectal (estimated 9,000), bladder (estimated 7,500), uterine (estimated 11,000), pancreatic (estimated 4,000), head and neck (estimated

130

Table of Contents

2,000), ovarian (estimated 1,100), esophageal (estimated 3,000), and biliary (estimated 3,000) cancers, providing the potential to address a large HER2-expressing tumor agnostic market estimated to be more than 160,000 newly-diagnosed patients annually in the United States based in part on estimated prevalence rates. HER2 IHC2+ and 3+ overexpression in breast cancer, gastric cancer, and NSCLC are 30.0%, 16.4%, and 23.2%, respectively. Most HER2 targeted therapies require the tumor cells to be dependent on HER2 signaling, often called an oncogenic driver. HER2 oncogenic-driven tumors are limited to subsets of breast and gastric cancer and hence the FDA-approved therapies that require HER2 signaling are limited to these indications as noted in the figure. SBT6050 does not require the tumor cells to be dependent on HER2 signaling for its anti-tumor activity and instead utilizes the HER2 protein to deliver the conjugate to adjacent myeloid cells. We believe that this expands the market opportunity beyond HER2-driven breast and gastric cancer in which targeted HER2 agents have been approved and are established as standard of care. Because of the rationale to combine SBT6050 with CPI's, which is supported by our preclinical data, we have noted in the figure below those tumor types with an approved CPI.

*Large Potential Market Opportunity for SBT6050 in Tumors That Express HER2 and in Combination With HER2 Targeted Agents and CPIs*



HER2 expression rates are well-understood in tumor types for which there is an FDA-approved HER2 targeted therapy available. Breast and gastric cancer cases are routinely screened for HER2 expression as a part of the standard of care. HER2 overexpression has been reported in other tumor types, but because of the lack of effective therapies targeting cancers outside of breast and gastric, screening is not readily performed. In calculating our potential addressable market for these tumor types, the figure above shows a range of HER2 expression cited in the literature and the lower end of the range was utilized for market considerations. In the United States, we believe that, based in part on estimated prevalence rates as described in the figure above, more than 48,000 patients annually with solid tumors that are refractory to standard of care treatments may benefit from SBT6050 as a single agent or combination therapy, if successfully developed and approved. In the future, if SBT6050 advances to earlier lines of treatment, based in part on estimated prevalence rates as described in the figure above, more than 160,000 patients annually may benefit.

In considering the market for combination treatment, SBT6050 was specifically designed to bind to the HER2 sub-domain II, the pertuzumab epitope, to enable combinations with trastuzumab-based therapies that bind to HER2 sub-domain IV such as Herceptin (trastuzumab), Kadcyla (trastuzumab-DM1), and Enhertu (DS-8201), all of which are FDA-approved HER2 agents. Our preclinical data has demonstrated the potential to use SBT6050 in combination with trastuzumab and CPI's. We believe that SBT6050 may also have the potential to be combined with tyrosine kinase

Table of Contents

inhibitors such as Tukysa (tucatinib), which is approved for combination with trastuzumab and Xeloda (capecitabine) for the treatment of HER2[pos] metastatic breast cancer. When considering the market potential for combination therapy, only combinations with trastuzumab and CPI's was utilized in our calculations.

SBT6050 is also active in HER2 IHC 2+ / FISH negative tumors, expanding the market beyond the scope of current approved HER2 targeted therapies indicated for IHC 3+ and IHC 2+ / FISH positive tumors as shown in the figure below. We considered this potential market extension in breast cancer and gastric cancer in calculating the potential addressable market.



*SBT6050 Potential Addressable Market in Indications with an FDA-Approved HER2 Targeted Therapy*

### SBT6290: TLR8 Agonist Conjugated to a Nectin4 Antibody

Our second product candidate, SBT6290, is comprised of the same TLR8 linker-payload used in SBT6050 conjugated to a Nectin4-directed monoclonal antibody. Nectin4 has been prioritized as our second target based on differential expression of extracellular proteins on tumor cells in comparison to healthy tissue, as well as the degree of myeloid cell infiltrate in the TME. Nectin4 is overexpressed in cancers including bladder, triple negative breast, and head and neck, among others.

Nectin4 is a target that has been clinically validated by Seattle Genetics through the approval of the Nectin4-directed antibody-drug conjugate Padcev. In 2019, Padcev was approved under the FDA's accelerated approval program indicated for the treatment of adult patients with locally advanced or metastatic urothelial cancer who have previously received a PD-1 inhibitor, and a platinum-containing chemotherapy.

Targeting Nectin4 to deliver a TLR8 agonist to adjacent myeloid cells presents a significant therapeutic opportunity across different cancers. We are developing SBT6290 in Nectin4-expressing tumors, including bladder, triple negative breast, and head and neck cancers. As shown in the figure below, the estimated incidence of newly diagnosed patients with bladder, triple negative breast, and head and neck cancers that express Nectin4 represents an estimated over 80,000 patients annually in the early line setting. The estimated yearly deaths of patients with bladder, triple negative breast, and head and neck cancer that express Nectin4 represents over 16,000 patients with relapsed or refractory cancer annually in the United States.

Table of Contents



*SBT6290 Potently Activated Human Myeloid Cells*

Nectin4 was recently described to be a ligand for T cell immunoglobulin and ITIM domain (TIGIT). TIGIT has emerged as an inhibitor of anti-tumor immune responses and several agents inhibiting this pathway are being tested in clinical trials. In addition to SBT6290's primary mechanism of action through TLR8 activation, the figure below demonstrated that the binding of TIGIT to Nectin4-expressing tumor cells was blocked by the binding domain of SBT6290.

*SBT6290 Binding Domain Blocked TIGIT Binding to Nectin4-Expressing Tumor Cells*



We engineered a mouse surrogate of SBT6290 (SBT6290-S) using a TLR7 agonist conjugated to a Nectin4 monoclonal antibody to account for species differences in our *in vivo* studies, as was described for SBT6050. As shown in the figure below, SBT6290-S improved overall survival in a Nectin4-expressing EMT6 mouse model. This study was powered for statistical significance using survival as a readout which is defined as tumor size remaining below 1,000 mm3. SBT6290-S demonstrated a statistically significant improvement in survival as compared to the two control groups as noted in the figure below.

134

Table of Contents

*Administration of SBT6290-S as Monotherapy Resulted in Improved Overall Survival in a Nectin4-Expressing EMT6 Preclinical Model*



As shown in the figure below, subcutaneous administration of SBT6290-S to mice bearing Nectin4-expressing EMT6 tumors induced the production of cytokines and chemokines in the tumors of treated mice. MCP-1 and IP-10 upregulation are indicative of myeloid cell activation and IFN$\gamma$ and IL-2 production are indicative of T cell activation in the treated mice.

*Administration of SBT6290-S as Monotherapy Induced the Production of Cytokines and Chemokines in Nectin4-Expressing EMT6Tumors*



135

Table of Contents

- performance of adequate and well-controlled human clinical trials in accordance with applicable IND regulations, GCP requirements and other clinical trial-related regulations to establish the safety and efficacy of the investigational product for each proposed indication;
- submission to the FDA of a BLA;
- payment of any user fees for FDA review of the BLA;
- a determination by the FDA within 60 days of its receipt of a BLA to accept the filing for review;
- satisfactory completion of one or more FDA pre-approval inspections of the manufacturing facility or facilities where the biologic, or components thereof, will be produced to assess compliance with cGMP requirements to assure that the facilities, methods and controls are adequate to preserve the biologic's identity, strength, quality and purity;
- satisfactory completion of any potential FDA audits of the clinical trial sites that generated the data in support of the BLA to assure compliance with GCPs and integrity of the clinical data;
- FDA review and approval of the BLA, including consideration of the views of any FDA advisory committee; and
- compliance with any post-approval requirements, including REMS, where applicable, and post- approval studies required by the FDA as a condition of approval.

The preclinical and clinical testing and approval process requires substantial time, effort and financial resources, and we cannot be certain that any approvals for our product candidates will be granted on a timely basis, or at all.

*Preclinical Studies*

Before testing any biological product candidates in humans, the product candidate must undergo rigorous preclinical testing. Preclinical studies include laboratory evaluation of product candidates and formulations, as well as *in vitro* and animal studies to assess the potential for adverse events and in some cases to establish a rationale for therapeutic use. The conduct of preclinical studies is subject to federal regulations and requirements, including GLP regulations for safety/toxicology studies. An IND sponsor must submit the results of the preclinical tests, together with manufacturing information, analytical data, any available clinical data or literature and plans for clinical studies, among other things, to the FDA as part of an IND. An IND is a request for authorization from the FDA to administer an investigational product to humans and must become effective before human clinical trials may begin. Some long-term preclinical testing may continue after the IND is submitted. An IND automatically becomes effective 30 days after receipt by the FDA, unless before that time the FDA raises concerns or questions related to one or more proposed clinical trials and places the trial on clinical hold. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. As a result, submission of an IND may not result in the FDA allowing clinical trials to commence.

*Clinical Trials*

The clinical stage of development involves the administration of the investigational product to healthy volunteers or patients under the supervision of qualified investigators, generally physicians not employed by or under the trial sponsor's control. Clinical trials must be conducted: (i) in compliance with federal regulations; (ii) in compliance with GCPs, an international standard meant to protect the rights and health of patients and to define the roles of clinical trial sponsors, administrators and monitors; as well as (iii) under protocols detailing, among other things, the objectives of the trial, the

149