# EXHIBIT D

Table of Contents

**Filed Pursuant to Rule 424(b)(4)**
**Registration Nos. 333-250009 and 333-251117**

11,500,000 Shares



Common Stock

This is the initial public offering of shares of common stock of Silverback Therapeutics, Inc. We are offering 11,500,000 shares of our common stock.

Prior to this offering, there has been no public market for our common stock. The initial public offering price is $21.00 per share of our common stock.

Our common stock has been approved for listing on the Nasdaq Global Market under the symbol "SBTX."

We are an "emerging growth company" as defined under the federal securities laws and, as such, have elected to comply with certain reduced reporting requirements in this prospectus and may elect to do so in future filings.

See the section titled "Risk Factors" beginning on page 13 to read about factors you should consider before deciding to invest in shares of our common stock.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per Share | Total |
|---|---|---|
| Initial public offering price | $ 21.00 | $ 241,500,000 |
| Underwriting discounts and commissions(1) | $ 1.47 | $ 16,905,000 |
| Proceeds, before expenses, to Silverback Therapeutics, Inc. | $ 19.53 | $ 224,595,000 |

(1)    See the section titled "Underwriting" for a description of the compensation payable to the underwriters.

We have granted the underwriters an option for a period of 30 days to purchase up to an additional 1,725,000 shares of our common stock at the initial public offering price, less the underwriting discounts and commissions.

The underwriters expect to deliver the shares against payment in New York, New York on December 8, 2020.

**Goldman Sachs & Co. LLC**                    **SVB Leerink**                    **Stifel**

**H.C. Wainwright & Co.**

Prospectus dated December 3, 2020

Table of Contents

**PROSPECTUS SUMMARY**

*This summary highlights selected information contained in greater detail elsewhere in this prospectus. This summary is not complete and does not contain all of the information you should consider in making your investment decision. Before investing in our common stock, you should carefully read this entire prospectus. You should carefully consider, among other things, the sections of this prospectus titled "Risk Factors," "Special Note Regarding Forward-Looking Statements" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes included elsewhere in this prospectus. Unless the context otherwise requires, the terms "Silverback Therapeutics," "Silverback," "we," "us," "our" and similar references in this prospectus refer to Silverback Therapeutics, Inc.*

**Overview**

We are a clinical-stage biopharmaceutical company with one product candidate in a Phase 1/1b clinical trial, and we are focused on leveraging our proprietary ImmunoTAC technology platform to develop systemically delivered, tissue targeted therapeutics for the treatment of cancer, chronic viral infections, and other serious diseases. Our platform enables us to strategically pair proprietary linker-payloads that modulate key disease-modifying pathways with monoclonal antibodies directed to specific disease sites. Initially, we are applying our platform to create a new class of targeted immuno-oncology agents that direct a myeloid cell activator to the tumor microenvironment (TME) in solid tumors to promote cancer cell killing. Our lead product candidate, SBT6050, is comprised of a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody that targets tumors such as certain breast, gastric and non-small cell lung cancers. SBT6050 is currently in a Phase 1/1b clinical trial as monotherapy and in combination with pembrolizumab, in patients with advanced or metastatic HER2-expressing solid tumors. In this trial, we have observed changes in pharmacodynamic markers in the first dose cohort, and we anticipate providing an update on interim data from the Phase 1 dose-escalation cohorts in the second half of 2021. SBT6290 is our second product candidate, expanding on the potential of a TLR8 agonist as a payload. SBT6290 is a TLR8 linker-payload conjugated to a monoclonal antibody that targets Nectin4, which is expressed in certain bladder, triple negative breast, head and neck, and non-small cell lung cancers. We anticipate submitting an investigational new drug application (IND) for SBT6290 in the fourth quarter of 2021. Our third TLR8 program, SBT8230, is comprised of a TLR8 linker-payload conjugated to an ASGR1 monoclonal antibody that is under development for the treatment of chronic hepatitis B virus infection (cHBV). We are also developing agents that localize therapies to modulate important pathways in additional oncology and fibrosis indications using TLR8 and other linker-payloads.

**Our ImmunoTAC Platform**

Our ImmunoTAC platform is the result of a focused effort to discover ways to systemically deliver disease-modifying small molecules in a directed fashion to sites of disease. Many potentially promising systemic therapies fail to maximize their therapeutic potential due to toxicities in healthy tissues. Our approach is designed to increase the therapeutic window and avert unacceptable toxicities by directly targeting specific disease sites where our therapeutics are locally active.

As shown in the figure below, our ImmunoTAC platform is comprised of three components:

(1)  **Antigen binding domain**—which is responsible for localizing the therapeutic activity of the payload to the site of the disease;

(2)  **Linker-payload**—a disease-modifying small molecule optimized for potency when conjugated to a monoclonal antibody via its linker; and

1

Table of Contents

Since our inception in 2016 through September 30, 2020, we have raised over $215 million in capital from leading investors including OrbiMed Advisors, Alexandria Venture Investments, Boxer Capital of Tavistock Group, Celgene, Colt Ventures, EcoR1 Capital, Fidelity, Hunt Technology Ventures, Nantahala Capital Management, Nextech Invest, Pontifax, RA Capital, and U.S. Venture Partners.

**Risks Associated with Our Business**

Our business is subject to a number of risks that you should be aware of before making a decision to invest in our common stock. These risks are more fully described in the section titled "Risk Factors" immediately following this prospectus summary. These risks include, among others, the following:

- We have incurred significant net losses since inception, and we anticipate that we will continue to incur significant losses for the foreseeable future and may never be able to achieve or sustain revenues or profitability in the future.
- Even if this offering is successful, we will need substantial additional funding.
- We have a limited operating history and face significant challenges and will incur substantial expenses as we build our capabilities.
- Drug development involves a lengthy and expensive process with uncertain outcomes, and the results of preclinical studies and early clinical trials are not necessarily predictive of future results.
- Our discovery and development activities are focused on developing systemically delivered and tissue targeted therapeutics for the treatment of cancer and other serious diseases and it is difficult to predict the time and cost of product candidate development and obtaining regulatory approval.
- Our product candidates are targeted to treat tumors that express specific antigens at certain levels, such as those that express moderate to high levels of HER2 or Nectin4. This requires diagnostic assays that may be subject to scrutiny by regulatory authorities. Commercial tests are available for HER2, but not currently for Nectin4. As an existing companion diagnostic does not currently exist for Nectin4, unless one is developed and approved, we may need to develop and obtain approval for a companion diagnostic for the SBT6290 program. We may not be successful in developing diagnostic assays or securing the assays for use.
- Our approach to the discovery and development of product candidates is unproven, and we may not be successful in our efforts to use and further develop our product engine to expand our pipeline of product candidates with commercial value.
- The market opportunities for our product candidates may be relatively small as it will be limited to those patients who are ineligible for or have failed prior treatments and our estimates of the prevalence of our target patient populations may be inaccurate.
- We rely, and expect to rely in the future, on third parties, including independent clinical investigators and contract research organizations (CROs), to conduct certain aspects of our preclinical studies and planned clinical trials.
- Our success is highly dependent on our ability to attract and retain highly skilled executive officers and employees.

5

Table of Contents

**RISK FACTORS**

*Investing in our common stock is speculative and involves a high degree of risk. You should consider carefully the risks described below, together with the other information contained in this prospectus, including our financial statements and the related notes included elsewhere in this prospectus and in the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" before deciding whether to invest in our common stock. If any of the following risks occur, our business, financial condition, results of operations and future growth prospects could be materially and adversely affected. In these circumstances, the market price of our common stock could decline, and you may lose all or part of your investment. This prospectus also contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of a number of factors, including the risks described below. See the section titled "Special Note Regarding Forward-Looking Statements."*

**Risks Related to Our Limited Operating History, Financial Position and Capital Requirements**

***We have a limited operating history, have incurred net losses since our inception, and anticipate that we will continue to incur significant losses for the foreseeable future. We may never generate any revenue or become profitable or, if we achieve profitability, may not be able to sustain it.***

We are an early-stage biopharmaceutical company with a limited operating history that may make it difficult to evaluate the success of our business to date and to assess our future viability. Our operations to date have been limited to organizing and staffing our company, business planning, raising capital, developing and optimizing our technology platform, identifying potential product candidates, undertaking research and preclinical studies and a clinical trial for our lead program, engaging in manufacturing for our development programs, establishing and enhancing our intellectual property portfolio, and providing general and administrative support for these operations. We have one product candidate in early clinical development and all of our other product candidates are in preclinical development, and none have been approved for commercial sale. We have never generated any revenue from product sales and have incurred net losses each year since we commenced operations. For the years ended December 31, 2018 and 2019, our net losses were $17.6 million and $24.0 million, respectively. We expect that it will be several years, if ever, before we have a product candidate ready for regulatory approval and commercialization. We expect to incur increasing levels of operating losses over the next several years and for the foreseeable future as we advance our product candidates through clinical development. Our prior losses, combined with expected future losses, have had and will continue to have an adverse effect on our stockholders' deficit and working capital.

To become and remain profitable, we must develop and eventually commercialize a product or products with significant market potential. This will require us to be successful in a range of challenging activities, including completing preclinical studies and clinical trials of our product candidates, obtaining marketing approval for these product candidates, manufacturing, marketing and selling those products for which we may obtain marketing approval and satisfying any post-marketing requirements. We may never succeed in these activities and, even if we succeed in commercializing one or more of our product candidates, we may never generate revenue that is significant or large enough to achieve profitability. In addition, as a young business, we may encounter unforeseen expenses, difficulties, complications, delays and other known and unknown challenges. If we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis and we will continue to incur substantial research and development and other expenditures to develop and market additional product candidates. Our failure to become and remain profitable would decrease the value of the company and could impair our ability to raise capital, maintain our research and development efforts, expand our business or continue our operations. A decline in the value of our company could also cause you to lose all or part of your investment.

13

Table of Contents

- demonstrating a risk-benefit profile acceptable to regulatory authorities;
- receipt of marketing approvals from applicable regulatory authorities;
- establishing manufacturing capabilities or arrangements with third-party manufacturers for clinical supply and, if and when approved, for commercial supply;
- establishing sales, marketing and distribution capabilities and launching commercial sales of our products, if and when approved, whether alone or in combination with others;
- acceptance of our products, if and when approved, by patients, the medical community and third-party payors;
- effectively competing with other therapies;
- developing and implementing marketing and reimbursement strategies;
- obtaining and maintaining third-party coverage and adequate reimbursement;
- obtaining and maintaining patent, trade secret and other intellectual property protection and regulatory exclusivity for our product candidates;
- the ability to obtain clearance or approval of companion diagnostic tests, on a timely basis, or at all; and
- maintaining a continued acceptable safety profile of any product following approval, if any.

If we do not achieve one or more of these requirements in a timely manner, we could experience significant delays or an inability to successfully commercialize our product candidates, which would materially harm our business.

***Preclinical and clinical development is a lengthy, expensive and uncertain process. The results of preclinical studies and early clinical trials are not always predictive of future results. Any product candidate that we advance into clinical trials, including SBT6050, may not achieve favorable results in later clinical trials, if any, or receive marketing approval.***

The research and development of drugs and biological products is extremely risky. Only a small percentage of product candidates that enter the development process ever receive marketing approval. Before obtaining marketing approval from regulatory authorities for the sale of our product candidates, we must conduct extensive clinical trials to demonstrate the safety and efficacy of the product candidates in humans. Clinical testing is expensive, can take many years to complete and its outcome is uncertain. We may face unforeseen challenges in our product candidate development strategy, and we can provide no assurances that we will ultimately be successful in our current and future clinical trials or that our product candidates will be able to receive regulatory approval. The results of preclinical studies and early clinical trials of our product candidates and other products, even those with the same or similar mechanisms of action, may not be predictive of the results of later-stage clinical trials. For example, it is not uncommon for product candidates to exhibit unforeseen safety or efficacy issues when tested in humans despite promising results in preclinical animal models. In particular, while we have conducted preclinical studies of SBT6050, we do not know how SBT6050 will perform in the ongoing Phase 1/1b clinical trial or in future clinical trials, whether any initial tumor responses that may be observed will be durable or whether adverse events will arise over time. Future results of preclinical and clinical testing of our product candidates are also less certain due to the novel and relatively untested nature of our approach to TLR8 and related platform technologies. In general, clinical trial failure may result from a multitude of factors including flaws in study design, dose selection, patient enrollment criteria and failure to demonstrate favorable safety or efficacy traits. As such, failure in clinical trials can occur at any stage of testing. A number of companies in the biopharmaceutical industry have suffered setbacks in the advancement of clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials.

17

Table of Contents

Prior to obtaining approval to commercialize any product candidate in the United States or abroad, we must demonstrate with substantial evidence from well-controlled clinical trials, and to the satisfaction of the FDA or comparable foreign regulatory authorities, that such product candidate is safe and effective for its intended uses. Results from preclinical studies and clinical trials can be interpreted in different ways. Even if we believe that the preclinical or clinical data for our product candidates are promising, such data may not be sufficient to support approval by the FDA and other regulatory authorities. The FDA may also require us to conduct additional preclinical studies or clinical trials for our product candidates either prior to or post-approval, or it may object to elements of our clinical development program, requiring their alteration.

If the results of our clinical trials are inconclusive or if there are safety concerns or adverse events associated with our product candidates, we may:
- incur unplanned costs;
- be delayed in or prevented from continuing clinical development and obtaining marketing approval for our product candidates;
- obtain approval for indications or patient populations that are not as broad as intended or desired;
- obtain approval with labeling that includes significant use or distribution restrictions or safety warnings including boxed warnings;
- be subject to changes or limitations in the way the product is administered;
- be required to perform additional clinical trials to support approval or be subject to additional post-marketing testing requirements;
- have regulatory authorities withdraw their approval of the product or impose restrictions on its distribution in the form of a modified Risk Evaluation and Mitigation Strategy (REMS);
- be subject to the addition of labeling statements, such as warnings or contraindications;
- be sued; or
- experience damage to our reputation.

Treatment of cancer patients with our oncology product candidates may be used in combination with other cancer drugs, such as other immuno-oncology agents, monoclonal antibodies or other protein-based drugs or small molecule anti-cancer agent such as targeted agents or chemotherapy, which can cause side effects or adverse events that are unrelated to our product candidate but may still impact the success of our clinical trials. Additionally, our product candidates could potentially cause adverse events. The inclusion of critically ill patients in our clinical trials may result in deaths or other adverse medical events due to other therapies or medications that such patients may be using. As described above, any of these events could prevent us from obtaining regulatory approval or achieving or maintaining market acceptance of our product candidates and impair our ability to commercialize our products. Because all of our product candidates are derived from our platform technologies, a clinical failure of one of our product candidates may also increase the actual or perceived likelihood that our other product candidates will experience similar failures.

Of the large number of products in development, only a small percentage successfully complete the FDA or comparable foreign regulatory authorities' approval processes and are commercialized. The lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would significantly harm our business, financial condition, results of operations and prospects.

Table of Contents

Even if we eventually complete clinical testing and receive approval of a biologics license application (BLA) or foreign marketing application for our product candidates, the FDA or the comparable foreign regulatory authorities may grant approval contingent on the performance of costly additional clinical trials, including post-market clinical trials. The FDA or the comparable foreign regulatory authorities also may approve a product candidate for a more limited indication or patient population than we originally request, and the FDA or comparable foreign regulatory authorities may not approve the labeling that we believe is necessary or desirable for the successful commercialization of a product candidate. Any delay in obtaining, or inability to obtain, applicable regulatory approval would delay or prevent commercialization of that product candidate and would adversely impact our business and prospects.

In addition, the FDA or comparable foreign regulatory authorities may change their policies, adopt additional regulations or revise existing regulations or take other actions, which may prevent or delay approval of our future product candidates under development on a timely basis. Such policy or regulatory changes could impose additional requirements upon us that could delay our ability to obtain approvals, increase the costs of compliance or restrict our ability to maintain any marketing authorizations we may have obtained.

***Our product candidates are based on novel technologies, which make it difficult to predict the timing, results and cost of product candidate development and likelihood of obtaining regulatory approval.***

We have concentrated our research and development efforts on product candidates using our platform technologies, and our future success depends on the successful development of this approach. We have not yet succeeded and may not succeed in demonstrating efficacy and safety for any product candidates based on our platform technologies in clinical trials or in obtaining marketing approval thereafter, and use of our platform technologies may not ever result in marketable products. We may also experience delays in developing a sustainable, reproducible and scalable manufacturing process or transferring that process to commercial partners or establishing our own commercial manufacturing capabilities, which may prevent us from completing our clinical trials or commercializing any products on a timely or profitable basis, if at all.

Our product candidates are targeted to treat tumors that express specific antigens at certain levels, such as those that express moderate to high levels of HER2 or Nectin4. This requires diagnostic assays that may be subject to scrutiny by regulatory authorities. Commercial tests are available for HER2, but not currently for Nectin4. We may not be successful in developing diagnostic assays or securing the assays for use. If we are successful in securing a diagnostic assay for a specific antigen, it may be difficult to enroll patients with tumors that have the required level of antigen expression.

In addition, the clinical trial requirements of the FDA, EMA and other regulatory agencies such as Australia and the criteria these regulators use to determine the safety and efficacy of a product candidate vary substantially according to the type, complexity, novelty and intended use and market of the potential products. The regulatory approval process for novel product candidates such as ours can be more expensive and take longer than for other, better known or extensively studied pharmaceutical or other product candidates.

The immuno-oncology industry is also rapidly developing, and our competitors may introduce new technologies improving the immune response to cancer that render our technologies obsolete or less attractive. New technology could emerge at any point in the development cycle of our product candidates.

19

Table of Contents

The TLR field is also rapidly evolving and as competitors use or develop alternative TLR technologies, any failures of such technologies could adversely impact our programs. For example, companies are developing TLR7, TLR7/8 and TLR9 agonists, some of which are conjugated to monoclonal antibodies. Regardless of our belief that our approach to activating the innate immune system has advantages, issues encountered with other TLR programs will create a negative perception of or increase scrutiny for our technologies and product candidates.

***We depend on enrollment of patients in our clinical trials for our product candidates. If we experience delays or difficulties enrolling in our clinical trials, our research and development efforts and business, financial condition and results of operations could be materially adversely affected.***

Successful and timely completion of clinical trials will require that we enroll a sufficient number of patient candidates. These trials and other trials we conduct may be subject to delays as a result of patient enrollment taking longer than anticipated, patient withdrawal or adverse events. For example, we have an ongoing Phase 1/1b clinical trial for our lead product candidate, SBT6050, which could generate adverse events that may cause us to delay the trial or halt further development. As of November 6, 2020, six patients were enrolled in the clinical trial, a very small number relative to the number of patients required for a full clinical development program. As has been described with other immune agonists administered in the presence of ADA in preclinical species, anaphylaxis upon repeat intravenous dosing with SBT6050 was observed in animal models. While our product candidate in humans is administered by the subcutaneous route of administration, If similar adverse events were to manifest, that could adversely impact our enrollment.

Our clinical trials will likely compete with other clinical trials that are in the same therapeutic areas as our product candidates, and this competition will reduce the number and types of patients available to us, because some patients who might have opted to enroll in our trials may instead opt to enroll in a trial being conducted by one of our competitors. Because the number of qualified clinical investigators and clinical trial sites is limited, we expect to conduct some of our clinical trials at the same clinical trial sites that some of our competitors use, which will reduce the number of patients who are available for our clinical trials at such clinical trial sites.

Patient enrollment depends on many factors, including the size and nature of the patient population, the severity of the disease under investigation, eligibility criteria for the trial, the proximity of patients to clinical sites, the design of the clinical protocol, the ability to obtain and maintain patient consents, the ability to recruit clinical trial investigators with the appropriate competencies and experience, the risk that patients enrolled in clinical trials will drop out of the trials before the administration of our product candidates or trial completion, the availability of competing clinical trials, the availability of new drugs approved for the indication the clinical trial is investigating, and clinicians' and patients' perceptions as to the potential advantages of the drug being studied in relation to other available therapies. These factors may make it difficult for us to enroll enough patients to complete our clinical trials in a timely and cost-effective manner. Delays in the completion of any clinical trial of our product candidates will increase our costs, slow down our product candidate development and approval process and delay or potentially jeopardize our ability to commence product sales and generate revenue. In addition, some of the factors that cause, or lead to, a delay in the commencement or completion of clinical trials may also ultimately lead to the denial of regulatory approval of our product candidates.

Table of Contents

***Serious adverse events, undesirable side effects or other unexpected properties of our product candidates may be identified during development or after approval, which could lead to the discontinuation of our clinical development programs, refusal by regulatory authorities to approve our product candidates or, if discovered following marketing approval, revocation of marketing authorizations or limitations on the use of our product candidates thereby limiting the commercial potential of such product candidate.***

To date, we have only tested SBT6050 in a limited number of patients with cancer and these clinical trial participants have only been observed for a limited period of time after dosing. As we continue developing our product candidates and initiate clinical trials of our additional product candidates, serious adverse events (SAEs), undesirable side effects, relapse of disease or unexpected characteristics may emerge causing us to abandon these product candidates or limit their development to more narrow uses or subpopulations in which the SAEs or undesirable side effects or other characteristics are less prevalent, less severe or more acceptable from a risk-benefit perspective or in which efficacy is more pronounced or durable. For example, a significant risk observed with systemic administration of motolimod, an unconjugated TLR8 small molecule agonist, was the induction of significant injection site reactions (ISR), and cytokine-induced flu-like symptoms that prevented dose-escalation. Should we observe severe cases of ISR and cytokine release syndrome in our clinical trials or identify other undesirable side effects or other unexpected findings depending on their severity, our trials could be delayed or even stopped and our development programs may be halted entirely.

Our TLR8 agonist containing product candidates, including SBT6050, activate dendritic cells among other innate immune cells. As a result, significant anti-drug antibodies (ADA) could develop that neutralize the effects of SBT6050 by reducing exposure. The development of ADA could also trigger hypersensitivity reactions that manifest as serious adverse events. For example, as has been described with other immune agonists administered in the presence of ADA in preclinical species, anaphylaxis upon repeat intravenous dosing with SBT6050 was observed. As a result, we have modified our dosing to subcutaneous; however, if patients experience adverse events (AEs), including anaphylaxis, our trials could be delayed or stopped and our development programs may be halted entirely if this is observed during clinical development. Even if ADAs are not detected in the early clinical trials, they may be detected after product launch and may significantly reduce the commercial potential or even result in the product being pulled from the market.

Even if our product candidates initially show promise in early clinical trials, the side effects of biological products are frequently only detectable after they are tested in larger, longer and more extensive clinical trials or, in some cases, after they are made available to patients on a commercial scale after approval. Sometimes, it can be difficult to determine if the serious adverse or unexpected side effects were caused by the product candidate or another factor, especially in oncology subjects who may suffer from other medical conditions and be taking other medications. If serious adverse or unexpected side effects are identified during development or after approval and are determined to be attributed to our product candidate, we may be required to develop a REMS to ensure that the benefits of treatment with such product candidate outweigh the risks for each potential patient, which may include, among other things, a communication plan to health care practitioners, patient education, extensive patient monitoring or distribution systems and processes that are highly controlled, restrictive and more costly than what is typical for the industry. Product-related side effects could also result in potential product liability claims. Any of these occurrences may harm our business, financial condition and prospects significantly.

In addition, if one or more of our product candidates receives marketing approval, and we or others later identify undesirable side effects or ADA caused by such products, a number of potentially significant negative consequences could result, including:

- regulatory authorities may suspend, withdraw or limit approvals of such product, or seek an injunction against its manufacture or distribution;

21

Table of Contents

- regulatory authorities may require additional warnings on the label, including "boxed" warnings, or issue safety alerts, Dear Healthcare Provider letters, press releases or other communications containing warnings or other safety information about the product;
- we may be required to create a medication guide outlining the risks of such side effects for distribution to patients;
- we may be required to change the way a product is administered or conduct additional clinical trials;
- the product may become less competitive, and our reputation may suffer;
- we may decide to remove the product from the marketplace; and
- we may be subject to fines, injunctions or the imposition of civil or criminal penalties.

***Interim, topline and preliminary data from our clinical trials may change as more patient data become available, and are subject to audit and verification procedures that could result in material changes in the final data.***

From time to time, we may publicly disclose preliminary, interim or topline data from our preclinical studies and clinical trials, which is based on a preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change as patient enrollment and treatment continues and more patient data become available. Adverse differences between previous preliminary or interim data and future interim or final data could significantly harm our business prospects. We may also announce topline data following the completion of a preclinical study or clinical trial, which may be subject to change following a more comprehensive review of the data related to the particular study or trial. We also make assumptions, estimations, calculations and conclusions as part of our analyses of data, and we may not have received or had the opportunity to fully and carefully evaluate all data. As a result, the interim, topline or preliminary results that we report may differ from future results of the same studies, or different conclusions or considerations may qualify such results, once additional data have been received and fully evaluated. Topline data also remain subject to audit and verification procedures that may result in the final data being materially different from the preliminary data we previously published. As a result, interim, topline and preliminary data should be viewed with caution until the final data are available.

Further, others, including regulatory agencies, may not accept or agree with our assumptions, estimates, calculations, conclusions or analyses or may interpret or weigh the importance of data differently, which could impact the value of the particular program, the approvability or commercialization of the particular product candidate or product and our company in general. In addition, the information we choose to publicly disclose regarding a particular study or clinical trial is based on what is typically extensive information, and you or others may not agree with what we determine to be material or otherwise appropriate information to include in our disclosure, and any information we determine not to disclose may ultimately be deemed significant with respect to future decisions, conclusions, views, activities or otherwise regarding a particular product candidate or our business. If the interim, topline, or preliminary data that we report differ from actual results, or if others, including regulatory authorities, disagree with the conclusions reached, our ability to obtain approval for and commercialize our product candidates, our business, operating results, prospects or financial condition may be harmed.

***We may encounter substantial delays in our clinical trials or we may fail to demonstrate safety and efficacy to the satisfaction of applicable regulatory authorities.***

Before obtaining marketing approval from regulatory authorities for the sale of our product candidates, we must conduct extensive clinical trials to demonstrate the safety and efficacy of the

Table of Contents

product candidate for its intended indications. Clinical trials are expensive, time-consuming and uncertain as to outcome. We cannot guarantee that any clinical trials will be conducted as planned or completed on schedule, if at all. For example, we cannot begin our planned Phase 1 clinical trials for SBT6290, our Nectin4-targeted product candidate until we complete certain preclinical development and submit and receive authorization to proceed under INDs. We also dosed the first patient in a Phase 1/1b clinical trial for SBT6050 in July 2020 and cannot predict how our technology may work in solid tumor indications until we have completed dose-escalation and dose expansion. Finally, the COVID-19 pandemic has impacted clinical trials broadly, including our own with some sites pausing or slowing enrollment.

A failure of one or more clinical trials can occur at any stage of testing. Events that may prevent successful or timely completion of clinical development include:

- delays in reaching a consensus with regulatory authorities on trial design or implementation of any future potential collaborators', clinical trials;
- delays in reaching agreement or failing to agree on acceptable terms with prospective CROs and clinical trial sites;
- delays in opening sites, including delays in obtaining required approvals from institutional review boards (IRBs) and recruiting suitable patients to participate in our clinical trials;
- delays in enrollment due to travel or quarantine policies, or other factors, related to COVID-19, other pandemics or other events outside our control;
- failure by our CROs, other third parties or us to adhere to the trial protocol or applicable regulatory requirements, including the FDA's good clinical practices (GCPs) or applicable regulatory requirements in other countries;
- regulatory authorities may find deficiencies in the manufacturing processes or facilities of third-party manufacturers with which we or any of our potential future collaborators contract for clinical and commercial supplies;
- delays in the testing, validation, manufacturing and delivery of our product candidates to the treatment sites, including due to a facility manufacturing any of our product candidates or any of their components being ordered by the FDA or comparable foreign regulatory authorities to temporarily or permanently shut down due to violations of current good manufacturing practices (cGMP) regulations or other applicable requirements, or infections or cross-contaminations of product candidates in the manufacturing process;
- imposition of a clinical hold by IRBs or regulatory authorities as a result of a serious adverse event, concerns with a class of product candidates, after an inspection of our clinical trial operations or trial sites, or for other reasons;
- suspensions or terminations by us, the IRBs of the institutions at which such trials are being conducted, by the Safety Review Committee or Data Safety Monitoring Board, for such trial or by regulatory authorities due to a number of factors, including those described above;
- delays in having patients complete participation in a trial or return for post-treatment follow-up;
- occurrence of serious adverse events associated with the product candidate that are viewed to outweigh its potential benefits or the discovery of other safety issues;
- lack of adequate funding; or
- changes in regulatory requirements and guidance that require amending or submitting new clinical protocols.

For instance, the ongoing COVID-19 pandemic and the measures taken by the governmental authorities could disrupt the supply chain and the manufacture or shipment of drug substances and

Table of Contents

finished drug products for our product candidates for use in our research and clinical trials, delay, limit or prevent our employees and CROs from continuing research and development activities, impede the ability of patients to enroll or continue in clinical trials, or impede testing, monitoring, data collection and analysis or other related activities, any of which could delay our clinical trials and increase our development costs, and have a material adverse effect on our business, financial condition and results of operations.

Our drug product is shipped from overseas and the ongoing COVID-19 pandemic and measures taken by the governmental authorities could disrupt the timing and therefore our clinical trials may not proceed or may be delayed, interrupted, or stopped as a result.

Any inability to timely and successfully complete preclinical and clinical development could result in additional costs to us or impair our ability to achieve regulatory and commercialization milestones. In addition, if we make manufacturing or formulation changes to our product candidates, we may need to conduct additional testing to bridge our modified product candidate to earlier versions. Clinical trial delays could also shorten any periods during which we may have the exclusive right to commercialize our product candidates, if approved, or allow our competitors to bring comparable drugs to market before we do, which could impair our ability to successfully commercialize our product candidates and may harm our business, financial condition, results of operations and prospects.

Additionally, if the results of our clinical trials are inconclusive or if there are safety concerns or serious adverse events associated with our product candidates, we may:
- be delayed in obtaining marketing approval, if at all;
- obtain approval for indications or patient populations that are not as broad as intended or desired;
- obtain approval with labeling that includes significant use or distribution restrictions or safety warnings;
- be subject to additional post-marketing testing requirements;
- be required to perform additional clinical trials to support approval or be subject to additional post- marketing testing requirements;
- have regulatory authorities withdraw, or suspend, their approval of the drug or impose restrictions on its distribution in the form of a modified risk evaluation and mitigation strategy, or REMS;
- be subject to the addition of labeling statements, such as warnings or contraindications;
- be sued; or
- experience damage to our reputation.

Our development costs will also increase if we experience delays in testing or obtaining marketing approvals. We do not know whether any of our preclinical studies or clinical trials will begin as planned, need to be restructured or be completed on schedule, if at all. Any delay in, or termination of, our clinical trials will delay the submission of a BLA to the FDA or other similar applications with other relevant foreign regulatory authorities and, ultimately, our ability to commercialize our product candidates, if approved, and generate product revenue. Even if our clinical trials are completed as planned, we cannot be certain that their results will support our claims for differentiation or the effectiveness or safety of our product candidate. The FDA has substantial discretion in the review and approval process and may disagree that our data support the claims we propose.

Moreover, principal investigators for our clinical trials may serve and have served as scientific advisors or consultants to us from time to time and receive compensation in connection with such

24

Table of Contents

services. Under certain circumstances, we may be required to report some of these relationships to the FDA or comparable foreign regulatory authorities. The FDA or comparable foreign regulatory authority may conclude that a financial relationship between us and a principal investigator has created a conflict of interest or otherwise affected interpretation of the trial. The FDA or comparable foreign regulatory authority may therefore question the integrity of the data generated at the applicable clinical trial site and the utility of the clinical trial itself may be jeopardized. This could result in a delay in approval, or rejection, of our marketing applications by the FDA or comparable foreign regulatory authority, as the case may be, and may ultimately lead to the denial of marketing approval of our product candidates.

Further, we, the FDA or an institutional review board may suspend our clinical trials at any time if it appears that we or our collaborators are failing to conduct a trial in accordance with regulatory requirements, including the FDA's current GCP, regulations, that we are exposing participants to unacceptable health risks or if the FDA finds deficiencies in our INDs or the conduct of these trials. Therefore, we cannot predict with any certainty the schedule for commencement and completion of future clinical trials. If we experience delays in the commencement or completion of our clinical trials, or if we terminate a clinical trial prior to completion, the commercial prospects of our product candidates could be negatively impacted, and our ability to generate revenues from our product candidates may be delayed or eliminated entirely.

***We may seek Breakthrough Therapy designation or Fast Track designation by the FDA for one or more of our product candidates, but we may not receive such designation, and even if we do, such designation may not lead to a faster development or regulatory review or approval process and it does not increase the likelihood that our product candidates will receive marketing approval.***

We may seek Breakthrough Therapy or Fast Track designation for some of our product candidates. If a product candidate is intended for the treatment of a serious or life-threatening condition and clinical or preclinical data demonstrate the potential to address unmet medical needs for this condition, the product candidate may be eligible for Fast Track Designation. The benefits of fast track designation include more frequent meetings with FDA to discuss the drug's development plan and ensure collection of appropriate data needed to support drug approval, more frequent written communication from FDA about such things as the design of the proposed clinical trials and use of biomarkers, eligibility for Accelerated Approval and Priority Review, if relevant criteria are met, and rolling review, which means that a drug company can submit completed sections of its BLA for review by FDA, rather than waiting until every section of the BLA is completed before the entire application can be reviewed. BLA review usually does not begin until the entire application has been submitted to the FDA.

A breakthrough therapy is defined as a drug or biologic that is intended, alone or in combination with one or more other drugs or biologics, to treat a serious or life-threatening disease or condition and preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development. Drugs or biologics designated as breakthrough therapies by the FDA may be eligible for all features of Fast Track designation, intensive guidance on an efficient drug development program, beginning as early as Phase 1, and organizational commitment involving senior managers at FDA.

The FDA has broad discretion whether or not to grant these designations, so even if we believe a particular product candidate is eligible, we cannot assure you that the FDA would decide to grant it. Even if we have obtained Fast Track Designation and/or Breakthrough Therapy Designation for one or more of our product candidates, we may not experience a faster development process, review or approval compared to non-expedited FDA review procedures. In addition, the FDA may withdraw Fast

25

Table of Contents

**Risks Related to Manufacturing, Commercialization and Reliance on Third Parties**

***We rely on third parties to conduct, supervise, and monitor our clinical trials and perform some of our research and preclinical studies.** If these third parties do not satisfactorily carry out their contractual duties or fail to meet expected deadlines, our development programs may be delayed or subject to increased costs, each of which may have an adverse effect on our business and prospects.*

We do not have the ability to conduct all aspects of our preclinical testing or clinical trials ourselves. As a result, we are and expect to remain dependent on third parties to conduct our preclinical studies, including GLP toxicology studies and ongoing Phase 1/1b clinical trial and any future clinical trials of our product candidates. Specifically, CROs that manage preclinical studies, GLP toxicology studies and our clinical studies as well as clinical investigators, and consultants play a significant role in the conduct of our preclinical studies and clinical trials and the subsequent collection and analysis of data. The timing of the initiation and completion of these studies and trials will therefore be partially controlled by such third parties and may result in delays to our development programs. Nevertheless, we are responsible for ensuring that each of our preclinical studies and clinical trials is conducted in accordance with the applicable protocol, legal requirements, and scientific standards, and our reliance on the CROs and other third parties does not relieve us of our regulatory responsibilities. We and our CROs are required to comply with GLP and GCP requirements, which are regulations and guidelines enforced by the FDA, the Competent Authorities of the Member States of the European Economic Area, and comparable foreign regulatory authorities for all of our product candidates in clinical development. Regulatory authorities enforce these GLP and GCP requirements through periodic inspections of preclinical study sites, trial sponsors, clinical trial investigators and clinical trial sites. If we or any of our CROs or clinical trial sites fail to comply with applicable GLP or GCP requirements, the data generated in our preclinical studies and clinical trials may be deemed unreliable, and the FDA or comparable foreign regulatory authorities may require us to perform additional preclinical or clinical trials before approving our marketing applications. In addition, our clinical trials must be conducted with product produced under cGMP regulations. Our failure to comply with these regulations may require us to stop and/or repeat clinical trials, which would delay the marketing approval process.

There is no guarantee that any such CROs, clinical trial investigators or other third parties on which we rely will devote adequate time and resources to our development activities or perform as contractually required. These risks are heightened as a result of the efforts of government agencies and the CROs themselves to limit the spread of COVID-19, including quarantines and shelter-in-place orders. If any of these third parties fail to meet expected deadlines, adhere to our clinical protocols or meet regulatory requirements, otherwise performs in a substandard manner, or terminates its engagement with us, the timelines for our development programs may be extended or delayed or our development activities may be suspended or terminated. If any of our clinical trial sites terminates for any reason, we may experience the loss of follow-up information on subjects enrolled in such clinical trials unless we are able to transfer those subjects to another qualified clinical trial site, which may be difficult or impossible. In addition, clinical trial investigators for our clinical trials may serve as scientific advisors or consultants to us from time to time and may receive cash or equity compensation in connection with such services. If these relationships and any related compensation result in perceived or actual conflicts of interest, or the FDA or any comparable foreign regulatory authority concludes that the financial relationship may have affected the interpretation of the trial, the integrity of the data generated at the applicable clinical trial site may be questioned and the utility of the clinical trial itself may be jeopardized, which could result in the delay or rejection of any marketing application we submit by the FDA or any comparable foreign regulatory authority. Any such delay or rejection could prevent us from commercializing our product candidates.

30

Table of Contents

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion and analysis of our financial condition and results of operations together with the section of this prospectus titled "Selected Financial Data" and our financial statements and related notes included elsewhere in this prospectus. Some of the information contained in this discussion and analysis are set forth elsewhere in this prospectus, including information with respect to our plans and strategy for our business and related financing, and includes forward-looking statements that involve risks and uncertainties. As a result of many factors, including those factors set forth in the section of this prospectus titled "Risk Factors," our actual results could differ materially from the results described in or implied by the forward-looking statements contained in the following discussion and analysis.*

**Overview**

We are a clinical-stage biopharmaceutical company with one product candidate in a Phase 1/1b clinical trial, and we are focused on leveraging our proprietary ImmunoTAC technology platform to develop systemically delivered, tissue targeted therapeutics for the treatment of cancer, chronic viral infections, and other serious diseases. Our platform enables us to strategically pair proprietary linker-payloads that modulate key disease-modifying pathways with monoclonal antibodies directed to specific disease sites. Initially, we are applying our platform to create a new class of targeted immuno-oncology agents that direct a myeloid cell activator to the tumor microenvironment in solid tumors to promote cancer cell killing. Our lead product candidate, SBT6050, is comprised of a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody that targets tumors such as certain breast, gastric and non-small cell lung cancers. SBT6050 is currently in a Phase 1/1b clinical trial as monotherapy and in combination with pembrolizumab, in patients with advanced or metastatic HER2-expressing solid tumors. In this trial, we have observed changes in pharmacodynamic markers in the first dose cohort, and we anticipate providing an update on interim data from the Phase 1 dose-escalation cohorts in the second half of 2021. SBT6290 is our second product candidate, expanding on the potential of a TLR8 agonist as a payload. SBT6290 is a TLR8 linker-payload conjugated to a monoclonal antibody that targets Nectin4, which is expressed in certain bladder, triple negative breast, head and neck, and non-small cell lung cancers. We anticipate submitting an investigational new drug application for SBT6290 in the fourth quarter of 2021. Our third TLR8 program, SBT8230, is comprised of a TLR8 linker-payload conjugated to an ASGR1 monoclonal antibody that is under development for the treatment of cHBV. We are also developing agents that localize therapies to modulate important pathways in additional oncology and fibrosis indications using TLR8 and other linker-payloads.

91

Table of Contents

Our ImmunoTAC platform drives our development pipeline of tissue targeted therapeutic candidates as summarized in the chart below:



We were incorporated in January 2016. To date, we have devoted substantially all of our resources to organizing and staffing our company, business planning, raising capital, developing and optimizing our technology platform, identifying potential product candidates, undertaking research and preclinical studies and a clinical trial for our lead program, engaging in manufacturing for our development programs, establishing and enhancing our intellectual property portfolio, and providing general and administrative support for these operations. We have one product candidate in early clinical development and all of our other product candidates are in preclinical development, and none have been approved for commercial sale. We have never generated any revenue from product sales and have incurred net losses each year since we commenced operations. We have funded our operations solely through private placements of our redeemable convertible preferred stock, convertible debt financings and term loan facility.

From inception to December 31, 2019, we raised aggregate gross proceeds of $65.0 million from the issuance of shares of our redeemable convertible preferred stock and the issuance of convertible notes. In March 2020, we issued 10,027,666 shares of our Series B redeemable convertible preferred stock for gross proceeds of $21.5 million and 4,673,388 shares upon conversion of then outstanding convertible notes. In July 2020, we issued 10,669,834 additional shares of our Series B redeemable convertible preferred stock for gross proceeds of $23.0 million. In September 2020, we issued 11,063,028 additional shares of our Series B redeemable convertible preferred stock for gross proceeds of $23.9 million and 24,926,685 shares of our Series C redeemable convertible preferred stock for gross proceeds of $84.9 million. We have incurred significant operating losses since our inception and have not yet generated any revenue. Our net losses were $17.6 million and $24.0 million for the years ended December 31, 2018 and 2019, respectively. Our net losses were $17.0 million and $19.9 million for the nine months ended September 30, 2019 and 2020, respectively. As of September 30, 2020, we had an accumulated deficit of $83.6 million and cash and cash equivalents of $142.3 million.

We expect our expenses will increase substantially and that we will to continue to incur significant losses for the foreseeable future as we continue our development of, and seek regulatory approvals for, our product candidates and begin to commercialize any approved products, seek to expand our product pipeline, invest in our organization and technology platform, as well as incur expenses

Table of Contents

**BUSINESS**

### Overview

We are a clinical-stage biopharmaceutical company with one product candidate in a Phase 1/1b clinical trial, and we are focused on leveraging our proprietary ImmunoTAC technology platform to develop systemically delivered, tissue targeted therapeutics for the treatment of cancer, chronic viral infections, and other serious diseases. Our platform enables us to strategically pair proprietary linker-payloads that modulate key disease-modifying pathways with monoclonal antibodies directed to specific disease sites. Initially, we are applying our platform to create a new class of targeted immuno-oncology agents that direct a myeloid cell activator to the tumor microenvironment (TME) in solid tumors to promote cancer cell killing. Our lead product candidate, SBT6050, is comprised of a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody that targets tumors such as certain breast, gastric and non-small cell lung cancers. SBT6050 is currently in a Phase 1/1b clinical trial as monotherapy and in combination with pembrolizumab, in patients with advanced or metastatic HER2-expressing solid tumors. In this trial, we have observed changes in pharmacodynamic markers in the first dose cohort, and we anticipate providing an update on interim data from the Phase 1 dose-escalation cohorts in the second half of 2021. SBT6290 is our second product candidate, expanding on the potential of a TLR8 agonist as a payload. SBT6290 is a TLR8 linker-payload conjugated to a monoclonal antibody that targets Nectin4, which is expressed in certain bladder, triple negative breast, head and neck, and non-small cell lung cancers. We anticipate submitting an investigational new drug application (IND) for SBT6290 in the fourth quarter of 2021. Our third TLR8 program, SBT8230, is comprised of a TLR8 linker-payload conjugated to an ASGR1 monoclonal antibody that is under development for the treatment of chronic hepatitis B virus infection (cHBV). We are also developing agents that localize therapies to modulate important pathways in additional oncology and fibrosis indications using TLR8 and other linker-payloads.

### Our ImmunoTAC Platform

Our ImmunoTAC platform is the result of a focused effort to discover ways to systemically deliver disease-modifying small molecules in a directed fashion to sites of disease. Many potentially promising systemic therapies fail to maximize their therapeutic potential due to toxicities in healthy tissues. Our approach is designed to increase the therapeutic window and avert unacceptable toxicities by directly targeting specific disease sites where our therapeutics are locally active.

As shown in the figure below, our ImmunoTAC platform is comprised of three components:
(1)     **Antigen binding domain**—which is responsible for localizing the therapeutic activity of the payload to the site of the disease;
(2)     **Linker-payload**—a disease-modifying small molecule optimized for potency when conjugated to a monoclonal antibody via its linker; and
(3)     **Fc region**—tuned for requisite effector function.

We have built a library of proprietary small molecule linker-payloads and antigen binding domains that allows us to mix and match these components to strategically pair and create new therapeutic agents.

110

Table of Contents

*Our ImmunoTAC Platform Strategically Pairs Antigen Binding Domains with Linker-Payloads to Modulate Pathways Underlying Difficult-to-Treat Diseases*



## Our Development Pipeline

Our ImmunoTAC platform drives our development pipeline of tissue targeted therapeutic candidates as summarized in the chart below:



### SBT6050

Our lead product candidate, SBT6050, is comprised of a TLR8 agonist linker-payload conjugated to a HER2-directed monoclonal antibody and is designed to activate myeloid cells in tumors expressing moderate to high levels of HER2. TLR8 is expressed in myeloid cell types prevalent in human tumors and TLR8 agonism can activate a broad spectrum of anti-tumor immune mechanisms. Therefore, we believe that TLR8 is the optimal target for activating human myeloid cell types in the TME.

Myeloid cells are a class of innate immune cells that develop from common monocyte-dendritic cell progenitor cells and are comprised of both immunosuppressive and pro-inflammatory

111

Table of Contents

subpopulations. Tumors are permeated with myeloid cells, which can comprise between 5% and 10% of the tumor. Activation of myeloid cells, either by reprogramming immunosuppressive myeloid cells towards a more pro-inflammatory phenotype or stimulating other myeloid cells that have been silenced (e.g., dendritic cells), results in direct tumor killing and recruitment of immune cells. Further, activated myeloid cells can prime and amplify T cell and natural killer (NK) cell responses, bridging the innate and adaptive immunity to elicit broad, durable anti-tumor responses.

SBT6050 utilizes HER2 to localize and facilitate the delivery of the TLR8 agonist conjugate into myeloid cells in the TME. Therefore, unlike HER2 targeted therapies that have been approved by the U.S. Food and Drug Administration (FDA) such as Herceptin (trastuzumab), SBT6050 does not require HER2 to be an oncogenic driver to elicit anti-tumor activity. Furthermore, SBT6050 recognizes the HER2 sub-domain II, the pertuzumab epitope, and does not cross-block trastuzumab, allowing for potential combinations with trastuzumab-based agents, which are standard of care therapies in some HER2-expressing cancers.

We are currently evaluating the safety and tolerability of SBT6050 in a Phase 1 dose-escalation trial in patients with advanced or metastatic HER2-expressing solid tumors. Changes in pharmacodynamic markers have been observed in the first dose-escalation cohort of this trial. We anticipate providing an update on interim data from the Phase 1 dose-escalation cohorts in the second half of 2021.

### SBT6290

SBT6290 is our second product candidate, expanding on the potential of a TLR8 agonist as a payload. The same TLR8 linker-payload used in SBT6050 is conjugated to a monoclonal antibody that targets Nectin4. Nectin4 is expressed in subsets of solid tumors including bladder, triple negative breast, head and neck, and non-small cell lung cancers, and has been clinically validated through the approval of the antibody-drug conjugate enfortumab vedotin (Padcev). We anticipate submitting the IND for SBT6290 in the fourth quarter of 2021.

### SBT8230

SBT8230, an ASGR1-TLR8 ImmunoTAC therapeutic, is our third TLR8 program. SBT8230 is engineered to potently activate human myeloid cells in the liver for the treatment of cHBV. Selgantolimod (GS-9688), an existing untargeted, orally administered TLR8 agonist being developed by Gilead Sciences, generated anti-viral immune responses in a cHBV animal model. The clinical development of this untargeted TLR8 agonist has shown promise, but we believe that toxicity prevented the use of a sufficient dose to elicit optimal clinical activity. We believe liver- localized TLR8 agonism could better realize the potential for effective therapy and potentially lead to functional cures, which is defined as sustained loss of hepatitis B surface antigen (HBsAg) in the blood, in patients suffering from cHBV. We selected a development candidate for this program in the fourth quarter of 2020, and we anticipate initiating IND-enabling tox studies in the first quarter of 2022 and submitting the IND in the second half of 2022.

### Additional Immuno-Oncology Programs

In addition to SBT6050 and SBT6290, we are evaluating other solid tumor targets to leverage the TLR8 linker-payload paired with additional tumor directed antibodies. These targets are differentially expressed on tumors compared to normal tissue.

### ASGR1-TGFß Receptor Antagonist—Fibrosis Program

TGFß signaling is a key mediator of fibrosis across multiple organ systems, including the liver. In the liver, TGFß drives fibrosis initiation and progression through multiple mechanisms, including

112

Table of Contents

hepatocyte apoptosis, hepatic stellate cell transdifferentiation to myofibroblasts, and pro-fibrotic macrophage activation. Our ASGR1-TGFßR1 antagonist conjugate pairs the ASGR1 antibody used in SBT8230 with a proprietary TGFßR1 antagonist to achieve liver-localized inhibition of TGFß signaling to treat fibrosis. Our tissue-directed approach has been designed to prevent toxicities associated with untargeted systemically distributed TGFßR1 antagonist agents. Our ASGR1-TGFßR1 antagonist conjugates are currently in preclinical testing and have demonstrated potent inhibition of TGFß signaling *in vitro*. We are currently evaluating conjugates *in vivo* in mouse disease models.

**Our Strategy**

Our goal is to transform the treatment of cancer and other serious diseases with unmet need using our ImmunoTAC platform to deliver a new class of systemically delivered, tissue-directed, and locally active therapies. The key elements of our business strategy are to:

- ***Advance SBT6050 through clinical development in late-stage disease that may allow us to seek expedited approval using regulatory pathways available from the FDA such as Accelerated Approval, Breakthrough Therapy, Priority Review or Fast Track designation.*** In early clinical trials, we will be examining the anti-tumor activity of SBT6050 in patients that have failed all available therapies associated with clinical benefit, in addition to measuring biomarkers of immune cell activation. This approach may allow us to seek expedited approval from the FDA based on surrogate endpoints (through the Accelerated Approval path) and expedited FDA review through programs such as Breakthrough Therapy, Priority Review, or Fast Track designation. We are evaluating activity broadly across HER2-expressing cancer types, including cancers where no HER2-directed therapies are currently approved, and have identified several tumor types and lines of therapy that potentially present opportunities for utilizing one or more of these accelerated approval pathways.
- ***Advance SBT6050 subsequently into earlier lines of therapy to maximize patient benefit and commercial success, if approved.*** Our long-term clinical development goal is to position SBT6050 in early-line standard of care regimens in key indications to potentially provide benefit to patients. We seek to accomplish this by evaluating combination therapy approaches with therapeutics approved as standard of care. We believe SBT6050 has the potential to be an ideal combination therapy in early line settings.
- ***Maximize the therapeutic potential of TLR8 in oncology and other serious diseases.*** We are adapting learnings from our SBT6050 program to expand the TLR8 agonist franchise by conjugating this payload to antibodies that target different tumor antigens that are prevalent in other cancer types. Additionally, the ability to drive myeloid cell activation in the liver presents an opportunity to treat cHBV infections, which is our most advanced initiative outside of immuno-oncology.
- ***Leverage our ImmunoTAC platform for promising new antibody-linker-payload combinations.*** We are strategically pairing our disease-modulating payloads with tissue targeted antibodies, such as our ASGR1-TGFßR1 antagonist conjugate, to create new therapeutic agents with the goal of providing benefits to patients who suffer from cancer and other serious diseases. We plan to continue to leverage our ImmunoTAC platform, discovery of targeted binding proteins (including antibodies), and efficient therapeutic discovery infrastructure to discover and develop novel small molecule therapeutics and ImmunoTAC conjugates.
- ***Evaluate opportunities to accelerate development timelines and/or enhance the commercial potential of our programs in partnership with third parties***. We plan to selectively explore potential strategic partnerships on a program-by-program basis with biopharmaceutical partners whose research, development, commercial, and/or geographic

113

Table of Contents

capabilities complement our own. We believe strategic partnerships can help mitigate clinical and commercial risk, accelerate timelines, and/or maximize global commercial potential.

**Our Team and Investors**

We have assembled an accomplished management team with a proven track record of therapeutic development expertise and of generating meaningful shareholder value. The members of our team have deep experience in discovering, developing, and commercializing therapeutics with a particular focus on cancer, having worked at companies such as Synthorx (acquired by Sanofi), Juno Therapeutics (acquired by Celgene), Cascadian Therapeutics (acquired by Seattle Genetics), Acerta Pharma (acquired by AstraZeneca), Ignyta (acquired by Roche), Roche/Genentech, Seattle Genetics, SUGEN (acquired by Pharmacia), and Trubion Pharmaceuticals (acquired by Emergent Biosolutions).

Since our inception in 2016 through September 30, 2020, we have raised over $215 million in capital from leading investors including OrbiMed Advisors, Alexandria Venture Investments, Boxer Capital of Tavistock Group, Celgene, Colt Ventures, EcoR1 Capital, Fidelity, Hunt Technology Ventures, Nantahala Capital Management, Nextech Invest, Pontifax, RA Capital, and U.S. Venture Partners.

**Lead Product Candidate SBT6050: TLR8 Agonist Conjugated to a HER2 Antibody**

SBT6050 is our lead product candidate, engineered using our ImmunoTAC platform. SBT6050 is comprised of a TLR8 agonist conjugated to a HER2-directed monoclonal antibody and is designed for subcutaneous delivery with tumor-localized activation of myeloid cells.

***Background and Our Approach in Addressing Limitations with Current Immuno-oncology Therapies***

Checkpoint inhibitors (CPIs) such as a programmed death receptor-1 (PD-1) and CTLA-4 blockers have emerged as important foundational immuno-oncology therapies because of their ability to generate durable responses in some patients, in previously intractable cancers and to improve the overall survival. Despite the significant benefit for patients with durable responses to CPIs, most patients unfortunately do not respond or have limited benefit. One of the important reasons why patients do not respond to CPIs is the absence of a sufficient number of T cells within the tumor. To achieve an anti-tumor response with a CPI, a baseline level of T cells must already be present in the tumor. Scientists and clinicians have termed tumors that lack the requisite T cell levels as "immune cell deserts" or "cold tumors," but more accurately these are "T cell deserts."

Solid tumors, including those resistant to T cell targeted immunotherapy, such as PD-1 and CTLA-4 blockers, are permeated with myeloid cells, which can comprise between 5% and 10% of the tumor—at least twice the number of T cells in the TME. Myeloid cells are a class of innate immune cells comprised of both immunosuppressive and pro-inflammatory subpopulations. Activation of myeloid cells, either by reprogramming immunosuppressive myeloid cells towards a more pro-inflammatory phenotype or stimulating other myeloid cells that have been silenced (e.g., dendritic cells), results in direct tumor killing and recruitment of immune cells. Further, activated myeloid cells can prime and amplify T cell and NK cell responses, bridging the innate and adaptive immunity to elicit broad, durable anti-tumor responses. Successful activation of myeloid cells can lead to anti-tumor immunity, even in tumors that are refractory to immune checkpoint blockade, which we believe may bring substantial benefit to a larger fraction of patients.

We designed SBT6050 to potently activate the myeloid cell compartment in the TME. We performed a thorough assessment of innate immune receptors with the goal of identifying a payload

114

Table of Contents

target that was well expressed in human myeloid cells. We believe TLR8 is unique in its breadth of expression across human myeloid cell subpopulations and its restricted expression to the myeloid cell lineage. In consideration of internally generated data and emerging external research on human myeloid cell biology, we selected TLR8 as the best payload target for activation of myeloid cells resulting in direct tumor killing and recruitment and activation of additional immune cells, such as T cells and NK cells, to further effect the anti-tumor response.

### *Activating the Myeloid Cell Compartment Through TLR8 Agonism*

Myeloid cells develop from common monocyte-dendritic cell progenitor cells and are critical mediators of innate immune responses. These cells are plastic in nature and their function and phenotype are heavily influenced by environmental cues. In the TME and tumor draining lymph nodes, macrophages, conventional dendritic cells, myeloid derived suppressor cells, and monocytes are highly prevalent, but also skewed towards inactive or immunosuppressive states. We believe TLR8 is the optimal target for activating these myeloid cell types due to its restricted expression and function within these cells. As shown in the figure below, TLR8 activation of human myeloid cells elicits an anti-tumor response through a multi-pronged mechanism of action, including direct tumor cell killing, recruitment of immune cells, and the secondary activation of NK cells, T cells and B cells, thus driving both an innate and adaptive immune response against the tumor.

*TLR8 is Highly Expressed in Human Myeloid Cell Types That Drive Anti-Tumor Responses When Activated*



*Myeloid cells can comprise between 5-10% of the tumor, at least twice the prevalence of T cells*

As a result of the broad immune activation triggered by a TLR8 agonist, systemically administered but untargeted TLR8 small molecule therapeutic candidates from other companies have resulted in an adverse event profile that we believe has limited achieving a dose level sufficient to produce the desired therapeutic benefit. An exemplary TLR8 small molecule agonist is motolimod, originally developed by Array Biopharma and licensed to VentiRx. Motolimod was the first TLR8 specific, but untargeted, agonist tested in the clinic for the treatment of solid tumors. Early trials of subcutaneously administered motolimod yielded adverse events we believe to be consistent with broad myeloid cell activation in the periphery, including injection site reactions and symptoms associated with systemic cytokine release, which limited dose-escalation. As a result, we believe that sufficient drug exposure in the TME was not reached to elicit meaningful anti-tumor activity. Similarly, Gilead Sciences is developing an orally administered untargeted TLR8 agonist for the treatment of cHBV. This

Table of Contents

therapeutic has resulted in adverse events consistent with myeloid cell activation in the gastrointestinal tract, including diarrhea and nausea. We believe these two cases support our hypothesis that tissue directed, localized activation is critical to maximizing the therapeutic potential of a TLR8 agonist.

TLR8 was selected as a target for an agonist after bioinformatic and functional assessments of several innate immune receptor targets. Important criteria of these targets we considered during our payload selection was intracellular localization and robust expression in myeloid cell compartments, with limited expression in non-immune FcR positive cells. Our selection of TLR8 as the optimal target to activate myeloid cells without activating other cell types outside of the hematopoietic lineage was supported by both external research results and internal data.

As shown in figure A below, unlike other intracellular innate immune receptors, TLR8 is highly expressed in human myeloid cell types, including conventional dendritic cells and macrophages. Conversely, as shown in figure B below, TLR8 is not expressed in fibroblasts and endothelial cells and we believe this restricted expression will reduce the risk of toxicities due to on-target, off-cell activation.



A)    Unlike other intracellular innate immune receptors, TLR8 is highly expressed in human myeloid cell types, including conventional dendritic cells and macrophages
B)    TLR8 is not expressed in fibroblasts and endothelial cells and we believe this restricted expression will reduce the risk of toxicities due to on-target, off-cell activation

Following the identification of TLR8 as the optimal receptor to activate myeloid cells in the TME, we designed and created a library of TLR8 agonists. Our proprietary TLR8 agonists were evaluated in the format of HER2 antibody conjugates for their ability to activate myeloid cells *ex vivo*. Within this library, we identified a HER2 antibody-TLR8 conjugate that activated myeloid cells in moderate and high HER2 settings as is found in HER2-expressing tumors.

116

Table of Contents

***Tissue Directed and Localized Activation Through HER2 Expression***

Many solid tumors, including those expressing HER2, are refractory to immunotherapy due to minimal T cell infiltrates. As shown in the figures below, HER2-expressing tumors (stained in blue, left panel) frequently contain abundant populations of tumor-associated myeloid cells which express TLR8 (stained in yellow, right panel).

***HER2-Expressing Tumors and TLR8-Expressing Myeloid Cells are Adjacent in the Human TME***

 

HER2 is an optimal marker to direct therapies like TLR8 agonist conjugates due to its differential expression between tumors and healthy tissue. Furthermore, HER2 expression is prevalent in meaningfully large patient sub-populations in a wide variety of tumor types including breast (estimated 83,000), gastric (estimated 6,400), non-small cell lung (estimated 31,500), colorectal (estimated 9,000), bladder (estimated 7,500), uterine (estimated 11,000), pancreatic (estimated 4,000), head and neck (estimated 2,000), ovarian (estimated 1,100), esophageal (estimated 2,500), and biliary (estimated 3,000) cancers, providing the potential to address a large HER2-expressing tumor agnostic market estimated to be more than 160,000 newly-diagnosed patients annually in the United States based in part on estimated prevalence rates. The 2020 American Cancer Society annual report on cancer statistics was used to determine the estimated incidence for each cancer type. HER2 overexpression and amplification prevalence rates documented in the literature were applied to the incidence rate for each cancer type to approximate the HER2-overexpressing sub-populations in each cancer type; 30.0%, 16.4%, and 23.2% HER2 overexpression rates were used for breast cancer, gastric cancer, and NSCLC, respectively.

As shown in the figure below, the SBT6050 potential mechanism of action is outlined sequentially as follows:

(1)    SBT6050 is administered systemically through subcutaneous injection. Systemic dosing is essential to access myeloid cells in both primary lesions and metastatic lesions, and in secondary lymphoid organs, to result in productive and durable anti-tumor responses.

(2)    SBT6050 is directed to tumors expressing HER2 and the TME, which is permeated with myeloid cells that express Fcγ receptors on their cell surface, and TLR8 within endosomes.

(3)    Upon co-engagement of the HER2 protein on the tumor and Fcγ receptors on the myeloid cell, SBT6050 is designed to be internalized by the myeloid cell into the endo-lysosomal compartment once there is a sufficient increase in avidity, which is provided by HER2 binding on the tumor cell.

(4)    SBT6050's TLR8 linker-payload engages TLR8 present in the endosomes of myeloid cells, which in turn drives activation.

117

Table of Contents

*Potential Mechanism of Action: SBT6050 is Designed to Localize TLR8 Activation of Myeloid Cells in Tumors via a HER2-Directed Antibody*



### Preclinical Development of SBT6050

Our preclinical studies have shown the potential for SBT6050 to activate innate and adaptive anti-tumor responses in the TME and demonstrate anti-tumor activity as a single agent and in combination with standard of care agents such as anti-PD-1 and trastuzumab-based therapies in HER2-expressing solid tumors. Highlights of our preclinical work using SBT6050 *in vitro* and SBT6050-S (our mouse surrogate) *in vivo* via subcutaneous delivery demonstrated:

- Potent activation of multiple anti-tumor immune mechanisms induced in the presence of HER2-expressing tumor cells.
- Equipotent immune cell activation in settings of moderate and high HER2 expression.
- Curative activity as a single agent in a xenograft model lacking T cells and B cells, and deficient in NK cells, highlighting the potential of myeloid cell activation alone to mediate robust tumor cell killing.
- Potent single agent activity in tumor models with low tumor infiltrating lymphocytes, highlighting the potential for clinical activity in tumors displaying immune evasive characteristics.
- Anti-tumor responses upon tumor re-challenge without additional dosing, highlighting the potential for durable effects through the activation and expansion of tumor antigen-specific T memory cells.
- Enhanced anti-tumor activity when used in combination with anti-PD-1 therapy in a CPI-refractory mouse tumor model.
- Enhanced anti-tumor activity when used in combination with trastuzumab in a mouse tumor model.

Collectively, these data supported our decision to clinically evaluate the anti-tumor activity of SBT6050 as a single agent and in combination with anti-PD-1 and trastuzumab-based therapeutics in relevant HER2-expressing tumor types.

Table of Contents

*SBT6050 In Vitro Preclinical Data*

In our *in vitro* studies, SBT6050 potently activated human myeloid cell types, including macrophages, dendritic cells, and monocytes. This activation resulted in the induction of multiple myeloid cell effector functions, including the production of cytokines and chemokines that are critical to the generation of anti-tumor immune responses. In addition, SBT6050 activation of myeloid cells *in vitro* resulted in the subsequent, indirect activation of NK cells and T cells. In our *in vitro* studies, SBT6050 also mediated antibody-dependent cellular phagocytosis and antibody-dependent cellular cytotoxicity. Further, TLR8 agonism drove the downmodulation of SIRP$\alpha$, highlighting the potential to block the CD47-SIRP$\alpha$ pathway, which, in turn, can potentially enable phagocytosis of tumor and red blood cells.

In our *in vitro* studies, human peripheral blood mononuclear cells (PBMC) were co-cultured with HER2[pos] or HER2[neg] tumor cell lines in the presence of SBT6050. As shown in the figures below, SBT6050 potently induced multiple anti-tumor immune activities, including general activation of myeloid cells as measured by pro-inflammatory cytokine and chemokine production (TNF$\alpha$), direct activation of dendritic cells (IL-12p40), and inflammasome activation (IL-18) in the presence of HER2[pos] tumor cells. No activation was seen when SBT6050 was co-cultured with HER2[neg] cells.



Similar *in vitro* studies using PBMCs were conducted to compare SBT6050 with conjugates that contain a TLR7 agonist, resiquimod or a resiquimod variant payload that were designed to mimic competitor molecules. Of note, the EC50 of the free, unconjugated TLR7 small molecule agonist was 9 nM on a TLR7 reporter line and no activity was observed on a TLR8 reporter line. The EC50 of unconjugated resiquimod on TLR7 was ~700 nM and >3 µM on TLR8, demonstrating that resiquimod is a weak TLR8 agonist. The resiquimod variant was of slightly better potency compared to resiquimod. As shown in the figures below, in these internal head-to-head studies SBT6050 demonstrated a superior ability to induce TNF$\alpha$, IL-12p40, and IL-18 in the presence of HER2[pos] tumor cells. This highlights the potential for favorable activity of SBT6050, which we believe is due to efficient

119

Table of Contents

engagement of TLR8 in conjugate form. SBT6050's functional profile was not replicated with conjugates comprised of TLR7-specific or resiquimod-derived agonists.

*SBT6050 Was Superior at Activating Human Myeloid Cells Compared to HER2 Antibody Conjugates that Use Either a Selective TLR7 Agonist or Resiquimod*



Robust activation of the myeloid cell compartment is also known to trigger an adaptive immune cell response. In an additional *in vitro* study using a similar PBMC assay, SBT6050 induced indirect activation of mediators associated with NK cell and T cell responses (IFN$\gamma$ and granzyme B), as shown in the figures below. In a separate *in vitro* study, the induction of IFN$\gamma$ and granzyme B by SBT6050 was shown to be secondary to myeloid cell activation as blockade of IL-12 and/or IL-18 abrogated the IFN$\gamma$ and granzyme B response.

*SBT6050 Indirectly Activated Mechanisms Associated with CTL/NK Cell Responses in the Presence of HER2pos Tumors*



120

Table of Contents

HER2 expression in tumor cells varies and can be measured by protein expression using immunohistochemistry (IHC) to understand the amount of HER2 in tumor cells. It is also common to determine the gene copy number using fluorescence in situ hybridization (FISH) or other methodologies as another way to understand if the HER2 gene is amplified. Gene amplification typically results in overexpression of the protein usually at the IHC3+ level, but some HER2-amplified tumors express protein at the IHC2+ level. It has become standard practice among pathologists to characterize protein expression using IHC1+, IHC2+ or IHC3+ and also to measure gene copy number because certain FDA-approved therapies, such as Herceptin, are approved in the setting of high HER2 expression levels. High HER2 expression tumors are categorized by either IHC3+ or IHC2+/FISH positive. Low HER2 expression in the industry is categorized as IHC2+/FISH negative and IHC1+. In our preclinical, studies we characterized IHC1+ HER2 tumor cells as expressing less than 25,000 HER2 receptors per cell. SBT6050 has been tuned to work in settings of IHC2+/FISH negative (moderate expression) as well as IHC3+ (high expression) but not IHC1+ (low expression). Targeting tumors with moderate HER2 expression allows us to address a patient population where most current HER2 targeted therapies are not effective. We believe that avoiding some normal tissues that express low levels of HER2 provides the opportunity for an improved safety and tolerability profile.

As shown in the figures below, our *in vitro* studies demonstrated that SBT6050 stimulated myeloid cells in the presence of IHC 2+ and 3+, but not in the presence of IHC 1+/- tumor cell lines.



*SBT6050 Activated Myeloid Cells Only in the Presence of IHC 2+ and 3+ Tumor Cell Lines*

*SBT6050 In Vivo Preclinical Data*

*Background Regarding SBT6050-S*

Because mice do not have a functional homologue of human TLR8, we designed SBT6050-S to enable preclinical mouse studies with a molecule that in mice matches the myeloid cell activation profile of SBT6050. TLR7 expression in mouse myeloid cells mirrors that of TLR8 in human myeloid cells. RNA sequencing data published by third parties, as shown in the figures below, highlight the differential expression of TLR8 and TLR7 across mouse and human myeloid cell sub populations. Activation of TLR7 in mouse myeloid cells results in a similar downstream functional profile as TLR8 activation does in human myeloid cells.

121

Table of Contents

***TLR7 Is Highly Expressed in Mouse Myeloid Cells and TLR8 Is Highly Expressed in Human Myeloid Cells, Whereas TLR7 Is Expressed at Low Levels in Human Myeloid Cells***



SBT6050-S is a proprietary conjugate that contains a selective TLR7 linker-payload and a mouse IgG2a Fc domain to promote uptake in mouse myeloid cells. Our preclinical data, as shown in the figure below, demonstrated similar *in vitro* potency of SBT6050 on human myeloid cells and SBT6050-S on mouse myeloid cells. In addition the *in vitro* activity of SBT6050-S is HER2-dependent as is the case for SBT6050 as described earlier.

***Functional Results with TLR7 Conjugate, SBT6050-S, on Mouse Myeloid Cells Matched Those of SBT6050 on Human Myeloid Cells In Vitro***

| ImmunoTAC Conjugate | EC$_{50}$ (nM) |
|---|---|
| SBT6050 | 0.2 (on human myeloid cells) |
| SBT6050-S | 0.3 (on mouse myeloid cells) |



122

Table of Contents

*Our SBT6050-S Monotherapy In Vivo Data*

Using SBT6050-S in preclinical studies, we have demonstrated that a systemically administered, HER2-directed myeloid cell agonist activated a broad spectrum of anti-tumor mechanisms and led to curative single agent activity in both a human tumor xenograft model lacking T cells and B cells and with defective NK cells as well as a T cell-excluded syngeneic mouse tumor model. In these models, the term "curative effects" describe the complete clearance of tumors (tumor size of 0 mm$^3$).

As shown in the figures below, SBT6050-S (at 10 mg/kg) demonstrated curative effects as a monotherapy in a human tumor xenograft (NCI-N87) mouse model that has an absence of T cells along with defective NK cells. This study was powered for statistical significance using survival as a readout which is defined as tumor size remaining below 1,000 mm$^3$. Treatment with SBT6050-S resulted in a statistically significant increase in survival as compared to the isotype and HER2 mAb control groups (p value<0.0001). We believe that the activity of SBT6050-S in this model is indicative of the potential of myeloid cells to drive tumor eradication. These data indicate that SBT6050 may have activity in tumors with low or no T cell infiltrate, which we believe has important implications regarding the substantial potential benefit of SBT6050 for patients who do not respond to T cell-directed immunotherapy.



*SBT6050-S Drove Robust, Curative Single Agent Activity in T Cell, NK Cell-Deficient Mouse Strains*

123

Table of Contents

In addition, in our preclinical studies, administration of SBT6050-S as monotherapy resulted in durable curative effects in a HER2-expressing, T cell excluded EMT6 syngeneic mouse tumor model. EMT6 is a mouse tumor that we engineered to express human HER2. Expression of human HER2 in this model is moderate, heterogenous, and may be lost over time, which is representative of certain HER2[pos] tumor types such as gastric cancer. While conducted in immunocompetent mice, the EMT6 model is also known to be resistant to anti-PD-1 treatment because T cells are excluded from tumor entry. The left panel in the figure below illustrates tumor cells that were demarcated by H&E staining. The central panel in the figure below illustrates that in the HER2-EMT6 model, CD8 T cells were sequestered on the periphery of the tumor. In contrast, the right panel below illustrates the presence of macrophage infiltrate within this T cell-excluded mouse tumor model.

*IHC Staining in EMT6 Tumor Models, Depicting CD8 T Cells and Macrophages (F4/80)*



**Tumor Staining**                **T Cell Desert**                **Replete w/ Macrophages**

124

Table of Contents

As shown in the figures below, SBT6050-S (at 10 mg/kg) as monotherapy resulted in a complete response (CR) rate, the percentage of animals with tumors < 30 mm³ at the end of study, of between 40% and 80% in the HER2-EMT6 model, depending on the study. This study was powered for statistical significance using survival as a readout which is defined as tumor size remaining below 1,000 mm³. Treatment with SBT6050-S resulted in a statistically significant increase in overall survival when compared to the isotype and HER2 mAb control groups (p value=0.002). Approximately 30-50% of EMT6 tumor cells express human HER2 at the time of dosing initiation. Given the lack of stability of HER2 expression in this model, we believe HER2 expression was lost in the tumors of the mice that did not respond to SBT6050-S in this study.



*Treatment with SBT6050-S Monotherapy Resulted in CR Rate of 40-80% in HER2-EMT6 Model*

As shown in the figure on the left below, HER2-EMT6 tumor-bearing mice that were cured by SBT6050-S treatment, meaning that no tumor was detectable, were fully protected from an EMT6 tumor re-challenge, indicative of the generation of immunological memory. As shown in the figure on the right below, mice that were re-challenged with EMT6 tumors that did not express HER2 were also shown to have complete protection, indicating SBT6050 engendered activation of an anti-tumor T cell response that was not restricted to HER2. This is consistent with the expansion of T cells reactive to tumor neoantigens observed in the tumors of mice after treatment with SBT6050-S.



*SBT6050-S Conferred HER2-Independent Protection in Preclinical Tumor Re-Challenge Studies*

125

Table of Contents

*Preclinical Data Supporting the Potential for Combination of SBT6050 with Other Therapies*

In our preclinical studies, SBT6050-S drove robust anti-tumor activity as a single agent and in combination with standard of care agents.

As shown in the figures below, our preclinical data demonstrated that the single agent activity of SBT6050-S in the immune-competent, checkpoint resistant HER2-EMT6 tumor model was further enhanced when combined with an anti-PD-1.



In a HER2$^{pos}$ human xenograft mouse model, a combination of low dose SBT6050-S with trastuzumab greatly enhanced the anti-tumor activity observed with either agent alone. As shown in the figures below, our preclinical data demonstrated the potential for enhanced clinical activity with SBT6050 in combination with trastuzumab. In this study, a lower dose of SBT6050-S (1 mg/kg) was used to allow for the combinatorial benefit to be observed. A lower dose of SBT6050-S (1 mg/kg) was used as a monotherapy control. We believe that the potential to combine with trastuzumab-based therapies unlocks the possibility of accessing earlier lines of therapy in breast and gastric cancer, where trastuzumab is a part of the standard of care.



***SBT6050 Was Well Tolerated in Non-Human Primates by the Subcutaneous Route of Administration***

SBT6050 demonstrated a wide therapeutic window in safety and tolerability studies following repeat subcutaneous administration including in the GLP toxicology study in non-human primates (NHP) that determined our first-in-human (FIH) dose. Forty-one NHPs have been administered repeat SC doses of SBT6050 in three NHP toxicity studies. In two non-GLP studies, 15 NHPs were treated at SC dose levels of 0.1 to 12 mg/kg, with the majority (8 of 15) administered 6 or 12 mg/kg every 2 or 3

126

Table of Contents

weeks (Q2W or Q3W) for 4 doses. In the GLP toxicity study, 26 NHPs received doses of 2, 6 or 12 mg/kg Q2W for 4 doses, with a 4-week recovery period for the higher two dose levels. Across the studies, there was no evidence of injection site reactions or cytokine release syndrome (CRS) in any animal. There were transient, dose-related hematological, clinical chemistry, and cytokine and chemokine changes reflective of the potential mechanism of action of SBT6050. Because of the broad therapeutic window demonstrated in these studies, our FIH starting dose level of 0.3 mg/kg was selected because of its equivalency to the minimum pharmacologically active dose level in NHP and the projection that this dose level may be pharmacologically active in patients. The FIH dose levels of immune activators, particularly those that are viewed as having a significant risk of CRS, are typically below the projected pharmacologically active dose of the agent, resulting in lengthy dose-escalations to an active dose level. Notably, that is not the case with SBT6050. Based on the totality of our preclinical data, we believe that we have potential to reach the recommended phase 2 dose (RP2D) for SBT6050 between the second and fourth dose levels.

Repeat administration of fully human or humanized proteins, such as that included in SBT6050, to preclinical species, like a NHP, has been extensively evaluated by many organizations over the years and has been found to frequently lead to the generation of anti-drug antibodies (ADA), reflecting the development of immunogenic responses with repetitive challenge of NHP with non-self or foreign proteins. Importantly, the generation of ADA against human or humanized proteins in NHP, even when accompanied by ADA-mediated toxicities such as anaphylaxis, has not been predictive of immunogenicity in humans. ADA developed against SBT6050 in our NHP toxicology studies. The formation of ADA against SBT6050 in NHP was expected given the inherent immunogenicity of humanized proteins in NHP and the potential mechanism of action of SBT6050, which includes the promotion of presentation of foreign antigens by dendritic cells, a mechanism critical to the formation of immune responses to tumor neoantigens. The development of ADA in NHP resulted in decreased exposure following repeat dosing. As has been seen with other immune agonists administered in the presence of ADA in preclinical species, repeat intravenous dosing with SBT6050 resulted in anaphylaxis but anaphylaxis was not seen in NPH studies using subcutaneous dosing of SBT6050. While no animal treated with SBT6050 subcutaneously showed signs of acute anaphylaxis, one animal in the highest dose group was euthanized due to what is believed to be ADA-related immune complex deposits in certain organs. Given the precedent data in the field, we do not believe that neutralizing ADA formation that affected SBT6050 exposure in NHP will translate into the clinic. Nevertheless, a reduction in exposure following repeat dosing of SBT6050 in the Phase 1/1b clinical trial could present a risk for clinical development. Of note, in our ongoing Phase 1/1b clinical trial, we have repeat dose pharmacokinetics (PK) after four doses of 0.3 mg/kg for one patient and reductions in SBT6050 exposure were not observed. Variable ADA titers have been observed across patients ranging from undetectable to low without impact on pharmacodynamic activity.

### SBT6050 Clinical Development Plan and Strategy

SBT6050 demonstrated a wide therapeutic window in our GLP toxicology study in NHP, enabling a FIH starting dose of 0.3 mg/kg, which was projected to be pharmacologically active and within 2-3 cohorts of where we could potentially achieve anti-tumor activity. In NHP, 0.5 mg/kg was defined as the minimum pharmacologically active dose as determined by blood-based biomarkers, 6 mg/kg was determined to be the No Adverse Event Level and the highest dose level evaluated was 12 mg/kg. Our FIH starting dose of 0.3 mg/kg is the human equivalent of the minimum pharmacologically active dose level in NHP and projected to be pharmacologically active in patients. Based on the totality of our preclinical data, we believe that the RP2D will be reached between the second and fourth dose levels in our Phase 1 dose-escalation, particularly if 0.3 mg/kg demonstrates pharmacological activity as projected from our preclinical modeling. Additional dose levels may be explored in our Phase 1/1b clinical trial to further characterize the tolerability profile. At the RP2D, we believe there is potential to demonstrate single agent anti-tumor activity in dose expansion cohorts.

127

Table of Contents

Our IND for SBT6050 was cleared in June 2020 with a starting dose of 0.3 mg/kg. In July 2020, we initiated a Phase 1/1b FIH, open-label, multicenter, dose-escalation and expansion clinical trial in patients with HER2-expressing solid tumors that have progressed following standard therapies. The trial is designed to evaluate the safety, tolerability, PK, pharmacodynamics (PD), immunogenicity, and anti-tumor activity of SBT6050 as a single agent and in combination with pembrolizumab, a PD-1 inhibitor.

In our Phase 1/1b clinical trial, we are monitoring key PD biomarkers in both the blood and the tumor which have been associated with tumor regression in our preclinical mouse studies and was observed in our preclinical NHP studies. Key biomarkers in the blood include elevations in MCP-1, IP-10, and C-reactive protein and induction of additional PD markers indicative of on target mechanism of action such as IFN$\gamma$. We will be obtaining tumor biopsies at baseline and on treatment to measure biomarkers that correlate with the activation of myeloid cells, T cells and NK cells in cohorts 2 and later.

The trial consists of four parts: monotherapy dose-escalation and expansion (Part 1), monotherapy dose expansion in tumor-specific cohorts (Part 2), pembrolizumab combination dose-escalation (Part 3), and a pembrolizumab combination dose expansion cohort (Part 4).

*Part 1: SBT6050 Single Agent Dose-Escalation and Expansion*

In Part 1, a standard 3 + 3 dose-escalation of SBT6050 is planned to study safety, tolerability, and PK of SBT6050, and to determine the maximum tolerated dose (MTD) and the RP2D. The MTD is defined as the dose just below the dose level where 2 or more out of 6 patients ($\geq$33%) experience dose-limiting toxicities (DLTs). The starting dose of the SBT6050 regimen is 0.3 mg/kg administered via subcutaneous injection once every 14 days. One or two dose levels may be expanded to 12 patients to obtain additional information to select the RP2D. Eligible patients must have HER2-expressing (HER2 IHC 2/3+) or HER2-amplified cancer refractory to or relapsed after standard therapies. We anticipate enrolling approximately 30 participants in Part 1.

*Part 2: SBT6050 Single Agent Dose Expansion in Tumor-Specific Cohorts*

Patients will be enrolled into parallel expansion cohorts based on tumor type and HER2 expression level. Patients enrolled in the expansion cohorts will receive SBT6050 at the recommended dose and schedule established in Part 1. The purpose of Part 2 is to further characterize the tolerability profile of the RP2D and evaluate the anti-tumor activity and PD effects of SBT6050 as a single agent. Enrollment will follow a Simon 2-stage design. Planned expansion cohorts, which may also be informed by experience in the dose-escalation phase, include the following tumor types:

- Cohort A: HER2pos breast cancer, n=40.
- Cohort B: HER2 low-expressing (IHC2+/amplification negative) breast cancer, n=30.
- Cohort C: HER2pos gastric cancer, n=40.
- Cohort D: HER2-expressing (IHC 2/3+) or HER2-amplified non-small cell lung cancer, n=40.
- Cohort E: HER2-expressing (IHC 2/3+) or HER2-amplified solid tumors, n=30.

*Part 3: SBT6050 Plus Pembrolizumab Dose-Escalation*

In Part 3, a standard 3 + 3 dose-escalation of SBT6050 plus the anti-PD-1 CPI, pembrolizumab is planned to determine the MTD and RP2D of SBT6050 when given in combination with pembrolizumab. The MTD is defined as above. SBT6050 will be administered via subcutaneous injection on Days 1, 15, and 29 of 42-day cycles in combination with 400 mg pembrolizumab administered via intravenous

128

Table of Contents

injection on Day 1 of each cycle. Eligible patients will have HER2-expressing or HER2-amplified solid tumors. Part 3 of the study will open when changes in PD markers exceeds the pre-defined criteria for pharmacological activity with demonstration of acceptable safety and tolerability in a cohort treated with single agent SBT6050. The pre-defined threshold is based on changes in peripheral PD markers in preclinical studies, and includes C-reactive protein elevation to $\geq$ 150 mg/L and 3-5x changes from baseline in certain cytokines and chemokines such as IP-10 and/or MCP-1 and induction of additional pharmacodynamic markers indicative of on-target mechanism of action, such as IFN$\gamma$. We anticipate enrolling approximately 15 participants in Part 3.

*Part 4: SBT6050 Plus Pembrolizumab Dose Expansion Cohort*

The combination treatment expansion part of the trial will be initiated once the RP2D has been defined by the safety monitoring committee from Part 3. The purpose of Part 4 is to further characterize the tolerability profile of the RP2D and evaluate the anti-tumor activity and PD effects of SBT6050 in combination with pembrolizumab. Approximately 30 patients with HER2-expressing or HER2-amplified tumors of multiple histologies will be enrolled.

**SBT6050 Preliminary Phase 1/1b Clinical Data**

We are currently in Part 1 of our Phase 1/1b clinical trial and as of November 25, 2020, six patients have been enrolled at 0.3 mg/kg. Patients are administered SBT6050 every two weeks by subcutaneous injection. The treated patients have received between one and nine doses of SBT6050 and no DLTs have been observed. Two of the first four patients did not complete the DLT period and therefore were replaced per the clinical protocol. The most common adverse events are flu-like symptoms (fever, chills, nausea, vomiting, fatigue) and redness and swelling at the injection site. Changes in pharmacodynamic markers consistent with the potential mechanism of action have been observed in treated patients where data are available. This includes increases in plasma levels of CRP (C-reactive protein), a marker of inflammation, increases in MCP-1, IP-10 and IL-6, which are indicative of myeloid cell activation, increases in IFN$\gamma$, which is a marker for T and NK cell activation, and decreases in hemoglobin, which we believe to be due to macrophage phagocytosis. For example, in patient 1, after the first dose, CRP levels increased from 2 mg/L to 288 mg/L, IP-10 increased from 354 pg/ml to 3040 pg/ml, MCP-1 increased from 340 pg/ml to 849 pg/ml, IL-6 increased from <0.6 pg/ml to 138 pg/ml and IFN$\gamma$ increased from 7.6 pg/ml to 465 pg/ml while hemoglobin transiently decreased following each of four administrations but not to levels considered clinically adverse. Transient decreases in hemoglobin and changes in cytokines and chemokines had also been observed in the NHP studies after treatment with SBT6050, with the exception of IFN$\gamma$ which was only observed intratumorally in mice upon treatment with SBT6050-S. Variable ADA titers have been observed ranging from undetectable to low without impact on pharmacodynamic activity. As of November 25, 2020, two patients in the first cohort at the 0.3 mg/kg dose level had formal reassessments of tumor status. The first patient, with metastatic breast cancer and who received 9 doses, had radiological assessments at 8 and 16 weeks with stable disease at each scan, and is now 17 weeks on treatment. The second patient, with NSCLC and who received 5 doses, had a radiological assessment at 8 weeks with target lesion reduction in diameter of >30%, per the investigator's assessment, and is now 10 weeks on treatment. The second cohort of Part 1 of our Phase 1/1b clinical trial is open to enrollment at a dose level of 0.6 mg/kg. We anticipate providing an update on interim data from the Phase 1 single agent dose-escalation cohorts in the second half of 2021.

We expect to initiate Part 3 (SBT6050 plus pembrolizumab dose-escalation) of the Phase 1 trial in the first quarter of 2021. We have met our pharmacodynamic threshold to open Part 3, which consists of CRP elevation of at least 150 mg/L, IP-10 and/or MCP-1 increases of 3-5x from baseline, and the induction of additional pharmacodynamic markers indicative of on-target mechanism of action, such as IFN$\gamma$. We anticipate providing an update on interim data from the Phase 1 SBT6050 plus pembrolizumab combination in the first half of 2022. We anticipate providing another further update on

Table of Contents

interim data from the Phase 1 monotherapy and combination dose-escalation as well as a first update of the Phase 1b monotherapy in tumor-specific expansion cohorts and the Phase 1b combination cohort the second half of 2022.

***SBT6050 Addressable Market***

As shown in the figure below, HER2 IHC 2+ and 3+ overexpression and amplification are documented in at least 11 different tumor types including breast (estimated 83,000), gastric (estimated 6,400), non-small cell lung (estimated 31,500), colorectal (estimated 9,000), bladder (estimated 7,500), uterine (estimated 11,000), pancreatic (estimated 4,000), head and neck (estimated 2,000), ovarian (estimated 1,100), esophageal (estimated 3,000), and biliary (estimated 3,000) cancers, providing the potential to address a large HER2-expressing tumor agnostic market estimated to be more than 160,000 newly-diagnosed patients annually in the United States based in part on estimated prevalence rates. HER2 IHC2+ and 3+ overexpression in breast cancer, gastric cancer, and NSCLC are 30.0%, 16.4%, and 23.2%, respectively. Most HER2 targeted therapies require the tumor cells to be dependent on HER2 signaling, often called an oncogenic driver. HER2 oncogenic-driven tumors are limited to subsets of breast and gastric cancer and hence the FDA-approved therapies that require HER2 signaling are limited to these indications as noted in the figure. SBT6050 does not require the tumor cells to be dependent on HER2 signaling for its anti-tumor activity and instead utilizes the HER2 protein to deliver the conjugate to adjacent myeloid cells. We believe that this expands the market opportunity beyond HER2-driven breast and gastric cancer in which targeted HER2 agents have been approved and are established as standard of care. Because of the rationale to combine SBT6050 with CPI's, which is supported by our preclinical data, we have noted in the figure below those tumor types with an approved CPI.

**Large Potential Market Opportunity for SBT6050 in Tumors that Express HER2 and in Combination with HER2 Targeted Agents and CPIs**



HER2 expression rates are well-understood in tumor types for which there is an FDA-approved HER2 targeted therapy available. Breast and gastric cancer cases are routinely screened for HER2 expression as a part of the standard of care. HER2 overexpression has been reported in other tumor types, but because of the lack of effective therapies targeting cancers outside of breast and gastric, screening is not readily performed. In calculating our potential addressable market for these tumor types, the figure above shows a range of HER2 expression cited in the literature and the lower end of the range was utilized for market considerations. In the United States, we believe that, based in part on estimated prevalence rates as described in the figure above, more than 48,000 patients annually with

Table of Contents

solid tumors that are refractory to standard of care treatments may benefit from SBT6050 as a single agent or combination therapy, if successfully developed and approved. In the future, if SBT6050 advances to earlier lines of treatment, based in part on estimated prevalence rates as described in the figure above, more than 160,000 patients annually may benefit.

In considering the market for combination treatment, SBT6050 was specifically designed to bind to the HER2 sub-domain II, the pertuzumab epitope, to enable combinations with trastuzumab-based therapies that bind to HER2 sub-domain IV such as Herceptin (trastuzumab), Kadcyla (trastuzumab-DM1), and Enhertu (DS-8201), all of which are FDA-approved HER2 agents. Our preclinical data has demonstrated the potential to use SBT6050 in combination with trastuzumab and CPI's. We believe that SBT6050 may also have the potential to be combined with tyrosine kinase inhibitors such as Tukysa (tucatinib), which is approved for combination with trastuzumab and Xeloda (capecitabine) for the treatment of HER2$^{pos}$ metastatic breast cancer. When considering the market potential for combination therapy, only combinations with trastuzumab and CPI's was utilized in our calculations.

SBT6050 is also active in HER2 IHC 2+ / FISH negative tumors, expanding the market beyond the scope of current approved HER2 targeted therapies indicated for IHC 3+ and IHC 2+ / FISH positive tumors as shown in the figure below. We considered this potential market extension in breast cancer and gastric cancer in calculating the potential addressable market.



*SBT6050 Potential Addressable Market in Indications with an FDA-Approved HER2 Targeted Therapy*

### SBT6290: TLR8 Agonist Conjugated to a Nectin4 Antibody

Our second product candidate, SBT6290, is comprised of the same TLR8 linker-payload used in SBT6050 conjugated to a Nectin4-directed monoclonal antibody. Nectin4 has been prioritized as our second target based on differential expression of extracellular proteins on tumor cells in comparison to healthy tissue, as well as the degree of myeloid cell infiltrate in the TME. Nectin4 is overexpressed in cancers including bladder, triple negative breast, and head and neck, among others.

Nectin4 is a target that has been clinically validated by Seattle Genetics through the approval of the Nectin4-directed antibody-drug conjugate Padcev. In 2019, Padcev was approved under the FDA's accelerated approval program indicated for the treatment of adult patients with locally advanced or metastatic urothelial cancer who have previously received a PD-1 inhibitor, and a platinum-containing chemotherapy.

Targeting Nectin4 to deliver a TLR8 agonist to adjacent myeloid cells presents a significant therapeutic opportunity across different cancers. We are developing SBT6290 in Nectin4-expressing tumors, including bladder, triple negative breast, and head and neck cancers. As shown in the figure below, the estimated incidence of newly diagnosed patients with bladder, triple negative breast, and

131

Table of Contents

head and neck cancers that express Nectin4 represents an estimated over 80,000 patients annually in the early line setting. The estimated yearly deaths of patients with bladder, triple negative breast, and head and neck cancer that express Nectin4 represents over 16,000 patients with relapsed or refractory cancer annually in the United States.



*Nectin4 Overexpression Across Select Tumor Types*

| | Bladder | TNBC | Head & Neck |
|---|---|---|---|
| **Estimated Nectin4 Moderate – High IHC Expression** | 60-83% | 53-78% | 18-59% |

■ Estimated U.S. Incidence of Early-Line Nectin4-Expressing Patients

■ Estimated U.S. Incidence of Relapsed or Refractory Nectin4-Expressing Patients

Bioinformatic analysis of data from The Cancer Genome Atlas (TCGA) database indicates that myeloid cells are present in Nectin4-expressing tumor types, as shown in the figure below. As reported in TCGA, myeloid cells can comprise, on average, between 7% to 14% of the tumor which is higher than the average number of T cells in the same tumor types.



*Nectin4-Expressing Tumor Types Are Infiltrated By Myeloid Cells*

■ Myeloid Cells   ⊟ T Cells

In our *in vitro* studies, human PBMCs were co-cultured with Nectin4$^{pos}$ or Nectin4$^{neg}$ tumor cell lines in the presence of SBT6290. As shown in the figures below, SBT6290 potently activated myeloid cells with an EC$_{50}$ of ~200 pM, in the presence of Nectin4-expressing tumor cells. TNF$\alpha$ production was measured as a marker of myeloid cell activation. The levels of TNF$\alpha$ induced by SBT6290 matched those observed with SBT6050 when tested in a similar *in vitro* assay. Not only did these data

Table of Contents

highlight the Nectin4-dependent activity of SBT6290, but also demonstrated that the TLR8 linker-payload used in SBT6050 was transferable to antibodies directed to diverse antigens.



*SBT6290 Potently Activated Human Myeloid Cells*

Nectin4 was recently described to be a ligand for T cell immunoglobulin and ITIM domain (TIGIT). TIGIT has emerged as an inhibitor of anti-tumor immune responses and several agents inhibiting this pathway are being tested in clinical trials. In addition to SBT6290's primary mechanism of action through TLR8 activation, the figure below demonstrated that the binding of TIGIT to Nectin4-expressing tumor cells was blocked by the binding domain of SBT6290.

*SBT6290 Binding Domain Blocked TIGIT Binding to Nectin4-Expressing Tumor Cells*

We engineered a mouse surrogate of SBT6290 (SBT6290-S) using a TLR7 agonist conjugated to a Nectin4 monoclonal antibody to account for species differences in our *in vivo* studies, as was described for SBT6050. As shown in the figure below, SBT6290-S improved overall survival in a Nectin4-expressing EMT6 mouse model. This study was powered for statistical significance using survival as a readout which is defined as tumor size remaining below 1,000 mm$^3$. SBT6290-S demonstrated a statistically significant improvement in survival as compared to the two control groups as noted in the figure below.

133

Table of Contents

*Administration of SBT6290-S as Monotherapy Resulted in Improved Overall Survival in a Nectin4-Expressing EMT6 Preclinical Model*



As shown in the figure below, subcutaneous administration of SBT6290-S to mice bearing Nectin4-expressing EMT6 tumors induced the production of cytokines and chemokines in the tumors of treated mice. MCP-1 and IP-10 upregulation are indicative of myeloid cell activation and IFN$\gamma$ and IL-2 production are indicative of T cell activation in the treated mice.

*Administration of SBT6290-S as Monotherapy Induced the Production of Cytokines and Chemokines in Nectin4-Expressing EMT6Tumors*



134

Table of Contents

In a single and repeat dose exploratory safety study, Nectin4-TLR8 conjugate was administered subcutaneously to NHP at a dose level >10-fold of the anticipated, minimum pharmacologically active dose level, a dose that was also evaluated with SBT6050. The overall safety, tolerability, PK and PD findings of the Nectin4-TLR8 conjugate were very similar to those observed with SBT6050 at this dose. A non-GLP toxicology study for SBT6290 has been completed, and we believe the results are supportive of a wide therapeutic window similar to that observed with SBT6050. GLP NHP toxicity studies are expected to commence in first half of 2021. In parallel, we are in the process of creating a master cell bank for GMP production of SBT6290. We anticipate submitting the SBT6290 IND in the fourth quarter of 2021 and initiating a Phase 1 clinical trial in the first quarter of 2022.

**SBT8230: TLR8 Agonist Conjugated to an ASGR1 Antibody**

As our lead virology program, we have engineered SBT8230 to treat cHBV using our ImmunoTAC platform. SBT8230 is comprised of an ASGR1 monoclonal antibody conjugated to the same TLR8 linker-payload as SBT6050 and SBT6290 and is designed to elicit an anti-viral immune response by targeting TLR8 activation to the liver.

cHBV infection remains a worldwide problem affecting approximately 257 million people and contributing to an estimated 887,000 deaths in 2015. In the United States alone, approximately 860,000 people suffer from cHBV. cHBV is estimated to be the cause of 60-80% of the world's primary liver cancers. There is a significant unmet need for therapies that can elicit a functional cure for the disease, which is defined as sustained loss of hepatitis B surface antigen (HBsAg) in the blood. Many of the approved therapies for cHBV have low functional cure rates or lack durability over time.

Clinical and preclinical evidence by third parties have demonstrated that IFNγ-mediated immune responses, including the activation of IFNγ+ T cell and IgG B cell anti-viral responses, can lead to a functional cure in cHBV patients and animal models of HBV. In HBV transgenic mice, HBV-specific CD4 and CD8 T cells have exhibited the ability to inhibit hepatocellular replication by a noncytopathic process that is mediated primarily by IFNγ. In acutely infected chimpanzees, viral replication was almost completely abolished soon after CD3 and IFNγ mRNA increased in the liver. Evidence by third parties has demonstrated that HBV-specific IFNγ producing CD4 T cells were associated with viral clearance in patients with cHBV infection. Additionally, these studies have demonstrated that TLR8 agonists were particularly effective in activation of myeloid cells and the induction of IFNγ. The figure below shows IFNγ production after human blood or liver-derived mononuclear cells were stimulated with the indicated TLR agonist. TLR8 was unique in its ability to induce IFNγ.

*TLR8 Drove IFNγ Production from Liver Mononuclear Cells in Third Party Preclinical Studies*



Supernatants in blood (n = 5) or liver- derived mononuclear cells (n = 9) stimulated with the indicated TLR agonist

*Jo et al, PLOS Pathogens, 2014*

135