# EXHIBIT Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number 001-39756**

# Silverback Therapeutics, Inc.
**(Exact name of Registrant as specified in its Charter)**

| | |
|---|---|
| **Delaware** | **81-1489190** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **500 Fairview Ave N, Suite 600** | |
| **Seattle, Washington** | **98109** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (206) 456-2900**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.0001 per share** | **SBTX** | **The Nasdaq Stock Market LLC** |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.     Yes ☐   No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.    Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act:

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | | Smaller reporting company | ☒ |
| | | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of March 28, 2022 there were  35,143,186 shares of registrant's common stock, $0.0001 par value per share, outstanding.

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant was approximately $676.8 million as of June 30, 2021 (the last trading day of the registrant's most recently completed second quarter) based on the closing price of $30.89 as reported on the Nasdaq Global Market on such date. Shares of the registrant's common stock held by executive officers, directors, and their affiliates have been excluded from this calculation. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

**DOCUMENTS INCORPORATED BY REFERENCE**

**Portions of the registrant's definitive proxy statement for its 2022 Annual Meeting of Stockholders, which the registrant intends to file pursuant to Regulation 14A with the Securities and Exchange Commission not later than 120 days after the registrant's fiscal year ended December 31, 2021, are incorporated by reference into Part III of this Annual Report on Form 10-K.**

PART I

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K (this Annual Report) contains forward-looking statements that involve risks and uncertainties. We make such forward-looking statements pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 and other federal securities laws. All statements other than statements of historical facts contained in this Annual Report are forward-looking statements. In some cases, you can identify forward-looking statements by words such as "anticipate," "believe," "contemplate," "continue," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "seek," "should," "target," "will," "would," or the negative of these words or other comparable terminology. These forward-looking statements include, but are not limited to, statements about:

- our plans to research, develop, and commercialize SBT8230 and any future product candidates;

- our ability to obtain and maintain regulatory approval of product candidates arising from our ImmunoTAC technology platform, including from our SBT8230 program, in any of the indications for which we plan to develop them;

- our ability to obtain funding for our operations, including funding necessary to commence and complete our planned clinical trials, conduct additional manufacturing and conduct preclinical studies of any of our product candidates, including from our SBT8230 program;

- the success, cost, and timing of our research and development activities, including our preclinical studies and planned clinical trials;

- the size of the markets for our product candidates, and our ability to serve those markets;

- our ability to successfully commercialize our product candidates;

- the rate and degree of market acceptance of our product candidates;

- our ability to develop and maintain sales and marketing capabilities, whether alone or with potential future collaborators;

- regulatory developments in the United States and foreign countries;

- the performance of our third-party service providers, including our contract research organizations (CROs), suppliers, and manufacturers;

- the safety, efficacy, and market success of competing therapies that are or become available;

- our ability to attract and retain key scientific and management personnel;

- our ability to attract and retain collaborators with development, regulatory and commercialization expertise;

- our expectations regarding the period during which we qualify as an emerging growth company under the Jumpstart Our Business Startups Act of 2012;

- the accuracy of our estimates regarding expenses, future revenues, capital requirements and needs for additional financing;

- our expectations regarding our ability to obtain and maintain intellectual property protection for our product candidates and our ability to operate our business without infringing upon the intellectual property rights of others;

- the impact of the COVID-19 pandemic on our business and operations; and

- other risks and uncertainties, including those described under Part I, Item 1A, "Risk Factors" of this Annual Report.

Any forward-looking statements in this Annual Report reflect our current views with respect to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. Factors that may cause actual results to differ materially from current expectations include, among other things, those listed under Part I, Item 1A, "Risk Factors" of this Annual Report. Given these uncertainties, you should not place undue reliance on these forward-looking statements. Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason, even if new information becomes available in the future.

Unless the context otherwise indicates, references in this Annual Report to the terms "Silverback", "the Company", "we", "our" and "us" refer to Silverback Therapeutics, Inc., and references to our "common stock" refers to our voting common stock.

3

## SUMMARY OF RISKS ASSOCIATED WITH OUR BUSINESS

An investment in shares of our common stock involves a high degree of risk. Below is a list of the more significant risks associated with our business. This summary does not address all of the risks that we face. Additional discussion of the risks listed in this summary, as well as other risks that we face, are set forth under Part I, Item 1A, "Risk Factors" in this Annual Report. Some of the material risks associated with our business include the following:

- We have a limited operating history, have incurred net losses since our inception, and anticipate that we will continue to incur significant losses for the foreseeable future. We may never generate any revenue or become profitable or, if we achieve profitability, may not be able to sustain it.

- The COVID-19 pandemic has had, and could continue to have, an adverse impact on our business, including on our preclinical studies and planned clinical trials, supply chain, and business development activities.

- Preclinical and clinical development is a lengthy, expensive, and uncertain process. The results of preclinical studies and early clinical trials are not always predictive of future results. Any product candidate that we advance into clinical trials, including from our SBT8230 program, may not achieve favorable results in later clinical trials, if any, or receive marketing approval.

- Our product candidates are based on novel technologies, which make it difficult to predict the timing, results and cost of product candidate development and likelihood of obtaining regulatory approval.

- Serious adverse events, undesirable side effects or other unexpected properties of our product candidates may be identified during development or after approval, which could lead to the discontinuation of our clinical development programs, refusal by regulatory authorities to approve our product candidates or, if discovered following marketing approval, revocation of marketing authorizations or limitations on the use of our product candidates thereby limiting the commercial potential of such product candidate.

- Even if we obtain regulatory approval for our product candidates, they will remain subject to ongoing regulatory oversight. Additionally, our product candidates, if approved, could be subject to labeling and other restrictions on marketing or withdrawal from the market, and we may be subject to penalties if we fail to comply with regulatory requirements or if we experience unanticipated problems with our product candidates, when and if any of them are approved.

- We may rely on third parties to conduct, supervise, and monitor our planned clinical trials and perform some of our research and preclinical studies. If these third parties do not satisfactorily carry out their contractual duties or fail to meet expected deadlines, our development programs may be delayed or subject to increased costs, each of which may have an adverse effect on our business and prospects.

- We contract with third parties for the manufacture and supply of certain of our product candidates for use in preclinical testing and planned clinical trials and will rely on third parties for commercial supply, which supply may become limited or interrupted or may not be of satisfactory quality and quantity.

- Any approved products may fail to achieve the degree of market acceptance by physicians, patients, hospitals, healthcare payors, and others in the medical community necessary for commercial success.

- If the market opportunities for any of our product candidates are smaller than we believe they are, our revenue may be adversely affected, and our business may suffer.

- If any of our product candidates are approved for marketing and commercialization and we are unable to establish sales and marketing capabilities or enter into agreements with third parties to sell and market our product candidates, we will be unable to successfully commercialize our product candidates if and when they are approved.

- We may not realize the benefits of any acquisitions, in-license, or strategic alliances that we enter into.

- We are highly dependent on our key personnel, and if we are not successful in attracting and retaining highly qualified personnel, we may not be able to successfully implement our business strategy.

- We face substantial competition, which may result in others discovering, developing, or commercializing products more quickly or marketing them more successfully than us.

- If we are unable to obtain and maintain sufficient intellectual property protection for our platform technologies and product candidates, or if the scope of the intellectual property protection is not sufficiently broad, our competitors could develop and commercialize products similar or identical to ours, and our ability to successfully commercialize our products may be adversely affected.

4

Further support for investigating TLR8 agonism for the treatment of cHBV comes from selgantolimod (GS-9688), an existing untargeted, orally administered TLR8 agonist being developed by Gilead Sciences.  Selgantolimod has generated anti-viral immune responses in a cHBV animal model. The clinical development of this untargeted TLR8 agonist has shown promise, but we believe that toxicity prevented the use of a sufficient dose to elicit optimal clinical activity. We believe liver-localized TLR8 agonism could better realize the potential for effective therapy and potentially lead to functional cure, which is defined as sustained loss of hepatitis B surface antigen (HBsAg) in the blood, in patients suffering from cHBV. We presented a preclinical update on SBT8230 in the fourth quarter of 2021. In the first quarter of 2022, we began a Phase 1-enabling toxicology study. We plan to complete a Phase 1 regulatory submission in the fourth quarter of 2022 and begin a Phase 1 single ascending dose (SAD) study in healthy volunteers in the first half of 2023. After completing the SAD study, we anticipate initiating a Phase 1 multiple ascending dose (MAD) study in patients with chronic HBV, who are virally suppressed on nucleoside reverse transcriptase inhibitors (NRTI) therapy.

In addition, our internal discovery programs are focused on evaluating and developing new antigen binding domains specific for targets of interest (including antibodies), next-generation linker technologies, and both agonist and antagonist small molecule payloads, that may be combined to create novel tissue-targeted antibody conjugates. The integration of medicinal chemistry, bioconjugation, protein engineering, bioinformatics, pharmacology, and translational medicine expertise focused on developing tissue-targeted therapies allows us to leverage key learnings from our previous clinical program to bring forward the next generation of therapeutics.  We anticipate providing an update on our discovery pipeline in the fourth quarter of 2022.

**Our ImmunoTAC Platform**

Our ImmunoTAC platform is the result of a focused effort to systemically deliver disease-modifying small molecules in a directed fashion to sites of disease. Many potentially promising systemic therapies fail to maximize their therapeutic potential due to toxicities in healthy tissues. Our approach is designed to localize disease-modifying payloads to specific sites of disease where our therapeutics are locally active.

**Our Development Pipeline**

Our ImmunoTAC platform drives our development pipeline of tissue targeted therapeutic candidates as summarized in the chart below:

| Program | Target / Payload | Indication(s) | Preclinical Studies | Phase 1 | Phase 2 | Anticipated Milestones |
|---|---|---|---|---|---|---|
| SBT8230 | ASGR1 TLR8 Agonist | cHBV | | | | • 4Q 2022 – Phase 1 regulatory submission<br>• 1H 2023 – Open enrollment for Phase 1 SAD study in healthy volunteers |
| Discovery Stage Pipeline | | | | | | |
| Undisclosed | Undisclosed | Multiple | | | | • 4Q 2022 – Preclinical update |

*ASGR1 = Asialoglycoprotein Receptor 1 (Liver Localized Protein)*
*cHBV = Chronic Hepatitis B Virus*
*SAD = Single Ascending Dose*
*TLR8 = Toll Like Receptor 8*

**Our Strategy**

Our goal is to transform the treatment of cHBV, cancer and other serious diseases with unmet need using our ImmunoTAC platform to deliver a new class of systemically delivered, tissue-directed, and locally active therapies. The key elements of our business strategy are to:

- *Demonstrate anti-viral properties of TLR8 in cHBV.* We are applying learnings from our TLR8 agonist oncology programs and clinical experience to maximize the potential of SBT8230. Our understanding of TLR8 conjugates in preclinical species and in the clinic guides our interpretation of the preclinical characteristics of SBT8230, an ASGR1 antibody conjugated to a TLR8 agonist linker payload for the treatment of cHBV that is currently in preclinical development.

- *Maximize the therapeutic potential of SBT8230.* The immune activating mechanism of SBT8230 is complimentary to other treatments for cHBV that interfere with components of the viral life cycle such as nucleoside and nucleotide analogs, capsid inhibitors, and RNAi-based therapies.  Furthermore, our ASGR1 antibody does not cross block GalNAc, allowing for combinations with RNAi-based therapies.

6

- ***Leverage our ImmunoTAC platform for promising new antibody-linker-payload combinations.*** We are strategically pairing our disease-modulating payloads with tissue targeted binding domains to create new therapeutic agents with the goal of providing benefits to patients. We plan to continue to leverage our ImmunoTAC platform, discovery of antigen binding domains (including antibodies), new linker technologies and therapeutic discovery infrastructure to discover and develop novel small molecule therapeutics conjugated to antibodies.

- ***Internally and externally source potentially transformative assets and technologies that align with our mission to develop tissue-targeted therapies.*** We have extensive expertise in protein engineering, small molecule linker and payload chemistry, and translational medicine that we apply to the discovery and advancement of new tissue-targeted agents to the clinic. Our clinical development team is a seasoned group with experience in developing antibody-drug conjugates and other therapeutics across all phases of development. While we have robust internal discovery capabilities, we also believe that innovative technologies can be acquired through business development activities. We therefore plan to continue to pursue synergistic, in-licensing opportunities to augment our internal discovery efforts.

- ***Evaluate opportunities to accelerate development timelines and/or enhance the commercial potential of our programs in partnership with third parties***. We plan to selectively explore potential strategic partnerships on a program-by-program basis with biopharmaceutical partners whose research, development, commercial, and/or geographic capabilities complement our own. We believe strategic partnerships can help mitigate clinical and commercial risk, accelerate timelines, and/or maximize global commercial potential.

**Our Team**

We have an accomplished management team with a proven track record of therapeutic research and development expertise and of generating meaningful stockholder value. The members of our team have deep experience in discovering and developing therapeutics, including acalabrutinib, brentuximab vedotin, entrectinib, etanercept, ibrutinib, lisocabtagene maraleucel, sunitinib, tezepelumab, tucatinib, and venetoclax.

*Activating the Myeloid Cell Compartment Through Liver-Targeted TLR8 Agonism*

As shown in the figure below, TLR8 activation of human myeloid cells plays an important role in the anti-viral immune response in cHBV. HBV-infected liver is highly immunosuppressive and the activation of macrophages and other myeloid cells in the liver can serve to overcome this immunosuppression. We believe TLR8 is the optimal target for activating these myeloid cell types due to its restricted expression and function within these cells. TLR8 is also highly expressed in conventional dendritic cells which promote antigen presentation and the production of cytokines important for the generation of T and B cell responses against hepatitis B virus. TLR8 is not expressed in T or B lymphocytes, but TLR8 activation in human myeloid cells secondarily induces IFNγ production by T cells and antibody production by B cells, both shown to be associated with the generation of functional cure in cHBV.

*TLR8 is Highly Expressed in Human Myeloid Cell Types That Drive Anti-Viral Responses when Activated*



7

*Silverback's Preclinical and Clinical Development Experience with a HER2-Directed TLR8 Agonist Conjugate, SBT6050*

We have gained pre-clinical and clinical experience with TLR8 conjugates through our recently discontinued SBT6050 program. In this program, a HER2-TLR8 agonist conjugate was administered to 58 patients as monotherapy and in combination with a checkpoint inhibitor at dose levels ranging from 0.15 mg/kg through 1.2 mg/kg with the length of patient experience ranging from 2 weeks through 41 weeks. We observed a dose response for adverse events related to immune activation, serum PK, serum pharmacodynamic markers, tumor exposure and intratumoral pharmacodynamic markers inclusive of data that demonstrates activation of immune mechanisms in biopsies collected from patients after treatment. However, antitumor activity was limited in the monotherapy arm, and increased toxicity in combination with checkpoint inhibitors limited dose escalation beyond 0.3 mg/kg. In the 18 patients treated in combination with pembrolizumab, while we observed decreasing volume stable disease in some patients, we did not see responses meeting RECIST criteria. Furthermore, at 0.3 mg/kg in combination with pembrolizumab, although there were no DLTs with additional patients and longer follow-up, it was determined that long-term tolerability was challenging. Several patients experienced grade 3 adverse events in later cycles, including grade 3 hypotension. Finally, PK and PD at 0.3 mg/kg were suboptimal.

On the other hand, there were important learnings from the SBT6050 clinical program that we are applying to SBT8230. In the SBT6050 clinical trial, exposures increased with dose and the data demonstrated that the conjugate was stable in circulation. Free payload was undetectable in ~98% of blood samples evaluated and in the few samples in which payload was detectable, the levels were at least an order of magnitude below the lowest active concentrations of payload. SBT6050 induced PD activity indicative of myeloid and natural killer (NK) and/or T cell activation at all dose levels, confirming the proposed mechanism of action of TLR8 agonism, and PD activity was maintained with repeat dosing.

Our understanding of TLR8 conjugates in preclinical species and in the clinic guides our interpretation of the preclinical characteristics of SBT8230, an ASGR1 antibody conjugated to a TLR8 agonist linker payload for the treatment of cHBV currently in preclinical development. ASGR1 is highly expressed in liver and is restricted in its expression to this organ. Other ASGR1-directed agents, such as those used by RNAi therapies, have shown robust liver localization. SBT8230 shows biodistribution profiles in NHP consistent with these agents and is distinct from SBT6050 and SBT6290 in this regard.

**SBT8230: TLR8 Agonist Conjugated to an ASGR1 Antibody**

We have engineered SBT8230 to treat cHBV by eliciting an anti-viral immune response through targeting TLR8 activation to the liver. SBT8230 is comprised of an ASGR1 monoclonal antibody conjugated to the same TLR8 linker-payload as SBT6050, but with an average drug antibody ratio (DAR) of about 2 as opposed to the average DAR of about 4 used in SBT6050.

cHBV infection remains a worldwide problem affecting approximately 257 million people and contributing to an estimated 887,000 deaths in 2015. In the United States alone, approximately 860,000 people suffer from cHBV. cHBV is estimated to be the cause of 60-80% of the world's primary liver cancers. There is a significant unmet need for therapies that can elicit a functional cure for the disease, which is defined as sustained loss of HBsAg in the blood. Many of the approved therapies for cHBV have low functional cure rates or lack durability over time.

Clinical and preclinical evidence by third parties have demonstrated that IFNg-mediated immune responses, including the activation of IFNg+ T cell and IgG B cell anti-viral responses, can lead to a functional cure in cHBV patients and animal models of HBV. In HBV transgenic mice, HBV-specific CD4 and CD8 T cells have exhibited the ability to inhibit hepatocellular replication by a noncytopathic process that is mediated primarily by IFNg. In acutely infected chimpanzees, viral replication was almost completely abolished soon after CD3 and IFNg mRNA increased in the liver. Evidence by third parties has demonstrated that HBV-specific IFNg producing CD4 T cells were associated with viral clearance in patients with cHBV infection. Additionally, these studies have demonstrated that TLR8 agonists were particularly effective in activation of myeloid cells and the induction of IFNg. The figure below shows IFNg production after human blood or liver-derived mononuclear cells were stimulated with the indicated TLR agonist. TLR8 was unique in its ability to induce IFNg.

8

*TLR8 Drove IFNg Production from Liver Mononuclear Cells in Third Party Preclinical Studies*



Supernatants in blood (n=5) or liver- derived mononuclear cells (n=9) stimulated with the indicated TLR agonist

*Jo et al, PLOS Pathogens, 2014*

In addition, the figures below show concentrations of individual cytokines quantified in the supernatant of purified peripheral blood mononuclear cells (PBMC) or isolated mononuclear cells from the liver after stimulation with either a TLR8 or TLR7 agonist. TLR8 agonism, but not TLR7 agonism, induced IFNγ production, along with the production of other cytokines important in the generation of anti-viral immunity such as TNFα, IL-1ß, and IL-6, from both liver and blood immune cells. We believe these data from third parties demonstrate that TLR8 is the agonist of choice for improving the outcome for patients with cHBV.

*TLR8 Agonism Drove Cytokine Production*



*Figure source: Jo et al, PLOS Pathogens, 2014.*

9

## Item 1A. Risk Factors

*We operate in a dynamic and rapidly changing environment that involves numerous risks and uncertainties. Certain factors may have a material adverse effect on our business, financial condition and results of operations, and you should carefully consider them. Accordingly, in evaluating our business, we encourage you to consider the following discussion of risk factors, in its entirety, in addition to other information contained in this Annual Report on Form 10-K and our other public filings with the SEC. Other events that we do not currently anticipate or that we currently deem immaterial may also affect our results of operations and financial condition.*

### Risks Related to Our Business and Industry

***We have a limited operating history, have incurred net losses since our inception, and anticipate that we will continue to incur significant losses for the foreseeable future. We may never generate any revenue or become profitable or, if we achieve profitability, may not be able to sustain it.***

We are an early-stage biopharmaceutical company with a limited operating history that may make it difficult to evaluate the success of our business to date and to assess our future viability. Our operations to date have been limited to organizing and staffing our company, business planning, business development, raising capital, developing and optimizing our technology platform, identifying potential product candidates, undertaking research and preclinical studies for our lead program and other development programs, undertaking clinical trials for our now discontinued SBT6050 and SBT6290 programs, establishing and enhancing our intellectual property portfolio, and providing general and administrative support for these operations. All of our product candidates are in preclinical development, and none have been approved for commercial sale. We have never generated any revenue from product sales and have incurred net losses each year since we commenced operations. For the years ended December 31, 2021 and 2020, our net losses were $89.5 million and $32.9 million, respectively. We expect that it will be several years, if ever, before we have a product candidate ready for regulatory approval and commercialization. We expect to incur increasing levels of operating losses over the next several years and for the foreseeable future as we advance our product candidates through clinical development. Our prior losses, combined with expected future losses, had and will continue to have an adverse effect on our stockholders' deficit and working capital.

To become and remain profitable, we must develop and eventually commercialize a product or products with significant market potential. This will require us to be successful in a range of challenging activities, including completing preclinical studies and clinical trials of our product candidates, obtaining marketing approval for these product candidates, manufacturing, marketing and selling those products for which we may obtain marketing approval and satisfying any post-marketing requirements. We may never succeed in these activities and, even if we succeed in commercializing one or more of our product candidates, we may never generate revenue that is significant or large enough to achieve profitability. In addition, as a young business, we may encounter unforeseen expenses, difficulties, complications, delays, and other known and unknown challenges. If we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis and we will continue to incur substantial research and development and other expenditures to develop and market additional product candidates. Our failure to become and remain profitable would decrease the value of the company and could impair our ability to raise capital, maintain our research and development efforts, expand our business, or continue our operations. A decline in the value of our company could also cause you to lose all or part of your investment.

35

*We incur significantly increased costs as a result of operating as a public company, and our management is required to devote substantial time to new compliance initiatives.*

As a public company listed on the Nasdaq Global Market, we incur significant legal, accounting and other expenses that we did not incur as a private company. In addition, the Sarbanes-Oxley Act, as well as rules subsequently implemented by the SEC, and the Nasdaq Global Market have imposed various requirements on public companies. In July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the Dodd-Frank Act) was enacted. There are significant corporate governance and executive compensation related provisions in the Dodd-Frank Act that require the SEC to adopt additional rules and regulations in these areas such as "say on pay" and proxy access. Recent legislation permits smaller "emerging growth companies" to implement many of these requirements over a longer period and up to five years from the pricing of our initial public offering. We intend to continue to take advantage of this new legislation but cannot guarantee that we will not be required to implement these requirements sooner than budgeted or planned and thereby incur unexpected expenses. Stockholder activism, the current political environment and the current high level of government intervention and regulatory reform may lead to substantial new regulations and disclosure obligations, which may lead to additional compliance costs and impact the manner in which we operate our business in ways we cannot currently anticipate. Our management and other personnel need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations increase our legal and financial compliance costs and make some activities more time- consuming and costlier. For example, these rules and regulations make it more difficult and more expensive for us to obtain director and officer liability insurance and we are required to incur substantial costs to maintain our current levels of such coverage.

*If we are unable to raise additional capital when needed, we may be forced to delay, reduce or eliminate our product development programs or other operations.*

Since our inception, we have used substantial amounts of cash to fund our operations and expect we will continue to incur significant losses for the foreseeable future. The development of biopharmaceutical product candidates is capital intensive. As our product candidates enter and advance through preclinical studies and potential clinical trials, we will need substantial additional funds to expand our clinical, regulatory, quality and manufacturing capabilities. In addition, if we obtain marketing approval for any of our product candidates, we expect to incur significant commercialization expenses related to marketing, sales, manufacturing and distribution. Furthermore, following the completion of our initial public offering in December 2020, we have incurred and expect to continue to incur additional costs associated with operating as a public company.

As of December 31, 2021, we had $319.1 million in cash, cash equivalents, restricted cash, and investments. Based upon our current operating plan, we estimate following our corporate restructuring plan approved in March 2022, that our existing cash, cash equivalents, restricted cash, and investments will be sufficient to fund our operating expenses and capital expenditure requirements into the second half of 2026. However, we believe that our existing cash, cash equivalents, restricted cash, and investments will not be sufficient to fund any of our product candidates through regulatory approval, and we will need to raise substantial additional capital to complete the development and commercialization of our product candidates.

We have based these estimates on assumptions that may prove to be incorrect or require adjustment as a result of business decisions, and we could utilize our available capital resources sooner than we currently expect. Our future capital requirements will depend on many factors, including:

- the initiation, trial design, progress, timing, costs and results of drug discovery, preclinical studies and clinical trials of our product candidates, and in particular future clinical trials for SBT8230;

- the number and characteristics of product candidates that we pursue;

- the outcome, timing, and costs of seeking FDA, EMA and any other regulatory approvals;

- the costs of manufacturing our product candidates and commercial manufacturing activities;

- the costs associated with hiring additional personnel and consultants as our preclinical, manufacturing and clinical activities increase;

- the receipt of marketing approval and revenue received from any commercial sales of any of our product candidates, if approved;

- the cost of commercialization activities for any of our product candidates, if approved, including marketing, sales and distribution costs;

- the emergence of competing therapies and other adverse market developments;

- the ability to establish and maintain strategic collaboration, licensing or other arrangements and the financial terms of such agreements;

36

**Risks Related to the Discovery, Development, and Regulatory Approval of Our Product Candidates**

***We are early in our development efforts and all of our product candidates and research programs are in preclinical development or discovery stage.***

We are early in our development efforts and most of our operations to date have been limited to developing our platform technologies and conducting drug discovery and preclinical studies. While we performed limited clinical trials for our now discontinued SBT6050 and SBT6290 programs, we have not begun clinical trials for any of our current product candidates or development programs. Our current product candidates remain in the preclinical and discovery stage. As a result, we have limited infrastructure, experience conducting clinical trials as a company and regulatory interactions, and cannot be certain that our planned clinical trials will be completed on time, if at all, that our planned development programs would be acceptable to the FDA or other comparable foreign regulatory authorities, or that, if approval is obtained, such product candidates can be successfully commercialized.

Because of the early stage of development of our products candidates, our ability to eventually generate significant revenues from product sales will depend on a number of factors, including:

- successful completion of additional preclinical studies with favorable results;

- submission and acceptance of INDs by the FDA or similar regulatory filing by comparable foreign regulatory authorities for the conduct of clinical trials of our product candidates and our proposed design of future clinical trials;

- successful enrollment in, and completion of, clinical trials and achieving positive results from the trials;

- demonstrating a risk-benefit profile acceptable to regulatory authorities;

- receipt of marketing approvals from applicable regulatory authorities;

- establishing manufacturing capabilities or arrangements with third-party manufacturers for clinical supply and, if and when approved, for commercial supply;

- establishing sales, marketing and distribution capabilities and launching commercial sales of our products, if and when approved, whether alone or in combination with others;

- acceptance of our products, if and when approved, by patients, the medical community and third-party payors;

- effectively competing with other therapies;

- developing and implementing marketing and reimbursement strategies;

- obtaining and maintaining third-party coverage and adequate reimbursement;

- obtaining and maintaining patent, trade secret and other intellectual property protection and regulatory exclusivity for our product candidates; and

- maintaining a continued acceptable safety profile of any product following approval, if any.

If we do not achieve one or more of these requirements in a timely manner, we could experience significant delays or an inability to successfully commercialize our product candidates, which would materially harm our business.

***Preclinical and clinical development is a lengthy, expensive, and uncertain process. The results of preclinical studies and early clinical trials are not always predictive of future results. Any product candidate that we advance into clinical trials, including from our SBT8230 program, may not achieve favorable results in later clinical trials, if any, or receive marketing approval.***

The research and development of drugs and biological products is extremely risky. Only a small percentage of product candidates that enter the development process ever receive marketing approval. Before obtaining marketing approval from regulatory authorities for the sale of our product candidates, we must conduct extensive clinical trials to demonstrate the safety and efficacy of the product candidates in humans. Preclinical and clinical development is expensive and can take many years to complete, and their outcome is inherently uncertain. We may face unforeseen challenges in our product candidate development strategy, and we can provide no assurances that we will ultimately be successful in our future clinical trials or that our product candidates will be able to receive regulatory approval. The results of preclinical studies and early clinical trials of our product candidates and other products, even those with the same or similar mechanisms of action, may not be predictive of the results of later-stage clinical trials. For example, it is not uncommon for product candidates to exhibit unforeseen safety or efficacy issues when tested in humans despite promising results in preclinical animal models. Future results of preclinical and clinical testing of our product candidates are also less certain due to the novel and relatively untested nature of our approach to TLR8 and related platform technologies. In general, clinical trial failure may result from a multitude of factors including flaws in study design, dose selection, patient enrollment criteria and failure to demonstrate favorable safety or efficacy traits. As such, failure in clinical trials can occur at any stage of testing. For example, on March 28, 2022, we made the decision to discontinue our clinical development programs for SBT6050 and SBT6290 due to SBT6050 exhibiting limited monotherapy activity and dose-limiting adverse events when used in combination with pembrolizumab. A number of companies in the biopharmaceutical industry have suffered setbacks in the advancement of clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials.

Prior to obtaining approval to commercialize any product candidate in the United States or abroad, we must demonstrate with substantial evidence from well-controlled clinical trials, and to the satisfaction of the FDA or comparable foreign regulatory authorities, that such product candidate is safe and effective for its intended uses. Results from preclinical studies and clinical trials can be interpreted in different ways. Even if we believe that the preclinical or clinical data for our product candidates are promising, such data may not be sufficient to support approval by the FDA and other regulatory authorities. The FDA may also require us to conduct additional preclinical studies or clinical trials for our product candidates either prior to or post-approval, or it may object to elements of our clinical development program, requiring their alteration.

If the results of our future clinical trials are inconclusive or if there are safety concerns or other adverse events associated with our product candidates, we may:

- incur unplanned costs;

- be delayed in or prevented from continuing clinical development and obtaining marketing approval for our product candidates;

- obtain approval for indications or patient populations that are not as broad as intended or desired;

- obtain approval with labeling that includes significant use or distribution restrictions or safety warnings including boxed warnings;

- be subject to changes or limitations in the way the product is administered;

- be required to perform additional clinical trials to support approval or be subject to additional post-marketing testing requirements;

- have regulatory authorities withdraw their approval of the product or impose restrictions on its distribution in the form of a modified Risk Evaluation and Mitigation Strategy (REMS);

- be subject to the addition of labeling statements, such as warnings or contraindications;

- be sued; or

- experience damage to our reputation.

Treatment of patients with chronic disease, such as HBV infection, with our product candidates may be used in combination with other drugs, such as monoclonal antibodies or other protein-based drugs, small molecule agents, and RNAi therapeutics which can cause side effects or adverse events that are unrelated to our product candidate but may still impact the success of our future clinical trials. Additionally, our product candidates could potentially cause adverse events. As described above, any of these events could prevent us from obtaining regulatory approval or achieving or maintaining market acceptance of our product candidates and impair our ability to commercialize our products. Because all of our product candidates are derived from our platform technologies, a clinical failure of one of our product candidates may also increase the actual or perceived likelihood that our other product candidates will experience similar failures.

Of the large number of products in development, only a small percentage successfully complete the FDA or comparable foreign regulatory authorities' approval processes and are commercialized. The lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would significantly harm our business, financial condition, results of operations and prospects.

Even if we eventually complete clinical testing and receive approval of a biologics license application (BLA) or foreign marketing application for our product candidates, the FDA or the comparable foreign regulatory authorities may grant approval contingent on the performance of costly additional clinical trials, including post-market clinical trials. The FDA or the comparable foreign regulatory authorities also may approve a product candidate for a more limited indication or patient population than we originally request, and the FDA or comparable foreign regulatory authorities may not approve the labeling that we believe is necessary or desirable for the successful commercialization of a product candidate. Any delay in obtaining, or inability to obtain, applicable regulatory approval would delay or prevent commercialization of that product candidate and would adversely impact our business and prospects.

In addition, the FDA or comparable foreign regulatory authorities may change their policies, adopt additional regulations or revise existing regulations or take other actions, which may prevent or delay approval of our future product candidates under development on a timely basis. Such policy or regulatory changes could impose additional requirements upon us that could delay our ability to obtain approvals, increase the costs of compliance or restrict our ability to maintain any marketing authorizations we may have obtained.

***Our product candidates are based on novel technologies, which make it difficult to predict the timing, results and cost of product candidate development and likelihood of obtaining regulatory approval.***

We have concentrated our research and development efforts on product candidates using our platform technologies, and our future success depends on the successful development of this approach. We have not yet succeeded and may not succeed in demonstrating efficacy and safety for any product candidates based on our platform technologies in clinical trials or in obtaining marketing approval thereafter, and use of our platform technologies may not ever result in marketable products. We may also experience delays in developing a sustainable, reproducible and scalable manufacturing process or transferring that process to commercial partners or establishing our own commercial manufacturing capabilities, which may prevent us from completing our planned clinical trials or commercializing any products on a timely or profitable basis, if at all.

In addition, the clinical trial requirements of the FDA, EMA and other regulatory agencies and the criteria these regulators use to determine the safety and efficacy of a product candidate vary substantially according to the type, complexity, novelty and intended use and market of the potential products. The regulatory approval process for novel product candidates such as ours can be more expensive and take longer than for other, better known or extensively studied pharmaceutical or other product candidates.

The cHBV market is also rapidly developing and our competitors may introduce new technologies that effectively target the virus lifecycle or modulate the immune response to the virus that render our technologies obsolete or less attractive. New technology could emerge at any point in the development cycle of our product candidates.

The TLR field is also rapidly evolving and as competitors use or develop alternative TLR technologies, any failures of such technologies could adversely impact our programs. For example, companies are developing other TLR8, TLR7, TLR7/8 and TLR9 agonists, some of which are conjugated to monoclonal antibodies. Regardless of our belief that our approach to activating the innate immune system has advantages, issues encountered with other TLR programs will create a negative perception of or increase scrutiny for our technologies and product candidates.

42

*If we experience delays or difficulties enrolling in our planned clinical trials, our research and development efforts and business, financial condition and results of operations could be materially adversely affected.*

We may not be able to initiate or continue our planned clinical trials for our product candidates if we are unable to identify and enroll a sufficient number of healthy volunteers or eligible patients to participate in these trials as required by the FDA or other regulatory agencies. Subject enrollment, a significant factor in the timing of clinical trials, is affected by many factors including the size and nature of the patient population, the proximity of patients to clinical sites, the eligibility criteria for the clinical trial, the design of the clinical trial, competing clinical trials and clinicians' and patients' perceptions as to the potential advantages of the product candidate being studied in relation to other available therapies, including any new drugs that may be approved for the indications we are investigating.

The timely completion of clinical trials in accordance with their protocols depends, among other things, on our ability to enroll a sufficient number of patients who remain in the study until its conclusion. We may experience difficulties in patient enrollment or retention in our planned clinical trials for a variety of reasons. The enrollment of patients depends on many factors, including:

- the eligibility criteria defined in the protocol;
- the size of the patient population required for analysis of the trial's primary endpoints;
- the proximity of patients to study sites;
- the design of the trial;
- our ability to recruit clinical trial investigators with the appropriate competencies and experience;
- clinicians' and patients' perceptions as to the potential advantages of the product candidate being studied in relation to other available therapies, including any new drugs that may be approved for the indications we are investigating;
- our ability to obtain and maintain patient consents; and
- the risk that patients enrolled in clinical trials will drop out of the trials before completion.

In addition, our planned clinical trials may compete with other clinical trials for product candidates that are in the same therapeutic areas as our product candidates, and this competition will reduce the number and types of patients available to us, because some patients who might have opted to enroll in our trials may instead opt to enroll in a trial being conducted by one of our competitors. Delays in patient enrollment may result in increased costs or may affect the timing or outcome of the planned clinical trials, which could prevent completion of these trials and adversely affect our ability to advance the development of our product candidates.

*Serious adverse events, undesirable side effects or other unexpected properties of our product candidates may be identified during development or after approval, which could lead to the discontinuation of our clinical development programs, refusal by regulatory authorities to approve our product candidates or, if discovered following marketing approval, revocation of marketing authorizations or limitations on the use of our product candidates thereby limiting the commercial potential of such product candidate.*

As we continue developing our product candidates and initiate any future clinical trials of our product candidates, serious adverse events (SAEs), undesirable side effects, relapse of disease, or unexpected characteristics may emerge causing us to abandon these product candidates or limit their development to more narrow uses or subpopulations in which the SAEs or undesirable side effects or other characteristics are less prevalent, less severe or more acceptable from a risk-benefit perspective or in which efficacy is more pronounced or durable. Should we observe any SAEs in our planned clinical trials or identify other undesirable side effects or other unexpected findings, depending on their severity, our trials could be delayed or even stopped and our development programs may be halted entirely.

Our TLR8 agonist containing product candidates, including from our SBT8230 program, activate dendritic cells among other innate immune cells, which can amplify anti-drug antibodies. As a result, significant anti-drug antibodies (ADA) generation could neutralize the effects of SBT8230 by reducing exposure. The development of ADAs could also trigger hypersensitivity reactions that manifest as SAEs. If patients experience adverse events due to ADAs, our preclinical studies and future trials could be delayed or stopped and our development programs may be halted entirely if this is observed during clinical development. Even if ADAs are not detected in the early clinical trials, they may be detected after product launch and may significantly reduce the commercial potential or even result in the product being pulled from the market.

Even if our product candidates initially show promise in early clinical trials, the side effects of biological products are frequently only detectable after they are tested in larger, longer, and more extensive clinical trials or, in some cases, after they are made available to patients on a commercial scale after approval. Sometimes, it can be difficult to determine if the serious adverse or unexpected side effects were caused by the product candidate or another factor, especially in oncology subjects who may suffer from other medical conditions and be taking other medications. If serious adverse or unexpected side effects are identified during development or after approval and are determined to be attributed to our product candidate, we may be required to develop a REMS to ensure that the benefits of treatment with such product candidate outweigh the risks for each potential patient, which may include, among other things, a communication plan to health care practitioners, patient education, extensive patient monitoring or distribution systems and processes that are highly controlled, restrictive and more costly than what is typical for the industry. Product-related side effects could also result in potential product liability claims. Any of these occurrences may harm our business, financial condition and prospects significantly.

In addition, if one or more of our product candidates receives marketing approval, and we or others later identify undesirable side effects or ADAs caused by such products, a number of potentially significant negative consequences could result, including:

- regulatory authorities may suspend, withdraw or limit approvals of such product, or seek an injunction against its manufacture or distribution;

- regulatory authorities may require additional warnings on the label, including "boxed" warnings, or issue safety alerts, Dear Healthcare Provider letters, press releases or other communications containing warnings or other safety information about the product;

- we may be required to create a medication guide outlining the risks of such side effects for distribution to patients;

- we may be required to change the way a product is administered or conduct additional clinical trials;

- the product may become less competitive, and our reputation may suffer;

- we may decide to remove the product from the marketplace; and

- we may be subject to fines, injunctions or the imposition of civil or criminal penalties.

***Interim, topline and preliminary data from our preclinical studies or planned clinical trials may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.***

From time to time, we may publicly disclose preliminary, interim, or topline data from our preclinical studies or planned clinical trials, which is based on a preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change as patient enrollment and treatment continues and more data become available. Adverse differences between previous preliminary or interim data and future interim or final data could significantly harm our business prospects. We may also announce topline data following the completion of a preclinical study or planned clinical trial, which may be subject to change following a more comprehensive review of the data related to the particular study or trial. We also make assumptions, estimations, calculations, and conclusions as part of our analyses of data, and we may not have received or had the opportunity to fully and carefully evaluate all data. As a result, the interim, topline or preliminary results that we report may differ from future results of the same studies, or different conclusions or considerations may qualify such results, once additional data have been received and fully evaluated. Topline data also remain subject to audit and verification procedures that may result in the final data being materially different from the preliminary data we previously published. As a result, interim, topline and preliminary data should be viewed with caution until the final data are available.

Further, others, including regulatory agencies, may not accept or agree with our assumptions, estimates, calculations, conclusions or analyses or may interpret or weigh the importance of data differently, which could impact the value of the particular program, the approvability or commercialization of the particular product candidate or product and our company in general. In addition, the information we choose to publicly disclose regarding a particular study or clinical trial is based on what is typically extensive information, and you or others may not agree with what we determine to be material or otherwise appropriate information to include in our disclosure, and any information we determine not to disclose may ultimately be deemed significant with respect to future decisions, conclusions, views, activities or otherwise regarding a particular product candidate or our business. If the interim, topline, or preliminary data that we report differ from actual results, or if others, including regulatory authorities, disagree with the conclusions reached, our ability to obtain approval for and commercialize our product candidates, our business, operating results, prospects or financial condition may be harmed.

Separately, in response to the global COVID-19 pandemic, in March 2020, the FDA announced its intention to postpone most foreign inspections of manufacturing facilities and products, and to temporarily postpone routine surveillance inspections of domestic manufacturing facilities. Subsequently, in July 2020 the FDA resumed certain on-site inspections of domestic manufacturing facilities on a risk-based prioritization system. The FDA intends to use this risk-based assessment system to identify the categories of regulatory activity that can occur within a given geographic area, ranging from mission critical inspections to resumption of all regulatory activities. Regulatory authorities outside the United States may adopt similar restrictions or other policy measures in response to the COVID-19 pandemic. If a prolonged government shutdown occurs, or if global health concerns continue to prevent the FDA or other regulatory authorities from conducting their regular inspections, reviews, or other regulatory activities, it could significantly impact the ability of the FDA or other regulatory authorities to timely review and process our regulatory submissions, which could have a material adverse effect on our business.

***We may expend our limited resources to pursue a particular product candidate or indication and fail to capitalize on product candidates or indications that may be more profitable or for which there is a greater likelihood of success.***

Because we have limited financial and managerial resources, we must prioritize our research programs and will need to focus our discovery and development on select product candidates and indications. Correctly prioritizing our research and development activities is particularly important for us due to the breadth of potential product candidates and indications that we believe could be pursued using our platform technologies. As a result, we may forego or delay pursuit of opportunities with other product candidates or for other indications that later prove to have greater commercial potential. Our resource allocation decisions may cause us to fail to capitalize on viable commercial products or profitable market opportunities. Our spending on current and future research and development programs and product candidates for specific indications may not yield any commercially viable products. If we do not accurately evaluate the commercial potential or target market for a particular product candidate, we may also relinquish valuable rights to that product candidate through collaboration, licensing or other royalty arrangements in cases in which it would have been more advantageous for us to retain sole development and commercialization rights to such product candidate. For example, on March 28, 2022, we made the decision to discontinue our clinical development programs for SBT6050 and SBT6290 and to prioritize resources on the development of SBT8230 and our early-stage discovery programs.

***We may not be successful in our efforts to identify or discover additional product candidates in the future.***

Our research programs may initially show promise in identifying potential product candidates, yet fail to yield product candidates for clinical development for a number of reasons, including:

- our inability to design such product candidates with the properties that we desire; or

- potential product candidates may, on further study, be shown to have harmful side effects or other characteristics that indicate that they are unlikely to be products that will receive marketing approval and achieve market acceptance.

Research programs to identify new product candidates require substantial technical, financial and human resources. If we are unable to identify suitable additional candidates for preclinical and clinical development, our opportunities to successfully develop and commercialize therapeutic products will be limited.

48

**Risks Related to Manufacturing, Commercialization, and Reliance on Third Parties**

***We may rely on third parties to conduct, supervise, and monitor our planned clinical trials and perform some of our research and preclinical studies. If these third parties do not satisfactorily carry out their contractual duties or fail to meet expected deadlines, our development programs may be delayed or subject to increased costs, each of which may have an adverse effect on our business and prospects.***

We do not have the ability to conduct all aspects of our preclinical testing or planned clinical trials ourselves. As a result, we are and expect to remain dependent on third parties to conduct our preclinical studies, including GLP toxicology studies, and any future clinical trials of our product candidates. Specifically, CROs that manage preclinical studies, GLP toxicology studies and our planned clinical trials as well as consultants play a significant role in the conduct of our preclinical studies and future clinical studies and the subsequent collection and analysis of data. The timing of the initiation and completion of these studies and trials will therefore be partially controlled by such third parties and may result in delays to our development programs. Nevertheless, we are responsible for ensuring that each of our preclinical studies and clinical trials is conducted in accordance with the applicable protocol, legal requirements, and scientific standards, and our reliance on the CROs and other third parties does not relieve us of our regulatory responsibilities. We and our CROs are required to comply with GLP and GCP requirements, which are regulations and guidelines enforced by the FDA, the Competent Authorities of the Member States of the European Economic Area, and comparable foreign regulatory authorities for all of our product candidates in clinical development. Regulatory authorities enforce these GLP and GCP requirements through periodic inspections of preclinical study sites, trial sponsors, clinical trial investigators and clinical trial sites. If we or any of our CROs or future clinical trial sites fail to comply with applicable GLP or GCP requirements, the data generated in our preclinical studies and planned clinical trials may be deemed unreliable, and the FDA or comparable foreign regulatory authorities may require us to perform additional preclinical or clinical trials before approving our marketing applications. In addition, our clinical trials must be conducted with product produced under cGMP regulations. Our failure to comply with these regulations may require us to stop and/or repeat clinical trials, which would delay the marketing approval process.

There is no guarantee that any such CROs, clinical trial investigators or other third parties on which we rely will devote adequate time and resources to our development activities or perform as contractually required. These risks are heightened as a result of the efforts of government agencies and the CROs themselves to limit the spread of COVID-19, including quarantines and shelter-in-place orders, which have also adversely impacted the supply chain for many research and clinical supplies, including animals for preclinical testing. If any of these third parties fail to meet expected deadlines, adhere to our clinical protocols or meet regulatory requirements, otherwise performs in a substandard manner, or terminates its engagement with us, the timelines for our development programs may be extended or delayed or our development activities may be suspended or terminated. If any of our clinical trial sites terminates for any reason, we may experience the loss of follow-up information on subjects enrolled in such clinical trials unless we are able to transfer those subjects to another qualified clinical trial site, which may be difficult or impossible. In addition, clinical trial investigators for our clinical trials may serve as scientific advisors or consultants to us from time to time and may receive cash or equity compensation in connection with such services. If these relationships and any related compensation result in perceived or actual conflicts of interest, or the FDA or any comparable foreign regulatory authority concludes that the financial relationship may have affected the interpretation of the trial, the integrity of the data generated at the applicable clinical trial site may be questioned and the utility of the clinical trial itself may be jeopardized, which could result in the delay or rejection of any marketing application we submit by the FDA or any comparable foreign regulatory authority. Any such delay or rejection could prevent us from commercializing our product candidates.

Furthermore, these third parties may also have relationships with other entities, some of which may be our competitors. If these third parties do not successfully carry out their contractual duties, meet expected deadlines or conduct our clinical trials in accordance with regulatory requirements or our stated protocols, we will not be able to obtain, or may be delayed in obtaining, marketing approvals for our product candidates and will not be able to, or may be delayed in our efforts to, successfully commercialize our products.

***We contract with third parties for the manufacture and supply of certain of our product candidates for use in preclinical testing and clinical trials and will rely on third parties for commercial supply, which supply may become limited or interrupted or may not be of satisfactory quality and quantity.***

We do not have any manufacturing facilities. We produce in our laboratory relatively small quantities of product for evaluation in our research programs. We rely on third parties for the manufacture of a portion of our product candidates for preclinical testing and all of our product candidates for clinical testing and we will continue to rely on such third parties for commercial manufacture if any of our product candidates are approved. We currently have limited manufacturing arrangements and expect that each of our product candidates, including from our SBT8230 program, will only be covered by single source suppliers for the foreseeable future. This reliance increases the risk that we will not have sufficient quantities of our product candidates or products, if approved, or such quantities at an acceptable cost or quality, which could delay, prevent or impair our development or commercialization efforts.

49

**Item 6. [Reserved]**

**Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

*You should read the following discussion and analysis together with our financial statements and related notes included in "Item 8. Financial Statements and Supplementary Data" in this Annual Report on Form 10-K. The following discussion contains forward-looking statements that involve risks and uncertainties. For a complete discussion of forward-looking statements, see the section above entitled "Forward Looking Statements." Our actual results could differ materially from those expressed or implied in any forward-looking statements as a result of various factors, including those set forth under the caption "Item 1A. Risk Factors."*

**Overview**

We are a biopharmaceutical company focused on leveraging our proprietary ImmunoTAC technology platform to develop systemically delivered, tissue targeted therapeutics for the treatment of chronic viral infections, cancer, and other serious diseases. Our ImmunoTAC platform is the result of a focused effort to discover ways to systemically deliver disease-modifying small molecules in a directed fashion to sites of disease. Our platform enables us to strategically pair proprietary linker-payloads that modulate key disease-modifying pathways with monoclonal antibodies directed to specific disease sites. Many potentially promising systemic therapies fail to maximize their therapeutic potential due to toxicities in healthy tissues. Our approach is designed to expand the therapeutic window and avert unacceptable toxicities by directly targeting specific disease sites where our therapeutics are locally active.

In July 2020, we initiated clinical development of our first ImmunoTAC product candidate, a TLR8 agonist conjugated to a HER2 antibody, SBT6050. Preclinical data suggested that we would be able to demonstrate a therapeutic window and advance SBT6050 through clinical development as a monotherapy and in combination with standard-of-care agents that had a complementary mechanism-of-action. Our Phase 1/1b program was designed to measure safety and tolerability, PK, PD and anti-tumor activity as monotherapy and in combination with pembrolizumab. On March 28, 2022, we made the decision to discontinue our clinical development program for SBT6050 due to limited monotherapy activity and dose-limiting adverse events when used in combination with pembrolizumab. SBT6290, comprised of the same linker payload conjugated to a Nectin4 antibody was expected to show a similar clinical profile and, therefore, we also terminated this program prior to dosing patients. We have prioritized our resources to focus on the development of SBT8230 and early-stage discovery programs.

Our understanding of TLR8 conjugates in preclinical species and in the clinic guides our interpretation of the preclinical characteristics of SBT8230, an ASGR1 antibody conjugated to a TLR8 agonist linker payload for the treatment of cHBV, which is currently in preclinical development. ASGR1 is highly expressed in liver and is restricted in its expression to this organ. Other ASGR1-directed agents, such as those used in RNAi therapies, have shown robust liver localization. SBT8230 shows biodistribution profiles in NHP consistent with these agents, which is distinct from SBT6050 and SBT6290. We believe that efficient liver targeting of SBT8230 via ASGR1 binding has the potential to lead to markedly lower serum exposures of SBT8230 in patients compared to those observed with SBT6050 in the clinic at any dose evaluated. We believe the preclinical to clinical experience for SBT6050, coupled with the NHP PK, PD, and tolerability data for SBT8230, suggest that the clinical safety, PK and PD profiles for SBT8230 has the potential to be notably different than those for SBT6050, given the large differences in serum exposures and overall conjugate disposition for SBT8230 that are expected in patients due to its efficient liver targeting. SBT8230 is designed to elicit an anti-viral immune response by targeting TLR8 activation to the liver. The anti-viral immune response is achieved through activation of myeloid cells and subsequent activation of immune cells that drive an IFNγ signal, which has been observed in the clinic with SBT6050. This has been shown by others to drive seroconversion, an important determinant of a functional cure. We see a significant opportunity in liver-localized immunotherapies as a potential way of achieving durable responses in these patients. We are focused on advancing SBT8230, our liver-targeted conjugate designed to potently activate human myeloid cells in the liver for the treatment of cHBV.

Further support for investigating TLR8 agonism for the treatment of cHBV comes from selgantolimod (GS-9688), an existing untargeted, orally administered TLR8 agonist being developed by Gilead Sciences. Selgantolimod has generated anti-viral immune responses in a cHBV animal model. The clinical development of this untargeted TLR8 agonist has shown promise, but we believe that toxicity prevented the use of a sufficient dose to elicit optimal clinical activity. We believe liver-localized TLR8 agonism could better realize the potential for effective therapy and potentially lead to functional cure, which is defined as sustained loss of HBsAg in the blood, in patients suffering from cHBV. We presented a preclinical update on SBT8230 in the fourth quarter of 2021. In the first quarter of 2022, we began a Phase 1-enabling toxicology study. We plan to complete a Phase 1 regulatory submission in the fourth quarter of 2022 and begin a Phase 1 SAD study in healthy volunteers in the first half of 2023. After completing the SAD study, we anticipate initiating a Phase 1 MAD study in patients with chronic HBV, who are virally suppressed on NRTI therapy.

In addition, our internal discovery programs are focused on evaluating and developing new antigen binding domains specific for targets of interest (including antibodies), next-generation linker technologies, and both agonist and antagonist small molecule payloads, that may be combined to create novel tissue-targeted antibody conjugates. The integration of medicinal chemistry, bioconjugation, protein engineering, bioinformatics, pharmacology, and translational medicine expertise focused on developing tissue-targeted therapies allows us to leverage key learnings from our previous clinical program to bring forward the next generation of therapeutics. We anticipate providing an update on our discovery pipeline in the fourth quarter of 2022.

Our ImmunoTAC platform drives our development pipeline of tissue targeted therapeutic candidates as summarized in the chart below:



| Program | Target / Payload | Indication(s) | Preclinical Studies | Phase 1 | Phase 2 | Anticipated Milestones |
|---|---|---|---|---|---|---|
| SBT8230 | ASGR1 TLR8 Agonist | cHBV | | | | • 4Q 2022 – Phase 1 regulatory submission<br>• 1H 2023 – Open enrollment for Phase 1 SAD study in healthy volunteers |
| Discovery Stage Pipeline | | | | | | |
| Undisclosed | Undisclosed | Multiple | | | | • 4Q 2022 – Preclinical update |

ASGR1 = Asialoglycoprotein Receptor 1 (Liver Localized Protein)
cHBV = Chronic Hepatitis B Virus
SAD = Single Ascending Dose
TLR8 = Toll Like Receptor 8

We have incurred significant operating losses since our inception. As of December 31, 2021, we had an accumulated deficit of $186.2 million. Our net losses were $89.5 million and $32.9 million for the years ended December 31, 2021 and 2020, respectively. Our losses have resulted primarily from research and development activities and general and administrative expenses. We do not have any products approved for sale and have not generated any revenue from product sales or otherwise.

We expect we will continue to incur significant losses for the foreseeable future as we continue our development of, and seek regulatory approvals for, our product candidates and begin to commercialize any approved products, seek to expand our product pipeline, invest in our organization and technology platform, as well as incur expenses associated with operating as a public company. Our net losses may fluctuate significantly from quarter-to-quarter and year-to-year, depending on a variety of factors including the timing and scope of our preclinical studies and clinical trials. Accordingly, until such time as we can generate significant revenue from sales of our product candidates, if ever, we expect to finance our cash needs through equity offerings, debt financings or other capital sources, including potential collaborations, licenses or other similar arrangements.

On March 28, 2022, our board of directors approved a corporate restructuring plan to discontinue our clinical development programs for SBT6050 and SBT6290 and to prioritize resources on the development of SBT8230 and early-stage discovery programs (the Restructuring Plan). In connection with the Restructuring Plan, our workforce will be reduced by 27%, with substantially all of the reduction in personnel expected to be completed by July 15, 2022. We initiated the reduction in force on March 31, 2022 and expect to provide severance payments, continuation of group health insurance coverage, and other benefits for a specified period to the affected employees. We currently estimate that we will incur costs of approximately $2.0 million for termination benefits related to the Restructuring Plan, all of which will be cash expenditures paid in 2022.

**Components of Our Results of Operations**

*Operating Expenses*

Our operating expenses consist of (i) research and development expenses and (ii) general and administrative expenses.

*Research and Development*

Our research and development expenses consist primarily of direct and indirect costs incurred in connection with the development of our ImmunoTAC technology platform, product candidates, discovery efforts and preclinical studies and clinical trial activities related to our program pipeline.

Our direct costs include:

•      expenses incurred under agreements with CROs and other vendors that conduct our preclinical and clinical activities;

90

**Item 9B. Other Information.**

On March 28, 2022, our board of directors approved a corporate restructuring plan to discontinue our clinical development programs for SBT6050 and SBT6290 and to prioritize resources on the development of SBT8230 and early-stage discovery programs (the Restructuring Plan). In connection with the Restructuring Plan, our workforce will be reduced by 27%, with substantially all of the reduction in personnel expected to be completed by July 15, 2022. We initiated the reduction in force on March 31, 2022 and expect to provide severance payments, continuation of group health insurance coverage, and other benefits for a specified period to the affected employees. We currently estimate that we will incur costs of approximately $2.0 million for termination benefits related to the Restructuring Plan, all of which will be cash expenditures.

**Item 9C. Disclosure regarding Foreign Jurisdictions that Prevent Inspections.**

Not applicable.