UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____
                                )
BENJAMIN DRESNER,               ) C21-1499-MJP
individually and on behalf      )
of all others similarly         ) Seattle, Washington
situated,                       )
                                ) October 28, 2022
                Plaintiffs,     ) 10:00 a.m.
v.                              )
                                ) Motion to Dismiss
SILVERBACK THERAPEUTICS,        ) via Zoom
INC., et al.,                   )
                                )
                Defendants.     )
_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE MARSHA J. PECHMAN
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

  For the Plaintiffs:      DUNCAN C. TURNER
                           Badgley Mullins Turner
                           19929 Ballinger Way N.E.
                           Suite 200
                           Seattle, WA 98155

                           TAMAR A. WEINRIB
                           Pomerantz
                           600 Third Ave., 20th Floor
                           New York, NY 10016

  For the Defendants:      KOJI F. FUKUMURA
                           Cooley
                           10265 Science Center Dr.
                           San Diego, CA 92121

                           CHRISTOPHER B. DURBIN
                           Cooley
                           1700 Seventh Ave., Ste. 1900
                           Seattle, WA 98101

Proceedings stenographically reported and transcript
produced with computer-aided technology

OCTOBER 28, 2022

*   *   *   *   *   *

THE DEPUTY CLERK:  The United States District Court for the Western District of Washington is now in session, the Honorable Marsha J. Pechman presiding.  This is the matter of Dresner versus Silverback Therapeutics, Cause Number C21-1499, assigned to this Court.

Will counsel please make their appearances for the record?

MR. FUKUMURA:  Good morning, Your Honor.  Koji Fukumura, from Cooley, for the defendants.  With me is Christopher Durbin, Christopher Andrews, and Germaine Habell.  And also, I have two clients on the line, Jeffrey Pepe and Laura Shawver.

THE COURT:  Thank you.

MS. WEINRIB:  Good morning, Your Honor.  Tamar Weinrib, from Pomerantz LLP, on behalf of plaintiffs.

MR. TURNER:  Your Honor, Duncan Turner.  I'm local counsel for the plaintiffs.

THE COURT:  Mr. Durbin.

MR. DURBIN:  Good morning, Your Honor.  I'm also with Cooley, for defendants.

THE COURT:  All right.  Thank you.

Counsel, I've had an opportunity to read your motion, and I have reviewed the defendants' motion to dismiss the Amended Class Action Complaint.  I've read the plaintiffs' memorandum

in response, and I have read the reply and the attachments included.

You should have received some questions that primarily go to the plaintiffs, and I hope you did receive those.  I'd like to have some answers to those questions during the course of your argument, but you can structure your argument any way you wish, just so, in the end, I have answers to these questions.

I also have received from the defendants a PowerPoint presentation, which I have printed out so that I can more easily see it.

MR. FUKUMURA:  Right, and I will have that on the screen, Your Honor, for mine, as well.

THE COURT:  Well, fortunately, I read a little better off the paper than I do off the screen, so I have it both ways, and certainly, you can make the presentation to me with that document.

MR. FUKUMURA:  I appreciate it.

THE COURT:  Is there anything else I should have reviewed in order to be prepared to hear you this morning?

MR. FUKUMURA:  No, Your Honor.

MS. WEINRIB:  No, Your Honor.

THE COURT:  All right.  Then, this is the defendants' motion.  Who will argue?

MR. FUKUMURA:  I will.  This is Koji Fukumura.

THE COURT:  Okay.

MR. FUKUMURA:  So I'd like to start with "falsity," because it's something that is defective throughout the Complaint, and I really sort of want to hammer these points in.  Your Honor asked a question which I understood to inquire whether Rule 8 or Rule 9 be applied and should guide the analysis, and let me start off by saying that under either the notice pleadings standard, Rule 8, or the particularity standard of Rule 9, this Complaint still should be dismissed, and I will explain why.

And at the end of the Section 11 portion of my argument, I will discuss, briefly, the Section 8 and 9 issue.  I don't think it matters.

So this claim relates to -- under Section 11 -- relates to statements that are made in the company's Registration Statement or its IPO, as amended, and that became effective on December the 3rd, 2020.  And in order to survive a motion to dismiss, plaintiffs' Complaint must plead the facts, not conclusions of fact, that defendants made a false or misleading statement in the Registration Statement, and it must be false or misleading at the time.

This is not a Rule 8 or Rule 9 issue.  This is from the language in the statute that says, when such a part becomes effective, the Registration Statement, it contains an untrue statement of material fact or omitted a statement of material

fact, or in part, to be stated therein so as not to be misleading.  And I will show you or walk through the three statements at issue.

Now, there are --

THE COURT:  Counsel, your voice sounds a little bit like it's an echo.

MR. FUKUMURA:  I apologize.

THE COURT:  Is there something we can do to get a little more clarity?

MR. FUKUMURA:  How about if I speak a little louder?  Is that helpful?

THE COURT:  No, it's not how loud you speak, but I'm getting an echo off your voice.  Is anyone else having that same problem, or is that just me?

MR. FUKUMURA:  Is this better?

THE COURT:  That seems to be a little better.

MR. FUKUMURA:  Please tell me if you are having difficulty understanding me, and I will even slow down a little bit so that you don't have any problems with that.

So in the Section 11 portion of the Complaint, there are a number of paragraphs, paragraph 47 to 52, and I'm happy to walk Your Honor through each paragraph in that section.  But if what the plaintiffs intended was for the Court and my clients to focus on this old, italicized language as being what is false or misleading, there are only three of those in

this section.  I am going to walk, briefly, through each of them.

So, this slide, the bold and italicized language is right here:  "Changes in pharmacodynamic markers have been observed in the first dose-escalation cohort of this trial."  Okay.  This is a very specific statement about a very specific subject.  It says, these PD markers -- and if Your Honor doesn't mind, rather than saying "pharmacodynamic" every time, I'm going to say "PD marker."  Is that okay with you?

THE COURT:  That's fine.

MR. FUKUMURA:  The PD markers for this trial were very specific.  There were PD markers that -- C-reactive protein -- that indicated, if elevated, inflammation, which is good.  If -- there are three others: MCP-10, IL -- or SP-1, IL-10, and R-6.  If those are elevated, that's good. It shows myeloid activation.

And there's another marker, interferon gamma -- and we will see this later -- that, if that's elevated, good.  It's at least indicative of activation of T and NK cells, both of which -- natural killer cells -- both of which show an innate immune response to the introduction of this TLR8 within the myeloid cell.  So that was a longwinded way of saying it's a very specific statement.  Nothing that plaintiffs allege that was omitted renders this misleading in any way.

The next statement is a statement of -- a forward-looking

statement, and it's talking about the company's long-term strategy.  It's not talking about any trial.  It's saying, hey, if approved, you know, we'd like to advance SBT6050 into earlier lines of therapy.  Well, I mean, this is the, sort of, classic forward-looking statement.  Under Section 11, it is protected by the "bespeaks caution" doctrine.

And the company -- so long as you provide adequate risk warnings, and we have all the risk warnings in a chart for Your Honor appended to our motion, but let me just walk through a couple of those here.  You know, the company says, "We can have no assurance that we'll be successful.  We don't know if SBT6050 works and, if it does, for how long, what the duration will be."  Our approach to TLR8, which is this, sort of, active halo that's in this -- in the SBT6050, it's a novel approach, and it's relatively untested.  You should know that when you're investing in this company.

And this is key:  To date -- this is dated as of November the 25th, 2020, a week before -- ish -- before the effective date of the Registration Statement.  They say, "Look, you should know, we have only tested SBT6050 in a limited number of patients that have been observed for a limited period of time."  And as we'll see later, those patients that are being referred to are in the lowest dose of the first part of a four-part Phase 1/1B clinical trial.

So what is the next -- there are two statements that we've

discussed so far, one that is unquestionably accurate.  The plaintiffs do not plead a single fact that -- that they did not observe elevations in the PD markers that they said and a transient decrease in hemoglobin, which is another PD marker.

The second was a forward-looking statement, and now we have an opinion statement, right?  We believe that -- and there's a predicate fact before that, and it really has nothing to do with anything that plaintiffs are saying is false.  And it's saying, based on that predicate statement, we believe this expands the market.  And again, this is not only an opinion statement, but it's also forward-looking in many respects.  So those are the three statements.

So what do plaintiffs say why those three statements are misleading?  They say that, "Well, you didn't tell the investing public on December the 3rd, 2020, that SBT6050 showed limited anti-tumor activity in patients treated with it."  Well, I don't know exactly what that fact is.  They don't -- surely don't explain it.  It's not pled in the Complaint that, as of that date, there was only limited tumor activity.  In fact, although they don't include this in the Complaint, Your Honor, this information upon which you could make this decision was disclosed in the Registration Statement that was filed in -- the last amendment of which was filed on December the 30th.  And it has lots of information about the limited, very early data from people

who were in the lowest dose of Part 1.

There were six patients.  Two of those patients did not complete the dose-limiting toxicity, which is 28 days, and had to be replaced.  There are some adverse events in here. Here are the changes in PD markers that include increases in CRP, the C-reactive protein, which is a marker for inflammation, MCP-1, IP-10, and IL-6, which are indicative of the myeloid cell activation, increases in interferon gamma, which is a marker for T and NK cell activation, and decreases in hemoglobin.  There is not a single fact pled in this Complaint that any of this is false.  And by the way, they're premising the three statements they've identified in the Registration Statement as being false because this wasn't disclosed, and it was.

And the last thing is, there is a discussion about the only two patients for whom they have sufficient information as of the date of November 25th.  And these datasets are a big deal.  It's not -- you know, plaintiffs say that, oh, this is an open-label study, and so you can just look at how people are doing.  This isn't taking an aspirin.  These are people that are literally in the end stage of cancer.  Many of them have, you know, more than seven lines of treatment that they've failed: surgery, chemotherapy, radiation, other immuno-oncology therapies.  This is not stuff that just happens overnight.

But, in any event, what they say was not disclosed was disclosed.  So plaintiffs seem to acknowledge that.  So, in their opposition, they say, well, the three statements that we talked about -- changes in PD markers, our strategy and our belief -- are all false because, ultimately, ultimately, all six of the patients discontinue the study due to disease progression, that is that their cancer -- or their tumor grew.  This is a hundred percent hindsight, right?  All of this stuff happened well after December the 3rd, 2020.  And even if they knew it then, it didn't render any of the statements that they've said misleading, and I am going to talk a little bit more about that when we get to the next section.

So, you know, again, as I said, whether Rule 8, the notice pleading standard, or Rule 9(b) applies, they still have to plead a false statement or a misleading statement.  We've talked about the three that they've identified, and none of them is misleading in any way.  Whether it was made negligently or intentionally doesn't matter.  There is no false statement.

And on this Rule 8, Rule 9(b), I don't want to dwell on it, the reason I set it under other standards, but they rely principally on the *Knollenberg* case, which is an unpublished 2005 opinion that under the Ninth Circuit rules cannot be cited in any court in this circuit, including the Western

District of Washington.

And we rely on the *Rigel Pharmaceutical* case, the published -- the 2012 decision that, among other things, says that, if you have this unified course of conduct, which, clearly, you will see in a moment, it's the same -- we are going to see the very same alleged misrepresentations and the very same this-is-why-they're-false in both the Section 11 and the Section 10(b).  And nominal efforts like throwing the word "negligence" in there just are not sufficient.

So I am going to stick with "falsity" as we move into Section 10, and again, you know, let's focus on the statement.  This is a federal securities case about statements that were made to the public, and that's going to be really critical here.  Under Section 10 of the Exchange Act and the Private Securities Litigation Reform Act, these plaintiffs must plead with particularity when a speaker possessed information that was contrary to a statement made and must plead in particularity why the omitted information rendered that statement misleading, and they do neither of those things, Your Honor.

So the relevant sections of the Complaint, for Section 10, will start at paragraph 4, end at paragraph 78.  There are 24 paragraphs of block quotes here, but they have highlighted nine statements, and we can walk through those, actually, really quickly.  So there's three time periods here.  The

first time period is March 29th, 2021, which is the time period when, of course, the company filed its annual report and issued a press release, and they take issue with statements that you are going to find remarkably similar to the ones that we just went over.  Changes in PD markers have been observed, you know, same thing.  We have observed pharmacological activity, changes in pharmacodynamic markers.

I'm going to talk a little bit about why there's a complete mismatch between what they said was omitted and the, sort of, unremarkable, historically-accurate information that they just disclose there.  So that's -- we are going to focus on historically-accurate information, and then, the next thing they do is they talk about this forward-looking statement again, the company's long-term strategy.  Okay. How -- in what way does the omitted information render this statement misleading?  It doesn't.

And just to, sort of, really focus the Court on why this is such a problem, let's talk about the *Kendall v. Odonate* case that my friends at Pomerantz and I had last year. You'll see there that there's no mismatch.  We are talking about apples and apples, between alleged misstatement and what was omitted.

In that case, in the CONTESSA trial, Odonate's drug, tesetaxel, at a time when -- with its drug tesetaxel, the company made statements about tesetaxel being well-tolerated

compared with others -- generally, well-tolerated -- that the drug had provided significant quality-of-life advantages over its competitors.  And at the time they made those statements, they also knew, because confidential -- they had five -- they had more than five confidential witnesses, but confidential witnesses said that wasn't true; that doctors in this clinical trial were alarmed by the rate of neutropenia; that these neutropenia adverse events were causing plaintiffs -- sorry -- patients, in plaintiffs' words, to flee from the study; that there were all-hands-on-deck meetings that included the highest levels of the company; that there was an emergency protocol amendment related to neutropenia; and that employees of the company went to a hundred-plus clinical sites to discuss this neutropenia issue with the clinical sites.

And then, after that, almost 10 percent of the hundred-plus clinical sites withdrew from the study.  Okay. So the omitted information, all of this stuff that is directly related to the statements -- "Oh, it's well-tolerated," you know, "It's significant quality-of-life improvements" -- are directly undermined by the very specific confidential witness statements here.

Their confidential witness, by the way, doesn't really say anything, doesn't say, "By the way, this was not their long-term strategy," "There were no changes in

pharmacodynamic markers," or "We saw decreases, and everyone was up in arms."  That's not in this case anywhere.

The next false statement is in May.  The next false statement is in May.  This is in relation to the company's 10-Q.  They bolded and highlighted this statement here, which is unremarkable and a hundred percent accurate, that the SBT6050 continues to advance in both monotherapy and embrolizumab -- I'm going to call it "embro" -- combination dose escalation arms, Parts 1 and 3 of the Phase 1/1b trial.  Okay.  And that Silverback is on track to deliver interim clinical data from the -- from Phase 1, Part 1 in the second half of 2021.  Both things happened.  They are unquestionably true.  In what way is that statement rendered misleading by the alleged omission of the three things they keep repeating over and over?

So this is not a highlighted, bolded part of the statement of the Complaint, but I thought I'd hit it because they seem to be arguing about it.  And here they say, "Oh, the company lied when it said that SBT6050 conferred a clinical benefit to patients with heavily pretreated advanced solid tumors."  And they have an expert, a so-called expert, who says, "How could the company say that about this whole program?"  Well, you'll see that the company doesn't say that about the whole program.

They say, "Oh, you lied about early signals of anti-tumor

activity.  You didn't tell anyone what that was," and that they -- "You lied when you had a manageable safety profile."  I guess this is what they're saying.  And what they are referring to, Your Honor, is a presentation that this company made in September at ESMO to scientists and doctors and analysts in which they made a presentation.  In that presentation, they used the phrase "conferred clinical benefit."  This is the only place in the record we can find the phrase "conferred clinical benefit," and it relates to the six people.  That's it.  It doesn't say "generally."  It doesn't say we conferred -- you know, "Hey, we were halfway through our study" -- or not even halfway -- "a third of the way through our study, and boy, this works."

What they're referring to here are six people.  You know, if you look at the number and talk a little bit about population-wise, if you look at Column Number 2, this 73-year-old woman had seven -- she failed seven prior lines of treatment.  She's been on -- her treatment duration here is 33 weeks, at 17 doses, and she's stable.  And this is the only thing that this statement refers to and nothing else.

The same thing with early signals of anti-tumor activity.  There's a couple -- the point is, this information, Your Honor, was disclosed.  It was disclosed to the doctors and scientists and people who are fighting cancer.  They can -- that was in this presentation.  It wasn't withheld, and

there's nothing in any of these charts that I'm putting up and that Your Honor is looking at right now that they said is false, right, any of these figures. It wasn't here on injection-site reaction. It wasn't one person who had Grade 3; it was 75 people. There are no well-pled facts that say that, right? So what does the -- their confidential witness doesn't say anything about any of these issues, and the only thing that we see, repeatedly, are undeniably true historical facts, opinions, or statements of -- the forward-looking statements.

And the last falsity issue, Your Honor, is that they have -- sorry, this is the last set of statements they say are misleading, right, and what they're talking about in this paragraph, Your Honor -- this is paragraph 72 of the Complaint. They're referring back to the presentation they made to ESMO, and they're saying, hey, you know, we presented all this information. Based on that data that you can look at and analyze for yourself, we believe that there are certain parts of it that are consistent with our proof of mechanism about this therapy's ability to activate myeloid cells, T cells, NK cells, right? That's one, and you're going to see that in a moment.

And number two, there is evidence of payload localization in the tumor microenvironment. You can see that. As well, you are going to see the adverse events, and we've already

seen the early signals of anti-tumor activity.

So let me just move into those. As we looked at before, there aren't signals. This is what they presented to the scientific community. Here's the elevations that were seen, here's the elevations we are seeing at different dose levels, here's the elevations we are seeing as the monotherapy, here's what we are seeing as the combo-therapy. And the same thing is true of this PD marker.

By the way, here is the payload detection in the tumor microenvironment. This was disclosed. Here are the DLTs information. This was disclosed. Plaintiffs don't say anything in here is wrong or incorrect.

So, in short, Your Honor, the plaintiffs have failed to identify a single statement in the Registration Statement or anything that they said in any of their public filings or press releases or in this abstract that was given to the ESMO conference and to all these scientists.

And I am going to make a few very brief points about scienter, as I see that my time is up. This is a securities case. It's about statements, right, and so they have to plead facts in great detail that, at a minimum, these defendants acted with deliberate recklessness, right? And deliberate recklessness exists when a statement -- one of the statements that we just looked at -- represents an "extreme departure from the standards of ordinary care which presents

a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

They haven't shown why any of the statements that they've identified are false, but they certainly haven't met this very exacting standard. And they don't -- in the scienter section, there's no description of why these doctors, these CEOs and directors of other companies who sit on the board, would engage in securities fraud. Dr. Peter Thompson, who trained at the National Cancer Institute and Yale University after he received his medical degree and started a number of companies to fight cancer; Dr. Laura Shawver, who's on the phone right now and the CEO of the company, who's been at the helm and has been at the forefront of a number of different life-sciences companies seeking to define treatments for cancer, why would they -- why would they commit fraud?

Why would these clinical sites, some of which, you know -- Mass General, I believe, is the number-one-rated hospital in the whole country and is a teaching hospital for Harvard. Duke is a teaching hospital. MD Anderson is, obviously, well-known. Why would any of these clinical trial sites continue with a trial that was doomed to fail, as these plaintiffs allege? So there's just none of the quintessential hallmarks of scienter, and plaintiffs have not met that exacting burden.

Your Honor, unless you have questions about loss causation, I'm going to be very quick with this.  Remember, we talked about apples and oranges.  Their misstatements are apples, and their alleged omissions are oranges.  They don't meet at all.  The same thing is true for loss causation.  They must plead -- in the Ninth Circuit, under *Apollo*, they must plead loss causation with particularity, and they failed to do that here.

There is nothing in any of these disclosures, which they say are corrective, that corrects anything.  And while I understand that there doesn't have to be a perfect match, it has to be -- there has to be proximate cause between a statement that was made that was false or misleading and then some information that comes up later that corrects it.  Here, the market is reacting to the trial data generally, right?  And the market here is reacting to the company's decision, very difficult decision, to terminate the program, so there's a -- there's a huge mismatch here.  We'll rely on our papers for those.

Unless you have any questions, Your Honor, I see my time is up.

THE COURT:  Okay.  Thank you.  Response?

MS. WEINRIB:  Good morning, Your Honor.  Again, my name is Tamar Weinrib, and I am from Pomerantz LLP on behalf of plaintiffs.

I will go through my presentation, but as Your Honor noted at the beginning, I know there were some questions that the Court has raised.  I believe my presentation will address all of those questions.  To the extent I miss something or there is any point that needs clarification, I'm happy to do so at any point.

THE COURT:  Okay.

MS. WEINRIB:  Your Honor, what this case is really about -- and let me clarify this, because there is some mischaracterization that happened in the presentation that preceded me.  What this case is about is defendants' issuance of statements both in the offering documents and in SEC filings thereafter that created the false impression that their only drug under development, called SBT6050, showed signs of efficacy and safety during Phase 1/1b testing that was so far from the truth that, ultimately, the company had to discontinue the clinical program for not only SBT6050, but for a second drug that worked using the same mechanism.

Your Honor, in the offering documents that kick off the class period -- and just to be clear, the statements in the offering documents do underpin both the Section 11 and Section 10(b) claims.  In that document, in those offering documents, defendants explained that in the Phase 1/1b trial, they were looking both at safety and at efficacy.  They made clear that they were looking to see if there were changes in

PD markers.  And I will abbreviate "PD," as my colleague at Cooley did, just for purposes of simplicity.  They said that they were going to be evaluating changes in PD markers, but what's important and what my colleague failed to mention is that they also pointed out in the offering documents that changes in PD markers have been associated with tumor regression.  In other words, to state that there were changes in pharmacodynamic markers, in PD markers, is to imply, unless clarified otherwise, that there has been signs of tumor regression.

In the offering documents and in the SEC filings that were issued subsequent to the offering documents, defendants did indeed state -- and as my colleague mentioned, it was a very specific statement on a very specific subject -- that they had observed changes in PD markers during the first five months of the trial.

When they issued the offering documents at the start of the class period, the trial had already been ongoing for five months.  Patients that had already been enrolled had been dosed with SBT6050 every 14 days during that time period. They had enough data with which to state in the offering documents, and then to repeat throughout the class period, that they had observed changes in PD markers.

However, they did not clarify that, though they may have seen such changes, they did not also observe signs of

anti-tumor activity.  And this is an extremely important fact given that this is the company's -- was the company's only drug under development at the time.  They have no drugs currently on the market.  They did not at the time, either. They never have.  They've never earned any revenue, and they have been suffering from operating losses since inception.

By stating that they had observed changes in PD markers, they incurred a duty to speak fully and completely and to also specify that they had not also seen signs of anti-tumor activity, because, Your Honor, defendants had linked the two in the same document that they said they had observed signs of changes in the PD markers.

Now, Your Honor, that's one category of misstatement, but as the opposition brief makes clear, there were three other categories.  One --

THE COURT:  Let me ask you a question here.  Is reduction in the tumor -- you link change in the markers with reduction in the tumor.  Where is it that you get that concept that they have to be presented together?

MS. WEINRIB:  From the defendants' own statements, Your Honor.  In the offering documents -- and I can point you to the paragraph in the Complaint that makes that connection.

THE COURT:  Okay.  So --

MS. WEINRIB:  I'm sorry, Your Honor, was there something else?

THE COURT:  -- you are saying that they have to have -- if they talked about a change in the markers, they must also talk about change in the tumor.

MS. WEINRIB:  Your Honor, what we're alleging is that because defendants explained that changes in PD markers are associated with tumor regression and they made clear that they were evaluating signs of anti-tumor activity in the Phase 1/1b trial, by stating that they did, in fact, observe changes in PD markers, they incurred a duty to, therefore, state either we did see changes in anti-tumor activity or we didn't, because by not giving that information and by stating they observed changes in PD markers, they gave the impression that that came along with limited -- excuse me -- they made clear that, because those two are linked, if they saw changes in PD markers, investors would have the impression that what came along with that was a reduction in tumor size, unless --

THE COURT:  Can't the marker, however, also be indicative of no further growth?

MS. WEINRIB:  Not necessarily, Your Honor, but again, I'm taking this from defendants' own statements.  And I can give you the quote from the offering documents where they state, "In our Phase 1/1b clinical trial, we are monitoring key PD biomarkers in both the blood and tumor which have been associated with tumor regression."  They don't state "with tumor regression and tumor stability."

But, in any event, even if that were true, even if changes in PD markers could mean either or, we allege that, in fact, they observed limited anti-tumor activities.  Stability would be considered anti-tumor activity, as well.  We are talking about a very sick population of patients that failed other therapies, whose diseases were progressing.  Stability and regression could, potentially, both be signs of anti-tumor activity, but nevertheless, defendants did not clarify that.  Though they stated changes in PD biomarkers are associated with tumor regression, they did not clarify when they stated they observed such changes that, in fact, they did not come along with, also, observations of tumor regression, and they incurred a duty to clarify as such by stating that those two were linked and then stating that they observed changes in PD markers.

In fact, Your Honor, the patients that had been treated up until that point -- and again, the trial had been ongoing for five months at that point, and it was an open-label trial.  The defendants, therefore, had access to the data all the way through.  At that point in time, we know that there wasn't any anti-tumor activity.  How do we know this?  Because all six of those patients ultimately withdrew from the trial because their diseases progressed.  Their diseases progressed, so there had never been any observation of anti-tumor activity in those patients.

And, Your Honor, in addition to misleading statements regarding changes in PD biomarkers, defendants also issued statements regarding a second drug they had under development that wasn't as far along as SBT6050, but it was a drug called SBT6290 that they described comprehensively in the offering documents and thereafter and explained that the drug worked using the same mechanism as SBT6050.  And they talked about plans for its development and how the drug works, but they never specified that, by the way, if the results of the Phase 1/1b trial are troubling either in terms of efficacy or safety, if we're not able to show signs of either one, that's not only going to spell the end of SBT6050, but will also spell the end of any development for SBT6290.

Your Honor, Category Number 3 of misstatements has to do with safety.  Defendants represented along the way that there were no observations of dose-limiting toxicities when the drug was taken, either alone or in combination with pembro, and also stated that -- and this is later on that they stated that the drug had manageable safety profile.  We know that that's not the case.  In fact, that was one of the main reasons that they ultimately discontinued the programs for both drugs, was that there was a troubling safety profile. There was cytokine-related adverse events that rendered the drug unsafe to continue development.  That was Category Number 3.

Category Number 4, relatedly, are statements that the company made comparing SBT60 with other available alternatives and stating that SBT6050 had a larger addressable market and had competitive advantages to alternative therapies because SBT6050 was not limited to treating, quote, "subsets of breast and gastric cancer," that it was intended for use with other approved standard-of-care treatments.  They stated that, because it was a targeted therapy as opposed to alternatives which are untargeted, there were safety benefits.  None of that was true.  They already knew at that point in time that there had not been any signs of anti-tumor activity sufficient to suggest efficacy and that, because there were troubling adverse safety events, that meant that not only could it not treat a larger population than in alternative therapies, but couldn't treat the population for which it was intended either.

Now, Your Honor, the Section 11 claim encompasses only the statements in the offering document.  The Section 10(b) claim encompasses the statements in the offering documents as well as the statements that were issued, and all of these statements, all four categories that we just discussed, were repeated throughout the class period in the 2020 10-K and in quarterly filings thereafter.

Now, for purposes of Section 11, the standard is different.  The Rule 11 standard is a strict-liability --

it's a strict-liability violation and is not subject to the same particularity standard as Section 10(b) as long as it does not "sound in fraud."  The Complaint makes it clear that these are two separate causes of action.  The Complaint makes clear that the Exchange Act allegations, the Section 10(b) allegations, are not included in the allegations of a Securities Act claim.  It also makes clear that it's disclaiming that the Securities Act claims are based in fraud.  There are many cases, including those cited in defendants' brief, for which courts have found that there are two separate standards for Section 11 versus Section 10(b) even when a Complaint alleges that the same misstatements are misleading in the offering documents under both the Securities Act and under the Exchange Act.

In fact, the Section 11 claim is also brought against the director defendants.  These are defendants that are not -- that are not targeted for purposes of the Section 10(b) claim.  Because the two claims are distinct and because the standards are distinct, the Section 11 claim does not "sound in fraud."

But, Your Honor, even if this Court were to determine that the Section 11 claim does "sound in fraud," the outcome is the same.  It's a distinction without a difference, because the Amended Complaint does allege with particularity which statements in the offering documents are misleading, why they

are misleading, and who made the misstatements, and that is what section 9(b) requires.

Your Honor, turning back to the Section 10(b) claim and addressing issues of scienter, because scienter is not an element of the Section 11 claim, but only of the Section 10(b) claim. The question is, is what facts are there -- what allegations are there that establish an inference of scienter that is at least as compelling as any opposing inference. Doesn't have to be more compelling. The Supreme Court standard in *Tellabs* is that the two inferences have to at least, minimally, be equal.

Now, what do we know about this trial? We know that this trial was open label. Why is that important? Your Honor, many of these clinical trials are blinded. What that means is that the companies that are sponsoring these trials when they are blinded do not have access to the data until the trial is complete. That was not the case here. This trial was open label. Defendants had access to the trial data starting day one.

Moreover, Your Honor, the Amended Complaint makes clear that CEO Defendant Shawver held biweekly meetings, all-hands-on-deck meetings. That means there was mandatory attendance for all members of the company at which the clinical data was discussed, which is no surprise, Your Honor, given that this was the only product under

development, and the only two things they were focused on were proving the efficacy and safety of this drug.  That that was the topic of the meetings is beyond reasonable or credible dispute.

THE COURT:  But don't you have to establish what about the data was discussed?  In other words, they may have been discussing particular patients and, you know, care for that particular patient.  They may not have been discussing the data that was collected.  How do you know what they talked about?

MS. WEINRIB:  Your Honor, the logical inference is that they were discussing the safety and efficacy of their only drug that was being tested at the time, and whether they were discussing specific patients or not, what they would have been discussing regarding those specific patients would pertain to safety and efficacy.  Those are the two things they made clear from the outset of the class period in the offering documents and thereafter that they were focused on examining anti-tumor activity and measuring biomarkers with immune cell activation.  They stated as such.  They said that this is what we are focused on, so they held these --

THE COURT:  All right.  At these meetings, you don't have anybody who says, "I was there; I heard them discuss the data; this is the data that we talked about."  You are making an assumption that they talked about these things.  Can you

show me what documents they might have been looking at at any particular time?

MS. WEINRIB:  Your Honor, given that we haven't gone through discovery yet, we don't have access to those documents.  They are uniquely within defendants' possession, but we do have a confidential witness that did attend these meetings, who was at these biweekly meetings and stated that all members of the trial team were there and that they discussed the trial data.  And given that the only two subjects of importance are whether the drug is efficacious or whether the drug is safe, the most likely inference is that those were the subjects that were discussed.

But, Your Honor, even putting that aside, the fact that defendants had access to the data all the way through, data that we allege contradicted their public statements, because the trial was open label and because they made clear from the outset that they were focused on and examining anti-tumor activity and these PD biomarkers, the most logical inference is that they had access to this information and knew that their statements were misleading when made.

THE COURT:  But at what point in time?  Because I'm assuming that, you know, you tell me what "open label" is, that, you know, each week or maybe even each day, that this cohort of patients are treated, the data is being gathered, so when do you get to the quantum of data that requires

disclosure?

MS. WEINRIB:  So, Your Honor, at the time that the offering documents were issued -- and those are the first statements that are made in this that are alleged as misleading in this case -- the trial had already been ongoing for five months and six patients had been treated.  Those six patients ultimately withdrew from the trial because their diseases had progressed, so --

THE COURT:  But when did they know?  In other words, if there were six of them in the trial at the time a statement is made, doesn't that make the statement true?

MS. WEINRIB:  Which statement, Your Honor?

THE COURT:  The statement showing what the efficacy was, that the biomarkers were affected.

MS. WEINRIB:  No, Your Honor, because we're not stating that the misstatement is that the patients were still enrolled in the trial.  We're stating that the misstatement is that they observed -- that they omitted the fact that, while they may have observed changes in PD biomarkers, they didn't also observe changes in anti-tumor activity.  And the reason we know there was no anti-tumor activity is because these patients all experienced disease progression.  It doesn't matter whether they had withdrawn from the trial at the time those statements were made.  We know that their tumors didn't shrink because they ultimately withdrew because

they progressed.

Moreover, Your Honor --

THE COURT:  Isn't it possible that someone can have a good outcome at the beginning of the trial and then have a poor outcome as they continue to receive the drug?  Isn't that one of the things that they're testing, is how long and how much of a dosage is effective?

MS. WEINRIB:  The data that we have at our disposal, and again, this is data that came from defendants, suggests that there were no signs of efficacy.  That is the reason why the drug was discontinued, ultimately.

In fact, in September of 2021, when they issue their abstract, on September 13th, 2021, and they made clear that the data covered by that presentation, the cutoff, was April 4th of 2021.  Now, why is that important?  April 4th of 2021 is only a few months after the offering documents, four days after the next misstatements, which were in the 2020 10-K issued on March 29th of 2021.  That same data, upon which they stated in September 2021 that they came to the conclusion that SBT6050 conferred clinical benefit and had a manageable safety profile is the same data that led them, three months later -- excuse me -- four to five months later, to then come out and say, "Actually, the truth is, we have to discontinue this program as well as our other clinical program for our second drug, because, in fact, there were

limited signs of anti-tumor activity when this drug is used alone, and it doesn't have a manageable safety profile when used in combination with pembro, because there are these cytokine-related adverse events."  That data didn't change.

The defendants assert multiple times in their motion that they based their decision on additional data that came out between September and March, but there is not a single fact in the record, not a single exhibit appended to their motion to dismiss that suggests of such.

In fact, to read the disclosure in March of 2022, there is no reference to a single additional piece of data that they did not have in their possession in September.  And again, the September abstract had a data cutoff of April 4th, multiple months earlier, and that was the data upon which they ultimately stated, "We are no longer going to develop these two drugs because there is limited anti-tumor activity and because there is a troubling safety profile," complete contradictions to what they had stated in September of 2021.

And, Your Honor, the Complaint also makes clear that loss causation here is sufficiently alleged.  There are two disclosures.  We have the September 2021 disclosures where they reveal for the first time that, of 14 evaluable patients, one had a reduction in tumor size, three had stable disease, and 10 had progressed, but they still stayed, and defendants, in fact, showed you the charts earlier in our

hearing today.  They, in fact, showed you the charts based upon which they still maintained and tried to convince the market -- and did convince the market -- that this drug conferred clinical benefit and had a manageable safety profile.  We know the market had that impression, because there are analyst reports out there stating as such.

As stated in the opposition, there is an SVB Leerink analyst report that came out right after the September 2021 statements putting an Outperform rating on the stock and stating, quote, "Abstract did report a clear signal of immune activation and disease control with clinical benefit."

We have an H.C. Wainwright & Co. report that came out at the same time where that analyst issued a buy rating and stated, quote, "We view the safety data and the biomarker data seen in the monotherapy arm to be positive and persuasive for development in combination to proceed."

When the company issued their quarterly results in November, less than two months later, they doubled down on those statements and continued to tell the market that their drug conferred a clinical benefit and had a manageable safety profile based on that same data.  They did mention that there were some adverse events in combination with pembro, but assured the market that they were resolved in supportive care.  They made it seem like it was no big deal.

Nevertheless, just a few months later, based on that same

data, they said, well, actually, remember what we told you a few months ago?  Not so much the case.  In fact, the drug had limited anti-tumor activity as a monotherapy.  In fact, cytokine-related adverse events rendered the drug unsafe when used in combination with pembro, so we are going to discontinue this program.  But not only that, not only that, we're also going to discontinue SBT6290.  And there's more: We're also going to fire 25 percent of our workforce.  The stock dropped an additional 8.55 percent that day after dropping significantly after the September 2021 statements, as well.  For purposes of loss causation, plaintiffs only need to meet the minimal pleading standard of Rule 8(a)(2) as set forth in *Dura Pharmaceuticals*, a Supreme Court case, and the Amended Complaint certainly meets that burden.

And again, defendants' defense is almost entirely based on the assertion that they discontinued this drug because of additional data that purportedly came out between September and March, but once again, I need to reiterate, there is not one fact in the record, including defendants' own disclosures, that indicate as such in any way, shape, or form.

Your Honor, I believe that I've addressed the questions that were set forth in the email that Ms. Singleton transmitted, but if there's anything I haven't covered or if there are any additional questions that Your Honor has, I'm

happy to address them now.

THE COURT:  Thank you.  I don't have anything further.

MR. FUKUMURA:  Your Honor, can I make two rebuttal remarks?

THE COURT:  Yes.

MR. FUKUMURA:  Yes.  So this is -- if you look at -- a huge predicate of her entire argument is the statement that these PD biomarkers, the company said PD biomarkers are associated with tumor regression.  And she read it -- she read it all the way until you get to the important part, which is, what they were saying here is -- and this is also in the Complaint.  And she stopped right before it said, "in our preclinical mouse studies" and "in our preclinical non-human primate studies."  This is also at paragraph 42 of the Complaint.  So the company was just saying, we did mouse studies, we did some non-human primate studies, and these PD markers -- this is hard work when we're dealing with immuno-oncology.  And you come up with ideas to say, in what way is our drug going to be better than another immunotherapy out there?  I mean, it's hard work.

So they're saying here -- all they're saying, if you look at paragraph 42 of their own Complaint -- and she stopped short of the preclinical -- is, we've seen in those, with the introduction of SBT6050, elevated pharmacodynamic -- PD

markers or the things that we're looking for, for inflammation, for these myeloid cell activations, for T and NK cell -- natural-killer cell activation. And why is that important? Because those are immune cells, and they hopefully will attack the tumor.

THE COURT: Is there always -- your opponent seems to connect the markers with tumor reduction. Is that always the case? Can't it be that you have a marker that responds, but --

MR. FUKUMURA: Right.

THE COURT: -- at the same time, you don't know if there's going to be an outcome on tumor reduction?

MR. FUKUMURA: Sure. And the reason why there's a risk warning that says, you know, our approach is novel, right, we don't know exactly how this is going to work, but what we can tell you is that there are markers that are associated with this type of activation, with myeloid cell activation, that are going to -- you know, there are certain types of immune cells that are getting activated that are myeloid cells. There are certain types of tumors that are -- sorry -- immune cells, like T cells and natural killer cells, that when we see these markers, we know they're activated.

It doesn't say anything about promising that this is going to lead to tumor reduction. It's the hypothesis, and again, Your Honor, when you take a step back and look at the

statements made, none of them are rendered misleading, as in *Odonate*, as in *Arena*.  *Arena* said, we have a great safety profile, you know, based on our clinical and preclinical studies.  What they didn't say -- that was another one of my cases -- is that, allegedly, they've had a year-long fight with the FDA over a preclinical study, a preclinical rat study, which was the sticking point between the FDA approving the drug.  That wasn't disclosed.  It relates directly to that.

They've -- you know, she read to you something unfairly, and you have to look at it, the whole paragraph 42, and look back at the Registration Statement at page 128.  That's not -- it's not the case.

Thanks.  That's all I wanted to -- oh, actually, one more thing:  Oncology trials are open label, right?  I mean, there's data being gathered all over the place.  When we are talking about resist, which is the methodology for measuring tumors, it's very complicated.  There are CT scans, x-rays, and then you have to get an independent radiologist to read this.  On top of that, there could be biopsies, and we know that they're testing blood for markers and other things, including any dose-limiting toxicities.  I'm happy to discuss that and why the company decided in March of 2020 to stop the program, but unless Your Honor has any questions about that, I'll rest here.

THE COURT: No, I don't. Anything further?

MS. WEINRIB: Your Honor, if I might address the remainder of the paragraph that Mr. Fukumura suggested that I left out on purpose? I'm happy to address that and why the rest of the paragraph doesn't change the argument, but if Your Honor doesn't have questions about that, then I'm happy to rest as well.

THE COURT: I don't.

MS. WEINRIB: Thank you.

THE COURT: All right, Counsel, thank you for your arguments.

MR. FUKUMURA: Thank you, Your Honor.

THE COURT: You should see an order coming out from me by next Friday.

MR. FUKUMURA: Thank you so much.

MS. WEINRIB: Thanks very much.

THE COURT: If, for some reason, we don't meet next Friday's deadline, you'll get a call that will tell you exactly when the order will be out.

MR. FUKUMURA: Appreciate it.

MS. WEINRIB: Thank you very much, Your Honor.

MR. FUKUMURA: Thank you.

THE COURT: All right. Is there anything else I can help you with in the case?

MR. FUKUMURA: No.

MS. WEINRIB:  I think that's all for now, Your Honor.

MR. FUKUMURA:  Thank you.

THE COURT:  Have a good day.

MS. WEINRIB:  Thank you.  Have a wonderful weekend.

THE DEPUTY CLERK:  Thank you.  Court is at recess.

(Adjourned.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Sheri Schelbert*

SHERI SCHELBERT
COURT REPORTER