THE HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| BENJAMIN DRESNER, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:21-cv-1499-MJP |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| SILVERBACK THERAPEUTICS, INC., LAURA K. SHAWVER, JONATHAN PIAZZA, RUSS HAWKINSON, PETER THOMPSON, VICKIE L. CAPPS, ROBERT HERSHBERG, SAQIB ISLAM, ANDREW POWELL, JONATHAN ROOT, THILO SCHROEDER, and SCOTT PLATSHON, | NOTE ON MOTION CALENDAR: January 27, 2023 |
| Defendants. | |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................................ 1

II.   STATEMENT OF FACTS ..................................................................................................... 2

III.  ARGUMENT ........................................................................................................................ 7

      A.    Applicable Standards ................................................................................................ 7

      B.    The SAC States a Section 11 Claim Against the Securities Act Defendants ....... 10

            1)    The SAC Adequately Pleads the Falsity of the Securities Act Defendants'
                  Misstatements Regarding SBT6050 ............................................................ 10

            2)    The SAC Adequately Pleads the Falsity of the Securities Act Defendants'
                  Misstatements Regarding SBT6290 ............................................................ 13

      C.    The SAC States a Section 10(b) Claim Against the Exchange Act Defendants... 14

            1)    The § 10(b) Falsity Allegations Satisfy Pleading Requirements .............. 14

            2)    The SAC Adequately Pleads the Falsity of the Exchange Act Defendants'
                  Misstatements Regarding SBT6050's Efficacy ........................................ 15

            3)    The SAC Adequately Pleads the Falsity of the Exchange Act Defendants'
                  Misstatements Regarding SBT6050's Safety ............................................ 20

      D.    The SAC Adequately Pleads the Exchange Act Defendants' Scienter ................ 21

            1)    The Exchange Act Defendants' Access to Data ...................................... 21

            2)    The Core Operations Doctrine .................................................................. 23

      E.    The SAC Adequately Pleads Loss Causation ........................................................ 24

      F.    The SAC Adequately Pleads §§ 15 and 20(a) Claims ......................................... 24

IV.   CONCLUSION .................................................................................................................... 25

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                    - i
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1982)................................................................................................14

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .................................................................................20

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
  2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ...................................................13, 15

*Constr. Workers Pension Tr. Fund v. Genoptix, Inc.*,
  2013 WL 12123841 (S.D. Cal. Mar. 22, 2013) ......................................................24

*Curry v. Hansen Med., Inc.*,
  2011 WL 3741238 (N.D. Cal. Aug. 25, 2011) .......................................................25

*Derr v. Ra Med. Sys., Inc.*,
  2021 WL 1117309 (S.D. Cal. Mar. 24, 2021) ........................................................11

*Dresner v. Silverback Therapeutics, Inc.*,
  2022 WL 16716165 (W.D. Wash. Nov. 4, 2022) ............................................ *passim*

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................................................24

*Eminence Cap., LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ................................................................................25

*Flynn v. Sientra, Inc.*,
  2016 WL 3360676 (C.D. Cal. June 9, 2016) .............................................9, 17, 23

*Gebhart v. S.E.C.*,
  595 F.3d 1034 (9th Cir. 2010) ................................................................................21

*Hagan v. Khoja*,
  204 L. Ed. 2d 264 (2019) .........................................................................................8

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)..................................................................................................8

*Hildes v. Arthur Andersen LLP*,
  734 F.3d 854 (9th Cir. 2013) ....................................................................................8

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                           - ii
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

*In re Acadia Pharm. Inc. Sec. Litig.*,
2020 WL 2838686 (S.D. Cal. June 1, 2020)................................................................15

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)..........................................19, 21, 22, 23

*In re Gilead Scis. Sec Litig.*,
536 F.3d 1049 (9th Cir. 2008) .....................................................................................8

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005).......................................................................10

*In re JDS Uniphase Corp. Sec. Litig.*,
2005 WL 43463 (N.D. Cal. Jan. 6, 2005).................................................................9, 10

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ...................................................................................11

*In re Shoretel Inc.*,
2009 WL 248326 (N.D. Cal. Feb. 2, 2009) ................................................................9

*In re Snap Inc. Sec. Litig.*,
2018 WL 2972528 (C.D. Cal. June 7, 2018) .........................................................8, 17

*In re Zillow Grp., Inc. Sec. Litig.*,
2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)........................................................8

*Jiangchen v. Rentech, Inc.*,
2017 WL 10363990 (C.D. Cal. Nov. 20, 2017)........................................................19

*Kendall v. Odonate Therapeutics, Inc.*,
2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ............................................................16

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988, 1008 (9th Cir. 2018) ............................................................................8

*Knollenberg v. Harmonic, Inc.*,
152 F. App' x 674 (9th Cir. 2005) ..............................................................................8

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)........................................................................................................8

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) .....................................................................................23

*Pino v. Cap.l*,
2021 WL 3502493 (C.D. Cal. Apr. 27, 2021) ...........................................................9

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                     - iii
(Case No. 2:21-cv-1499-MJP)

*Primo v. Pac. Biosciences of Cal., Inc.*,
   940 F. Supp. 2d 1105 (N.D. Cal. 2013) ......................................................................9

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ....................................................................................8

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ....................................................................................13

*Slomnitsky v. Caldwell (In re Allied Nev. Gold Corp. Sec. Litig.)*,
   743 F. App'x 887 (9th Cir. 2018) ..............................................................................18

*Sparling v. Daou (In re Daou Sys.)*,
   411 F.3d 1006 (9th Cir. 2005) ..................................................................................22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).............................................................................................8, 21

*Todd v. Tempur-Sealy Int'l, Inc.*,
   2016 WL 5746364 (N.D. Cal. Sep. 30, 2016) ..........................................................19

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009).....................................10

**Statutes**

15 U.S.C. §77k........................................................................................... *passim*

15 U.S.C. §78j(b) ....................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 12(f)..................................................................................................19

Fed. R. Civ. P. 15(a)(2)..............................................................................................25

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                    - iv
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

## I.   PRELIMINARY STATEMENT[1]

At the time of its IPO, Silverback had no revenue, no marketable products, and only one lead drug candidate in active clinical testing --- an antibody drug conjugate called SBT6050 designed to target and activate immune cells within certain types of tumors and to thereby promote localized tumor killing by those immune cells without impacting non-targeted cells.  The SAC alleges that in the negligently prepared Offering Documents the Securities Act Defendants filed to effectuate the IPO, they claimed to have observed signs of efficacy (*i.e.* anti-tumor activity) in patients treated in the first dose cohort of the open label trial, which had begun five months earlier. Specifically, they described changes in pharmacodynamic biomarkers that had been associated with tumor regression in preclinical studies and then told investors they had observed *those same changes* in first dose cohort patients. They further claimed that the only two patients they had formally assessed showed signs of efficacy.  What they failed to disclose is that ***a third*** of the first dose cohort, *whom they had also evaluated prior to the IPO*, in fact showed disease progression. The Securities Act Defendants also chose to speak in detail regarding Silverback's second drug candidate, SBT6290, but failed to reveal that if the trial data for SBT6050 showed insufficient efficacy and/or safety, that would doom both drug programs, wiping out Silverback's arsenal. These allegations suffice under § 11, which does not require either scienter or loss causation.

The SAC separately alleges that the Exchange Act Defendants issued three categories of misstatements with scienter, beginning with the 2020 10-K: statements regarding efficacy, safety, and SBT6290. Specifically, the Exchange Act Defendants misled investors by stating they had observed the same changes in pharmacodynamic markers that had previously been associated with tumor regression though by then, they had observed that 71% of patients treated with SBT6050 in Parts 1 (SBT6050 alone) and 3 (SBT6050 with pembrolizumab) of the trial had experienced disease progression.  By the time they filed their 2Q21 later in the Class Period, they had access

---

[1] All "¶ __" references are to the Second Amended Class Action SAC ("SAC"), filed December 5, 2022, ECF No. 45. All terms not defined herein are defined in the SAC.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                    - 1
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

to data showing that 27 out of 40 patients had progressive disease, *17 of whom had withdrawn from the trial,* and five who died during treatment. The Exchange Act Defendants also misled investors regarding SBT6050's safety, touting the lack of dose limiting toxicities and only minor ailments as the most common adverse events, without revealing that, the drug did not have a manageable safety profile due to "cytokine-related[2]" adverse events they had observed no later than August 1, 2021. Lastly, the Exchange Act Defendants misled investors by describing SBT6290, which they touted as expanding on the same mechanism SBT6050 used to activate immune cells, but never mentioning that deficient SBT6050 trial data would doom both programs. As set forth below, Defendants admit to always knowing that SBT6050 and SBT6290's fates were intertwined. The SAC's streamlined allegations thus suffice to state a claim under § 10(b).

Given that the SAC addresses the deficiencies noted in the Court's dismissal order, Defendants' Motion[3]— which depends on mischaracterizations of fact and misplaced arguments— must fail.

## II.    STATEMENT OF FACTS

Silverback has incurred significant operating losses since inception, has never had products for sale, and has never earned revenue. ¶ 46. The Company's lead product candidate during the Class Period was SBT6050, a treatment designed to target HER-2 expressing tumors, such as breast, gastric, and non-small cell lung cancers. ¶ 47. SBT6050 is an Antibody-Drug Conjugate ("ADC"). *Id.* ADCs consist of a payload (a small molecule drug) and an antibody that is engineered against an antigen, like a tumor-specific antigen, on the target cell surface. *Id.* The payload and the antibody are joined by a chemical linker. *Id.* When the ADC binds to the target antigen, the payload is released and exerts its effect in the targeted cell, ideally minimizing the effect on non-targeted cells that don't have that antigen. *Id.* For SBT6050, the payload is a TLR8 agonist, which is linked to a HER2-directed antibody. ¶ 48. It is designed to activate myeloid cells that exert an immune

---

[2] Cytokine-release syndrome is a potentially life-threatening systemic inflammatory reaction which is observed after infusion of agents targeting different immune effectors.

[3] "Motion" or "Mot." refers to Defendants' Motion to Dismiss the SAC. Doc. No. 47.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                   - 2
(Case No. 2:21-cv-1499-MJP)

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

response to treat targets. *Id.* Activating those cells "results in direct tumor killing and recruitment of immune cells." *Id.*

**Clinical Testing of SBT6050:** Defendants initiated a Phase 1/1b trial in July 2020 to evaluate the safety and efficacy of SBT6050, both as a monotherapy and in combination with pembrolizumab ("pembro"), a type of immunotherapy that stimulates the body's immune system to fight cancer cells. ¶¶ 50-51. The Company explained that the trial would evaluate pharmacodynamic (or "PD") biomarkers of immune cell activation and anti-tumor activity. ¶ 52. Defendants explained that "key PD biomarkers in both the blood and the tumor…have been associated with tumor regression [i.e. anti-tumor activity]"—efficacy—in "preclinical mouse studies and was observed in our preclinical NHP studies." *Id.* Defendants identified the precise changes in "key" pharmacodynamic biomarkers that had been associated with tumor regression, *i.e.*, "elevations in MCP-1, IP-10, and C-reactive protein and induction of… IFNg" which indicates "on target mechanism of action." ¶ 53. At the time of the IPO, the Phase 1/1b trial had been ongoing for five months. ¶ 54. The six patients enrolled in the first dose cohort had already received 0.3 mg/kg of SBT6050 in Part 1 of the trial every 14 days and Defendants evaluated the patients every few weeks. *Id.* The trial was open-label so both the researchers and participants knew what treatment was being administered, and Defendants could access the trial data in real time. *Id.*

By April 4, 2021 (and likely sooner), the Exchange Act Defendants had access to data showing that ten out of fourteen evaluable trial participants—including patients that had been treated with SBT6050 as a monotherapy as well as patients that had received SBT6050 in combination with pembrolizumab from Parts 1 and 3-- had experienced disease progression. ¶ 55. Additionally, by April 4, 2021 Defendants had access to all the safety data, and particularly the treatment emergent adverse events ("TEAEs") that had occurred to date, from those same patients treated in both Part 1 and Part 3 of the Phase 1/1b trial. *Id.* Moreover, no later than August 1, 2021 (and likely sooner), the Exchange Act Defendants had access to information indicating that sixty percent of trial patients experienced disease progression. ¶ 56. Specifically, twenty seven out of forty patients in Part 1 (SBT6050 alone) and Part 3 (SBT6050 with pembro) of the trial experienced

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                          - 3
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

disease progression; seventeen had to withdraw from the trial as a result. *Id.* Moreover, the Exchange Act Defendants had access to safety data regarding all forty patients, which included data regarding incidents of TEAEs, including cytokine-release syndrome. *Id.*

Defendant Shawver held biweekly companywide meetings, with mandatory attendance for all employees to report on and discuss trial data, which focused on inter alia, safety tolerability, pharmacodynamics, anti-tumor activity, and immune cell activation. ¶ 103.

**Materially False and Misleading Statements in the Negligently Prepared Offering Documents (§ 11)**: The Securities Act Defendants represented in the negligently prepared Offering Documents, issued five months into the SBT6050 Phase 1/1b trial, that they had already "observed changes in pharmacodynamic markers in the first dose cohort," *i.e.*, a sign of efficacy, and described those changes in detail. ¶ 61. Defendants also stated that those same changes "*have been associated with tumor regression*." ¶ 64. Providing further assurance to investors that SBT6050 exhibited early signs of efficacy, the Securities Act Defendants claimed to have only evaluated two first dose cohort patients and to have observed stable disease in one, and "target lesion reduction" in the other. ¶ 62. Unbeknownst to investors, Defendants had already observed that a third of the first dose cohort patients already showed disease *progression*. ¶ 64.

The Offering Documents also touted the Company's second drug candidate, SBT6290, which Defendants described as "expanding on the potential of a TLR8 agonist as a payload," comprehensively illustrated how the drug works, and stated that the Company planned to submit "an investigational new drug application (IND) for SBT6290 in the fourth quarter of 2021." ¶ 63. While comprehensively describing SBT6290, the Securities Act Defendants failed to disclose that: if SBT6050 did not demonstrate more than limited anti-tumor activity as a monotherapy, the Company would have to discontinue the clinical programs for both SBT6050 and SBT6290. ¶ 64.

**Materially False and Misleading Statements Issued During the Class Period (§10(b))**: The Class Period begins on March 29, 2021, when Silverback filed the 2020 10-K. ¶ 66. After explaining that changes in pharmacodynamic markers had been associated with tumor regression in preclinical studies, the Exchange Act Defendants represented therein, and five additional times

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS    - 4 -
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

throughout the Class Period, that those same "[c]hanges in pharmacodynamic markers have been observed in the first dose-escalation cohort of this trial." *Id.*, ¶¶ 70, 74, 78. They described these changes in pharmacodynamic markers in detail. *Id.* Moreover, after describing one patient who had stable disease and one who had a "reduction in the diameter of her target lesion at 8 weeks" they further represented that, "[c]hanges in pharmacodynamic markers consistent with the potential mechanism of action were observed in treated patients." *Id.* The foregoing statements misled Silverback investors by failing to disclose that, though these same changes in pharmacodynamic biomarkers had been "associated with tumor regression" in preclinical studies and NHP studies of SBT6050, patients treated with SBT6050 as a monotherapy in the first dose cohort of the Phase 1/1b trial only showed limited anti-tumor activity, or even disease progression. In fact, a third of first dose cohort patients had already experienced disease progression months before the Class Period began, by no later than April 4, 2021 (six days after the 2020 10-K, and a month before the 1Q21) ten patients had already experienced disease progression in Parts 1 and 3 of the Phase 1/1b trial, by no later than August 1, 2021 (eleven days before the 2Q21) seventeen patients had already withdrawn from Part 1 (SBT6050 as a monotherapy) and Part 3 (SBT6050 in combination with pembrolizumab) of the trial due to disease progression, and ten patients remaining on trial also experienced disease progression. ¶¶ 71, 75, 79.

The Exchange Act Defendants touted the drug's safety, claiming SBT6050, a targeted therapy, had a safety advantage over *untargeted* TLR8 small molecule therapeutic candidates from other companies. ¶¶ 67. They then represented that the "most common adverse events included flu-like symptoms (fever, chills, nausea, vomiting, fatigue) and redness and swelling at the injection site." *Id*. The Exchange Act Defendants' statements regarding safety data from the Phase 1/1b trial misled Silverback investors because patients treated in Part 3 of the trial with SBT6050 in combination with pembro suffered cytokine related adverse events thus demonstrating that SBT6050 used in conjunction with pembrolizumab did not have a manageable safety profile. ¶ 72

Defendants also touted Silverback's second drug candidate, SBT6290, as "expanding on the potential of a TLR8 agonist as a payload," comprehensively illustrated how the drug works,

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS                                    - 5
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

and stated that the Company planned to submit "an investigational new drug application (IND) for SBT6290 in the fourth quarter of 2021." ¶¶ 68, 76. The Exchange Act Defendants' statements regarding SBT6290 failed to reveal that if SBT6050 did not demonstrate more than limited anti-tumor activity as a monotherapy in Phase 1/1b testing or demonstrated troubling safety signals, the Company would have to discontinue the clinical programs for both SBT6050 **and** SBT6290 given that they both utilize the TLR8 agonist as a payload (*i.e.* function using the same mechanism to activate immune cells for targeted tumor treatment). ¶¶ 73, 77.

**The Truth Begins to Emerge:** On September 13, 2021, Silverback issued a press release announcing that it would present interim data from the trial evaluating SBT6050 as a monotherapy and in combination with pembro at the ESMO 2021 Congress from September 16-21, 2021" and advising that "[t]he accepted abstract . . . is now available on the ESMO website" ("Abstract"). ¶ 81. The Abstract indicated that the data reported therein was "[a]s of 4 April 2021." Out of eighteen patients treated at four dose levels either with SBT6050 as a monotherapy in Part 1 or in combination with pembrolizumab in Part 3 prior to April 4, 2021, only fourteen were evaluable. Out of those fourteen, only one patient showed a partial response, three showed stable disease, and ten showed disease progression. ¶ 82. The Abstract also reported on safety data, and stated that SBT6050 has a manageable safety profile. ¶¶ 83-84.

Then, on September 16, 2021, Defendants presented the full investor slide presentation at the European Society of Medical Oncology, titled "SBT6050-101: Phase 1/1B, Interim Clinical Study Update." ¶ 87. The ESMO Presentation indicated that the data contained therein from Parts 1 and 3 of the Phase 1/1b trial, had a cutoff of August 1, 2021. The ESMO Presentation stated that out of forty evaluable patients, only thirteen remained on treatment as of August 1, 2021. *Id.* The ESMO Presentation further revealed for the first time that prior to August 1, 2021, seventeen patients discontinued study treatment due to progression of disease and seven discontinued study treatment due to withdrawal of consent (for unidentified reasons). *Id.* Moreover, five patients died on study due to disease progression. Of eighteen evaluable patients, only one patient had a partial response showing tumor regression, seven had stable disease, and the remaining ten showed

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                    - 6
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

disease progression. *Id.* Nevertheless, Defendants identified "Proof-of-mechanism established" and "Early signals of anti-tumor activity" as highlights of the interim data, and further represented in the ESMO Presentation that "SBT6050 conferred clinical benefit." ¶ 88. Further, while detailing safety data, including cytokine related adverse events, Defendants claimed SBT6050 had a "manageable safety profile." *Id.* Silverback stock dropped $4.54 per share, or 23.35%, to close at $14.90 on September 13, 2021, and fell 23% on September 16, 2021, to close at $12.50. ¶¶ 85, 90.

Then, on November 10, 2021, the Company filed its 3Q21, wherein Defendants continued to misleadingly state that they "observed induction of pharmacodynamic biomarkers" and that the interim trial data demonstrated ***"proof-of-mechanism …and early signals of anti-tumor activity*.*"* ¶ 92. While the 3Q21 discussed DLTs in patients treated with 0.3 mg/kg of SBT6050 in combination with pembro, and an instance of cytokine release syndrome, they assured investors that "these adverse events resolved with supportive care." ¶ 94. The 3Q21 also once again described SBT6290, without revealing the intertwined fates of the two drugs ¶¶ 96-97.

Investors finally learned the truth on March 31, 2022, when Defendants announced they had discontinued SBT6050 based on limited monotherapy anti-tumor activity and cytokine-related adverse events that limited the dose in combination with pembro. ¶ 98. Based on the SBT6050 data, the Company announced that it also had to discontinue its SBT6290. *Id.* Defendants did not identify any *new* data that had been analyzed between September 2021 and March 2022 as a basis for the decision. ¶ 17. Silverback further revealed that it had to cut its workforce by 27%. ¶ 98. On this news, Silverback's stock dropped 8.55%. ¶ 99. With its two main clinical programs wiped out and dwindling cash reserves, Silverback pivoted entirely, merging with ARS Pharmaceuticals, Inc. ("ARS Pharma") on November 8, 2022 via reverse merger, following which Silverback changed its name to ARS Pharma. ¶ 19. It is now developing an epinephrine nasal spray. *Id.*

## III.   ARGUMENT

### A.   Applicable Standards

Plaintiffs "need only allege 'enough facts to state a claim to relief that is plausible on its

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).[4] "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 204 L. Ed. 2d 264 (2019). Courts must accept as true all well-pled factual allegations, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).

To state a claim under § 10(b) of the Exchange Act, Plaintiffs must plead: (1) a material misstatement or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293 at *2 (W.D. Wash. Apr. 19, 2019).

§ 11, on the other hand, "'places a relatively minimal burden on a plaintiff,'" *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013), requiring only that "any part of the registration statement . . . contain[] an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §77k(a).  Issuers can therefore be liable for what the registration statement says as well as what it leaves out.  *See In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *8 (C.D. Cal. June 7, 2018) ("*Snap I*"). ***Liability "is virtually absolute, even for innocent misstatements."*** *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). § 11 does not require proof of scienter, reliance, or loss causation. *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009).

Plaintiffs' § 11 claim does not "sound in fraud" and is, therefore, subject to the permissive notice pleading standards of Rule 8(a)(2), which only requires a "short and plain statement of the claim showing that the pleader is entitled to relief." *See Knollenberg v. Harmonic, Inc.*, 152 F.

---

[4] All citations are omitted, and emphasis is added, unless otherwise noted.

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

App' x 674, 683-84 (9th Cir. 2005) (Rule 9(b) did not apply where "claims [were] not 'grounded in fraud' because Plaintiffs allege[d] a basis for Section 11 liability other than fraud; *i.e.*, the omission of a material fact from the Registration Statement.").

The SAC is split into two parts, with distinct sections for the Exchange Act claims and Securities Act claims, and disclaims that its Securities Act claims involve fraud. ¶¶ 88, 97. *See In re JDS Uniphase Corp. Sec. Litig.*, 2005 WL 43463, at *9 (N.D. Cal. Jan. 6, 2005) (claims did not sound in fraud because the causes of action "expressly disclaim 'any allegations  based on fraud or deliberate recklessness'"). The SAC does not allege a unified course of ***fraudulent*** conduct for both claims because the Securities Act claims do not allege ***intentional*** misrepresentations whereas the Exchange Act claims do. *See In re Shoretel Inc.,* 2009 WL 248326, at *2 (N.D. Cal. Feb. 2, 2009)(applying Rule 8 because "Plaintiffs never allege that any individual *knew* the statements in the Registration Statement were false")[5]; *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1113 (N.D. Cal. 2013). ***Indeed, scienter allegations are set forth in a separate section pertaining solely to § 10(b).*** The Counts for the Securities Act claims also explicitly exclude the paragraphs related to the Exchange Act claims. ¶¶ 116, 125. *See Flynn v. Sientra, Inc.,* 2016 WL 3360676 , at *17 (C.D. Cal. June 9, 2016)(Rule 8 applied where "Plaintiffs have 'stripped' their Securities Act allegations of fraud and only 'levie[d] fraud allegations against a select few defendants' based upon 'specifie[d] unique, particularized facts as to those defendants.'")

Moreover, the §11 claim concerns misstatements in the Offering Documents (Dec. 3, 2020), whereas the §10(b) claim concerns misstatements in annual, quarterly filings, and press releases (Mar. 29, 2021-Mar. 31, 2022). The two disparate claims thus involve misstatements from two distinct categories of documents, two distinct timeframes, and involve different defendants, ¶¶ 33-41. The SAC alleges non-fraudulent bases for §11 liability, including that the Securities Act

---

[5] *See also Pino v. Cap.l,* 2021 WL 3502493, at *10 (C.D. Cal. Apr. 27, 2021), *judgment entered*, 2021 WL 2273461 (C.D. Cal. Apr. 30, 2021), *and aff'd in part, rev'd in part and remanded,* 55 F.4th 1253 (9th Cir. 2022) ("In this case, the FAC does not specifically allege fraud and avoids allegations inherently suggestive of fraud — *e.g.*, ***there is no allegation that Defendants "knowingly" or "intentionally" concealed information or made misrepresentations***.")

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                     - 9
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

Defendants negligently signed the Offering Documents with untrue facts and material omissions. ¶¶ 33-44, 116-124. *See JDS Uniphase Corp. Sec. Litig.,* 2005 WL 43463, at \*9.

Regardless, the SAC also meets Rule 9(b)'s pleading standard as Plaintiffs "specify each statement alleged to have been misleading, the…reasons why…, and if an allegation…is made on information and belief, … all facts on which that belief is formed.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990-991 (9th Cir. 2009), *as amended* (Feb. 10, 2009).

**B.       The SAC States a Section 11 Claim Against the Securities Act Defendants**

The SAC alleges two streamlined categories of misstatements in the Offering Documents regarding observed changes in pharmacodynamic markers and statements touting SBT6290, and "explain[s] what is false or misleading about these statements and why they are false." *Dresner v. Silverback Therapeutics, Inc.*, 2022 WL 16716165, at \*9 (W.D. Wash. Nov. 4, 2022).

**1)     The SAC Adequately Pleads the Falsity of the Securities Act Defendants' Misstatements Regarding SBT6050**

Providing investors with the false impression that SBT6050 exhibited early signs of efficacy, the Offering Documents stated that the Securities Act Defendants "observed changes in pharmacodynamic markers in the first dose cohort," described those changes in detail, stated that these changes are "consistent with the potential mechanism of action," and explicitly represented that those exact same changes had been associated with tumor regression (*i.e.* efficacy) in preclinical and NHP studies of the drug. What the Securities Act Defendants negligently omitted, however, was that despite purportedly observing the same changes in pharmacodynamic markers in the first cohort of Phase 1/1b as they had observed in preclinical/NHP studies, the first cohort trial data demonstrated only limited anti-tumor activity and most patients in fact experienced disease progression. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1019 (S.D. Cal. 2005) (finding falsity where, "Plaintiffs' criticism is not that what was said was inaccurate, but that it was incomplete, thus portraying the results of the clinical trial in an unduly optimistic light"

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

and "[w]hether Defendants' statements were accurate is not an issue at this stage").[6]

The SAC addresses each of the Court's prior concerns pertaining to the actionability of the foregoing statements. <u>First</u>, the Court stated that, "Plaintiffs appear to equate Silverback's statements that it 'observed changes in pharmacodynamic markers' to Silverback claiming SBT6050's efficacy," but, "do not explain how Silverback's statements are the same as stating efficacy, and critically, Plaintiffs fail to contextualize the statement." *Dresner*, 2022 WL 16716165, at \*7. The SAC is clear that ***the Securities Act Defendants*** equated changes in pharmacodynamic markers with efficacy. In the same Offering Documents in which the Securities Act Defendants stated they had observed changes in pharmacodynamic markers in the first dose cohort of Phase 1/1b, they also stated that such changes had been "associated with tumor regression" in preclinical studies and NHP studies of SBT6050. ¶¶ 5, 52,  Moreover, as the Court noted, the Offering Documents "state explicitly what these changes were." *Dresner*, 2022 WL 16716165, at \*7. The precise changes the Securities Act Defendants identified are the precise changes they stated had been associated with tumor regression, *e.g.,* increases in MCP-1, IP-10, and IFNg. ¶¶ 53, 62.

<u>Second</u>, the Court stated that, though all six trial participants in the first dose cohort withdrew due to disease progression, ***proving the drug did not demonstrate anti-tumor activity despite the changes in pharmacodynamic markers***, 1) that data was presented to *investors* nine months after the IPO, 2) the Offering Documents disclosed that two patients did not complete the DLT period and had to be replaced; and 3) the Offering Documents stated that only two patients had *formal* reassessments of their tumor status at the time of the IPO. *Id.* at \*21-22. The SAC alleges that though *investors* did not know until September 2021 that most trial patients experienced disease progression, the trial data reflected limited anti-tumor activity far sooner.

---

[6] That the SAC frames this misrepresentation as one of omission is not a concession that the statement is actually true. Mot. at 9. However, prior to discovery, Plaintiffs do not have access to data which would confirm or debunk its accuracy. As such, at this juncture, the § 11 claim is one of omission.  In any event, even if a statement is literally true, it can still mislead if it omits material information or "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014); *Derr v. Ra Med. Sys., Inc.*, 2021 WL 1117309, at \*6 (S.D. Cal. Mar. 24, 2021).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                     - 11
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

Indeed, the September 2021 Abstract revealed trial data with an ***April 4, 2021*** cutoff. By then, Silverback had also begun treating patients with SBT6050 in combination with pembro in the third dose cohort. No later than April 4, 2021, and likely sooner, ***ten out of fourteen trial participants in the two dose cohorts had experienced disease progression***. Given that at the time of the IPO the first dose cohort had already received 0.3 mg/kg of SBT6050 every two weeks for five months, and that by only three months later ten out of fourteen trial patients in both dose cohorts—***over 71% of patients*-- had already experienced disease progression, the most logical inference (drawn in Plaintiffs' favor as the Supreme Court requires) is that at the time of the IPO, the data not only demonstrated *limited anti-tumor activity*, but also showed disease progression.

The Court need not take too far an inferential leap. While the Offering Documents selectively reported the tumor status of the only two patients that had not experienced disease progression as of November 25, 2020[7], claiming they'd been the only ones formally assessed, the ESMO presentation revealed that at least two other first dose cohort patients treated with 0.3 mg/kg had been evaluated at 5 and 8 weeks post initial dose respectively (the first dose cohort began treatment in July 2020), ***and both showed disease progression***. *See* Weinrib Decl., Ex. A, at 20.

Finally, it is irrelevant that the Offering Documents stated that two of the initially enrolled patients had not completed the DLT period, because ***they were replaced.*** *Id.* at *22. Subsequently, the first dose cohort ***still contained six patients,*** dosed every two weeks, all of whom *also* withdrew from the trial. The departure of these two initial enrollees revealed nothing regarding the tumor *progression* that patients remaining on study experienced *despite the observed changes in pharmacodynamic markers that had previously been associated with tumor regression*.

Misreading the SAC and citing facts specific to the § 10(b) claim (e.g., ¶¶ 102-103, set forth in a section titled "Additional Scienter Allegations for § 10(b)"), the Securities Act

---

[7] One of the two patients, who initially showed stable disease as of November 25, 2020, ultimately experienced disease progression when evaluated at 34 weeks. According to the ESMO presentation, no other trial participant that experienced disease progression initially exhibited stable disease, much less disease regression. *See* Weinrib Decl., Ex. A, at 20. Indeed, the other of the two patients, the only to exhibit target lesion reduction in the first cohort, was in fact the sole patient to show a "partial response" to SBT6050 at any point during the Phase 1/1b trial.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                        - 12
(Case No. 2:21-cv-1499-MJP)

Defendants challenge falsity with a scienter argument (see Mot. at 10-11 ("[t]he SAC still rests on the fallacy that because the trial was 'open-label,'" Defendants knew …," "Plaintiffs allege that Defendants must have been aware…"). Scienter arguments have no place in a § 11 discussion as it is not an element of the claim. As set forth supra, the SAC's § 11 falsity allegations do not turn on what the Securities Act Defendants knew, but rather their negligence.

### 2) The SAC Adequately Pleads the Falsity of the Securities Act Defendants' Misstatements Regarding SBT6290

The negligently prepared Offering Documents further misled investors by describing SBT6290, touting it as an "expan[sion] on the potential of a TLR8 agonist as a payload," and setting a timeline to file an IND. Once the Securities Act Defendants opted to speak comprehensively about SBT6290, they incurred a duty to disclose that the Company could not develop SBT6290 if SBT6050's trial data reflected a lack of efficacy and/or safety, given that both drugs used the same TLR8 agonist as a payload. *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-706 (9th Cir. 2016) (once a company speaks it is "bound to do so in a manner that wouldn't mislead investors"); *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *4 (N.D. Cal. Aug. 7, 2020) ("[T]he information defendants *did* disclose created an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."). Defendants should have disclosed that a failure for SBT6050 doomed *both* drug candidates in one fell swoop.[8]

The Securities Act Defendants' argue that investors should have discerned that failure for SBT6050 doomed SBT6290, despite their silence, citing one analyst report and improperly asking the Court to make an inference in their favor as well as take judicial notice of the report *for the truth of the matters asserted therein*. *Dresner*, 2022 WL 16716165, at *5 ("the Court must…draw all reasonable inferences in favor of the plaintiff;" courts cannot take judicial notice of analyst reports "for the truth of the matter asserted"). Specifically, one analyst opined that "SBT6050's

---

[8] The Court did not reject any of the foregoing arguments, instead stating that because the first amended complaint did not identify the misleading statements regarding SBT6290, Plaintiffs had not "met the pleading standards under Rule 9(b). *Dresner*, 2022 WL 16716165, at *8. The SAC cures this deficiency.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

clinical success" would "significantly de-risk[]" SBT6290. Defs. Ex. U, at 1. Speculating that SBT6290 is "*de-risked*" is not the same as saying that SBT6050's clinical success would *guarantee* SBT6290's clinical success. Similarly, even if investors could have gleaned on their own that failure for SBT6050 created *risk* for SBT6290, that is not the same as saying that failure for SBT6050 *doomed* SBT6290. Investors could just as easily have concluded that though the two drugs use the same TLR8 agonist, because they are not identical, failure for one would not necessarily mean failure for both. Given that the Company had no FDA approved products, and no revenue source, the fact that the failure of the clinical program for its lead product candidate would also doom its second product candidate would certainly "alter the total mix of information," *i.e.* materiality.[9] *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1982). Indeed, following its discontinuation of the two drug programs, Silverback *had to abandon its business model completely* and is now developing a nasal spray alternative to the EpiPen.

### C.      The SAC States a Section 10(b) Claim Against the Exchange Act Defendants

The Exchange Act Defendants issued three categories of misstatements: 1) misstatements regarding SBT6050's efficacy; 2) misstatements regarding SBT6050's safety; and 3) misstatements regarding SBT6290. The SAC "specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief…state[s] with particularity all facts on which that belief is formed." Dresner, 2022 WL 16716165, at *10.

#### 1)      The § 10(b) Falsity Allegations Satisfy Pleading Requirements

Defendants wrongly argue that the SAC's § 10(b) allegations are puzzle pled, Mot. at 13, though—as the Court instructed—the SAC sets forth clear streamlined misstatements and related omissions, including date and the author thereof, and explains why each misstatement misled investors. Indeed, most of the misstatement quotes are ***one sentence long***; the lengthiest quote in

---

[9] Incidentally, that same analyst report shows that the market read the Offering Documents as stating that the Phase 1/1b trial results indicated the "establishment of clear single-agent anti-tumor efficacy." *Id.*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                - 14 -
(Case No. 2:21-cv-1499-MJP)

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

¶¶ 66-80 is four sentences—hardly the lengthy block quotes Defendants claim are "worse…than before." Mot. at 13. Moreover, the SAC carefully identifies which portion of each misstatement is misleading and for what reason. *See, e.g.,* ¶¶ 71-72 ("statements … ***regarding changes in pharmacodynamic markers*** and potential mechanism of action misled Silverback investors by failing to disclose…;" "statements ***regarding safety data*** from the Phase 1/1b trial misled Silverback investors because…"). There is thus no "burden on the reader to sort out the statements and match them with the corresponding adverse facts."*Dresner*, 2022 WL 16716165, at \*10.[10]

Additionally, the Exchange Act Defendants repeated their misstatements several times throughout the Class Period.  These statements misled investors the same way when first issued as they did when subsequently repeated. It logically follows, therefore, that the SAC identifies the "same... reasons for falsity" each time an identical misstatement is repeated.  Such repetition does not render the SAC puzzle pled.  Mot. at 13. Defendants lastly, and feebly, argue that font choice should render the allegations puzzle pled. *Id.* Bold and italics are commonly used for emphasis. Nowhere does the SAC claim that bold and italics are used to delineate which statements are misleading.  Plaintiffs' use of bold and italics for emphasis rather than for the sole purpose of identifying misstatements is not tantamount to puzzle pleading. *Id.*

### 2) The SAC Adequately Pleads the Falsity of the Exchange Act Defendants' Misstatements Regarding SBT6050's Efficacy

In the 2020 10-K, the Exchange Act Defendants told investors that in "our Phase 1/1b clinical trial, we are monitoring key [pharmacodynamic] biomarkers ***which have been associated with tumor regression…***" The Exchange Act Defendants then repeated at least six times during the Class Period, including in the 2020 10-K, that they had observed ***those precise changes in pharmacodynamic biomarkers***, consistent with the potential mechanism of action, in Phase 1/1b.

---

[10] *In re Acadia Pharm. Inc. Sec. Litig.,* 2020 WL 2838686, at \*4 (S.D. Cal. June 1, 2020) (rejecting puzzle pleading argument though complaint "does contain large block quotes," because, "Plaintiff's complaint does single out the actual statements that are the basis of Plaintiff's securities fraud claim."); *Uber Techs., Inc.,* 2020 WL 4569846, at \*5 (rejecting defendants' puzzle pleading argument though the complaint was "long, confusing, and meandering," because defendants could still "figure[e] out what statements are alleged to be false.").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 15 (Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

¶¶ 66, 70, 74, 78, 88, 92.  The SAC alleges that these misstatements duped investors because, though these same changes in pharmacodynamic biomarkers had been "associated with tumor regression" in prior SBT6050 studies, patients treated with SBT6050 in the first dose cohort of Phase 1/1b only showed limited anti-tumor activity, or even disease progression.  To further convince investors that these changes in pharmacodynamic biomarkers meant early signs of efficacy, the Exchange Act Defendants claimed to have only evaluated two out of the six first dose cohort patients, reporting that one had stable disease and one had disease *regression*.  In fact, the Company had evaluated additional patients prior to the Class Period and had observed disease *progression* in at least two other patients. *See* Weinrib Decl., Ex. A, at 20.

Moreover, by no later than April 4, 2021, *six days after* the 2020 10-K dated March 29, 2021 and *over one month before* the 1Q21 dated May 13, 2021, **_ten out of fourteen patients (71%)_** had already experienced disease progression in Part 1 (SBT6050) and Part 3 (SBT6050 with pembro) of the Phase 1/1b trial.  By no later than August 1, 2021, *eleven days before* the 2Q21 dated August 12, 2021, **_twenty-seven out of forty patients (67.5%)_** had experienced disease progression, seventeen of whom had to withdraw from the trial.  *See Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, at *5 (S.D. Cal. Aug. 4, 2021) (statements actionable where defendants failed to reveal a high percentage of patient withdrawals from a clinical trial).  Defendants ignore these facts, arguing scienter to challenge falsity, and wrongly state that the SAC does not allege that "Defendants were contemporaneously aware of information." Mot. at 14.  The timing of the data and patient withdrawals due to disease progression prove Defendants' awareness of **open label** trial data that rendered their statements misleading when made.

Mischaracterizing the facts to suit their false narrative, Defendants try to deflect the significance of the April 4, 2021 data cutoff, by arguing that the SAC does not allege "how Defendants knew of data [when they made their March 29, 2021 statements] that was not collected from the study until a week later." Mot. at 15.  Not a single fact in the record suggests that Defendants first "collected" the data on April 4, 2021.  Rather, the Abstract makes clear that the data reflected therein had a data cutoff of April 4, 2021, *i.e.,* it did not include trial data post April

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                    - 16
(Case No. 2:21-cv-1499-MJP)

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

4, 2021.[11]  Indeed, the ESMO Presentation proves that Silverback observed disease progression in at least one third of patients enrolled in the first dose cohort, which began dosing in July 2020, within 5 - 8 weeks after their *initial* dose.  *See* Weinrib Decl., Ex. A, at 20.  In other words, *the facts in the record* demonstrate that the Exchange Act Defendants not only had access to the open label trial data from day one[12], but that they evaluated patients at least every few weeks, observed disease progression in a third of patients well before the March 29, 2021 misstatements, knew no later than April 4, 2021 that ten out of fourteen patients in the first and third cohorts had progressive disease, and knew no later than August 1, 2021 that twenty seven out of forty patients in the first and third cohorts had progressive disease.  Defendants argue that they warned that they could not predict "whether any initial tumor responses that may be observed will be durable or whether adverse events will arise over time." Mot. at 18.  The Court similarly inquired whether it's "possible that someone can have a good outcome at the beginning of the trial and then have a poor outcome as they continue to receive the drug." Weinrib Decl., Ex. B, at 32:3-5.  However, the trial data reflects that, *with only one exception*, every patient that experienced progressive disease exhibited progressive disease *at each evaluation*.[13] *See* Weinrib Decl., Ex. A, at 20.

That any reasonable investor would have understood the Exchange Act Defendants' misstatements as representing that the Phase 1/1b data reflected early signs of efficacy is illustrated by an SVB Leerink analyst report issued following publication of the Abstract.  That report

[11] Defendants argue that the "Abstract's data cut-off date is not a particularized factual allegation of what Defendants knew at the time." Mot. at 16.  To the contrary.  The contents of the Abstract reflect precisely what the Exchange Act Defendants knew no later than April 4, 2021.

[12] Defendants ask this Court to take judicial notice of a National Cancer Institute web page for the truth of matter asserted therein, *i.e.,* the definition of an open label study, to argue that because health providers and patients knew what treatment they received, it somehow follows that the trial sponsor (Silverback) did not have access to the trial data. The Court, however, "cannot take judicial notice of this without potentially making a finding on a disputed fact." *Dresner*, 2022 WL 16716165 , at \*5.  It is equally improper for Defendants to ask the Court to accept as true out-of-context quotes which are not incorporated by reference into the SAC, and make an inference in their favor that they did not analyze the trial data until several weeks after the cutoff. Mot. at 17.

[13] Moreover, Defendants' generic warning that because trial patients are "critically ill" they may die or experience adverse medical events does nothing to alert investors to contemporaneously known data demonstrating a lack of efficacy, *i.e.,* disease progression during treatment with SBT6050. Mot. at 18. *See, e.g.*, *Pirani*, 445 F. Supp. 3d at 386; *Flynn*, 2016 WL 3360676, at \*10-\*12 (boilerplate warning misleading where specific conditions known but concealed caused the risk to manifest or made it significantly more likely); *Snap I*, 2018 WL 2972528, at \*6 (hypothetical risk disclosures insufficient to absolve defendants of their duty to disclose).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                  - 17
(Case No. 2:21-cv-1499-MJP)

confirmed that Silverback's stock plummeted in the wake of the Abstract because the misstatements had created "investor expectations for eye-catching efficacy," which the Abstract had dashed. ¶ 86.  However, even the Abstract had not fully revealed the truth.  That same analyst stated that though the Abstract had not reflected "eye catching" efficacy, the "abstract did report a clear signal of immune activation and disease control with clinical benefit..." *Id.* ¶ 86.

The Exchange Act Defendants continued to mislead investors in the ESMO Presentation by claiming "Proof-of-mechanism established" and "Early signals of anti-tumor activity in a heavily pre-treated heterogenous population," and that "SBT6050 conferred clinical benefit." ¶ 88. The H.C. Wainwright report released that day underscores the success of Defendants' continued deception. ¶ 91.  ***Relying on the misstatements in the ESMO Presentation*** (*cf.* Mot. at 19), the report states, "We view the safety data and the biomarker data seen in the monotherapy arm to be positive and persuasive for development in combination to proceed." *Id.* The Exchange Act Defendants continued to claim SBT6050 conferred clinical benefit in the 3Q21 on November 10, 2021, by stating that the data in the ESMO Presentation is "consistent with proof-of-mechanism," and "pharmacodynamic biomarkers indicative of… early signs of anti-tumor activity..." ¶ 92[14].

Defendants cannot credibly claim that stating "SBT6050 conferred clinical benefit" is a statement of opinion. Mot. at 19.  They did not couch the statement (nor their statements regarding "proof-of-mechanism" or "early signals of anti-tumor activity") as one of belief or opinion; they portrayed it as conclusive fact seemingly based on the hard data included in the presentation, thus giving investors no cause to dispute it. *Id.*, Weinrib Decl., Ex. A, at 21.  Regardless, opinion statements are actionable where there are "particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Slomnitsky v. Caldwell (In re Allied Nev. Gold*

---

[14] Defendants characterize their statement that "SBT6050 conferred clinical benefit"… "as specific to the clinical data disclosed in the ESMO presentation." Mot. at 20.  As explained, it is that very same clinical data that Defendants cite to support their misstatements in the 3Q21.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

*Corp. Sec. Litig.)*, 743 F. App'x 887, 887-88 (9th Cir. 2018).  As Defendants admitted in March 2022, ***without identifying a single new piece of data that altered their evaluation after September 2021*[15]** , SBT6050 in fact did not confer clinical benefit, causing Silverback to discontinue developing SBT6050 **and** SBT6290 as well as fire over a quarter of their employees.

Other statements Defendants argue are inactionable opinions are similarly statements of fact. *See, e.g.,* Def. Ex. 3,[16] citing to ¶¶ 61, 66 (describing the changes in pharmacodynamic markers observed); ¶ 66 ("Changes in pharmacodynamic markers have been observed …"); ¶¶ 70, 88 ("…Changes in pharmacodynamic markers consistent with the potential mechanism of action were observed in treated patients…"); ¶ 92 ("we observed induction of pharmacodynamic biomarkers indicative of myeloid, T, and NK cell act on, early signs of anti-tumor activity, and no dose limiting toxicities (DLTs)").  Defendants had no basis for these proclamations of fact given their contemporaneous review of data that only demonstrated limited anti-tumor activity and showed a high percentage of disease progression (including patient withdrawals for that reason).[17]

Unable to defend against unassailable *facts*, Defendants argue that the claim is merely a dispute over "Defendants' ***interpretations*** of clinical data." Mot. at 20. "But with this argument, Defendants knock down a strawman." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at **16-17 (C.D. Cal. Aug. 4, 2014).  The SAC alleges that Defendants failed to disclose that SBT6050 did not confer a clinical benefit due to limited anti-tumor activity and did not have a manageable safety profile.  Plaintiffs don't base this claim on the opinion of the FDA, some other third party, or even Plaintiffs' own interpretation of the data—Defendants themselves observed this

---

[15] Defendants abandon their prior unsupported claims that that they discontinued SBT6050 and SBT6290 *based on new data*. *See* Motion to Dismiss the Amended Class Action Complaint, ECF No. 34, at 3, 9, 17, 19, 22, 24.

[16] Exhibits 1-5 to the Fukumura Decl., ECF Nos. 48-1 – 48-5, are collectively 17 pages of additional argument as to why statements in the SAC, ***that are not discussed in Defendants' Mot.***, are inactionable, and thus constitute a violation of LCR 7(e)-(f) and should be stricken. FED. R. CIV. P. 12(f). *See, e.g., Todd v. Tempur-Sealy Int'l, Inc.*, 2016  WL 5746364 , at *4 n.3 (N.D. Cal. Sep. 30, 2016) ("It is difficult to view this appendix as anything other than an unsubtle vehicle for deliberately circumventing the page limits imposed on the parties' briefing."); *Jiangchen v. Rentech, Inc.*, 2017 WL 10363990, at *4 (C.D. Cal. Nov. 20, 2017)(striking charts submitted for "convenience".)

[17] Defendants' misstatements of fact regarding safety and SBT6290 were similarly not crafted as statements of opinion. ¶¶ 76-77 ("progress and preclinical data" described with detailed facts); ¶ 84 ("based on preliminary safety data, SBT6050 given alone or in combination with pembrolizumab has a manageable safety profile").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                              - 19
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

throughout the trial and decided to halt development of their two lead drug candidates as a result.

### 3)   The SAC Adequately Pleads the Falsity of the Exchange Act Defendants' Misstatements Regarding SBT6050's Safety

The Exchange Act Defendants additionally misled investors regarding safety, falsely representing that SBT6050 had a "manageable safety profile," with no DLTs, and detailing only minor adverse events including flu-like symptoms and redness/swelling at the injection site.  At no point did Defendants reveal that SBT6050 in fact did not have a manageable safety profile and that this, along with limited anti-tumor activity, would mean the end of the SBT6050 clinical program.  In fact, Defendants even discussed cytokine related adverse events in both the ESMO Presentation (¶¶ 14, 89) and the 3Q21 (¶ 94) but mitigated their significance by still stating "SBT6050 administered alone or in combination with pembrolizumab has a manageable safety profile" and assuring investors that it resolved with supportive care.  Indeed, the September 16, 2021 H.C. Wainwright report cited the lack of severe cytokine related adverse events as a basis for its conclusion that it viewed, "the safety data…to be positive and persuasive for development in combination to proceed." ¶ 91. Defendants are not entitled to cherry pick trial data to disclose when doing so without complete transparency as to related data would mislead investors.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (once defendants chose to speak, they "were bound to do so in a manner that wouldn't mislead investors").  By opting to detail safety events from the clinical trial, and even cytokine related adverse events in particular, the Exchange Act Defendants incurred a duty to reveal that dose limiting cytokine related adverse events meant that SBT6050 did not have a manageable safety profile and that they'd therefore have to discontinue developing SBT6050 as well as SBT6290, the two main drugs in their pipeline.

The Exchange Act Defendants defend their representation that SBT6050 "has a manageable safety profile" by citing data in the ESMO Presentation suggesting "[t]here had been no treatment-related deaths, no treatment-related adverse events leading to discontinuation, and all DLTs were resolved with supportive care." Mot. at 19-20.  Yet, based on *no newly identified*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                    - 20
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

*data*,[18] Defendants discontinued SBT6050 because of cytokine-related adverse events in patients treated with SBT6050 along with pembro; *i.e.*, **SBT6050 did not have a manageable safety profile**. Once again attacking scienter to challenge falsity, the Exchange Act Defendants argue that "there are no particularized factual allegations that data from Part 3 of the trial even existed at the time" they made their misstatements. Mot. at 15. The data cutoffs reflected in both the Abstract and ESMO Presentation, which include data from **Part 3 of the trial**, prove otherwise.[19]

### D.    The SAC Adequately Pleads the Exchange Act Defendants' Scienter

A strong inference of scienter exists if "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Allegations are examined holistically. *Id.* The inference "need not be irrefutable, *i.e.* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* "Scienter can be established by direct or circumstantial evidence." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010). Between competing inferences, "a tie goes to the plaintiff." *In re Amgen, Inc. Sec. Litig.*, 2014 WL 12585809, at *8.

### 1)    The Exchange Act Defendants' Access to Data

As the Court instructed, the SAC "put[s] forth [] evidence suggesting that Defendants were on notice of clinical findings that contradicted their public statements at the time those statements were made." *Dresner*, 2022 WL 16716165, at *12. Specifically, while the SAC still alleges that Defendants Shawver and Piazza, Silverback's CEO and CFO, had access to the Phase 1/1b **open label** trial data of its lead product candidate, it goes much further. The SAC alleges that the Abstract states that by no later than April 4, 2021, *six days after* the 2020 10-K dated March 29,

---

[18] The Exchange Act Defendants falsely claim they discussed cytokine related adverse events for the first time in the 3Q21 (Mot. at 21), but the SAC clearly states they discussed such events in the ESMO Presentation as well. ¶¶ 14, 89.

[19] The Exchange Act Defendants argue that "the interlocked fates of SBT6050 and SBT6290 [should have been] obvious to investors," Mot. at 12, thus conceding that fact was at least obvious to Defendants (Plaintiffs do not agree it was obvious to investors) but argue that the "SAC contains no particularized allegations of any facts known to Defendants in November that rendered the discontinuation of [both] programs a foregone conclusion." Mot. at 21. In fact, the SAC alleges that Defendants based their decision to discontinue both programs on data with a cutoff no later than August 1, 2021, well in advance of the November 2021 disclosure.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                    - 21
(Case No. 2:21-cv-1499-MJP)

2021 and *over one month before* the 1Q21 dated May 13, 2021, the open label data showed that *ten out of fourteen patients* had already experienced disease progression in Part 1 (SBT6050) and Part 3 (SBT6050 with pembro) of the Phase 1/1b trial. ¶ 55. The ESMO Presentation states that by no later than August 1, 2021, *eleven days before* the 2Q21 dated August 12, 2021, the open label data showed that *twenty-seven out of forty patients* had experienced disease progression, seventeen of whom had to withdraw from the trial[20]. ¶ 56. The timing of the data and patient withdrawals due to disease progression establish an inference *at least as compelling as any opposing inference* that the Exchange Act Defendants had contemporaneous access to **open label** trial data that rendered their statements misleading when made.  Moreover, the ESMO Presentation proves that Silverback observed disease progression in at least one third of patients enrolled in the first dose cohort, which began dosing in July 2020, within 5 - 8 weeks after their *initial* dose—**at least six months prior to the first Class Period misstatement**.  *See* Weinrib Decl., Ex. A, at 20.  *See Sparling v. Daou (In re Daou Sys.),* 411 F.3d 1006, 1022 (9th Cir. 2005) (allegations that executives monitored company database a factor in favor of inferring scienter).

In other words, the Exchange Act Defendants not only had access to the open label trial data, but evaluated patients every few weeks, observed disease progression in a third of patients well before the March 29, 2021 misstatements, had access to data no later than April 4, 2021 that ten out of fourteen patients in Parts 1 and 3 had progressive disease, and had access to data no later than August 1, 2021 that twenty seven out of forty patients in Parts 1 and 3 had progressive disease. "Where a strong inference suggests that a defendant was on notice of clinical findings before making contradictory public statements, the defendant's conduct is at least "deliberately reckless" under Section 10(b)." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *11.

Moreover, the SAC still alleges that Defendant Shawver held company wide meetings every two weeks, with mandatory attendance for *all employees* to report on and discuss trial data. ¶ 103. The Court previously held that, "Plaintiffs do not put forth any evidence that all the

---

[20] Seven other patients also withdrew for unidentified reasons.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                              - 22
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

Defendants attended these meetings." *Dresner,* 2022 WL 16716165, at \*12.  However, the SAC is clear that ***Defendant Shawver is the one that held these meetings***.  Defendant Shawver's attendance is therefore not in question.  Moreover, the SAC states that Defendant Shawver mandated the attendance of *all employees,* which would include CFO Defendant Piazza. The Exchange Act Defendants' attendance at these meetings further contributes to the inference of scienter because it is at least as plausible as any opposing inference that the attendees discussed the trial data, which they admitted to evaluating for safety and anti-tumor activity, ¶ 50. *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at \*9.

### 2)  The Core Operations Doctrine

Where a particular issue "'is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter,'" the core operations doctrine allows the Court to infer scienter even in the absence of specific evidence establishing that a particular individual knew a particular fact.  *Flynn*, 2016 WL 3360676, at \*15.  The essentiality of SBT6050 to Silverback's business is undisputed.  With no approved products, no revenue, and no other product undergoing clinical testing, SBT6050 was the *sin qua non* of Silverback's business. Indeed, the efficacy and safety of SBT6050 was "of such prominence" that the Company had to abandon its business model entirely due to the deficient trial data. ¶ 19 The most compelling inference is that each Defendant monitored the open label trial data of their lead drug candidate and only drug in active development, and thus had "knowledge of the matter." Courts in this Circuit have used the core operations doctrine to find scienter even in the absence of actual knowledge. *See, e.g., In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at \*11; *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 941-43 (9th Cir. 2003).

Unsurprisingly, Defendants Shawver and Piazza—*the CEO and CFO--* claimed to have knowledge of Silverback's core operations when they signed the misleading filings. They chose to put themselves forth as knowledgeable by speaking about the efficacy and safety data in the Phase 1/1b trial and SBT6290's development.  If they did not in fact possess knowledge to support their statements, then at minimum they exhibited deliberate recklessness.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                    - 23
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

**E.      The SAC Adequately Pleads Loss Causation**

The Exchange Act Defendants ask this Court to apply Rule 9(b) to the loss causation analysis (Mot. at 23) though the Supreme Court is clear that loss causation is subject to the less rigorous pleading requirement of Rule 8(a)(2) and is "not meant to impose a great burden upon a plaintiff." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The SAC alleges that Silverback shares fell on heavy volume in response to three corrective disclosures: 1) the Abstract issued on September 13, 2021, which caused a 23.35% stock drop; 2) the ESMO Presentation on September 16, 2021, which caused a 23% stock drop; and 3) the March 31, 2022 announcement that Silverback discontinued the SBT6050 and SBT6290 programs, which caused an 8.55% drop. ¶¶ 81-90; 98-99. These allegations suffice to create a connection between the misstatements and the decline of Silverback shares following the corrective disclosures *See Constr. Workers Pension Tr. Fund v. Genoptix, Inc.,* 2013 WL 12123841, at *9 (S.D. Cal. Mar. 22, 2013). The Abstract revealed for the first time that ten out of fourteen patients treated in Parts 1 and 3 of the trial prior to April 4, 2021 showed disease progression. ¶ 82. The ESMO Presentation revealed for the first time that out of forty enrolled patients, seventeen patients discontinued study treatment due to disease progression, ten patients remaining on study had disease progression, five patients died on study due to disease progression, only one patient had a partial response, and only seven had stable disease. *Id.* Nevertheless, Defendants continued to claim that SBT6050 conferred clinical benefit and had a manageable safety profile. The March 31, 2022 corrective disclosure revealed for the first time that the SBT6050 trial data showed insufficient anti-tumor activity to proceed as a monotherapy, an unmanageable safety profile when used in combination with pembro, that therefore the Company had to discontinue both SBT6050 <u>and</u> SBT6290, and had to terminate 27% of its workforce. Defendants' arguments, a rehashed summary of their falsity and scienter arguments, thus hold no water.

**F.      The SAC Adequately Pleads §§ 15 and 20(a) Claims**

Defendants concede that if the Court upholds the §11 and §10(b) claims, the §15 and §20(a) claims also survive. *See* Mot. at 24.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                    - 24
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

## IV.    CONCLUSION

For these reasons, Plaintiffs respectfully request that the Motion be denied.[21]

Dated:  January 23, 2023                        **BADGLEY MULLINS TURNER PLLC**

                                                /s/ *Duncan C. Turner*
                                                Duncan C. Turner, WSBA No. 20597
                                                19929 Ballinger Way NE, Suite 200
                                                Seattle, WA 98155
                                                Telephone: (206) 621-6566
                                                dturner@badgleymullins.com

                                                *Of Counsel*

                                                **POMERANTZ LLP**
                                                Jeremy A. Lieberman
                                                (*pro hac vice*)
                                                Tamar A. Weinrib
                                                (*pro hac vice*)
                                                600 Third Avenue
                                                New York, New York 10016
                                                Telephone: (212) 661-1100
                                                Facsimile: (917) 463-1044
                                                jalieberman@pomlaw.com
                                                taweinrib@pomlaw.com

                                                *Lead Counsel for Plaintiffs*

---

[21] If the Court is inclined to grant the Motion, Plaintiffs respectfully request leave to amend.  *See* Fed. R. Civ. P. 15(a)(2); *Curry v. Hansen Med., Inc.*, 2011 WL 3741238, at *2 (N.D. Cal. Aug. 25, 2011)(in §10(b) cases, "[l]eave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment"); *Eminence Cap., LLC v. Aspeon, Inc*., 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                      - 25
(Case No. 2:21-cv-1499-MJP)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of January, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Yonten Dorjee*
Yonten Dorjee, Paralegal
**BADGLEY MULLINS TURNER PLLC**
Email:  ydorjee@badgleymullins.com

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS                                                          - 26
(Case No. 2:21-cv-1499-MJP)

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686
