UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BENJAMIN DRESNER, individually and on behalf of all others similarly situated, | CASE NO. C21-1499 MJP |
| Plaintiff, | ORDER ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT |
| v. | |
| SILVERBACK THERAPEUTICS, INC., LAURA K. SHAWVER, JONATHAN PIAZZA, RUSS HAWKINSON, PETER THOMPSON, VICKIE L. CAPPS, ROBERT HERSHBERG, SAQIB ISLAM, ANDREW POWELL, JONATHAN ROOT, THILO SCHROEDER, and SCOTT PLATSHON, | |
| Defendants. | |

This matter comes before the Court on Defendants' Motion to Dismiss the Second

Amended Class Action Complaint. ("Motion" (Dkt. No. 47).) Having reviewed the Motion,

Plaintiffs' Response ("Response" (Dkt. No. 51)), the Reply ("Reply" (Dkt. No. 54)), and all

1   other supporting materials and documents, the Court GRANTS Defendants' Motion and

2   DISMISSES the Second Amended Class Action Complaint with prejudice.

3                                    **BACKGROUND**

4          Defendant, Silverback Therapeutics ("Silverback"), is a biopharmaceutical company that

5   developed SBT6050, an Antibody-Drug Conjugate. (Second Am. Compl. ("SAC") ¶ 47 (Dkt.

6   No. 45).) Antibody-drug conjugates consist of a payload (a small molecule drug), and an

7   antibody that is engineered against a specific antigen. (Id.) The payload and the antibody are

8   joined by a chemical linker. (Id.) When an antibody-drug conjugate binds to the target antigen,

9   the payload is released and affects the targeted cell, ideally minimizing the effect on non-targeted

10  cells. (Id.) SBT6050 is a TLR8 agonist linker-payload conjugated to a HER2-directed

11  monoclonal antibody that targets tumors, such as breast, gastric, and non-small cell lung cancers.

12  (Id.)

13         Before drugs candidates like SBT6050 can be sold commercially, it must first undergo

14  three phases of clinical trials. (Motion at 2.) Phase 1 trials test the drug's safety, dose tolerance,

15  and other properties. (Id.) Silverback's "Phase 1/1b Trial" was designed to evaluate SBT6050's

16  safety, tolerability, pharmacokinetics ("PK"), pharmacodynamics ("PD"), and anti-tumor activity

17  for the treatment of advanced or metastatic HER2-expressing solid tumors in patients for whom

18  all available therapies associated with clinical benefit had failed. (Id.) And because Silverback

19  designed SBT6050 to induce the immune system to kill cancer cells without harming healthy

20  cells, identifying the optimal dosages was critical. (Id. at 3.) Accordingly, the Phase 1/1b Trial

21  was designed to evaluate the safety and tolerability of SBT6050 through a series of dose-

22  escalation studies in monotherapy (utilizing the drug by itself) and combination therapy (using

23

24

1   the drug in combination with other drugs), that Silverback anticipated to continue for more than
2   two years. (Id.)

3          Silverback designed the trial to proceed through four parts with data from each cohort
4   informing the dose escalation for the proceeding cohorts. (Id.) Part 1 began with monotherapy
5   doses escalating from 0.3 mg/kg, 0.6 mg/kg, 0.9 mg/kg, to 1.2 mg/kg. (Id.) Part 2 was supposed
6   to provide monotherapy in tumor-specific cohorts, using the optimal dose identified in Part 1.
7   (Id.) Part 3 provided combination therapy with pembrolizumab ("pembro") doses escalating from
8   0.15 mg/kg, 0.3 mg/kg, to 0.6 mg/kg. (Id.) Finally, Part 4 intended to provide combination
9   therapy with pembro in tumor-specific cohorts, using the optimal dose identified in Part 3. (Id.)
10  The clinical sites administering these tests were located in the U.S., Australia, and South Korea,
11  and patients received CT scans every eight weeks until week twenty-four and then every sixteen
12  weeks thereafter. (Id.) Silverback began its Phase 1/1b Trial in July 2020. (SAC ¶ 3.)

13  **A.      Silverback's Initial Public Offering**

14         Silverback's Initial Public Offering ("IPO") took place on December 3, 2020, five
15  months after it commenced the Phase 1/1b Trial. (Motion at 3.) Silverback filed a registration
16  statement and a prospectus (collectively "Offering Documents") with the Securities and
17  Exchange Commission ("SEC") in connection with its IPO. (SAC ¶ 4.) Pursuant to the Offering
18  Documents, Silverback conducted the IPO, issuing 11.5 million shares of common stock priced
19  at $21.00 per share. (Id.) Through the Offering Documents, Silverback disclosed that six patients
20  were enrolled in the first, lowest-dose cohort of Part 1 – monotherapy at 0.3 mg/kg every two
21  weeks. (Motion at 3-4.) At the time of the IPO, one of the six patients had stable disease at scans
22  at eight weeks and sixteen weeks, another patient had a reduction in the diameter of her target
23  lesions at eight weeks, and two patients had withdrawn from the trial. (Id. at 4.) Silverback
24

1    further disclosed that "changes in the PD markers consistent with the potential mechanism of

2    action have been observed in the first dose cohort, including increases in plasma levels of CRP

3    (C-reactive protein), MCP-1, IP-10 and IL-6, which are indicative of myeloid cell activation and

4    IFNγ, a marker for T and NK cell activation." (Id.) Silverback also discussed its second drug

5    candidate, SBT6290, which expands on the potential of a TLR8 agonist as a payload and utilizes

6    the same mechanism as SBT6050 to activate immune cells for localized tumor treatment.

7    (Motion at 4; SAC ¶ 6.)

8         Plaintiffs allege the Offering Documents were negligently prepared and misled investors

9    in violation of Section 11 of the Securities Act of 1933 ("Securities Act"). (SAC ¶ 7.)

10   Specifically, Plaintiffs allege that though the Offering Documents discuss changes in the PD

11   markers and SBT6290, Silverback and the individual Securities Act Defendants failed to disclose

12   that patients treated thus far in the Phase 1/1B Trial only exhibited limited anti-tumor activity

13   despite the observed changes and that if SBT6050 failed then Silverback would have to

14   discontinue clinical programs for both SBT6050 and SBT6290. (Id.)

15   **B.    Silverback's Statements from March 2021 – August 2021**

16        On March 29, 2021, Silverback filed an Annual Report on Form 10-K with the SEC,

17   reporting the Company's financial and operating results for the 2020 year. (SAC ¶ 66.) The 10-K

18   filing reiterated the observed changes in PD markers from the first monotherapy dose cohort, and

19   that these changes were associated with tumor regression in preclinical studies. (Motion at 5.)  It

20   also discussed the safety data emerging from the trial, detailing the most common adverse events

21   (side effects) included flu-like symptoms (fever, chills, nausea, vomiting, fatigue), and redness

22   and swelling at the injection site. (SAC ¶ 68.) The 10-K filing stated that Silverback anticipated

23   providing an update on interim data in the second half of 2021. (Motion at 5.)

24

In conjunction with the 10-K filing, Silverback issued a press release announcing the Company's fourth quarter and full 2020 financial results and recent corporate updates. (SAC ¶ 70.) The press release stated that "pharmacological activity was observed in the first dose cohort" and "[c]hanges in the pharmacodynamic markers consistent with potential mechanism of action have been observed in patients treated in the first monotherapy dose cohort." (Id.)

Plaintiffs allege the 2020 10-K and corresponding press release statements that disclosed the changes in the PD markers and potential mechanism of action misled Silverback's investors by failing to disclose that, though these same changes in PD markers had been associated with tumor regression in preclinical studies and non-human primate studies, patients treated with SBT6050 as a monotherapy in the first dose cohort only exhibited limited anti-tumor activity. (SAC ¶ 71.) Plaintiffs also allege that Silverback's statement regarding safety data misled investors because patients treated in Part 3 of the trial with SBT6050 in combination with prembro suffered cytokine related adverse events, which meant that SBT6050 used in conjunction with pembro did not have a manageable safety profile. (Id. at ¶ 72.) Lastly, Plaintiffs allege the documents failed to reveal that is SBT6050 trial failed, Silverback would have to discontinue the clinical programs for both SBT6050 and SBT6290. ( Id. at ¶ 73.)

Silverback later filed 10-Qs in May and August 2021. (Motion at 5.) Silverback announced in May that SBT6050 continued to advance through monotherapy and pembro combination dose escalation arms, and that changes in the PD markers in the first dose cohort had been observed. (Id.; SAC ¶ 74.) In August, Silverback reiterated it had "observed changes in the PD markers in the first monotherapy dose cohort." (Id.; SAC ¶ 78.) Plaintiffs allege these statements misled investors because patients only exhibited limited anti-tumor activity. (SAC ¶¶ 75, 79.)

**C.      Silverback's Statements from September to November 2021**

On September 13, 2021, Silverback disclosed the interim results of the Phase 1/1b Trial via a press release and an abstract for an upcoming European Society for Medical Oncology ("ESMO") presentation. (SAC ¶ 81.) The Abstract indicated the data reported therein had a cutoff date of April 4, 2021, and explained "that 18 patients across 10 tumor types were treated at 4 dose levels in monotherapy and combination therapy and that dose levels ranging from 0.15 mg/kg to 1.2 mg/kg were pharmacologically active as demonstrated by the induction of blood-based biomarkers associated with myeloid cell and NK or T cell activation." (Id. at ¶ 82; Motion at 5.) Of the 18 patients, 14 were evaluable, of which one demonstrated a partial response and three demonstrated stable disease. (Id.; Motion at 5.) The Abstract also reported on safety data and reported that the most common adverse events were flu-like symptoms consistent with immune activation. (Id. at ¶ 83; Motion at 5-6.) Dose limiting toxicities were observed, but resolved with supportive care, and based on this preliminary safety data, Silverback believed SBT6050 had a manageable safety profile. (Id.) On this news Silverback's stock price dropped from $19.44 to $14.90 per share. (Motion at 6.)

Three days later, Silverback presented the interim results at ESMO based on clinical data as of August 1, 2021. (Motion at 6.) Silverback disclosed "the doses, treatment duration, and tumor-response rates for six specific patients, concluding that SBT6050 conferred clinical benefit to patients with heavily pre-treated, advanced, solid tumors." (Id.) With this information, Silverback also disclosed that forty patients enrolled across five dose levels had been evaluated, "allowing for robust safety, pharmacokinetic, and PD evaluation." (SAC ¶ 87.) Of the forty patients, only thirteen remained on treatment as of August 1, 2021. (Id.) The presentation further revealed that seventeen patients discontinued the treatment due to disease progression, seven

1   discontinued treatment because they withdrew consent for unidentified reasons, and five patients

2   died due to disease progression. (Id.) Of the evaluable patients, only one patient showed a partial

3   response, and seven had stable disease. (Id.) Silverback also reiterated that SBT6050 had a

4   manageable safety profile. (Id. at ¶ 89.) Following the presentation, Silverback's stock once

5   again fell, this time by 23% to close at $12.50 a share. (Id. at ¶ 90.)

6        On November 10, 2021, Silverback filed its 10-Q for the third quarter 2021 and informed

7   investors that three patients treated with higher doses of SBT6050 in combination therapy

8   experienced serious dose-limiting toxicities, including one patient death. (Motion at 6.)

9   Silverback reported that it would continue combination therapy at a lower dose for which no

10  dose-limiting toxicities were observed, and which interim data had shown activated myeloid

11  cells and had early signals of anti-tumor activity. (Id.)

12       Plaintiffs allege these statements misled investors because trial data demonstrated limited

13  tumor activity, that SBT6050 used in conjunction with prembro did not have a manageable

14  safety profile, and finally, that Silverback failed to reveal that if SBT6050 were to be

15  discontinued then so would SBT6290. (SAC ¶¶ 93, 95, 97.)

16  **D.   March 2022: Silverback Ceases Development of SBT6050 and SBT6290**

17       On March 31, 2022, Silverback filed its 10-K for fiscal year 2021. (Motion at 6.) It

18  announced it had discontinued the SBT6050 trial after a review of the entire of body of data

19  revealed limited monotherapy anti-tumor activity and cytokine-related adverse events that

20  limited the dose in combination with pembro. (SAC ¶ 98.) Based on this data, Silverback also

21  decided to discontinue SBT6290 due to the likelihood of failure because it had a similar clinical

22  profile to SBT6050. (Id.) On this news, Silverback's stock dropped 8.55% to close at $3.20. (Id.

23  at ¶ 99.)

24

1    Plaintiffs bring this class action alleging negligence and securities fraud based on the

2  premise that Silverback and the individually named Defendants knew or should have known

3  SBT6050 was not safe or effective as an anti-tumor drug and failed to disclose SBT6290's

4  success was tied to SBT6050's success. Plaintiffs formulated their claims as actions under

5  sections 11 and 15 of the Securities Act of 1933 ("Securities Act"); sections 10(b) and 20(a) of

6  the Securities Exchange Act of 1934 ("Exchange Act"); and SEC Rule 10b-5. Plaintiffs'

7  Securities Act claims pertain only to the Offering Documents, which Plaintiffs allege were

8  prepared negligently. Plaintiffs' Exchange Act claims encompasses all filings, press releases, and

9  statements made during the entire class period from March 29, 2021, to March 31, 2022.

10                                              **ANALYSIS**

11  **A.      Incorporation by Reference and Judicial Notice**

12    Generally, district courts may not consider material outside the pleadings when assessing

13  the sufficiency of a complaint under Rule 12(b)(6). Lee v. City of Los Angeles, 250 F.3d 668,

14  688 (9th Cir. 2001).

15    The parties previously requested the Court incorporate by reference and take judicial

16  notice of several documents, which the Court granted with the exception of one document.

17  Defendants once again ask the Court to incorporate and take judicial notice of several

18  documents. (Dkt. No. 49.) Plaintiffs do not oppose the request.

19    A court may take judicial notice of facts that are "not subject to reasonable dispute," Fed.

20  R. Evid. 201(b), as well as documents that are referred to in the complaint, that are central to the

21  plaintiff's claims, and whose authenticity is not disputed. See, e.g., Branch v. Tunnell, 14 F.3d

22  449, 454 (9th Cir. 1994) overruled on other grounds by Galbraith v. Cty of Santa Clara, 307 F.3d

23  1119, 1127 (9th Cir. 2002). A court may also take judicial notice of public documents filed with

24

1    the SEC, <u>Metzler Inv. GMBH v. Corinthian Colleges, Inc.</u>, 540 F.3d 1049, 1065 n. 7 (9th Cir.

2    2008), undisputed matters of public records, <u>Lee</u>, 250 F.3d at 689, records and reports of

3    administrative bodies, <u>Mack v. South Bay Beer Distributors</u>, 798 F.2d 1279, 1282 (9th Cir.

4    1986), <u>overruled on other grounds by</u> <u>Astoria Fed. Sav. And Loan Ass'n v. Solimino</u>, 501 U.S.

5    104, 110-11 (1991), and accounting standards, <u>In re Asyst Tech, Inc. Derivative Litig.</u>, No. C-06-

6    04669 EDL, 2008 WL 2169021, at *1 n. 1 (N.D. Cal. May 23, 2008).

7            Defendants ask the Court to incorporate by reference Exhibits A-S attached to the

8    Declaration of Koji Fukumura. (Dkt. No. 48.) Exhibits A-S are all Silverback's SEC filings and

9    statements, on which Plaintiffs' allegations are based. The Court previously incorporated these

10   by reference and will do so again as these are referred to extensively in the SAC. The Court

11   GRANTS Defendants request as to Exhibits A-S.

12           Defendants then ask the Court to take judicial notice of Exhibits T-Y. Exhibits T-V are

13   analyst reports published during the Class Period. Courts have regularly taken judicial notice of

14   analyst reports, not for the truth of the matter asserted, but "for the purpose of showing that

15   particular information was available to the stock market." <u>Helitrope Gen., Inc. v.</u> <u>Ford Motor</u>

16   <u>Co.</u>, 189 F.3d 971, 981 n.18 (9th Cir. 1999); see also, <u>In re Apple Inc. Sec. Litig.</u>, No. 19-cv-

17   02033-YGR, 2020 WL 2857397, at *6 (N.D. Cal. June 2, 2020) (noting that courts routinely take

18   judicial notice of analyst reports and providing list of cases). The Court GRANTS Defendants'

19   request as to these Exhibits.

20           Exhibits W and X are government resources. Exhibit W is a guidance document detailing

21   good clinical practices for trials such as Silverbacks and Exhibit X is the National Cancer

22   Institute's definition of an "open-label study." Exhibit Y is a publication by PharmaSUG,

23   entitled <u>Implementation of Data Cut off in Analysis of Clinical Trials</u>. While the parties'

24

understanding of what an open-label study is in dispute, the Court will take judicial notice of these documents for the purpose of understanding what is generally understood by "open-label" and best clinical practices. The Court GRANTS Defendants' request as to these Exhibits.

**B.      Motion to Dismiss**

　　　**1.      Legal Standard**

Under Fed. R. Civ. P. 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." In ruling on a motion to dismiss, the Court must construe the complaint in the light most favorable to the non-moving party and accept all well pleaded allegations of material fact as true. Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005); Wyler Summit P'ship v. Turner Broad. Sys., 135 F.3d 658, 661 (9th Cir. 1998). Dismissal is appropriate only where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

　　　**2.      Section 11 Claim**

　　　　　**a.      Elements of Claim**

Section 11 of the Securities Act creates a private remedy for any purchaser of a security if the registration statement published in connection with the offering "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). To prevail on a section 11 claim, a plaintiff must prove "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." In re Daou

ORDER ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT - 10

Sys., Inc., 411 F.3d 1006, 1027 (9th Cir. 2005) (internal quotation and citation omitted). Under section 11, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements," if the plaintiff can show a material misstatement or omission. Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983).

### b.    Applicable Pleading Standards

Defendants move to dismiss Plaintiffs' section 11 claim arguing that it is subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard and that Plaintiffs have failed to meet that standard. The Court agrees.

Federal Rule of Civil Procedure 8(a) typically applies to a section 11 claim because they do not require an allegation of scienter. Daou, 411 F.3d at 1027. But if the section 11 claim sounds in fraud, the complaint must satisfy the particularity requirements of Federal Rule of Civil Procedure Rule 9(b). Rubke v. Capital Bankcorp LTD, 551 F.3d 1156, 1161 (9th Cir. 2009). "To ascertain whether a complaint sounds in fraud, we must normally determine, after a close examination of the language and structure of the complaint, whether the complaint alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim." In re Rigel Pharms, Inc. Sec. Litig., 697 F.3d 869, 885 (2012) (internal quotation and citation omitted). When a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud. See Daou, 411 F.3d at 1028. A plaintiff cannot escape the requirements of Fed. R. Civ. P. 9(b) with a general disclaimer that a claim is based on negligence rather than fraud. Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1278 (11th Cir. 2006); In re Stratosphere Sec. Litig., 1 F.Supp.2d 1096, 1104 (D. Nev. 1998).

In the Court's previous order dismissing Plaintiffs' first amended complaint, the Court found that Rule 9 applied to Plaintiffs' section 11 claim because the class period for Plaintiffs'

1    section 10(b) fraud claim began with the IPO and because Plaintiffs relied on the same factual

2    allegations for their section 11 claim as they did their section 10(b) claim. In the SAC, Plaintiffs

3    changed the class period to begin with Silverback's March 10-K filing, but they continue to rely

4    on the same factual allegations for their fraud claim as they do their section 11 claim.

5           Plaintiffs allege the Offering Documents were negligently prepared because Silverback

6    failed to disclose that patients treated with SBT6050 as a monotherapy in the first dose cohort

7    only exhibited limited anti-tumor activity despite the observed changes in the PD markers. (SAC

8    ¶ 64.) Plaintiffs also claim the Offering Documents failed to inform investors that "if SBT6050

9    did not demonstrate more than limited anti-tumor activity as a monotherapy in Phase 1/1b

10   testing, the Company would have to discontinue the clinical programs for both SBT6050 and

11   SBT6290." (Id.) With regard to the first allegation, Plaintiffs claim that because the trial was

12   open label, Silverback knew patient scans showed limited tumor activity but failed to disclose it.

13   (Id. at ¶ 62.)

14          These same omissions and Plaintiffs' reliance on the trial's open label as evidence are

15   repeated in Plaintiffs 10(b) claim. For example, Plaintiffs highlight the following excerpt

16   regarding changes in PD markers from the Offering Documents:

17              "This includes increases in plasma levels of CRP (C-reactive
                protein), a marker of inflammation, increases in MCP-1, IP-10 and IL-6,
18              which are indicative of myeloid cell activation, increases in IFNg which is
                a marker for T and NK cell activation, and decreases in hemoglobin which
19              we believe to be due to macrophage phagocytosis."

20   (SAC ¶ 61.)

21          This same paragraph is contained in Silverback's March 2021 10-K filing, which

22   Plaintiffs extracted to argue that though Silverback reported changes in the PD markers, it failed

23   to disclose that "patients treated with SBT6050 as a monotherapy in the first dose cohort of the

24

1   Phase 1/1b trial only exhibited limited anti-tumor activity despite observed changes in the [PD]

2   markers." (SAC ¶ 71.) Silverback continued to repeat that it had "observed changes in [PD]

3   markers in the first dose cohort" in its other filings. (See id. at ¶¶ 74, 78, 92.) Plaintiffs allege

4   each of these statements are misleading for the same reason they were misleading in the Offering

5   Documents. (See id. at ¶¶ 75, 79, 93.) And Plaintiffs purported evidence for demonstrating the

6   falsity of these statements is the trial's open label status.

7          The same pattern applies to Silverback's statements on SBT6290. Plaintiffs allege that all

8   of Silverback's statements as to SBT6290 omitted the same thing: "if SBT6050 did not

9   demonstrate more than limited anti-tumor activity as a monotherapy in Phase 1/1b testing, the

10  Company would have to discontinue the clinical programs for both SBT6050 and SBT6290

11  given that they both utilize the TLR8 agonist as a payload (i.e., function using the same

12  mechanism to activate immune cells for targeted tumor treatment)." (SAC ¶ 64.) Plaintiffs claim

13  Silverback omitted this information in both the Offering Documents and during the class period.

14  (See id. ¶¶ 64, 73, 77, 97.) Despite making the same omissions, Plaintiffs fail to explain how the

15  omission made in the Offering Document was negligent, but fraudulently made during the class

16  period.

17         Plaintiffs' SAC alleges the same misleading statements and omissions for both the

18  section 11 claim and the section 10(b) claim. And Plaintiffs suggest the same evidence would be

19  used as well for both claims. Because Plaintiffs' claims allege the same factual allegations and

20  evidence for both claims, the Court finds Plaintiffs' section 11 claim is grounded in fraud and

21  must meet the heightened pleading requirements of Rule 9(b).

22                    c.    **Plaintiffs' Section 11 Claim Fails to Satisfy Rule 9(b)**

23         In order to satisfy Rule 9(b)'s pleading requirements, Plaintiffs must "state with

24  particularity the circumstances constituting fraud. . ." Fed. R. Civ. P. 9(b). In other words, the

1    complaint must "set forth what is false or misleading about a statement, and why it is false."

2    Yourish v. Cal. Amplifier, 191 F.3d 983, 993 (9th Cir. 1999).

3         Plaintiffs identify two statements that were omitted from the Offering Documents that

4    make them materially false and misleading. The first statement deals with the efficacy of

5    SBT6050. As discussed above, Plaintiffs allege that even though Silverback discusses observed

6    changes in the PD markers in the first dose cohort and that such changes are consistent with

7    potential mechanism of action, Silverback failed to disclose that patients in the first dose cohort

8    only exhibited limited anti-tumor activity. (SAC ¶¶ 61, 64.) In support of this claim, Plaintiffs

9    point to statements in the Offering Documents that claim one of the six patients from the first

10   dose cohort had stable disease and another had "target lesion reduction," which gave investors

11   the false impression that SBT6050 showed early signs of efficacy. (Id. at ¶ 62.) Plaintiffs claim

12   that Silverback knew the other four patients demonstrated disease progression but did not

13   disclose this information. (Id.) Plaintiffs base this belief on Silverback's access to the open label

14   data and allege that by April 4, 2021, all six of the patients from the first done cohort withdrew

15   due to disease progression. (Id.)

16        Defendants argue Plaintiffs are attempting to plead fraud by hindsight. The Court agrees.

17   "A claim under section 11 based on the omission of information must demonstrate that the

18   omitted information existed at the time the registration statement became effective." Rubke, 551

19   F.3d at 1164 (internal citation omitted). Plaintiffs argue that by April 4, ten out of fourteen trial

20   participants in the two dose cohorts had experienced disease progression, and the most logical

21   inference of this is that Silverback knew at the time of the IPO that the data not only

22   demonstrated limited anti-tumor activity, but also disease progression. (Response at 12.) But

23

24

ORDER ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT -
14

1    Plaintiffs pointing to patient withdrawals by April 4, 2021, fails to demonstrate falsity because it

2    uses data that had a cutoff date that occured four months after the IPO.

3            Plaintiffs then argue the inference is supported by the trial data. Though the Offering

4    Documents reported the tumor status of only two patients, neither of whom experienced disease

5    progression, Plaintiffs argue that the ESMO presentation revealed that at least two other first

6    dose cohort patients had been evaluated prior to the IPO. (Response at 12.) But a review of the

7    data does not support this. Plaintiffs point to Silverback's ESMO presentation, which reported on

8    the first dose cohorts' results. (See Declaration of Tamar Weinrib, Exhibit A at 20 (Dkt. No. 52-

9    1).) The data from this presentation had a cutoff date of August 1, 2021. (Id.) And while the

10   study reports on five patients from the first dose cohort it does not say when the patients began

11   receiving doses. Though the first dose cohort treatment began in July 2020, that too does not

12   mean that all patients from the first dose cohort began at that time. Rather, the Registration

13   Statement disclosed that as of November 25, 2020, six patients had been enrolled at 0.3 mg/kg

14   and had received between one and nine doses. (Declaration of Koji Fukumura, Exhibit C at 129

15   (Dkt. No. 48-8).) Two of the first four patients had to be replaced after the trial began. (Id.) The

16   most logical inference of this is that not all patients had been on SBT6050 long enough to

17   receive scans and be evaluated. And while all first dose cohort patients ultimately were

18   evaluated, Plaintiffs fail to put forth anything to suggest that Silverback evaluated more than two

19   of them by the time of the IPO.

20           Finally, even assuming more than two patients had been evaluated, disease progression

21   does not necessarily make Silverback's statements false or misleading. In order to prevail on

22   their claim, Plaintiffs must prove that the omission "would have misled a reasonable investor

23   about the nature of his or her investment." Daou, 411 F.3d at 1027. Silverback argues that even if

24

ORDER ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT - 15

1  Silverback had data showing disease progression, a reasonable investor would not be surprised

2  by such a report given that the first dose cohort were on the lowest dose and all the patients had

3  advanced metastatic tumors and failed all prior therapies. (Reply at 4.) The Court agrees.

4  Plaintiffs appear to mistake correlation for causation. Silverback's statements repeatedly make

5  clear that the changes in PD markers are "consistent with the <u>potential</u> mechanism of action" and

6  the changes "had been <u>associated</u> with tumor regression." (SAC ¶¶ 61, 64.) These statements are

7  a far cry from an absolute statement declaring the drug efficacious. A reasonable investor able to

8  follow and understand the technicalities of a cancer drug's development would not construe

9  statements that discuss the "potential mechanism of action" and "associations with tumor

10  regression" as claims of efficacy. And it is likely a reasonable investor would even expect to see

11  limited anti-tumor activity in patients with advanced diseases on the lowest dose of a trial drug.

12  For all these reasons, Plaintiffs fail to demonstrate falsity with regard to these statements.

13       Plaintiffs' second omission deals with Silverback's failure to disclose that SBT6290's

14  future success depended on SBT6050's success. (SAC ¶ 64.) Plaintiffs argue that once

15  Silverback opted to speak about SBT6290, it incurred an obligation to disclose the company

16  could not develop SBT6290 if SBT6050's trial data reflected a lack of efficacy and/or

17  unmanageable safety problems, given that both the drugs used the same TLR8 agonist as a

18  payload. (Response at 13.) But a wholistic view of the Offering Documents demonstrates

19  Silverback properly disclosed the relationship between SBT6050 and SBT6290, and the risks

20  associated with SBT6290's future. For instance, the following statements were included in the

21  Offering Documents:

22           "SBT6290 is our second product candidate, expanding on the potential of
          a TLR8 agonist as a payload. The same TLR8 linker-payload used in SBT6050 is
23        conjugated to a monoclonal antibody that targets Nectin4."

24

"Future results of preclinical and clinical testing of our product candidates are also less certain due to the novel and relatively untested nature of our approach to TLR8 and related platform technologies. In general, clinical trial failure may result from a multitude of factors including flaws in study design, dose selection, patient enrollment criteria and failure to demonstrate favorable safety or efficacy traits."

(Fukumura Decl. Ex. A at 3, 10 (Dkt. No. 48-6).)

"We cannot guarantee that any clinical trials will be conducted as planned or completed on schedule, if at all. For example, we cannot begin our planned Phase 1 clinical trials for SBT6290, our Nectin4-targeted product candidate until we complete certain preclinical development and submit and receive authorization to proceed under INDs. We also dosed the first patient in a Phase 1/1b clinical trial for SBT6050 in July 2020 and cannot predict how our technology may work in solid tumor indications until we have completed dose-escalation and expansion."

(Fukumura Decl. Ex. B at 23 (Dkt. No. 48-7).)

And perhaps the most notable:

"Because all of our product candidates are derived from our platform technologies, a clinical failure of one of our product candidates may also increase the actual or perceived likelihood that our other product candidates will experience similar failures."

(Fukumura Decl. Ex. C at 18.)

Plaintiffs' argument essentially asks the Court to find the Silverback had an extra obligation to spell out that it could not develop SBT6290's unless SBT6050's was successful. But there is no requirement that a company must draw out all inferences in order to provide a complete and accurate disclosure. And these disclosures are sufficient such that a reasonable investor would not have the impression that SBT6050's failure would not impact SBT6290's future. Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002) ("To be actionable under the securities law, an omission must be misleading; in other words, it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.") Further, Plaintiffs point

1   to no data or documents that suggest Defendants knew they would have to discontinue

2   SBT6290's development if SBT6050 failed.

3          Because Plaintiffs have failed to demonstrate that the omission that SBT6050's

4   failure dooms SBT6290 is material and necessary to make the documents not misleading,

5   their claim as to this statement fails. The Court GRANTS Silverback's Motion to Dismiss

6   as to Plaintiffs' section 11 claims.

7          **3.      Section 10(b) and SEC Rule 10b-5 Claims**

8          Section 10(b) and 10b-5 claims are subject to heightened pleading standards under the

9   Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b). The Court

10  previously dismissed Plaintiffs section 10(b) claims for failure to meet these standards.

11  Plaintiffs' SAC fails to cure the deficiencies.

12         **a.      <u>Elements of Claim</u>**

13         Section 10(b) provides, in part, that it is unlawful "to use or employ in connection with

14  the purchase or sale of any security. . . any manipulative or deceptive device or contrivance in

15  contravention of such rules and regulations as the [SEC] may prescribe. . ." 15 U.S.C. § 78j(b).

16  SEC Rule 10b-5 makes it unlawful for any person to use interstate commerce:

17      (a) To employ any device, scheme, or artifice to defraud,

18      (b) To make any untrue statement of a material fact or to omit to state a material fact

19          necessary in order to make the statements made, in light of the circumstances under

20          which they were made, not misleading, or

21      (c) To engage in any act, practice or course of business which operates or would operate as a

22          fraud or deceit upon any person, in connection with the purchase or sale of any security.

23  17 C.F.R. § 240.10b-5.

24

To prevail on a Section 10(b) claim, a plaintiff must prove "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." Daou, 411 F.3d at 1014. At the pleading stage, a complaint stating claims under Section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Rule 9(b) and the PSLRA. Id.

**b.   Falsity**

Under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at the that time." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1008 (9th Cir. 2018). "Even if a statement is not false, it may be misleading if it omits material information." Id. "Disclosure is required . . . only when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading." Matrixx Initiatives, Inc. v. Siracusano, 53 U.S. 27, 44 (2011) (internal citation and quotation omitted). "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005). "In order to survive a motion to dismiss under the heightened pleading standards of the [PSLRA], the plaintiffs' complaint must specify the reason or reasons why the statements made by [defendant] were misleading or untrue, not simply why the statements were incomplete." Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002).

**Silverback's Statements from March - August 2021**

1            Plaintiffs' claim Silverback's March, May and August statements were false and

2    misleading because they contained material omissions that: (1) the trial data demonstrated only

3    limited anti-tumor activity despite the observed changes in the PD markers; (2) patients in Part 3

4    of the trial with SBT6050 in combination with pembro suffered cytokine related adverse events,

5    meaning SBT6050 did not have a manageable safety profile ; and (3) if SBT6050 failed then

6    SBT6290 would be discontinued. (SAC ¶¶ 71-73.)

7            Plaintiffs' allegations as to falsity for these statements fall short. Plaintiffs' theory of the

8    case mistakenly relies on the trial's "open label" status. Plaintiffs mistake open label to mean that

9    Silverback had access to trial data in real time. But that is not what open label means. As

10   Defendants point out, an open label trial is defined as "[a] type of study in which both the health

11   providers and the patients are aware of the drug or treatment being given." (Fukumura Decl. Ex.

12   X (Dkt. No. 48-29).) It does not mean the data is gathered, cleaned, analyzed and summarized in

13   real time. And though, hypothetically, a company could have access to data at all times,

14   Plaintiffs would need factual allegations other than an "open label" status to demonstrate this.

15   Silverback previously disclosed this did not occur for the Phase 1/1b trial. Instead, Silverback

16   stated at the time of the IPO, in its Form 424B Prospectus, that:

> "We rely on third parties to conduct, supervise, and monitor our clinical
> trials and perform some of our research and preclinical studies."

> "We do not have the ability to conduct all aspects of our preclinical testing
> or clinical trials ourselves . . . Specifically, CROs that manage preclinical studies,
> GLP toxicology studies and our clinical studies as well as clinical investigators,
> and consultants play a significant role in the conduct of our preclinical studies and
> clinical trials and the subsequent collection and analysis of data. The timing of the
> initiation and completion of these studies and trials will therefore be partially
> controlled by such third parties and may result in delays to our development
> programs."

23   (Fukumura Decl. Ex. D at 30 (Dkt. No. 48-9).)

24

ORDER ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT -
20

1    To conduct the trial, Silverback utilized twelve clinical sites in three countries: the United

2    States Australia and South Korea. (See Fukumura Decl. Ex. S at 7-8 (Dkt. No. 58-24.)

3        Plaintiffs allege that by no later than April 4, 2021, six days after the 10-K and a month

4    before the 10-Q, ten out of fourteen patients demonstrated disease progression. (Response at 16.)

5    Silverback disclosed this information in the Abstract on September 13, 2021, which had a data

6    cutoff date of April 4, 2021. (SAC ¶ 12.) Plaintiffs emphasize this data cutoff date to argue that

7    Silverback and the Exchange Act Defendants had access from the "open label" data from "day

8    one" and they evaluated patients every few weeks and observed disease progression "well before

9    the March 29, 2021, misstatements, knew no later than April 4, 2021, that ten out of fourteen

10   patients in the first and third cohorts had progressive disease . . ." (Response at 17.) But again,

11   Plaintiffs theory is based on a misunderstanding of open label and data cutoff dates.

12       Plaintiffs conflate data cutoff dates to mean the data had been gathered and reviewed by

13   no later than that cutoff date. That is not generally what data cutoff means. (See Fukumura Decl.

14   Ex. Y at 12 (Dkt. No. 48-30) ("A period of several weeks are commonly required for data

15   cleaning and query resolution" after a data cutoff date). Plaintiffs essentially argue the Court

16   should infer from the trial's open label that the twelve clinical sites located in the three countries

17   were continuously cleaning and aggregating data, reviewing it, and summarizing it, and making

18   it available before the data cutoff date, and that the Exchange Act Defendants, Silverback's CEO

19   and CFO, had access to that information at any given moment.

20       But the only demonstrated facts are: (1) Third parties conducted and administered

21   SBT6050 and evaluated patients; (2) Silverback had a data cutoff date of April 4, 2021; (3) the

22   collected and analyzed data showed ten out of fourteen patients had progressive disease. Notably

23   missing are any articulable facts that Silverback or the Exchange Act Defendants had access to

24

1    that data or knowledge of the disease progression prior to the data cutoff date or even a month

2    later with the May 10-Q filing. And though it is possible that Silverback did not follow

3    generalized practices, and Defendants had access to all the data at any given moment, the Court

4    is unwilling to disregard generally accepted definitions and principals simply because Plaintiffs

5    argue otherwise, but forth no evidence in support.

6         Even assuming, the Exchange Act Defendants were aware that disease progression

7    occurred, that still does not make the statement that changes in the PD markers occurred

8    misleading. As previously stated with regard to Plaintiffs' section 11 claim, Silverback's

9    statements regarding changes in the PD markers makes clear that these changes had been

10   <u>associated</u> with tumor regression in preclinical studies, not that these changes meant tumor

11   regression occurred. For these reasons, Plaintiffs fail to plead falsity as to these statements.

12        Plaintiffs' arguments regarding safety data also fail. Plaintiffs claim that patients treated

13   in Part 3 of the trial suffered cytokine related adverse events, which demonstrated SBT6050 did

14   not have a manageable safety profile. (SAC ¶ 72.) Notably lacking are any allegations or facts

15   that the Exchange Act Defendants knew this at the time the March and May statements were

16   made. The only allegation Plaintiffs put forth is a sentence in the Response brief that both the

17   Abstract and ESMO presentation shows these adverse events were demonstrated by the data

18   collected by the cutoff dates. (Response at 21.) But again, cutoff dates alone do not demonstrate

19   Defendants had that information at the time the statements were made. For the same reasons

20   articulated above, Plaintiffs fail to plead falsity as to this statement.

21        Lastly, turning the Silverback's statements regarding SBT6290, the Court finds Plaintiffs

22   fail to show the statements are misleading. Silverback made the following statements about

23   SBT6290 in the March and May disclosures:

24

1

2

> "SBT6290 is our second product candidate, expanding on the potential of a TLR8 agonist as a payload. The same TLR8 linker-payload used in SBT6050 is conjugated to a monoclonal antibody that targets Nectin4 . . . We anticipate submitting the IND for SBT6290 in the fourth quarter of 2021."

3

(SAC ¶ 68.)

4

5

6

7

> "SBT6290 . . . continues to advance through preclinical development. SBT6290 includes the same TLR8 agonist linker-payload used in SBT6050, conjugated to a proprietary Nectin4-directed monoclonal antibody. Pre-Investigational New Drug (IND) alignment with the FDA was achieved in February 2021 and an IND application is expected in the fourth quarter of 2021. The initiation of a Phase 1/1b clinical study is anticipated in the first quarter of 2022."

8

(Fukumura Decl. Ex. F at 1 (Dkt. No. 48-11).)

9

10

11

12

13

14

15

16

17

Plaintiffs claim these statements are false and misleading because they do not disclose that if SBT6050 fails then SBT6290 would have to be discontinued as well. But these statements do not give the impression that SBT6290 will be developed regardless of SBT6050's outcome. They simply contain the drug's development thus far and Silverback's forward-looking statement as to future development plans. There is nothing to suggest that Silverback and the Exchange Act Defendants knew they would have to cease development of SBT6290 if SBT6050 failed. If anything, the omission would make the statement "incomplete," but there is nothing to suggest the statement is untrue or misleading. The Court finds these statements fail as to falsity.

**Silverback's Statements in the Abstract and ESMO Presentation**

18

19

20

21

22

23

In the SAC, Plaintiffs do not identify any false or misleading statements made in the Abstract or during the ESMO presentation. It is only in Plaintiffs' Response that they allege Silverback falsely stated: (1) proof-of-mechanism was established; (2) early signs of anti-tumor activity occurred; (3) SBT6050 conferred clinical benefit; and (4) SBT6050 had a manageable safety profile. (Response at 18.)

24

ORDER ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT - 23

1    When placed in context the statements do not appear to be false. As Defendants correctly

2    argue, the statements are accompanied by detailed clinical data that puts the statements into

3    context. For instance, the ESMO presentation states "Proof-of-mechanism established" and then

4    proceeds to explain this is supported by PD markers indicative of myeloid and T/NK cell

5    activation that generally increased with the dose, and plateaued at 0.6 mg/kg. (Fukumura Decl.

6    Ex. O at 8 (Dkt. No. 48-20.) And "[e]arly signals of anti-tumor activity" is accompanied by data

7    that explains among eighteen evaluable patients, one patient showed a partial response and seven

8    patients had stable disease. (Id.) Though Silverback's statements may be slightly optimistic, they

9    are not necessarily false. And Silverback accompanied the statements with data that gives

10   investors a full picture.

11   Plaintiffs argue that Defendants have no basis for making these statements, as well as

12   statements regarding changes in the PD markers, given that the data only demonstrated limited

13   anti-tumor activity and a high percentage of disease progression. But in order to allege falsity,

14   Plaintiffs "must set forth facts explaining why the difference between two statements is not

15   merely the difference between two permissible judgments, but rather the result of a falsehood."

16   Rigel, 697 F.3d at 879. Plaintiffs essentially disagree with Silverback's analysis and conclusion

17   of the data, but Plaintiffs are pointing to the same data Silverback used to support these

18   conclusions, disclosed in the same documents, in support of their argument. Plaintiffs may

19   disagree with Silverback's conclusion and the import of the data used in support of these

20   conclusions, but it does not make the statements false or misleading.

21   With regard to Silverback's statement that SBT6050 had a manageable safety profile,

22   Plaintiffs similarly fail to demonstrate falsity. Plaintiffs allege that the Exchange Act Defendants

23   had a duty to disclose that dose limiting cytokine related adverse events meant that SBT6050 did

24

ORDER ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT - 24

1    not have a manageable safety profile. Plaintiffs argue that Silverback knew by the ESMO

2    presentation it would have to discontinue SBT6050 because of cytokine related adverse events,

3    but waited until March 2022 to do so and did not identify any new data in support of that

4    decision. (Response at 20-21.) But this is not true. In the ESMO presentation, Silverback's

5    presentation stated that it was currently enrolling patients for Part 3 pembro combination dose

6    escalation at 0.6 mg/kg. (Fukumura Decl. Ex. O at 9.) In Silverback's November 10-Q, it then

7    states:

8            Two patients dosed at 0.6 mg/kg each experienced a [dose-limiting
         toxicity], including hypotension and cytokine release syndrome (CRS) . . . Two
9        patients were subsequently enrolled at a dose level of 0.45 mg/kg plus
         pembrolizumab . . .The second patient . . . experienced serious adverse events
10       (SAEs) of CRS, hypoxia, and hypotension following the first dose . . and
         subsequently passed away.

11

12   (Fukumura Decl. Ex. P at 24 (Dkt. No. 48-21).)

13           Plaintiffs fail to point to any false information presented at the ESMO or in the Abstract

14   that would make Silverback's statements on SBT6050's safety false, but instead rely on

15   Silverback's November and March disclosures to allege falsity. For these reasons, Plaintiffs fail

16   to adequately plead falsity as to these statements.

     **Silverback's November 10-Q filing**

17           Lastly, Plaintiffs argue Silverback's 10-Q filing in November 2021 is false because: (1)

18   Silverback continued to represent that SBT6050 conferred clinical benefit despite limited tumor

19   activity; (2) SBT6050 did not have a manageable safety profile; and (3) Silverback failed to

20   disclose that if SBT6050 failed SBT6290 failed as well. Plaintiffs fail to demonstrate falsity as to

21   these statements. (SAC ¶¶ 93, 95, 96.)

22           The statements Plaintiffs highlight in the SAC as allegedly false statements regarding

23   SBT6050's clinical benefit reiterates Silverback's findings from the September 2021 disclosures.

24

1    (SAC ¶¶ 92-93.) Plaintiffs point to no new statements Silverback made or data released, but

2    simply repeat their accusations from the September disclosures. (Id.) This conclusory allegation

3    of falsity fails for the same reason as before.

4          With regard to SBT6050's safety profile, Plaintiffs point to the data released that

5    discusses the adverse events, including the dose-limiting toxicities and CRS that patients

6    experienced at the higher dose levels in combination with pembro. (SAC ¶ 94.) Interestingly, this

7    disclosure seems to highlight the issues emerging with regard to the safety of SBT6050 at higher

8    dose levels. And Plaintiffs do not point to any statement by Silverback claiming that despite this

9    information there were no concerns about SBT6050's safety. Plaintiffs do not point to anything

10   at all that is false about this disclosure, but simply state that Silverback misled investors because

11   the occurrence of the CRS in patients meant SBT6050 did not have a manageable safety profile.

12   Again, Plaintiffs do not point to any data or reports that suggest Defendants knew at the time this

13   statement was made. Instead, the statement accurately reports the safety issues and states the

14   patients subsequently were enrolled at a lower dose level. Because Plaintiffs cannot point to any

15   other statement made by Silverback that contradicts this disclosure, this statement fails to

16   demonstrate falsity.

17         Finally, Silverback's statement discussing SBT6290, what it is designed to do and where

18   it was in the developmental stage, is the same disclosure Silverback had made multiple times

19   previously. (SAC ¶ 96.) Again, Plaintiffs claim Silverback had a duty to disclose that SBT6290's

20   fate was tied to SBT6050's success. Similar to the previous statements, Plaintiff point to nothing

21   false or even misleading about this statement. This statement is at most incomplete, which does

22   not make it false or misleading. Plaintiffs' claims as to this statement fails.

23

24

1    For all the reasons articulated above, the Court finds Plaintiffs have failed to meet the

2    pleading requirements for falsity under Rule 9(b) and the PSLRA. The Court GRANTS

3    Defendants' Motion as to Plaintiffs' section 10(b) claim.

4         c.   **Scienter**

5    Plaintiffs also fail to advance sufficient allegations of scienter.

6    A Section 10(b) fraud complaint must "state with particularity facts giving rise to a strong

7    inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

8    "The court must determine whether all the facts alleged, taken collectively, give rise to a strong

9    inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

10   standard." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 9or81, 991 (9th Cir. 2009) (internal

11   citation and quotation omitted). When "determining whether the pleaded facts give rise to a

12   'strong' inference of scienter, the court must take into account plausible opposing inferences."

13   Id. Essentially, a complaint survives a motion to dismiss "if the malicious inference is at least as

14   compelling as any opposing innocent inference." Id.

15   To adequately demonstrate that the "defendant acted with the required state of mind," a

16   complaint must "allege that the defendants made false or misleading statements either

17   intentionally or with deliberate recklessness." Daou, 411 F.3d 1014-15 (internal citation

18   omitted). Critically, deliberate recklessness is more than recklessness or motive to commit fraud

19   – it is "an *extreme* departure from the standards of ordinary care," which "presents a danger of

20   misleading buyers or sellers that is either known to the defendant or so *obvious* that the actor

21   must have been aware of it." Zucco Partners, 552 F.3d at 991 (emphasis in the original).

22   Plaintiffs argue Silverback's statements during the class period were misleading because

23   they failed to disclose: (1) only limited anti-tumor activity despite changes in the PD markers;

24   (2) patients treated in part 3 of the trial suffered cytokine related adverse events that

ORDER ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT -
27

demonstrated SBT6050 did not have a manageable safety profile; and (3) Silverback would have to discontinue SBT6290 if SBT6050 failed. (SAC ¶¶ 71, 72, 73, 75, 77, 78, 89, 93, 95, 97.) Plaintiffs' claims fail because they fail to adequately plead scienter, for many of the same reasons that they fail for falsity. See Daou, 411 F.3d at 1015 ("[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA.")

Plaintiffs' argument in support of scienter hinges on their belief that Silverback and the Exchange Act Defendants had access to data at all times due to the trial's open label status. (SAC ¶ 102.) But again, Plaintiffs' argument is flawed because it fundamentally misunderstands what open label means. As Defendants and this Court have repeatedly pointed out, open label simply means both the patient and the researcher are aware what drug is given and when. It does not mean Silverback and the Exchange Act Defendants had access to data in real time.

And Plaintiffs conflate data cutoff dates to mean the data had been gathered and reviewed by that date. Plaintiffs essentially argue the Court should infer from the trial's open label that the twelve clinical sites located in the United States, Australia, and South Korea were continuously aggregating data, reviewing it, and summarizing it before the data cutoff date, and that the Exchange Act Defendants had access to that information at any given moment. But Plaintiffs' point to no particularized facts that suggest that the data had been gathered and reviewed by the individual Defendants prior to the cutoff dates and the Court is unwilling to make such an inferential leap. "[T]he PSLRA neither allows nor requires us to check our disbelief at the door." Nguyen v. Endologix, Inc., 962 F.3d 405, 415 (9th Cir. 2020) ("'Plausibility' is a concept more commonly associated with the base-level 'non-fraud' pleading standards in Rule 12(b)(6).") Even if the Court could assume Silverback and the Defendants had access to data in real time,

1  the Ninth Circuit previously held that knowledge alone is insufficient to plead scienter. See In re

2  Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 883 (9th Cir. 2012) ("Even assuming, arguendo,

3  that Plaintiff adequately pled that all of the defendants had knowledge of the detailed clinical

4  results at the time the allegedly false statements were made, such an allegation does not support a

5  strong inference of scienter.")

6         Plaintiffs' argument that because Defendant Shawver held company wide meetings every

7  two weeks to discuss trial data means the Exchange Act Defendants had the requisite knowledge,

8  but deliberately omitted material information is equally flawed. In response to Defendants' first

9  motion to dismiss, Plaintiffs put forth a Confidential Witness ("CW") 1 for the general premise

10 that the bi-weekly meetings occurred, and mandatory attendance was required. The Court in

11 response to CW1 found these allegations to be insufficient to support scienter, in part because

12 CW1 put forth no specific details about what was discussed during the meetings that would

13 demonstrate the Exchange Act knew their statements were false and misleading. Plaintiffs put

14 forth no additional information in the SAC than they did in the first. Again, CW1 states that

15 "Defendant Shawver held company wide meetings every two weeks with mandatory attendance

16 for all employees to report and discuss trial data." (SAC ¶ 57.) The mandatory attendance is all

17 Plaintiffs have to suggest that CFO Defendant Piazza was present, and it is the only allegation

18 Plaintiffs have to claim Defendant Piazza had any information related to the trial. (Response at

19 23.)

20        Again, Plaintiffs ask the Court to make inferential leaps unsupported by the facts. Despite

21 having CW1, Plaintiffs put forth no specific allegations that the meetings discussed concerns that

22 emerging data showed limited anti-tumor activity and poor safety outcomes, or that this data

23

24

ORDER ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT - 29

1  meant SBT6290 was doomed. Plaintiffs' utilization of CW1 falls well short of the detailed

2  factual allegations needed for scienter.

3      The Ninth Circuit's reasoning in <u>Nguyen v. Endologix, Inc.</u>, 962 F.3d 405 (9th Cir. 2020)

4  is instructive here. In <u>Nguyen</u>, plaintiffs alleged that a medical device company and its officers

5  made false or misleading statements about the likelihood that the Food and Drug Administration

6  would approve of the company's aneurysm sealing product. Plaintiffs' complaint relied heavily

7  on a confidential witness who worked at the company and alleged that the product had migration

8  issues, meaning it moved away from the location where it was initially placed, which can cause

9  serious health issues. <u>Id.</u> at 408-09. The complaint alleged the confidential witness was involved

10 in the development of the product from the start and from early on the company received

11 complaints and incident reports regarding the migration. <u>Id.</u> at 409. The confidential witness

12 alleged the main defendants became very involved in the problem, putting everything into

13 solving it and that the issue was the "biggest thing going on at the company." <u>Id.</u> at 409-410. In

14 further support of this allegation, the confidential witness claimed he and other staff compiled

15 weekly reports about the migration issue for the main defendants, but that ultimately, the

16 defendants failed to act on or fully disclose the information. <u>Id.</u> at 410.

17     The Ninth Circuit found that the allegations were high on alarming adjectives, such as

18 "serious and unsolvable," "dangerous," "urgent" and so on, but short on facts. <u>Nguyen</u>, 962 F.3d

19 at 416. The main problem with the confidential witness was that the information attributed to

20 them lacked any detail about the migration device problems the company encountered. <u>Id.</u> For

21 instance, the witness did not identify the number of patients that experienced migration, how

22 much the device was migrating in these patients, whether the migration led to any medical

23 issues, and whether the patients had particular conditions that exacerbated the migrations. <u>Id.</u> The

24

ORDER ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT -
30

1    Ninth Circuit found that "while CW1 references a 'stream of complaints and incident reports and

2    a general concern that these reports supposedly cause, the complaint does not plead any details

3    about these reports that would demonstrate a strong inference of scienter in [defendants] later

4    statements about FDA approval or [device] migration." Id. at 417.

5        Here, CW1's statements do not even meet the level of specificity described by the

6    plaintiffs' confidential witness in Nguyen. Despite being employed as a senior research scientist

7    and an associate scientist for Silverback, CW1 does not discuss any specifics of what was shared

8    during the bi-weekly meetings or even allege that negative data or reports existed. CW1 does not

9    even confirm that Defendant Piazzo actually attended the meetings. Instead, the Court is asked to

10   again infer that because all employees were required to attend the meetings, Defendant Piazzo

11   attended as well, and that concerns regarding efficacy, safety and SBT6290 were discussed. The

12   Court is unwilling to make these inferential leaps. The Court finds CW1's claim that Defendant

13   Shawver held bi-weekly meetings insufficient to demonstrate a strong inference of scienter.

14       Finally, Plaintiffs argument that the core-operations inference is a sufficient basis for

15   scienter also fails. The core-operations inference stands for the proposition that "facts critical to a

16   business's core operations or an important transaction generally are so apparent that their

17   knowledge may be attributed to the company its key officers under the PSLRA." S. Ferry LP,

18   No. 2 v. Killinger, 542 F.3d 776, 783 (9th Cir. 2008). "Allegations that rely on the core-

19   operations inference are among the allegations that may be considered in the complete PSLRA

20   analysis." Id. at 784. "Where a complaint relies on allegations that management had an important

21   role in the company but does not contain additional detailed allegations about the defendants'

22   actual exposure to information, it will usually fall short of the PSLRA standard." Id. Only in

23   unusual circumstances will the core-operations inference, without more, raise the strong

24

1    inference required. Id. at 785. For instance, the Ninth Circuit in Berson v. Applied Signal

2    Technology, Inc. 527 F.3d 982 (9th Cir. 2008) permitted a plaintiff to rely on the core operations

3    inference without particularized allegations about defendants' access to relevant information

4    because defendants had allegedly failed to disclose a "stop-work order" from its largest

5    customers, which halted between $18 and $23 million of work that made up roughly 80% of the

6    company's revenue.

7         That is hardly the case here. Here, plaintiffs allege that at the time of the Phase 1/1b trial,

8    Silverback had no approved product, revenue or other product undergoing clinical testing, which

9    therefore means that SBT6050 must have been the sole focus of the company and the Exchange

10   Acts Defendants. Plaintiffs then argue that the most compelling inference of this "is that each

11   Defendant monitored the open label trial data of their lead drug candidate and only drug in active

12   development and thus had knowledge of the matter." (Response at 23.) But this is merely a

13   conclusory allegation based on nothing more than the trial's open label. Plaintiffs do not point to

14   any facts to suggest that Defendants acted with the requisite scienter.

15        Overall, the inference of scienter here is weak and certainly falls well below the required

16   strong inference needed to survive a motion to dismiss. The Court finds Plaintiffs failure to

17   adequately plead scienter as an additional ground to dismiss the claim.

18        **4.    Section 15 and 20(a) Claims**

19        Section 15 and section 20(a) both require underlying primary violations of the securities

20   laws. 15 U.S.C. §§ 77o, 78t(a); Rigel Pharms, 697 F.3d. Because Plaintiffs have failed to

21   adequately plead a violation of the federal securities laws, Plaintiffs' section 15 and section 20(a)

22   claims are also DISMISSED.

23

24

1

## CONCLUSION

2          Plaintiffs' Second Amended Complaint fails to allege with particularity that Silverback

3   and the individually named Defendants made materially misleading statements and omissions in

4   the Offering Documents and during the class period in violation of section 11 of the Securities

5   Act and section 10(b) of the Exchange Act. Because the Court previously dismissed Plaintiffs'

6   First Amended Complaint without prejudice and the Second Amended Complaint fails for the

7   same reasons, the Court DISMISSES Plaintiffs' Second Amended Complaint with prejudice.

8          The clerk is ordered to provide copies of this order to all counsel.

9          Dated April 12, 2023.

10

11                                                        Marsha J. Pechman
                                                          United States Senior District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24